# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### DELTA DIVISION

State of KANSAS,
State of ARKANSAS,
State of IOWA,
State of MONTANA,
State of ALABAMA,
State of ALASKA,
State of GEORGIA,
State of IDAHO,
State of INDIANA,
State of KENTUCKY,
State of MISSOURI,
State of NEBRASKA,
State of NEW HAMPSHIRE,
State of NORTH DAKOTA,
State of OKLAHOMA,
State of SOUTH CAROLINA,
State of SOUTH DAKOTA,
State of TENNESSEE,
State of VIRGINIA,
State of WEST VIRGINIA,
State of WYOMING,
PHILLIP JOURNEY,
ALLEN BLACK,
DONALD MAXEY, and
CHISHOLM TRAIL ANTIQUE GUN
ASSOCIATION,

                              Plaintiffs,


v.


MERRICK B. GARLAND, in his official
capacity, as Attorney General of the United
States,
STEVEN DETTELBACH, in his official
capacity, as the Director of the Bureau of
Alcohol, Tobacco, Firearms, and Explosives,
UNITED STATES DEPARTMENT OF
JUSTICE, and
BUREAU OF ALCOHOL, TOBACCO,
FIREARMS, AND EXPLOSIVES,

                              Defendants.

**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

MAY 01 2024

TAMMY H. DOWNS, CLERK
By: _____
                    DEP CLERK

Civil Action No. *2:24CV 88-JM*

This case assigned to District Judge _Moody_
and to Magistrate Judge _Misty_

## <u>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

### INTRODUCTION

The right to keep and bear arms is central to our country's history and traditions, so Congress must be careful when addressing that right through federal legislation. For that reason, current law is tailored to regulate and reach only interstate, commercial firearm sales—not small-scale sales and certainly not private sales between individual citizens. And Congress has affirmed that aim time and again through clear statutory text and express statements of purpose. Yet Defendants, Attorney General Merrick Garland and Director of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF" or "Director") Steven Dettelbach, claim that Congress gave them authority to regulate far more broadly. Under a new rule, *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 Fed. Reg. 28,968 (Apr. 19, 2024) ("Final Rule"), ATF claims the power to reach and regulate (via an extensive licensing scheme) a citizen who makes a local sale of even one firearm to another individual.

For more than 40 years, the relevant federal statute has already defined who is required to become a federal firearms licensee. Yet Defendants seized on a recent, minor change in that statute and effectively rewrote the entire definition. Until now, only those who *repetitively* purchased and sold firearms as a *regular course* of business had to become a licensee. But through the Final Rule, Defendants will now presume that anyone who sells or resells even one firearm with the intent to profit (no matter how little), combined with other (nebulously defined) evidence, is a firearms dealer who must become a licensee. This would put innocent firearms sales between law-abiding friends and family members within the reach of federal regulation. Such innocent sales between

friends and family would constitute a felony if the seller did not in fact obtain a federal firearms license and perform a background check.

Defendants' claim of authority to implement this scheme dramatically upends both our constitutional traditions and the federal firearms licensing regime Congress designed. Not only does the Final Rule go beyond the Defendants' statutory authority, but it also contradicts the applicable statutory language. The Final Rule is therefore unlawful and this Court should set it aside.

## THE PARTIES

1.     Plaintiffs Alabama, Alaska, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Missouri, Montana, Nebraska, New Hampshire, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Virginia, West Virginia, Wyoming ("Plaintiff States") are all sovereign states of the United States of America, and they sue to vindicate their sovereign, quasi-sovereign, and proprietary interests.

2.     Plaintiff States bring this suit through their Attorneys General, who are each the chief legal officer of their state and have the authority to represent their state in federal court. *See* Ala. Code § 36-15-1(2); AS 44.23.020; Ark. Code Ann. 25-16-703; GA Code § 45-13-3-6; Idaho Code § 67-1401; Ind. Code § 4-6-1-6; Iowa Code § 13.2; Kan. Stat. Ann. 75-702(a), Ky. Rev. Stat. § 15.020; Mo. Rev. Stat. 27.060; Mont. Code. Ann. § 2-15-501; Neb. Rev. Stat. § 84-203; N.H. Rev. Stat. § 21-M:2; N.D.C.C. § 54-12-01; Okla. Stat. tit. 74, § 18b(A)(2); SDCL ch. 1-11, Tenn. Code Ann. § 8-6-109(b)(1); Va. Code §§ 2.2-507, 2.2-513; W. Va. Code § 5-3-2; Wyo. Stat. Ann. § 9-1-603; *State ex rel. Condon v. Hodges*, 349 S.C. 232, 239–40, 562 S.E.2d 623, 627 (2002) (the South Carolina attorney general "'may institute, conduct and maintain all such suits and *proceedings as he deems* necessary for *the enforcement of the laws of the State,* the *preservation of order,* and the

3

*protection* of *public rights*.'" (emphasis in original) (quoting *State ex rel. Daniel v. Broad River Power Co.*, 157 S.C. 1, 68, 153 S.E. 537, 560 (1929), *aff'd* 282 U.S. 187 (1930)).

3.     Plaintiff Phillip Journey ("Journey") is a firearms collector and hobbyist residing in Wichita, Kansas.  He is also a shooting sports coach and instructor.  He is an American citizen who is not engaged in the firearms business.  Indeed, he is a state court judge in Kansas in Division 1, 18th judicial district.  He attends 4-5 gun shows every year where he buys and sells firearms for and from his personal collection that includes firearms considered self-defense weapons.  Journey is not currently a federal firearms licensee.

4.     Plaintiff Allen Black ("Black") is a firearms collector and hobbyist residing in Wichita, Kansas.  He is an American citizen who is not engaged in the firearms business.  He attends multiple gun shows every year in Kansas.  In addition, he sells firearms from his personal collection at gun shows.  Black is not currently a federal firearms licensee.

5.     Plaintiff Donald Maxey ("Maxey") is a firearms collector and hobbyist residing in Valley Center, Kansas.  He is an American citizen who is not engaged in the firearms business.  He helps to organize and attends multiple gun shows every year in Kansas.  In addition, he purchases firearms for his personal collection at gun shows.  Maxey is not currently a federal firearms licensee.

6.     Plaintiff Chisholm Trail Antiques Gun Association ("Chisholm Trail") is a Kansas not-for-profit corporation founded in 1957 in Wichita, Kansas.  Chisholm Trail was organized for the purposes of serving the interests of collectors and shooters of antique and antique-replica firearms and to help preserve the craftsmanship and the history of the arms of our forefathers for the enlightenment and enjoyment of future

generations.  Chisholm Trail is not a federal firearms licensee, nor are most of its members, including Allen Black and Donald Maxey, who attend gun shows each year where they buy and sell firearms for and from their personal collections.  Chisholm Trail sponsors and manages a biannual gun show and relies on the proceeds to fund its activities.

### B.   Defendants

7.   Defendant Merrick B. Garland is Attorney General of the United States and is sued in his official capacity.

8.   As Attorney General, Defendant Garland is the head of the U.S. Department of Justice ("DOJ") and is responsible for its actions under federal firearms statutes.

9.   Defendant Steven Dettelbach is the Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") and is sued in his official capacity.

10.   Defendant DOJ is an executive agency of the United States.

11.   ATF is a sub-agency or component of the DOJ and is responsible for, among other things, enforcing, conducting investigations, and executing arrests and seizures in connection with federal firearms statutes.

12.   As ATF Director, Defendant Dettelbach is the head of ATF and is responsible for its actions under federal firearms statutes.

13.   DOJ and ATF issued the Final Rule.

### JURISDICTION AND VENUE

14.   The Court has subject matter jurisdiction pursuant to 5 U.S.C. §§ 702–03 and 28 U.S.C. § 1331. The federal government has waived its immunity for this suit. *See* 5 U.S.C. § 702.

15.   The Final Rule constitutes "agency action" under 5 U.S.C. § 551(13) for

purposes of review under the Administrative Procedure Act ("APA"), 5 U.S.C. § 702.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because: (1) Plaintiff State of Arkansas is in this judicial district, and (2) there is no real property involved in this action.

17.     Activities affected by the Final Rule routinely take place in this judicial district.  For example, the Arkansas Gun and Cartridge Collectors Club (AGCCC) Little Rock Gun & Knife Show is scheduled for April 27-28, 2024, in Little Rock; the Northeast Arkansas Gun & Knife Show is scheduled for May 3-4, 2024 in Jonesboro; and the AGCCC Little Rock Gun & Knife Show is scheduled for September 7-8, 2024, in Little Rock.  ATF also maintains a field office in Little Rock, Arkansas, that on information and belief conducts activities to carry out and enforce the Final Rule.

**BACKGROUND**

18.     Schoolchildren are taught of Paul Revere's ride, Lexington, and Concord, and the shot heard 'round the world.  But the lesson often omits why those events occurred: British General Thomas Gage sought to seize or destroy the guns and powder the colonists had stockpiled at Concord.

19.     The Founding Fathers were staunch advocates of the people's right to keep and bear privately-owned arms, both for personal protection and to protect their liberty. Alongside the events at Concord, Thomas Paine recognized that "[a]rms discourage and keep the invader and the plunderer in awe, and preserve order in the world as well as property."  Likewise, Thomas Jefferson recognized that laws forbidding the carrying of arms "disarm only those who are neither inclined nor determined to commit crimes" and only "make things worse for the assaulted and better for the assailants."  Thomas Jefferson, *The Commonplace Book of Thomas Jefferson: A Repertory of His Ideas on*

*Government* 314 (Gilbert Chinard ed., 1926) (quoting 18th century Italian criminologist Cesare Beccaria).  With respect to commerce, Jefferson noted that "[o]ur citizens have always been free to make, vend, and export arms.  It is the constant occupation and livelihood of some of them."  Thomas Jefferson, 3 *Writings* 558 (H.A. Washington ed., 1853).

20.    Ever observant of human nature, George Mason looked back after the Revolution and explained that "[w]hen the resolution of enslaving America was informed in Great Britain, the British Parliament was advised by an artful man, who was governor of Pennsylvania, to disarm the people; that it was the best and most effectual way to enslave them; but that they should not do it openly, but weaken them, and let them sink gradually ...." *Journal Notes of the Virginia Ratification Convention Proceedings* (June 13, 1788).

21.    The Founding Fathers thus enshrined the right to keep and bear arms in the Constitution: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.

22.    As noted attorney David Kopel explained: "In terms of the original meaning of the Second Amendment, the right to engage in firearms commerce is clear."  David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 HARV. L. REV. F. 230 (Apr. 11, 2014) (reviewing Founding Era sources).  "It is one of the most important reasons why America's political dispute with Great Britain turned into an armed revolution."  *Id.*

### FEDERAL FIREARMS ACT OF 1938 AND GUN CONTROL ACT OF 1968
### LICENSING OF DEALERS "ENGAGED IN THE BUSINESS"

23.     With that background, it's unsurprising that federal involvement in firearms possession and transfer was insignificant during the first 150 or so years of our nation's history.

24.     Congress didn't attempt to regulate the interstate firearms industry until 1934, when it enacted the National Firearms Act ("NFA"). Pub. L. 73-474, 48 Stat. 1236 (June 26, 1934).  The NFA required dealers of short-barreled rifles, short-barreled shotguns, and machineguns to register and pay a tax.  *See id.* § 1(a)-(b), § 2(a); 48 Stat. at 1236-37.

25.     Four years later, Congress imposed the first general licensing requirement for firearms dealers.  Federal Firearms Act of 1938 ("FFA"), Pub. L. 75-785, 52 Stat. 1250 (June 30, 1938).  It required "[a]ny ... dealer desiring a license to transport, ship, or receive firearms or ammunition in interstate or foreign commerce" to apply for a license with "the Secretary of the Treasury, who shall prescribe by rules and regulations the information to be contained in such application."  *Id.* § 3, 52 Stat. at 1251.  Once the applicant paid the prescribed fee, the Secretary was required to issue the license which "entitle[d] the licensee to transport, ship, and receive firearms and ammunition in interstate and foreign commerce."  *Id.* § 3, 52 Stat. at 1251.

26.     The FFA defined a "dealer" as "any person engaged in the business of selling firearms or ammunition or cartridge cases, primers, bullets or propellent powder, at wholesale or retail, or any person engaged in the business of repairing such firearms or of manufacturing or barrels, stocks, trigger mechanisms, or breach mechanisms to firearms[.]" 52 Stat. at 1250.

27.     In 1968, Congress revised the dealer licensing scheme in the Gun Control Act of 1968 ("GCA"), Pub. L. 90-168, 82 Stat. 1213 (Oct. 22, 1968), "the most comprehensive gun control law ever signed in this Nation's history."   President Lyndon B. Johnson, Remarks Upon Signing the Gun Control Act of 1968, 2 Pub. Papers 1059, 1059 (Oct. 22, 1968). The Gun Control Act sought to prevent "crime and violence" without "intending to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." 82 Stat. at 1213-14.

28.     The GCA's definition of "dealer" largely tracked the FFA's definition.   It defined "dealer" as "(A) any person engaged in the business of selling firearms or ammunition at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker."   82 Stat. at 1216 (codified at 18 U.S.C. § 921(a)(11)).

## FIREARM OWNERS PROTECTION ACT OF 1986

29.     As moonshining faded away, ATF shifted its efforts to enforcing firearms laws.   But complaints about the techniques ATF used to generate firearm cases led to congressional hearings in late 1979 and early 1980.   *The Right to Keep and Bear Arms*, Report of the Subcommittee on the Constitution, Sen. Jud. Comm., 97th Cong., 2d Sess., at 20 (1982).   The Senate Subcommittee on the Constitution's report summarized the jarring evidence it received and its conclusions:

- The "enforcement tactics made possible by current federal firearms laws are constitutionally, legally and practically reprehensible." *Id.*
- "Although Congress adopted the Gun Control Act with the primary object of limiting access of felons and high-risk groups to firearms, the overbreadth of the law has led to neglect of precisely this area of enforcement." *Id.*

9

- ATF's statistics showed "that in recent years the percentage of its arrests a devoted to felons in possession and persons knowingly selling to them have dropped from 14 percent down to 10 percent of their firearms cases." After the hearings, ATF said "that 55 percent of its gun law prosecutions overall involve persons with no record of a felony conviction, and a third involve citizens with no prior police contact at all." *Id.*

- The Committee found that ATF had "primarily devoted its firearms enforcement efforts to the apprehension, upon technical malum prohibitum charges, of individuals who lack all criminal intent and knowledge." *Id.*

- The Committee also found that ATF "[a]gents anxious to generate an impressive arrest and gun confiscation quota [had] repeatedly enticed gun collectors into making a small number of sales—often as the few as four—from their personal collections," even though each of the sales "was completely legal under state and federal law." ATF still "charged the collector with having 'engaged in the business' of dealing in guns without the required license," which saddled "numerous collectors ... [with] a felony record carrying a potential sentence of five years in federal prison" even though many had "no criminal knowledge or intent." *Id.*

- The Committee also received expert evidence "establishing that approximately 75 percent of [ATF] gun prosecutions were aimed at ordinary citizens who had neither criminal intent nor knowledge, but were enticed by agents into unknowing technical violations." *Id.* at 22.

30. Based on this evidence, the Committee concluded that the "reform of federal firearm laws is necessary to protect the most vital rights of American citizens." *Id.*

31. Two years later, the Senate Judiciary Committee issued a report showing "the urgent need for changes [to federal firearms law] to prevent the recurrence of [ATF] abuses documented in detail." *Federal Firearms Owners Protection Act*, Sen. Rep. 98-583, Sen. Jud. Com., 98th Cong., 2d Sess., at 3 (1984). It explained that firearm hobbyists often sold from their personal collections and many were charged and convicted for selling without a license based on courts' broad reading of the GCA's reach. *Id.* at 8. And it claimed that the proposed bill would narrow the GCA's "broad parameters" by requiring

that dealers "undertake such activities as part of a 'regular course of trade or business with the principal objective of livelihood and profit.'" *Id.*

32.    During a Senate debate in 1985, Senator Hatch, the bill's floor manager, observed that many collectors had been "convicted for just a few sales which were made during the regular and normal course of their collecting or hobby activities."  131 Cong. Rec. S9111, S9125 (1985).

33.    Similar concerns were raised during a House debate the next year. Representative Volkmer, the chief sponsor of the bill, recounted the experience of Patrick Mulcahey, a person who was arrested for dealing without a license "after he sold three firearms from his personal collection over the period of 1 year."  132 Cong. Rec. H1651, H1652 (1986).

34.    Congress responded to those abuses with the Firearm Owners Protection Act ("FOPA"), Pub. L. 99-308, 100 Stat. 449 (May 19, 1986); *see also* S. Rep. No. 98–583, at 6 (1984) ("[T]he general purpose of the legislation [is] to limit Federal regulation to those involved in more than isolated activities.").

35.    Congress found that "(1) the rights of citizens … require additional legislation to correct existing firearms statutes and enforcement policies; and (2) additional legislation is required to reaffirm the intent of the Congress, as expressed in section 101 of the Gun Control Act of 1968, that 'it is not the purpose of this title to place undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap-shooting, target shooting, *personal protection*, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use

11

of firearms by law-abiding citizens for lawful purposes.'"  100 Stat. at 449 (emphasis added) (codified at 18 U.S.C. § 921 Note).

36.    The FOPA narrowed the definition of "dealer" by defining "engaged in the business" as "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms."  100 Stat. at 450 (to be codified at 18 U.S.C. § 921(a)(21)).  But the FOPA expressly excluded "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." *Id*.  It also narrowed the definition of "dealer" by defining "with the principal objective of livelihood and profit" as an intent that "the sale or disposition of firearms is predominantly [to] obtain livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection."  *Id*. (to be codified at 18 U.S.C. § 921(a)(22)).

37.    When the FOPA was passed, private firearm sales at gun shows were a well-known phenomenon.  *See Sales of Firearms and Ammunition by Licensees at Gun Shows*, 49 Fed. Reg. 46889 (Nov. 29, 1984) (noting commenters "felt that it was inherently unfair to restrict sales by licensees to their licensed premises, while non-licensees who are not engaged in a firearms business may sell at such gun shows").  Far from seeking to restrict those private sales, Congress amended the GCA to specifically authorize licensed dealers to make sales at gun shows, too.

38.    Congress amended the FOPA's definition of "with the principal objective of livelihood and profit" a few months later, clarifying that "proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and

disposition of firearms for criminal purposes or terrorism." Pub. L. 99-360, 100 Stat. 766, 766 (July 8, 1986) (to be codified at 18 U.S.C. § 921(a)(22)).

## THE BIDEN ADMINISTRATION CIRCUMVENTS CONGRESS

39.    As the ranking member on the Senate Judiciary Committee, then-Senator Biden helped pass the FOPA. Senator Biden said that the FOPA struck "a fair balance between unnecessary restrictions and regulations on lawful ownership of rifles and handguns and the legitimate interests of law enforcement in carrying out their responsibilities." 131 Cong. Rec. S18229 (July 9, 1985).  Senator Biden elaborated:

> I believe the compromises that are now a part of this bill have resulted in a balanced piece of legislation that protects the rights of private gun owners while not infringing on law enforcement's ability to deal with those who misuse guns or violate laws.
>
> During my 12 years as a Member of this body, *I have never believed that additional gun control or Federal registration of guns would reduce crime. I am convinced that a criminal who wants a firearm can get one through illegal, nontraceable, unregistered sources, with or without gun control.*

*Id.* (emphasis added).

40.    Despite his original support for the FOPA, Senator Biden eventually yielded to the increasingly extreme demands of his gun restrictionist electoral base and ran for President advocating for far-reaching gun control measures.

41.    Four months after taking office, in April 2021, President Biden held a Rose Garden event to push gun control initiatives, stating that "no amendment to the Constitution is absolute."  Joseph R. Biden, President, *Remarks by President Biden on Gun Violence Prevention*, WHITEHOUSE.GOV (Apr. 8, 2021), https://perma.cc/QNN5-YCTR.  President Biden said he asked the Justice Department to "identify immediate, concrete actions" he could take "without having to go through … Congress."  He also announced his nomination of David Chipman—a senior policy adviser for the gun control

advocacy group Giffords—to be the Director of ATF. *Id.* That nomination was ultimately withdrawn in the face of stiff Congressional and popular opposition, with one Senator explaining that "[m]any see putting a committed gun control proponent like David Chipman in charge of ATF is like putting a tobacco executive in charge of the Department of Health and Human Services, or antifa in charge of the Portland Police Department." The Newsroom, Republican Leader, *Anti-Gun Zealot David Chipman is the Wrong Choice to Lead ATF*, REPUBLICANLEADER.SENATE.GOV (July 29, 2021), https://perma.cc/FF4M-PWAN. Yet nominating Chipman revealed much about the Biden Administration's approach to gun control.

42.     Keeping with that approach, President Biden nominated another gun control advocate—Stephen Dettelbach—as director of ATF. Learning from the failed Chipman nomination, Dettelbach was more subtle with the public and Congress. But after he was confirmed, Dettelbach showed his colors and called for universal background checks and a ban on many of the most popular types of firearms. *See* S. Mac Healy & Michael A. Maines, *ATF Director Calls for Universal Background Checks, Assault Weapons Ban at Harvard IOP Forum*, THE HARVARD CRIMSON (Nov. 1, 2023), https://perma.cc/7FDQ-GKNW. After confirmation, and without any need to mask his disdain for the Second Amendment, Dettelbach characterized many pro-Second Amendment individuals as selfish and un-American. *Id.* ("People who have the view that their rights, their individual rights, are the only thing that should be taken into account — it is just not who we are as Americans.")

43.     Meanwhile Congress repeatedly rejected many bills that the Biden Administration was advocating, including additional regulations on private sales of

firearms to close the so-called "gun show loophole." *See* 89 Fed. Reg. at 28986. For example, the House passed, but the Senate rejected, the Bipartisan Background Checks Act. *See* H.R. 8.

44.    Rather than do anything to restrict private sales of firearms as requested by the Biden Administration, two years ago, Congress passed a narrow amendment to the GCA in the Bipartisan Safer Communities Act ("BSCA"), Pub. L. 117-159, 136 Stat. 1313 (June 25, 2022) ("BSCA"). BSCA amended the definition of "dealer" in two ways.

45.    *First*, it replaced "with the principal objective of livelihood and profit" with "to predominantly earn a profit." 136 Stat. at 1324.

46.    *Second*, it defined "to predominantly earn a profit" as an "intent underlying the sale or disposition of firearms [that] is primarily one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." 136 Stat. at 1325. But the only difference between the FOPA's definition of intent— "primarily one of obtaining *livelihood and* pecuniary gain"—and the BSCA's definition— "primarily one of obtaining pecuniary gain"—was the BSCA's omission of "livelihood," *see id.*—hardly a sweeping substantive change that warrants the expansive Final Rule.

47.    From that tiny seed, the Biden Administration and Defendant Dettelbach sought to smuggle in the backdoor what Congress had long-refused to allow in the front door: near-universal background checks, with the criminal edges so fuzzy that few individuals would risk private sales of firearms.

### REDEFINING "ENGAGED IN THE BUSINESS"

48.    On March 14, 2023, President Biden issued an Executive Order directing the Attorney General to "develop and implement a plan to: (i) clarify the definition of who is engaged in the business of dealing in firearms, and thus required to become Federal

firearms licensees (FFLs), in order to increase compliance with the Federal background check requirement for firearm sales, including by considering a rulemaking, as appropriate and consistent with applicable law[.]"  Exec. Order 14092, 88 Fed. Reg. 16527, 16527-28 (Mar. 17, 2023).

49.     On September 8, 2023, ATF proposed a rule "to implement the 'engaged in the business' provisions of the BSCA and the [DOJ's] plan in response to Executive Order 14092 by making conforming changes to the new or amended definitions, by clarifying the updated BSCA definition of 'engaged in the business,' and by preventing former FFLs whose licenses have been revoked or surrendered from continuing to engage in the business of dealing in firearms." *Definition of "Engaged in the Business" as a Dealer in Firearms*, 88 Fed. Reg. 61993, 61996 (Sept. 8, 2023) ("NPRM" or "proposed rule").

50.     ATF conceded that its "proposed rule would impact unlicensed persons who would now have to become licensed dealers to lawfully operate as a small business," including the additional costs of acquiring a firearms license and satisfying record retention requirements.  88 Fed. Reg. at 62017.

51.     All of the Plaintiff States in this case along with five other states ("Objecting States")—submitted a comment letter opposing the proposed rule.  The Objecting States explained that the proposed rule departed from the plain meaning and purpose of the federal firearms law and ignored the Second Amendment, which the proposed rule also violated.

52.     Undeterred, ATF nonetheless issued the Final Rule without any significant alterations. *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 Fed. Reg. 28,968 (Apr. 19, 2024).

53.     A contemporaneous DOJ press release shows that the Final Rule goes well beyond implementing the BSCA: "[I]in addition to implementing the revised statutory definition [of 'engaged in the business'], the Final Rule clarifies the circumstances in which a license is—or is not—required by, among other things, adding a definition of 'personal firearms collection' to ensure that genuine hobbyists and collectors may enhance or liquidate their collections without fear of violating the law.  The Final Rule also provides clarity as to what licensees must do with their inventory when they go out of business."  Press Release, U.S. Dep't of Just., *Justice Department Publishes New Rule to Update Definition of "Engaged in the Business" as a Firearms Dealer* (Apr. 10, 2024), https://perma.cc/U3GB-7FSJ.

54.     The Final Rule has the practical effect of requiring background checks for a large number of firearm sales that would not have been required under the prior definition of "engaged in the business."  *See* 18 U.S.C. § 922(t)(1)(A).  That effect registered with the public: "Many commenters indicated a belief that the ... rule created a universal background check requirement."  89 Fed. Reg. at 28987.  Indeed, Mark Collins of the anti-gun Brady Campaign called the proposed rule "a big step closer to" universal background checks.  Media coverage of the Final Rule describes it as closing the so-called gun show loophole and resulting in the largest expansion of background checks since 1993.  Peter Weber, *ATF Finalizes Rule to Close 'Gun Show Loophole,'* THE WEEK (April 11, 2024), https://perma.cc/FL7Y-3C85.  All of this would occur without any action by Congress.

55.     While the White House was careful with its public statements, it still made it clear that it believes the Final Rule will have a sweeping impact.  Indeed, the White House specifically boasted that it was now going to require background checks for all sales

at gun shows.  It explained that just as those doing business from a brick-and-mortar store must "become a licensed dealer and run background checks," those "dealing firearms *at a gun show*, online, in [their] home, in the trunk of a car, at a flea market, or anywhere else … must obtain a license and run background checks."  *FACT SHEET: Biden-Harris Administration Announces New Action to Implement Bipartisan Safer Communities Ace, Expanding Firearm Background Checks to Fight Gun Crime*, WHITEHOUSE.GOV (Apr. 11, 2024), https://perma.cc/L8YB-J4AS (emphasis added).  And it added that "[e]*vidence that a person placed ads online or reserved a table at a gun show shows that the person is intending to profit from the sale.*"  *Id.* (emphasis added).

56.    ATF explained that the Final Rule "will result in more persons who are already engaged in the business of dealing in firearms [as ATF defines it] becoming licensed and deter others from engaging in the business of dealing in firearms without a license." 89 Fed. Reg. at 28968.  And "[a]s more persons become licensed under this rule, those licensees will conduct more background checks." *Id.*

57.    The federal dealer licensing scheme drives the injuries that are caused by the Final Rule.  Becoming a dealer is costly; the fee to obtain a license is $200. In addition to the monetary costs, dealers are subject to significant regulatory burdens.  For example, licensed dealers must maintain records at their places of business of all sales or other dispositions of firearms.  18 U.S.C. § 923(g)(1)(A).  Dealers also face yearly compliance inspections of their sales and dispositions records. *Id.* § 923(g)(1)(B)(ii)(I).  The Attorney General may also inspect a dealer's records without a warrant during criminal investigations.  *Id.* § 923(g)(1)(B)(i), (iii).  On top of the recordkeeping requirements, dealers must maintain premises in a state "from which he conducts business subject to license." *Id.* § 923(d)(1)(E).  And dealers must certify that "secure gun storage or safety

devices will be available at any place in which firearms are sold under the license." *Id.* § 923(d)(1)(G).

58.   Engaging in the unlicensed dealing of firearms exposes individuals to criminal sanctions.  Federal law makes it unlawful for anyone other than a licensed dealer to engage in the business of dealing in firearms.  18 U.S.C. § 922(a)(1)(A).  Persons who willfully engage in the business of dealing in firearms without a license are subject to a term of imprisonment of up to five years, a fine of up to $250,000, or both.  18 U.S.C. § 922(a)(1)(A); § 924(a)(1)(D); § 3571(b)(3).

59.   The Final Rule asserts that it will increase the number of licensed dealers, but it acknowledges that some people will instead stop selling firearms altogether (and it estimates that number as 10% of current sellers).  *See* 89 Fed. Reg. at 29054.

## HARM TO PLAINTIFFS

60.   The Final Rule harms the Plaintiff States in at least two ways.

61.   First, the Final Rule is expected to reduce the number of individuals who sell firearms, period.  The Final Rule estimates that reduction at 10%.  The actual percentage will likely be much greater.

62.   The expected decrease in individuals selling firearms will, in turn, decrease the number of vendors at gun shows, as that is a target of the Final Rule. A significant number of small-scale firearm sales occur between individuals at gun shows.

63.   Although many vendors at gun shows are licensed dealers, a significant portion are private individual sellers who are not currently required to be licensed dealers.

64.   A decrease in vendors would reduce the number of tables that are rented at gun shows.

65.     States that collect taxes or fees related to gun shows will lose revenue if the Final Rule goes into effect.

66.     In addition, the Final Rule also targets firearms sales in online websites such as Armslist.com.   The decrease in firearms sellers would also be applicable to those websites.

67.     Many websites that allow individuals to sell firearms do not require someone to be an FFL to sell on those websites.

68.     This Final Rule would reduce the number of individuals who sell on these websites.

69.     Plaintiff Alabama collects a sales tax both for admissions and sales of firearms at gun shows. *See* Ala. Code § 40-12-143; Ala. Admin. Code 810-6-1-.125(3)(b)(4).

70.     Plaintiff Arkansas charges a 1% short-term-rental tax on the cost of any table rentals that are at gun shows.  Plaintiff Arkansas also has a sales tax that applies to sale of firearms at gun shows and online.

71.     Plaintiff Georgia collects a 4% sales tax that generally applies to sale of firearms during gun shows.

72.     Plaintiff Idaho collects a 6% sales tax that generally applies to the sale of firearms.

73.     Plaintiff Indiana collects a 7% sales tax for sale of firearms during gun shows. Non-FFL sellers have rented tables and sold firearms at gun shows in Indiana.

74.     Plaintiff Iowa imposes a six percent sales tax on the sale of all tangible personal property sold at retail in the state to consumers, including firearms sold online. *See* Iowa Code §§ 423.2; 423.15. Plaintiff Iowa also collects sales tax on tickets for

admission to gun shows. *See* Iowa Admin. Code r. 701-205.5(423).

75.     Plaintiff Kansas collects a 6.5% sales tax both for admissions and sale of firearms during gun shows.

76.     Plaintiff Kentucky applies its 6% sales tax to "admissions," Ky. Rev. Stat. § 139.200(2)(c), which would include admissions to gun shows. The 6% sales tax would also apply to retail sales of firearms. Ky. Rev. Stat. § 139.200(1)(a). However, note that Plaintiff Kentucky's sales tax does not apply to "occasional sales," Ky. Rev. Stat. § 139.470(3); *see* Ky. Rev. Stat. § 139.010(27), which likely includes sales by small-scale hobbyists at a gun show who are not in the business of selling firearms.

77.     Plaintiff Missouri collects 4.225% sales that applies to admissions and sales of firearms at gun shows.

78.     Plaintiff Nebraska's tax regulations require that sales tax be collected when a firearm is sold at a gun show. See 316 Neb. Admin. Code Ch. 1, 033.01, 03, 03A. The sales tax due can be collected by the promoter of the gun show rather than the individual seller in the event the seller is not engaged in regular sales and therefore does not have a sales tax permit. *Id.*

79.     Plaintiff North Dakota collects sales tax for both the admission tickets and sale of firearms during gun shows. N.D.C.C. § 57-39.2-10.1 North Dakota also charges sales taxes on online sales, including for firearms. N.D.C.C. § 57-39.2-12.1.

80.     Plaintiff Oklahoma collects sales tax from gun shows. *See* OKLA. STAT. tit. 68, § 1364.2 – gun shows qualify as a "special event" in Oklahoma, § 1364.2(J)(2), gun show vendors "shall collect sales tax from purchasers of tangible property" at such events, § 1364.2(D), and organizers or promoters of gun shows must remit those taxes to the Oklahoma Tax Commission. § 1364.2(E).

81.    Plaintiff South Carolina taxes retail gun sales, including sales of guns at gun shows. S.C. Code Ann. § 12-36-910(A) ("A sales tax, equal to five percent of the gross proceeds of sales, is imposed upon every person engaged or continuing within this State in the business of selling tangible personal property at retail.").

82.    Plaintiff South Carolina taxes online gun sales through a use tax. S.C. Code Ann. § 12-36-1310(A) ("A use tax is imposed on the storage, use, or other consumption in this State of tangible personal property purchased at retail for storage, use, or other consumption in this State, at the rate of five percent of the sales price of the property, regardless of whether the retailer is or is not engaged in business in this State.").

83.    Plaintiff South Dakota also taxes sales of firearms and attendance fees at gun shows.

84.    Plaintiff Tennessee generally charges a flat fee to each vendor that has a booth at gun shows. *See* T.C.A. § 67-4-710.

85.    The Final Rule further conflicts with Tennessee policy governing nonprofits' participation in gun shows.

86.    Plaintiff Tennessee generally provides more favorable treatment to nonprofit gun collectors who engage in the firearms trade, including by exempting them from paying any sales taxes on proceeds at gun shows. T.C.A. § 67-6-310.

87.    In addition, Tennessee law generally does not require nonprofit gun collectors to have a license to minimally partake in the sale and showing of firearms; instead, they have fallen into a safe harbor under Tennessee law, as they have not historically qualified as firearms dealers. *Id.* § 39-17-1316.

88.    Such policies aim to avoid onerous fees levied upon organizations that pursue purposes other than purely maximizing profit. *See* Tenn. Op. Atty. Gen. No. 85-

280 (Tenn.A.G.), 1985 WL 193831, at *4 (1985) (referencing Tennessee's statutes and Constitution favoring nonprofits and exempting such entities from various expenses).

89.    By requiring nonprofit gun collectors providing limited wares at gun shows to acquire federal licenses, ATF's promulgated rule runs afoul of Tennessee's legal treatment of nonprofit gun collectors and the State's policy of exempting nonprofits from burdensome regulations.

90.    Plaintiff Virginia taxes retail gun sales, including sales of guns online and at gun shows. See Va. Code §§ 58.1-603; 58.1-604.

91.    Plaintiff Wyoming imposes an excise tax upon the sales price of tangible personal property within the State. Most retail sales of firearms in Wyoming are subject to the imposition of the excise tax.  There is an underlying State mandated 4% excise tax rate that applies to the sale of firearms during gun shows including firearms sold online. In addition, each county and local jurisdiction may increase the tax rate above the State mandated 4% excise tax rate.

92.    Plaintiff Alaska's state government does not levy any tax related to gun shows, but local governments do charge for vendor tables.  A reduction in vendors would likely result in loss of revenue for Plaintiff Alaska.

93.    Second, the Final Rule anticipates a significant increase in the number of individuals becoming federal firearms licensees once the Final Rule takes effect.

94.    Some states require additional information or perform their own background analyses prior to executing a sale or transfer of firearms.

95.    Plaintiff Tennessee runs background checks and collects data on each licensed firearm transaction within its borders.  Tenn. Code Ann. § 39-17-1316.

96.    Plaintiff Tennessee uses the same statutory language as federal law when

defining a gun dealer for licensing purposes. *Id.*   The relevant statute, § 39-17-1316, incorporates 18 U.S.C § 921's definition of a gun dealer, as well as any associated requirements imposed by federal regulation—including all applicable licensing regimes under 18 U.S.C. § 923.

97.   Each month, Tennessee evaluates tens of thousands of firearm transactions through a statewide law enforcement agency known as the Tennessee Bureau of Investigation (TBI).  In 2023, TBI evaluated well over 500,000 firearm transactions.

98.   Tennessee requires that such transactions and background checks be verified immediately so a dealer may be informed how to proceed with a transaction. Tennessee Code Annotated § 39-17-1316.

99.   A dealer is required to send purchaser identification, including social security number, firearm information, and FFL information directly to TBI.  *Id.*

100.  Should the identity of a purchaser be in question, TBI may require thumbprints to be collected by the dealer and sent to a law enforcement agency for evaluation. *Id.*

101.  Should a purchaser be denied, especially on grounds related to criminal history information, he has a right to appeal such a determination. *Id.*

102.  If the purchaser and TBI are unable to locate final disposition information within fifteen (15) days, TBI will inform the dealer that they may conditionally proceed with a sale and the federal firearms licensees may transfer the firearm. *Id.*

103.  If it is later found that the firearm transaction was initially properly denied, TBI will take actions to implement the recovery of the wrongfully transferred firearm.

104.  Tennessee currently has 25 dedicated employees to providing background check services timely and in accordance with Tennessee Code Annotated § 39-17-1316.

24

105.    There are currently 3,103 federal firearms licensees in Tennessee.  As stated above, Tennessee law requires all applicable transactions that FFLs partake in to be evaluated by TBI.

106.    The Final Rule also notes that Plaintiff Tennessee is required to run a background check on every firearm that occurs within the state that involves a federal firearms licensee.  89 Fed. Reg. 29065.

107.    The Final Rule expects an increase in background checks and notes that it is state law enforcement agencies in Tennessee that conduct these background checks.  89 Fed. Reg. 29088.

108.    This will result in an increase in administrative costs and reallocation of law enforcement resources for Plaintiff Tennessee.

109.    Plaintiff New Hampshire law permits the New Hampshire Department of Safety ("NHDOS") to become a point of contact for the federal government for the purposes of the National Instant Criminal Background Check System (NICS). N.H. Rev. Stat. Ann. § 159-D:1.

110.    Since approximately 1999, NHDOS has served as a partial point of contact in that a federal firearms licensee contacts the state for purchases of handgun, the frame or receiver of any firearm, firearm mufflers, and firearm silencers, and contacts the FBI for long guns, rifles and shotgun purchases.

111.    The Permits and Licensing Unit of the Division of State Police fulfills the point of contact ("POC") role.  It must access the NICS as part of the background check process and search the New Hampshire Criminal History Record database established under RSA 106-B:14.

112.    In addition, it must conduct a review of a list of individuals produced by the

25

New Hampshire Judiciary who currently have a domestic violence protection orders issued against him or her. This review is conducted because state law prohibits firearm sales to individuals who are under an ex parte domestic violence protective order; federal law contains a different standard. Compare N.H. Rev. Stat. Ann. § 173-B:4, II with 18 U.S.C. § 922(g)(8).

113.    Thus, maintaining the NHDOS's current practice as a POC not only benefits public safety in New Hampshire, but ensures the continued enforcement of RSA 173-B:4, II.

114.    The Final Rule expects an increase in background checks. This increase will likely result in an increase in administrative costs and resources for Plaintiff New Hampshire.

115.    The Final Rule harms Plaintiff Journey because it arguably would require him to become a federal firearms licensee and follow all the requirements required of one or stop selling firearms, and would reduce trade among collectors such that prices will increase while purchasing options decrease for him.

116.    The Final Rule harms Plaintiff Black because it arguably would require him to become a federal firearms licensee and follow all the requirements required of one or stop selling firearms, and would reduce trade among collectors such that prices will increase while purchasing options decrease for him.

117.    The Final Rule harms Plaintiff Maxey because as a collector of firearms and a purchaser of firearms at gun shows, the Final Rule would reduce trade among collectors such that prices will increase while purchasing options decrease for him.

118.    The Final Rule harms Plaintiff Chisholm Trail because it would reduce its revenues from the gun shows that it sponsors and manages because it would result in

fewer vendors and attendees and would increase its costs and administrative and other burdens at its shows. In addition, the Final Rule will harm Chisholm Trail's members, many of whom, including Plaintiff Black and Plaintiff Maxey, are not federal firearm licensees and buy and sell firearms for their personal collections at gun shows, because it arguably would require them to become a federal firearms licensee and follow all the requirements required of one or stop selling firearms.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### VIOLATION OF APA 5 U.S.C. § 706(2)(A), (C)
### FINAL RULE IS NOT "NECESSARY"

119. The foregoing allegations are repeated and realleged as if fully set forth herein.

120. The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be ... (A) ... not in accordance with law; ... [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

121. The GCA authorized regulations as follows:

The Secretary may prescribe such rules and regulations as he deems *reasonably necessary* to carry out the provisions of this chapter, including—

(1) regulations providing that a person licensed under this chapter, when dealing with another person so licensed, shall provide such other licensed person a certified copy of this license; and

(2) regulations providing for the issuance, at a reasonable cost, to a person licensed under this chapter, of certified copies of his license for use as provided under regulations issued under paragraph (1) of this subsection.

The Secretary shall give reasonable public notice, and afford to interested parties opportunity for hearing, prior to prescribing such rules and regulations.

82 Stat. at 1226 (emphasis added) (to be codified at 18 U.S.C. 926).

122.    The FOPA amended that regulatory authority as follows:

(a) The Secretary may prescribe **only** such rules and regulations ~~as he deems reasonably~~ **as are** necessary to carry out the provisions of this chapter, including—

(1) regulations providing that a person licensed under this chapter, when dealing with another person so licensed, shall provide such other licensed person a certified copy of this license; and

(2) regulations providing for the issuance, at a reasonable cost, to a person licensed under this chapter, of certified copies of his license for use as provided under regulations issued under paragraph (1) of this subsection.

~~The Secretary shall give reasonable public notice, and afford to interested parties opportunity for hearing, prior to prescribing such rules and regulations.~~

<u>No such rule or regulation prescribed after the date of the enactment of the Firearms Owners' Protection Act may require that records required to be maintained under this chapter or any portion of the contents of such records, be recorded at or transferred to a facility owned, managed, or controlled by the United States or any State or any political subdivision thereof, nor that any system of registration of firearms, firearms owners, or firearms transactions or dispositions be established. Nothing in this section expands or restricts the Secretary's authority to inquire into the disposition of any firearm in the course of a criminal investigation.</u>

<u>(b) The Secretary shall give not less than ninety days public notice, and shall afford interested parties opportunity for hearing, before prescribing such rules and regulations.</u>

<u>(c) The Secretary shall not prescribe rules or regulations that require purchasers of black powder under the exemption provided in 18 use 845. section 845(a)(5) of this title to complete affidavits or forms attesting to that exemption.</u>

100 Stat. 459-60 (strike-through reflects deletions; underlines reflect additions).

123.    "When Congress amends legislation, courts must 'presume it intends [the change] to have real and substantial effect.'" *Ross v. Blake*, 578 U.S. 632, (2016) (quoting *Stone v. INS*, 514 U.S. 386, 397 (1995)).

124.    Congress's amendment of Section 926 in the FOPA removed any affirmative grant of discretion to Defendants, and instead requires the regulations be truly

"necessary" to carry out the provisions of Chapter 44 of Title 18.  That is confirmed by the statutory purpose provisions enacted as part of the FOPA: reinforcing that "it is not the purpose of this title to place *undue or unnecessary* Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap-shooting, target shooting, personal protection, or any other lawful activity, and that this title is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes.'"  100 Stat. at 449 (codified at 18 U.S.C. 921 Note) (emphasis added).  It's further confirmed by the problem the FOPA was intended to address: BATF's "reprehensible" abuses of the overbroad definition of "engaged in the business" in the GCA.  *See* Senate Subcommittee on the Constitution, *The Right to Keep and Bear Arms* 20-21 (Comm. Print Feb. 1982).

125.  Even assuming that agencies are entitled to deference under any circumstances, *see Loper Bright Enters. v. Raimondo*, 143 S. Ct. 2429 (2023) (granting certiorari on "[w]hether the Court should overrule *Chevron* or at least clarify that statutory silence concerning controversial powers expressly but narrowly granted elsewhere in the statute does not constitute an ambiguity requiring deference to the agency"), deference has "no role to play" in construing statutes with criminal penalties, *Guedes v. BATFE*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., concurring in denial of certiorari).  Indeed, the Supreme Court has "never held that the Government's reading of a criminal statute is entitled to any deference."  *Id.* (quoting *Apel v. United States*, 571 U.S. 359 (2016)).

126.  The Final Rule is not "necessary" beyond purely technical conforming amendments that track the change in statutory language in the BSCA.

127.   The Final Rule is thus contrary to federal statutory law and in excess of Defendants' statutory authority.

## SECOND CAUSE OF ACTION
## VIOLATION OF APA 5 U.S.C. § 706(2)(A), (C)
## NO AUTHORITY TO DEFINE STATUTORY TERMS

128.   All of the foregoing allegations are repeated and realleged as if fully set forth herein.

129.   The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be ... (A) ... not in accordance with law; ... [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

130.   By statute, Defendants "may prescribe *only* such rules and regulations as are *necessary* to carry out the provisions of" Chapter 44 of Title 18.   18 U.S.C. § 926(a) (emphasis added).

131.   In § 921(a)(13), Congress provided that "[t]he term 'collector' means any person who acquires, holds, or disposes of firearms as curios or relics, *as the Attorney General shall by regulation define* ...."  The affirmative grant authority to define "curios or relics" by regulation necessarily implies the absence of authority to define other statutory terms by regulation.  *See, e.g., Bittner v. United States*, 143 S. Ct. 713, 720 (2023) (applying the *expressio unius est exclusion alterius* canon).

132.   But Congress restricted even that limited authority via a spending prohibition. Pub. L. 113-6, 127 Stat. 248 (Mar. 26, 2013).

133.   Congress delegated express authority in both § 922 (unlawful acts) and § 923 (licensing) to promulgate rules and regulations to implement multiple statutory provisions.  *See* § 922(p)(2)(C)(ii), (3) (previously prohibited firearms detectable as

Security Exemplars); *id*. § 923(a) (firearms license applications); *id*. § 923(b) (licenses for firearms collectors); *id*. § 923(g)(1)(A) (recordkeeping requirements for licensed importers, manufacturers, and dealers); *id*. § 923(g)(2) (recordkeeping requirements for licensed collectors); *id*. § 923(i) (serialization requirements for imported or manufactured firearms); *id*. § 923(j) (temporarily conducting business at locations other than location specified on license); *id*. § 923(k) (distribution requirements for packages containing armor piercing ammunition).

134.   But given these specific delegations—which includes licensing and recordkeeping requirements for importers, manufacturers, dealers, and collectors, *see* § 923(a), (b), (g)(1)(A), (g)(2)—courts should be reluctant to infer from congressional silence a delegation of authority to ATF to define (or redefine) statutory definitions. *See Bittner*, 598 U.S. at 94.

135.   And none of these express statutory grants of rulemaking authority permit Defendants to enforce their new statutory definitions or redefinitions via presumptions.

136.   Accordingly, (a) all definitions in the Final Rule that consist of anything other than repeating statutory language and (b) all presumptions in the Final Rule are contrary to law, in excess of Defendants' statutory authority, and must be set aside.

## THIRD CAUSE OF ACTION
### VIOLATION OF APA 5 U.S.C. § 706(2)(A), (C)
### DEFINITION OF "ENGAGED IN THE BUSINESS"

137.   The foregoing allegations are repeated and realleged as if fully set forth herein.

138.   The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be ... (A) ... not in accordance with law; ... [or] (C) in

excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

139.    The GCA defined a "dealer" as "(A) any person engaged in the business of selling firearms or ammunition at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker." 82 Stat. at 1216.

140.    Courts applying the GCA's definition construed the phrase "engaged in the business" as "strongly imply[ing] more than one isolated sale or transaction," and "dealing" as "connot[ing] a regular course of conduct carried on over a period of time or, at least, on more than one or two unrelated occasions." *United States v. Tarr*, 589 F.2d 55 (1st Cir. 1978). Thus, for example, in *United States v. Swinton*, 521 F.2d 1255, 1259 (10th Cir. 1975), the court held that a single sale, without more, would not have been sufficient to establish a violation of 18 U.S.C § 922(a)(1).

141.    The FOPA narrowed the definition of "engaged in the business" (as applied to a dealer in firearms) to mean "a person who devotes time, attention, and labor to dealing in firearm**s** as a *regular course* of trade or business with the principal objective of livelihood and profit through the *repetitive* purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 100 Stat. at 450 (emphases added).

142.    The reference to the plural "firearms" and the addition of the words "regular course" and "repetitive" eliminate any doubt that a single purchase or sale is not enough to establish a person is engaged in the business, regardless of whether that purchase or sale has a profit motive.

143.   "Regular" means "recurring at fixed times" or "periodic."   *Regular*, DICTIONARY.COM,  https://www.dictionary.com/browse/regular.   "Course" means "a customary    manner    of    procedure."    *Course*,    DICTIONARY.COM, https://www.dictionary.com/browse/course defined as "an accustomed procedure or normal action."   The term "repetitive" is commonly used to refer to something that happens    more    than    once.    *See    Repetition*,    DICTIONARY.COM, https://www.dictionary.com/browse/repetition ("repetition" refers to "the act of repeating … or doing something again"—that is, "repeated action").   These terms clearly imply plurality.

144.   Although the BSCA ostensibly changed the intent requirements to constitute being "engaged in the business," it did not alter the requirement for a "regular course" of trade involving "repetitive" firearms transactions.

145.   Even so, the Final Rule states "even a single firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to require a license."   89 Fed. Reg. at 28976, 29091.   It also identifies profit motive, but that is a distinct element.

146.   But even if a single purchase or sale can be enough to constitute being "engaged in the business" when combined with nebulous "more" evidence, that "more" cannot consist of acts commonly incidental to a single sale or liquidating all or part of a personal collection, like renting a table at a gun show or running advertisements.

147.   And if a single purchase or sale can be enough to constitute being "engaged in the business" when combined with nebulous "more" evidence, that "more" cannot consist of profit motive, which is a distinct element of being "engaged in the business."

148.   While the Final Rule retains the requirements for a "regular course of trade

or business" and the "repetitive purchase and resale of firearms," it conditions that by noting that whether a person is "engaged in the business" is a "fact-specific inquiry" and there "is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement." 89 Fed. Reg. at 29091 (quoting 27 C.F.R. § 478.13(a), (b)). But these nebulous requirements fail to retain the statutory requirement of a "regular course of business" or "repetitive" transactions.

149.   The Final Rule definition of "engaged in the business" and all related definitions are contrary to law in excess of Defendants authority, and must be set aside.

**FOURTH CAUSE OF ACTION**
**VIOLATION OF APA 5 U.S.C. § 706(2)(A), (C)**
**DEFINING AWAY STATUTORY EXEMPTIONS**

150.   The foregoing allegations are repeated and realleged as if fully set forth herein.

151.   The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be ... (A) ... not in accordance with law; ... [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

152.   Federal law excludes someone from being "engaged in the business" if that person "makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C).

153.   Defendants concede that the BSCA's amending the definition of "engaged in the business" "did not alter the longstanding FOPA exclusions for 'a person who makes occasional sales, exchanges or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.'"

34

89 Fed. Reg. at 28971 (quoting 18 U.S.C. § 921(a)(21)(C)).

154. Nevertheless, the Final Rule redefines this unqualified "personal collection" exception by limiting it to "[p]ersonal firearms that a person accumulates for study, comparison, exhibition (*e.g.*, collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (*e.g.,* noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction)" and by excluding "*any* firearm purchased for the purpose of resale with the predominant intent to earn a profit" and "firearms accumulated *primarily for personal protection.*"  89 Fed. Reg. at 29090 (emphases added) (to be codified at 27 C.F.R. § 478.11).

155. Nothing in the text of the statute warrants excluding firearms obtained for personal protection from the statutory term "personal collection."   Indeed, *Heller* expressly recognized that personal self-defense is "central to the Second Amendment right" and a primary reason that individuals acquire firearms for personal use.  *See District of Columbia v. Heller*, 554 U.S. 570, 628 (2008).

156. By removing "any firearm" purchased with a predominant intent to earn a profit from the "personal collection" exemption, the Final Rule also—when combined with its new regulatory presumptions—threatens to force a person who sells a single firearm to comply with federal firearms licensing requirements, even though the statute demands "repetitive" transactions as a part of a "regular course" of business.  It's yet another example of Defendants blurring the distinct statutory requirements for "repetitive" transactions and profit motive.

157. The Final Rule also contradicts the statutory allowance of "occasional sales" (plural) from "a personal collection or for a lobby."

158.    The Final Rule creates a new distinction between firearms for personal protection and other firearms, and that is found nowhere in relevant federal law.  This distinction is contrary to law.

159.    The Final Rule is thus not in accordance with federal law, is in excess of Defendants' statutory authority, and must be set aside.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF APA 5 U.S.C. § 706(2)(A)**
**ARBITRARY AND CAPRICIOUS CHANGE IN USE OF DEFINITIONS /**

**PRETEXT**

160.    The foregoing allegations are repeated and realleged as if fully set forth herein.

161.    Under the APA, a court shall "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, [or] an abuse of discretion[.]" 5 U.S.C. § 706(2)(A).

162.    An agency acts arbitrarily and capriciously when it departs sharply from prior practice without reasonable explanation or disregards either alternatives to its action or the affected communities' reliance on the prior rule.  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020).

163.    The past practice of the Defendants for at least the past 36 years was to stick to the definitions Congress provided for terms such as "engaged in the business."  *See* 27 C.F.R. § 478.

164.    The Final Rule departs sharply from that past practice of not redefining congressional terms without providing a reasonable explanation for why that is necessary.

165.    For the past 36 years, these statutory definitions have been utilized by

Defendants, individuals, and courts in determining who is considered a dealer without the need for "clarification." In fact, Defendants cite many cases where courts have applied the existing definitions in support of the Final Rule.

166. Defendants do not provide a reasonable explanation as to why such a sharp deviation from past practice is warranted.

167. Defendants claim the Final Rule "implements the provisions of the Bipartisan Safer Communities Act, Public Law 117–159, sec. 12002, 136 Stat. 1313, 1324 (2022) ('BSCA'), that amended the definition of 'engaged in the business' in the [GCA] at 18 U.S.C. 921(a)(21)(C), as well as the Department's plan in response to Executive Order 14092 of March 14, 2023 (Reducing Gun Violence and Making Our Communities Safer), 88 FR 16527 (Mar. 17, 2023)." 89 Fed. Reg. at 28968.

168. But many of the changes in the Final Rule are unrelated to, and not necessitated by, the BSCA, leaving only the politically motivated Executive Order as justification.

169. The Final Rule nods toward "new technologies, mediums of exchange, and forums in which firearms are bought and sold." 89 Fed. Reg. at 28973. But the Final Rule doesn't limit itself to (or even focus on) those new forums. Rather, the Final Rule makes it difficult or impossible for ordinary citizens to get a table at an old fashioned, regular, low-tech gun show without risking a felony. And if new technological forms are the problem, existing regulations already cover them.

170. Stripping away the pretext, Defendants' primary reason for this abrupt change was a raw, political desire to close the so-called "gun show loophole" after their political party failed to achieve the same through legitimate legislative processes.

171. In addition, the Defendants did not consider the reliance interests of the

States that operate off these congressional definitions for things such as the collection of tax revenue, reciprocal licenses and expanded background checks.

172.   The Final Rule claims that it exists to "clarify" definitions Congress already provided by statute.  But the content of the Final Rule does the opposite of clarifying definitions, it modifies and confuses them.

173.   The Final Rule redefines already-defined statutory terms and expresses those new definitions through a series of presumptions.  Then it creates exceptions to the presumptions that have their own exceptions within them.  This results in a nebulous and convoluted standard that makes it impossible to identify who and what conduct is covered under the Final Rule.

174.   For example, the Final Rule claims to uphold a statutory exemption by not presuming someone selling firearms from their personal collection is a dealer.  But it invents the following exceptions to the exception to the presumption, a personal collection (1) does not include firearms purchased for self-defense, (2) does not include any firearm that was brought with any intent to obtain profit, and (3) does not include anyone who purchases any additional firearms after selling from their personal collection.

175.   No reasonable person would conclude that these nebulous and convoluted definitions clarify anything.  Instead, they provide a moving target for the Defendants to maximize the scope of who they claim is covered under the Final Rule.

176.   The idea that this "clarifies" anything is so implausible that it cannot be ascribed to difference in view or being the product of agency expertise and end the so-called "gun show loophole."

177.   The Final Rule is not the product of a well-reasoned decision. Rather it betrays a series of post-hoc justifications that serve as a pretext for doing what the

Defendants truly want to do, which is create near-universal background checks.

178.   The Final Rule is thus arbitrary and capricious and must be set aside.

## SIXTH CAUSE OF ACTION
## VOID FOR VAGUENESS

179.   The foregoing allegations are repeated and realleged as if fully set forth herein.

180.   A regulation is unconstitutionally vague if it does not give a person of reasonable intelligence fair notice that his or her conduct is unlawful or it "fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chi. v. Morales*, 527 U.S. 41, 52, 60 (1999); *see also United States v. Berger*, 553 F.3d 1107, 1110 (8th Cir. 2009) ("To defeat a vagueness challenge, a penal statute must pass a two-part test: The statute must first provide adequate notice of the proscribed conduct, and second, not lend itself to arbitrary enforcement.").

181.   An average person reading the Final Rule would not be able to determine whether his or her conduct is lawful.  The Final Rule ostensibly permits some behavior (or, rather, does not extend to some behavior), while at the same time, Defendants give themselves ample room to apply the Final Rule to the same behavior if they so choose.

182.   As an example, the Final Rule states that if someone "restocks" his personal collection after selling a firearm he may not be subject to the exemption for selling from a personal collection.  *Cf. Stahl v. City of St. Louis*, 687 F.3d 1038, 1041 (8th Cir. 2012) ("Though there are certainly times when a speaker knows or should know that certain speech or activities likely will cause a traffic problem, in many situations such an effect is

difficult or impossible to predict.").[1]  It is common for gun owners to sell a firearm with the intent to replace that firearm with a  superior or preferred firearm.

183.   "The lack of clarity also makes the Final Rule susceptible to arbitrary enforcement." *Parents Defending Educ. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 669 (8th Cir. 2023).

184.   Providing cover for arbitrary enforcement by the Defendants appears to be an intended goal (and not an ancillary effect) of the Final Rule because it is difficult, if not impossible, to imagine a situation where the Defendants would not be able to point to some provision in the Final Rule that justifies an arrest, investigation, or prosecution.

185.   The Defendants are clearly "able to decide arbitrarily which members of the public [the agency] will [enforce it against]." *Morales*, 527 U.S. at 58.  This lack of "established safeguards" is the definition of arbitrary enforcement.

186.   Defendants' actions violate private Plaintiffs' civil rights and, accordingly, fall within the scope of 42 U.S.C. 1983.

187.   Because the Final Rule is unconstitutionally vague, it must be set aside.

**SEVENTH CAUSE OF ACTION**
**VIOLATION OF THE SECOND AMENDMENT**

188.   The foregoing allegations are repeated and realleged as if fully set forth herein.

189.   The Second Amendment provides that "A well-regulated Militia, being

---

[1] *Stahl* found the statute in question violated the due process clause of the Fourteenth Amendment, rather being facially void for vagueness. 687 F.3d at 1041 (statute violated the Due Process Clause because it failed to "provide people with fair notice of when their actions are likely to become unlawful").  This characterization does not make the Final Rule any less unconstitutional, because under either theory it fails to provide adequate notices of what is or is not permitted.

necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

190.    "In terms of the original meaning of the Second Amendment, the right to engage in firearms commerce is clear."  David B. Kopel, *Does the Second Amendment Protect Firearms Commerce?*, 127 HARV. L. REV. F. 230 (Apr. 11, 2014) (reviewing Founding Era sources).  Even if that weren't true, the right to "keep and bear arms" can be exercised only by "get[ting] one, either through sale, rental, or gift." *Md. Shall Issue, Inc. v. Moore*, 2023 WL 8043827, \*4 (4th Cir. 2023).

191.    Thus, if one's ability to obtain and dispose of firearms is restricted, one's right to keep and bear arms is hindered and burdened.

192.    Courts have held that the ability to buy a firearm is encompassed in the right to keep a firearm.  *Range v. Attorney General*, 69 F.4th 96, 106 (3d Cir. 2023).

193.    Accordingly, the ability to sell a firearm to another is also protected. *See Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010), *abrogated on other grounds as recognized by Range*, 69 F.4th 96.

194.    "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, ... the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022).

195.    The Defendants cannot demonstrate that the Final Rule is consistent with the "Nation's historical tradition of firearm regulation," because no analogous regulation of non-commercial sales of firearms existed at the time the Second Amendment was

ratified.

196.    Indeed, when Congress enacted the FOPA, it found that "additional legislation [was necessary] to correct existing firearms statutes and enforcement policies." 100 Stat. at 449. In particular, it found legislation was necessary to safeguard citizens' right "to keep and bear arms under the [S]econd [A]mendment." *Id.* Congress also found "additional legislation [was] needed to reaffirm [its] intent," as expressed in the GCA, that this title did not intend to impose "undue or unnecessary ... burdens on law-abiding citizens" in the lawful "acquisition, possession or use of firearms" or to "discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." *Id.* That is nothing like what the Final Rule does.

197.    Because the Final Rule violates the Second Amendment, it should be set aside.

## EIGHTH CAUSE OF ACTION
## VIOLATION OF SEPARATION OF POWERS – NON-DELEGATION DOCTRINE

198.    The foregoing allegations are repeated and realleged as if fully set forth herein.

199.    Criminal statutes are for the courts, not for the Executive, to construe. Separation of powers prohibits Congress from "handing off to [the Attorney General and his subordinates] the power to write [their] own criminal code." *Gundy v. United States*, 139 S. Ct. 2116 (2019) (Gorsuch, J., joined by Roberts and Thomas, JJ.); *see also id.* (Alito, J., concurring, calling for reconsideration of non-delegation jurisprudence); *Whitman v. United States*, 135 S. Ct. 352 (2014) (statement of Scalia, J., joined by Thomas, J.). Article I of the U.S. Constitution reserves the legislative power exclusively to Congress.

200.    Alternatively, particularly if the BSCA is construed as broadly as Defendants

contend in the Final Rule, the BSCA lacks any intelligible principle to guide Defendants' rulemaking.

201.    Thus, at least in this instance, the Final Rule would be an unconstitutional delegation of lawmaking and must be set aside.

## NINTH CAUSE OF ACTION
## SEPARATION OF POWERS – PRETEXT / MAJOR QUESTIONS DOCTRINE

202.    The foregoing allegations are repeated and realleged as if fully set forth herein.

203.    Over the past several years, the Supreme Court has applied a new "label" to a doctrine that has developed over decades—the major questions doctrine. *See Biden v. Nebraska*, 143 S. Ct. 2355, 2374 (2023). The doctrine requires "clear congressional authorization" for agency action in certain "extraordinary cases" where an agency invokes broad authority over matters of great economic and political significance. *See West Virginia v. EPA*, 597 U.S. 697, 721-22 (2022). Otherwise, the major question is reserved for Congress-not the agency-to answer.

204.    A variety of circumstances may trigger the application of the doctrine, including the economic or political impact of the agency action. *See Nebraska*, 143 S. Ct. at 2375; *West Virginia*, 597 U.S. at 724.

205.    Whether the federal government should conduct universal background checks on firearms purchases is an issue of major political significance.

206.    The Final Rule effectively makes everyone who sells any firearm for a profit a firearms dealer who has to register as a federal firearms licensee, be granted a license, and pay $200 for it.

207.    This is turn requires every purchaser to fill out an ATF Form 4473 and be

subject to a background check.  Because of the broad scope of this rule, this would be a backdoor way to institute universal or near-universal background checks.

208.   There is an earnest and profound debate going on around the country about whether and the what extent the federal government should conduct universal background checks, as evidenced by the fact that the proposed rule received nearly 388,000 comments.

209.   In addition, Congress has attempted to pass similar measures on multiple occasions but has failed to do so.

210.   States have also implemented their own laws to either provide greater protection for Second Amendment rights or to impose more gun control.

211.   Defendants attempt to unilaterally end this debate through the Final Rule.

212.   Defendants use the pretextual artifice of a minor statutory amendment to justify their sweeping redefinition of what it is to be engaged in the business of dealing in firearms.

213.   To adopt a regulation so sweeping on such a politically sensitive issue, Defendants need to point to clear statutory authorization for their actions to be legal. They cannot, so the Final Rule should be set aside.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully ask this Court to:

a.      Postpone the effective date of the Final Rule pending judicial review;

b.      Declare that the Final Rule is unlawful and an *ultra vires* agency action and of no force and effect;

c.      Declare that the Final Rule violates the Administrative Procedure Act as it was not promulgated "in accordance with law" and is of no force and effect;

  d.  Declare that the Final Rule violates the Administrative Procedure Act as it is arbitrary and capricious and is of no force and effect;

  e.  Declare that the Final Rule violates the Administrative Procedure Act insofar as it is contrary to constitutional right, power, privilege, or immunity;

  f.  Declare that the Final Rule violates rights protected by the Second Amendment and is of no force and effect;

  g.  Vacate the Final Rule as contrary to law and unreasonable, arbitrary, and capricious;

  h.  Issue an injunction prohibiting Defendants from enforcing the Final Rule;

  i.  Issue an injunction prohibiting Defendants and anyone acting in concert with them from taking any action inconsistent with the rescission of the Final Rule;

  j.  Grant Plaintiffs their costs and reasonable attorney's fees under 28 U.S.C. § 2412, 42 U.S.C. § 1988, or other applicable law; and

  k.  Grant Plaintiffs such other and further relief as this Court deems just and proper.


  Dated:  May 1, 2024

            Respectfully submitted,

*signature*

KRIS W. KOBACH
Kansas Attorney General

/s/Abhishek S. Kambli
*Abhishek S. Kambli
*Deputy Attorney General*
*Jesse A. Burris
*Assistant Attorney General*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-2215
Fax: (785) 296-3131

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Kansas*

BRENNA BIRD
Iowa Attorney General

/s/ Eric H. Wessan
*Eric H. Wessan
Solicitor General
Office of the Iowa Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
Eric.Wessan@ag.iowa.gov

*Motion for admission forthcoming

*Counsel for Plaintiff State of Iowa*

*signature*

TIM GRIFFIN
Arkansas Attorney General

/s/ Nicholas J. Bronni
Nicholas J. Bronni (2016097)
 Solicitor General
Dylan L. Jacobs (2016167)
 Deputy Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Telephone: (501) 682-2007
Fax: (501) 683-2520

*Counsel for Plaintiff State of Arkansas*

AUSTIN KNUDSEN
 Montana Attorney General

/s/ Christian B. Corrigan
*CHRISTIAN B. CORRIGAN
 *Solicitor General*
*PETER M. TORSTENSEN, JR.
 *Deputy Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Montana*

STEVE MARSHALL
Alabama Attorney General

*/s/ Edmund G. LaCour, Jr.*
*Edmund G. LaCour, Jr.
Solicitor General
Office of the Alabama
Attorney General
501 Washington Avenue
P.O. Box 300152
Montgomery, AL  36130
Telephone: (334) 242-7300
Fax: (334) 353-8400
Email: Edmund.LaCour@AlabamaAG.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Alabama*

TREG R. TAYLOR
Alaska Attorney General

*/s/ Aaron C. Peterson*
*Aaron C. Peterson
Senior Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: aaron.peterson@alaska.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Alaska*

CHRISTOPHER CARR
Georgia Attorney General

*/s/ Stephen Petrany*
*Stephen Petrany
Solicitor General
Office of the Attorney General of Georgia
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Georgia*

RAÚL R. LABRADOR
Idaho Attorney General

*/s/ Joshua N. Turner*
*Joshua N. Turner
Chief of Constitutional Litigation and
Policy
*Alan M. Hurst
Solicitor General
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
Tel: (208) 334-2400
Josh.turner@ag.idaho.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Idaho*

TODD ROKITA
Indiana Attorney General

*/s/ James A. Barta*
*James A. Barta
Solicitor General
Office of the Attorney General of Indiana
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, Indiana 46204
Telephone:  (317) 232-0709
James.Barta@atg.in.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Indiana*

RUSSELL COLEMAN
Kentucky Attorney General

*/s/ Victor B. Maddox*
*Victor B. Maddox
*Aaron J. Silletto
*Zachary M. Zimmerer
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Victor.Maddox@ky.gov
Aaron.Silletto@ky.gov
Zachary.Zimmerer@ky.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff Commonwealth of
Kentucky*

ANDREW BAILEY
Missouri Attorney General

*/s/ Bryce Beal*
*Bryce Beal
Assistant Attorney General
Missouri Attorney General's Office
207 West High Street
Jefferson City, MO 65101
(573) 751-6633
Bryce.Beal@ago.mo.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Missouri*

MICHAEL T. HILGERS
Nebraska Attorney General

*/s/ Zachary A. Viglianco*
*Zachary A. Viglianco
Deputy Solicitor General

Office of the Nebraska
Attorney General
2115 State Capitol
Lincoln, NE 68509
(531) 739-7645
zachary.viglianco@nebraska.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Nebraska*

JOHN M. FORMELLA
New Hampshire Attorney General

/s/Brandon F. Chase
*Brandon F. Chase
Assistant Attorney General
New Hampshire Department of Justice
1 Granite Place – South
Concord, NH 03301
(603) 271-3650
brandon.f.chase@doj.nh.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff New Hampshire*

DREW H. WRIGLEY
North Dakota Attorney General

/s/ *Katie L. Carpenter*
*Katie L. Carpenter
*Deputy Solicitor General*
North Dakota Office of the Attorney
General
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
Email: katcarpenter@nd.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of North
Dakota*

GENTNER DRUMMOND
Oklahoma Attorney General

/s/ Garry M. Gaskins, II
*GARRY M. GASKINS, II
 *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:      (405) 521-3921
garry.gaskins@oag.ok.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State Oklahoma*

ALAN WILSON
South Carolina Attorney General

/s/ *Joseph D. Spate*
*Joseph D. Spate
Assistant Deputy Solicitor General
Office of the Attorney General
State of South Carolina
1000 Assembly Street
Columbia, SC  29201
(803) 734-3371
josephspate@scag.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State South Caro-
lina*

MARTY J. JACKLEY
South Dakota Attorney General

*/s/ Charles D. McGuigan*
*Charles D. McGuigan
Deputy Attorney General
Office of the Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Facsimile: (605) 773-4106
charles.mcguigan@state.sd.us

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of South Dakota*

JONATHAN SKRMETTI
Tennessee Attorney General and Re-
porter

*/s/ Whitney D. Hermandorfer*
*WHITNEY D. HERMANDORFER
Director of Strategic Litigation Unit
*BRIAN DANIEL MOUNCE
Counsel for Strategic Litigation &
Assistant Solicitor General
Office of the Tennessee Attorney Gen-
eral
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-1400
whitney.hermandorfer@ag.tn.gov
brian.mounce@ag.tn.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for the State of Tennessee*

JASON S. MIYARES
Attorney General of Virginia

*/s/ Kevin M. Gallagher*
*Kevin M. Gallagher
*Principal Deputy Solicitor General*
*Brendan T. Chestnut
*Deputy Solicitor General*
*M. Jordan Minot
*Assistant Solicitor General*
Virginia Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Fax: (804) 786-1991
Email: kgallagher@oag.state.va.us
Email: bchestnut@oag.state.va.us
Email: mminot@oag.state.va.us

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff Commonwealth of
Virginia*

PATRICK MORRISEY
West Virginia Attorney General

*/s/ Michael R. Williams*
*Michael R. Williams
*Principal Deputy Solicitor General*
Office of the Attorney General of West
Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for State of West Virginia*

BRIDGET HILL
Wyoming Attorney General

*/s/ Ryan Schelhaas*
*Ryan Schelhaas
*Chief Deputy Attorney General*
Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State Wyoming*

*/s/ Michael D. McCoy*
*Michael D. McCoy
*William E. Trachman
Mountain States
Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
Mmccoy@mslegal.org

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiffs Allen Black, Donald
Maxey, and Chisholm Trail Antique Gun
Association*

*/s/ Anna St. John*
Anna St. John
Hamilton Lincoln Law Institute
1629 K St. NW Suite 300
Washington, DC 20006
(917) 327-2392
anna.stjohn@hlli.org

*/s/ M. Frank Bednarz*
M. Frank Bednarz
Hamilton Lincoln Law Institute
1440 W. Taylor St. #1487
Chicago, IL 60607
(801) 706-2690
frank.bednarz@hlli.org

*Motion for admission forthcoming

*Counsel for Plaintiff Phillip Journey*