## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

| | |
|---|---|
| **STATE OF KANSAS,** *et al.* | |
| Plaintiffs, | |
| v. | |
| **MERRICK GARLAND**, *et al.*, | Civil Action No. 2:24-cv-88-JM |
| Defendants. | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF
## MOTION FOR STAY/PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... ii

INTRODUCTION ..................................................................................................... 1

BACKGROUND ........................................................................................................ 1

      A.    Federal Firearms Act of 1938 and Gun Control Act of 1968 ...................... 1

      B.    The Firearms Owners' Protection Act ........................................................ 2

      C.    The Bipartisan Safer Communities Act ...................................................... 5

      D.    The Final Rule............................................................................................. 5

      E.    The Plaintiffs............................................................................................... 7

LEGAL STANDARD................................................................................................ 12

ARGUMENT ............................................................................................................ 13

    I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS. ..................... 13

      A.    The Final Rule exceeds Defendants' statutory authority and is contrary to federal firearms law.............................................................. 13

      B.    The Final Rule is Unconstitutionally Vague.............................................. 23

      C.    The Final Rule is Arbitrary and Capricious. .............................................. 28

      D.    The Final Rule Violates the Second Amendment....................................... 34

    II.    PLAINTIFFS Suffer Irreparable Harm and the Court should Weigh the Balance of Equities in Plaintiffs' Favor...................................................... 35

      A.    The Final Rule Irreparably Harms Plaintiffs. ............................................ 35

      B.    The Balance of the Equities and Public Interest Favor Plaintiffs. ............. 39

    III.    RELIEF Should NOT BE LIMITED TO THE PARTIES.................................... 39

CONCLUSION......................................................................................................... 41

# TABLE OF AUTHORITIES

Cases

*Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466 (8th Cir. 1994) ................................................ 36

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335 (2020) ........................................... 40

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ................................................................................... 19

*Bittner v. United States*, 598 U.S. 85 (2023) ........................................................................... 15, 16

*Branstad v. Glickman*, 118 F. Supp. 2d 925 (N.D. Iowa 2000) ................................................... 12

*Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500 (8th Cir. 1987) ...................... 13

*Career Colleges & Sch. of Texas v. United States Dep't of Educ.*,
    98 F.4th 220 (5th Cir. 2024) ...................................................................................................... 40

*City of Chi. v. Morales*, 527 U.S. 41 (1999) ............................................................................ 23, 28

*Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109  (8th Cir. 1981) (en banc) .......................... 12

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................................................................... 23

*Entergy, Arkansas, Inc. v. Nebraska*, 210 F.3d 887 (8th Cir. 2000) ............................................ 36

*Ezell v. City of Chi.*, 651 F.3d 684 (7th Cir. 2011) ...................................................................... 34

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ............................................. 20

*Gonzales v. Oregon*, 546 U.S. 243 (2006) .................................................................................... 14

*Guedes v. BAFTE*, 140 S. Ct. 789 (2020) (Gorsuch, J., concurring in the denial of certiorari) ... 17

*Hardin v. ATF*, 65 F.4th 895 (6th Cir. 2023) .......................................................................... 29, 30

*Johnson v. United States*, 576 U.S. 591 (2015) ............................................................................ 27

*Kearney Reg'l Med. Ctr., LLC v. HHS*, 934 F.3d 812 (8th Cir. 2019) ......................................... 32

*LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55 (D.C. Cir. 2004) (Roberts, J.) ............................... 31

*Leocal v. Ashcroft*, 543 U.S. 1 (2004) .......................................................................................... 17

*Loper Bright Enters. v. Raimondo*, 143 S. Ct. 2429 (2023) ......................................................... 17

*Mock v. Garland*, 75 F.4th 563 (5th Cir. 2023) ................................................................ 31

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ............................................................................................................ 32

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022) ........................... 34

*Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109 (2022) ................................................ 13

*Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399 (D.C. Cir. 1998) ................. 40

*Nelson v. Priap*, 139 S. Ct. 954 (2019) .............................................................................. 15

*Packard Elevator v. I.C.C.,* 782 F.2d 112 (8th Cir. 1986) ................................................. 12

*Parents Defending Edu. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658 (8th Cir. 2023) ................. 27

*Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023) ...................................................... 34

*Rec. Head Corp. v. Sachen*, 682 F.2d 672 (7th Cir. 1982) ................................................. 31

*S&M Constructors, Inc. v. Foley Co.*, 959 F.2d 97 (8th Cir. 1992) .................................... 12

*Stahl v. City of St. Louis*, 687 F.3d 1038 (8th Cir. 2012) .................................................. 24

*U.S. Postal Serv. v. Postal Regul. Comm'n*, 785 F.3d 740 (D.C. Cir. 2015) ...................... 31

*United States v. Berger*, 553 F.3d 1107 (8th Cir. 2009) .................................................... 23

*United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010) ................................................ 34

*VanDerStok v. Garland*, 2023 WL 7403413 (5th Cir. Nov. 9, 2023) (Oldham, J., concurring) .. 32

*West Virginia v. EPA*, 597 U.S. 697 (2022) ............................................................... 19, 20

*Whitman v. Am. Trucking Ass'n*, 531 U.S. 457 (2001) ....................................................... 20

### Statutes

§ 923(g)(1)(B) ..................................................................................................................... 20

18 U.S.C. § 921 .................................................................................................................... 17

18 U.S.C. § 921(a)(11)(A) .......................................................................................... 6, 16, 18

18 U.S.C. § 921(a)(13) ............................................................................................... 14, 15, 29

18 U.S.C. § 921(a)(2) ............................................................................................. 18

18 U.S.C. § 921(a)(21)(C) ................................................................................. passim

18 U.S.C. § 922 ......................................................................................... 6, 14, 20

18 U.S.C. § 923 ............................................................................................. 18, 20

18 U.S.C. § 923(a) ........................................................................................ 16, 18

18 U.S.C. § 923(b) ............................................................................................... 16

18 U.S.C. § 923(g)(1)(A) .............................................................................. 16, 20

18 U.S.C. § 923(g)(1)(B)(ii)(I) ........................................................................... 20

18 U.S.C. § 923(g)(2) .......................................................................................... 16

18 U.S.C. § 926 ............................................................................................. 13, 14

18 U.S.C. § 926(a) ................................................................................... 16, 17, 29

28 U.S.C. § 599A(b)(1)-(2) .................................................................................. 14

28 U.S.C. § 599A(c)(1) ........................................................................................ 14

5 U.S.C. § 705 ............................................................................................... 12, 40

5 U.S.C. § 706(2) .......................................................................................... 28, 40

5 U.S.C. § 706(2)(A) ........................................................................................... 18

5 U.S.C. § 706(2)(C) ........................................................................................... 13

Arkansas Code Ann. § 26-52-518 ......................................................................... 8

Bipartisan Safer Communities Act,
  Pub. L. Section 3 of 117-159, 136 Stat. 1313 (2022) ................................. 5, 16, 21

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891 (2020) ................. 28, 29

**Federal Firearms Act of 1938, Pub. L. 75-785, 52 Stat. 1250 (June 30, 1938)**.................. 1, 2

Firearm Owners Protection Act, Pub. L. 99-308, 100 Stat. 449 (May 19, 1986) ................. 4, 5, 16

Gun Control Act of 1968, Pub. L. 90-168, 82 Stat. 1213 (Oct. 22, 1968) ........................ 2, 20, 21

*In re Operation of Mo. River Sys. Litig.*, 421 F.3d 618 (8th Cir. 2005) ...................................... 28

Kan. Stat. Ann. 92-19-22a .................................................................................................... 8

Tenn. Code Ann. § 39-17-1316 ........................................................................... 9, 10, 36, 37

Tenn. Code Ann. § 67-4-710 ................................................................................................. 8

Tennessee Code Ann. § 39-17-1316 ..................................................................................... 9

Other Authorities

131 Cong. Rec. at S9125 ...................................................................................................... 3

132 Cong. Rec. at H1652 ..................................................................................................... 3

88 Fed. Reg. 16527 (Mar. 17, 2023).................................................................................... 33

*Course*, Dictionary.com ..................................................................................................... 19

David B. Kopel, *Does the Second Amendment Protect Firearms Commerce*,
127 Harv. L. Rev. F. 230 (2014)..................................................................................... 35

Joan Burbick, *Cultural Anatomy of a Gun Show*, 17 Stan. L. & Pol'y Rev. 657 (2006) ............ 33

*Nebraska v. Biden*, 52 F.4th 1044 (8th Cir. 2022)................................................................. 39, 40

*Regular*, Dictionary.com ................................................................................................... 19

*Repetition*, Dictionary.com ............................................................................................... 19

Tenn. Op. Atty. Gen. No. 85-280 (Tenn.A.G.), 1985 WL 193831 (1985)................................... 37

*The Right to Keep and Bear Arms*, Report of the Subcommittee on the Constitution,
Sen. Jud. Comm., 97th Cong., 2d Sess. (1982) ............................................................... 2, 3, 14

Regulations

18 C.F.R. § 478.102(a)........................................................................................................ 20

27 C.F.R. § 478 .................................................................................................................. 29

27 C.F.R. 478 ..................................................................................................................... 29

28 C.F.R. § 0.130(a)(1)–(2) ................................................................................................ 14

## INTRODUCTION

The Second Amendment preserves treasured rights that are deeply rooted in our nation's history and tradition. Because of this fact, Congress has always been careful when addressing regulation of firearms, even in firearms commerce. It has been especially careful in how much authority it delegates to the branch in defining the firearms commerce statutes they pass. Yet Defendants ignored all of this and adopted a rule that not only exceeds their statutory authority but also blatantly violates both the statute it claims to interpret and the Constitution itself. *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 Fed. Reg. 28,968 (Apr. 19, 2024) ("Final Rule"). Under the Final Rule, Defendants claim the power to reach and regulate (via an extensive licensing scheme) a citizen who makes a sale or trade of even one firearm to another Individual. The Final Rule is not only unlawful, but also its implementation will cause irreparable harm to all of the Plaintiff States, along with Plaintiffs Chisholm Trail Antique Gun Association (and its members) and Plaintiff Phillip Journey, Allen Black and Donald Maxey. Plaintiffs ask the Court to prevent this harm by granting a preliminary injunction against enforcement of the Final Rule.

## BACKGROUND

### A.     Federal Firearms Act of 1938 and Gun Control Act of 1968

For the first 150 years of our nation's history, there was not significant regulation of firearms possessions and transfers. The first licensing requirement for firearms dealers took place when Congress enacted the Federal Firearms Act of 1938 ("FFA"), Pub. L. 75-785, 52 Stat. 1250 (June 30, 1938). It required "[a]ny . . . dealer desiring a license to transport, ship, or receive firearms or ammunition in interstate or foreign commerce" to apply for a license with "the Secretary of the Treasury, who shall prescribe by rules and regulations the information to be contained in such application." *Id.* § 3, 52 Stat. at 1251. Once the applicant paid the prescribed fee, the Secretary was required to issue the license.  *Id.* § 3, 52 Stat. at 1251. The FFA defined a "dealer"

as "any person engaged in the business of selling firearms or ammunition or cartridge cases, primers, bullets or propellent powder, at wholesale or retail, or any person engaged in the business of repairing such firearms or of manufacturing or barrels, stocks, trigger mechanisms, or breach mechanisms to firearms." 52 Stat. at 1250.

Thirty years later, Congress passed the Gun Control Act of 1968 ("GCA"), Pub. L. 90-168, 82 Stat. 1213 (Oct. 22, 1968). The GCA sought to prevent "crime and violence" without "intending to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." 82 Stat. at 1213-14. The GCA's definition of "dealer" largely tracked the FFA's definition: it defined "dealer" as "(A) any person engaged in the business of selling firearms or ammunition at wholesale or retail, (B) any person engaged in the business of repairing firearms or of making or fitting special barrels, stocks, or trigger mechanisms to firearms, or (C) any person who is a pawnbroker." 82 Stat. at 1216 (codified at 18 U.S.C. § 921(a)(11)).

### B.      The Firearms Owners' Protection Act

In late 1979 and early 1980 Congress held hearings to investigate accusations that ATF was utilizing questionable techniques to generate arrests. *The Right to Keep and Bear Arms*, Report of the Subcommittee on the Constitution, Sen. Jud. Comm., 97th Cong., 2d Sess., at 20 (1982). The report of the Senate Subcommittee on the Constitution among other things summarized the jarring evidence it received and concluded as follows:

- The "enforcement tactics made possible by current federal firearms laws are constitutionally, legally and practically reprehensible." *Id.*

- "Although Congress adopted the Gun Control Act with the primary object of limiting access of felons and high-risk groups to firearms, the overbreadth of the law has led to neglect of precisely this area of enforcement." *Id.*

- ATF's statistics showed "that in recent years the percentage of its arrests devoted to felons in possession and persons knowingly selling to them have dropped from 14 percent down to 10 percent of their firearms cases." After the hearings, ATF said "that 55 percent of its gun law prosecutions overall involve

2

persons with no record of a felony conviction, and a third involve citizens with no prior police contact at all." *Id.*

- The Subcommittee found that ATF had "primarily devoted its firearms enforcement efforts to the apprehension, upon technical *malum prohibitum* charges, of individuals who lack all criminal intent and knowledge." *Id.*

- The Subcommittee also found that ATF "[a]gents anxious to generate an impressive arrest and gun confiscation quota [had] repeatedly enticed gun collectors into making a small number of sales—often as the few as four—from their personal collections," even though each of the sales "was completely legal under state and federal law." *Id.* ATF still "charged the collector with having 'engaged in the business' of dealing in guns without the required license," which saddled "numerous collectors … [with] a felony record carrying a potential sentence of five years in federal prison" even though many had "no criminal knowledge or intent." *Id.*

- The Committee also received expert evidence "establishing that approximately 75 percent of [ATF] gun prosecutions were aimed at ordinary citizens who had neither criminal intent nor knowledge, but were enticed by agents into unknowing technical violations." *Id.* at 23.

Two years later, the Senate Judiciary Committee issued a report showing "the urgent need for changes [to federal firearms law] to prevent the recurrence of [ATF] abuses documented in detail in earlier Committee hearings and in hearings held by other Committees." Federal Firearms Owners Protection Act, S. Rep. No. 98-583, Sen. Jud. Com., 98th Cong., 2d Sess., at 3 (1984) (footnoted omitted).  It explained that many hobbyists sold firearms from their personal collections; and many were charged and convicted for selling without a license, based on courts' broad reading of the GCA's reach. *Id.* at 8. And it claimed that the proposed bill would "narrow" the GCA's "broad parameters by requiring" that dealers "undertake such activities as part of a 'regular course of trade or business with the principal objective of livelihood and profit.'"  *Id.* Both Senator Hatch and Representative Volker, sponsors of the bill in the Senate and House, highlighted ATF's improper focus on small-scale local sales that demonstrated Congress' concerns with ATF. *See* 131 Cong. Rec. at S9125; 132 Cong. Rec. at H1652.

Congress found that "additional legislation [was necessary] to correct existing firearms

statutes and enforcement policies." 100 Stat. at 449 (detailing need to safeguard citizens' Second, Fourth, and Fifth Amendment rights and to prevent the "unconstitutional exercise of authority" under the Ninth and Tenth Amendments). Congress also found "additional legislation [was] needed to reaffirm [its] intent," as expressed in the GCA, that this title did not intend to impose "undue or unnecessary . . . burdens on law-abiding citizens" in the lawful "acquisition, possession or use of firearms" or to "discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." *Id.*

Congress responded to those abuses with the Firearm Owners Protection Act ("FOPA"), Pub. L. 99-308, 100 Stat. 449 (May 19, 1986); *see also* S. Rep. No. 98–583, at 6 (1984). In doing so, Congress made a few findings. First, "the rights of citizens . . . require additional legislation to correct existing firearms statutes and enforcement policies." 100 Stat. at 449 (codified at 18 U.S.C. § 921 Note). Second, "additional legislation is required to reaffirm the intent of the Congress, as expressed in section 101 of the Gun Control Act of 1968." *Id.* Recognizing that need, the FOPA clarified that "it is not the purpose of this title to place undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms appropriate to the purpose of hunting, trap-shooting, target shooting, *personal protection*, or any other lawful activity." *Id.* (emphasis added). And, importantly, that FOPA reiterated that it "is not intended to discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes.'" *Id.*

The FOPA narrowed the definition of "dealer" by defining "engaged in the business" as "a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms." 100 Stat. at 450 (to be codified at 18 U.S.C. § 921(a)(21)). But

4

the FOPA expressly excluded "a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." *Id.* Importantly, for the case at bar, the plural term "sales, exchanges, [and] purchases" were used. Also, the FOPA did not bar private individuals from making a profit when "such occasional sales" occurred. *Id.* It also narrowed the definition of "dealer" by defining "with the principal objective of livelihood and profit" as an intent that "the sale or disposition of firearms is predominantly [to] obtain livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.* (to be codified at 18 U.S.C. § 921(a)(22)).

### C.    The Bipartisan Safer Communities Act

In 2022, Congress passed a narrow amendment to the GCA in the Bipartisan Safer Communities Act, Pub. L. Section 3 of 117-159, 136 Stat. 1313 (2022) ("BSCA").   BSCA amended the definition of "dealer" in two ways.  First, it replaced "with the principal objective of livelihood and profit" with "to predominantly earn a profit."  § 12002, 136 Stat. at 1324.  Second, it defined "to predominantly earn a profit" as an "intent underlying the sale or disposition of firearms [that] is primarily one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id*. at 1325.  The only difference between FOPA's definition of intent—"primarily one of obtaining livelihood and pecuniary gain"—and BSCA's definition—"primarily one of obtaining pecuniary gain"—was the BSCA's omission of "livelihood." *See id.*

### D.    The Final Rule

The Final Rule took the statutory tweak in the BSCA and used it as a pretext for creating a very different definition of what it means to be "engaged in the business" as a firearms dealer. While the BSCA altered the requisite level of motive to constitute being "engaged in the business,"

it did not alter the requirement for a "regular course" of trade involving "repetitive" transactions of "firearms." In contrast, the Final Rule states "even a single firearm transaction, or offer to engage in a transaction, when combined with other evidence, may be sufficient to require a license." 89 Fed. Reg. at 28976, 29091.

In addition to redefining already-defined statutory terms, the Final Rule creates a series of five presumptions—three of which are explicitly multipart—any one of which ATF will use to presume someone is dealing in firearms. *See* 89 Fed. Reg. at 29,091. Indeed, the Final Rule has exceptions to those presumptions that have their own exceptions. *See id*. This multi-tiered, multi-factor test results in a nebulous and convoluted standard that makes it impossible to identify who and what conduct is covered under the Final Rule. For example, ATF will presume someone is "engaged in the business of dealing in firearms . . . when the[y] . . . [r]esell[] *or* offer[] for resale firearms, ***and also represent***[] to potential buyers or otherwise ***demonstrate***[] ***a willingness and ability*** to purchase and resell additional firearms[.]" *Id.* (emphasis added). Therefore, just offering to sell one gun and then *suggesting* the possibility that a subsequent sale could occur fits this presumption. But the GCA does not criminalize such conduct. *See* 18 U.S.C. §§ 921(a)(11)(A) and (21)(C) (defining "dealer" and "engaged in the business"); 922 (unlawful acts). Although this presumption is—and the other four are—rebuttable, they are not exhaustive of the conduct that could require a person to obtain a license. 89 Fed. Reg. at 29,092.

The Final Rule also narrows the express safe harbor that Congress created in the FOPA. 18 U.S.C. § 921(a)(21)(C) excludes someone from being "engaged in the business" if that person "makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms." But the Final Rule purports to change this unqualified exception by re-defining of the term "personal

collection" as "[p]ersonal firearms that a person accumulates for study, comparison, exhibition (*e.g.*, collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (*e.g.,* noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction).  The term shall not include *any firearm* purchased for the purpose of resale with the predominant intent to earn a profit….  In addition, the term shall not include firearms accumulated primarily for personal protection." 89 Fed. Reg. at 29,090 (emphasis added) (to be codified at 27 C.F.R. § 478.11).  The Final Rule also states that if someone "restocks" their personal collection after selling a firearm, they may not be subject to the exemption for selling from a personal collection.  *Id.* at 29,092.

The Final Rule acknowledges that it will produce several effects on those who sell firearms without a license. The first is that a significant number of them will become federal firearms licensees and be compelled to abide by the new regulations. *Id.* at 29,898. A second anticipated effect is that there will be many individuals that stop selling firearms altogether. *Id.* at 29,054. The Final Rule places that number at 10%. *Id.* The Final Rule takes effect May 20, 2024. *Id.* at 28,968.

### E.     The Plaintiffs

The majority of Plaintiffs are States that will suffer economic and other harms if the Final Rule goes into effect. According to the Final Rule, its implementation will both reduce gun sales and increase the number of federal firearms licensees. *Id.* at 29,898 and 29,054.

Plaintiffs Alabama, Arkansas, Georgia, Idaho, Indiana, Iowa, Kansas, Kentucky, Missouri, Nebraska, North Dakota, Oklahoma, South Carolina, South Dakota, Tennessee, Virginia and Wyoming all have a sales tax that applies to the sale of firearms at gun shows and/or online platforms. Plaintiff Kansas also charges a tax on the sale of admission tickets to gun shows. *See* Kan. Stat. Ann. 92-19-22a. Plaintiff Arkansas charges a 1% short-term-rental tax on any fees

charged for vendors to rent tables.  Arkansas Code Ann. § 26-52-518.  Plaintiff Tennessee also charges a similar fee.  Tenn. Code Ann. § 67-4-710.

The table below lists the number of gun shows in each Plaintiff state currently scheduled to take place from the time the Final Rule takes effect through July 31, 2024.[1]

| | |
|---|---|
| Alabama | 8 |
| Arkansas | 12 |
| Georgia | 12 |
| Idaho | 6 |
| Indiana | 11 |
| Iowa | 7 |
| Kansas | 4 |
| Kentucky | 4 |
| Missouri | 17 |
| Nebraska | 2 |
| Oklahoma | 15 |
| South Carolina | 4 |
| Tennessee | 13 |
| Virginia | 5 |
| Wyoming | 6 |

---

[1] https://gunshowtrader.com/gun-shows. Information found by clicking on the calendar of gun shows in each respective state.

Plaintiff Tennessee runs background checks and collects data on each licensed firearm transaction within its borders. Tenn. Code Ann. § 39-17-1316. Tennessee uses the same statutory language as federal law when defining a gun dealer for licensing purposes. *Id.* The relevant statute, Tennessee Code Ann. § 39-17-1316, incorporates 18 U.S.C. § 921's definition of a gun dealer, as well as any associated requirements imposed by federal regulation- including all applicable licensing regimes under 18 U.S.C. § 923. *Id.* at (b)(2).

Each month, Tennessee evaluates tens of thousands of firearm transactions through a statewide law enforcement agency known as the Tennessee Bureau of Investigation (TBI). In 2023, TBI evaluated 570,184 firearm transactions.[2] Tennessee requires that such transactions and background checks be verified immediately so a dealer may be informed how to proceed with a transaction. Tenn. Code Ann. § 39-17-1316(d). A dealer is required to send purchaser identification, the purchaser's social security number, date of birth, name, and gender, firearm information, the business name of the gun dealer, the location of the transfer, and the dealer's FFL information, all directly to TBI for verification and background check purposes. *Id.* at (c). Should the identity of a purchaser be in question, TBI may require thumbprints to be collected by the dealer and sent to a law enforcement agency for evaluation. *Id.* at (g). Should a purchaser be denied, especially on grounds related to criminal history, he has a right to appeal such a determination. *Id.* at (o).

If the purchaser and TBI are unable to locate final disposition information within fifteen (15) days, TBI will inform the dealer that they may conditionally proceed with a sale and the federal firearms licensees may transfer the firearm. *Id.* If it is later found that the firearm

---

[2] https://www.tn.gov/tbi/divisions/cjis-division/firearm-background-checks.html. Information can be found by clicking the link to "2023."

transaction was initially properly denied, TBI will take actions to implement the recovery of the wrongfully transferred firearm. *See Id.* The Final Rule also notes that Plaintiff Tennessee is required to run a background check on every firearm sale within the State that involves a federal firearms licensee. 89 Fed. Reg. 29065. The Final Rule expects an increase in background checks and notes that it is state law enforcement agencies in Tennessee that conduct these background checks. 89 Fed. Reg. 29088. This will likely result in an increase in administrative costs and reallocation of law enforcement resources for Plaintiff Tennessee.

Plaintiff New Hampshire is also a partial point of contact state for the federal government for the purposes of the National Instant Criminal Background Check System (NICS). *See* Exhibit E – Declaration of Eddie Edwards. Its Permits and Licensing Unit of the Division of State fulfills that role. *Id.* Federal firearms licensees contact the state for purchases of handguns, the frame or receiver of any firearm, firearm mufflers, and firearms silencers. *Id.* As noted above, the Final Rule expects an increase in background checks. 89 Fed. Reg. 29088. This will likely increase administrative costs and reallocation of law enforcement resources for Plaintiff New Hampshire

Plaintiff Phillip Journey is a firearms collector and hobbyist residing in Wichita, Kansas. *See* Exhibit A – Declaration of Phillip Journey. In his spare time, he is also a shooting-sports coach and instructor. *Id.* He is an American citizen. *Id.* He attends 4-5 gun shows every year where he buys and sells firearms for and from his personal collection that includes firearms considered self-defense weapons. *Id.* Journey is not currently a federal firearms licensee. *Id.* Journey does not wish to give up selling firearms from his personal collection at gun shows, but the Final Rule makes him believe that he will potentially be subject to civil, administrative, and possibly criminal penalties if he does so. *Id.* As discussed further below, various of the Final Rule's definitions are written so broadly that they cover conduct that Congress left lawful under the statute, or are written

10

so narrowly that they eviscerate explicit statutory protections for personal collections such as Journey's—creating uncertainty for Journey as to the lawful nature of certain firearm sales without a federal firearm license. The requirements of becoming a federal firearms licensee would be burdensome on him as someone who buys, sells, and collects firearms as a hobby.

Plaintiff Chisholm Trail is a Kansas not-for-profit corporation founded in 1957 in Wichita, Kansas. *See* Exhibit C – Declaration of Jim Fry. Chisholm Trail was organized to serve the interests of collectors and shooters of antique and antique-replica firearms and to help preserve the craftsmanship and the history of the arms of our forefathers for the enlightenment and enjoyment of future generations. *Id.* Chisholm Trail is not a federal firearms licensee, nor are most of its members, including Allen Black and Donald Maxey, who attend gun shows each year where they buy and sell firearms for and from their personal collections. *Id.* Chisholm Trail also sponsors and manages a biannual gun show and relies on the proceeds to fund its activities. *Id.*

Chisholm Trail sponsors and manages a biannual gun show each year and relies on the proceeds generated from these events to fund its annual club activities. *Id.*  Approximately 70% of Chisholm Trail's annual operating expenses are covered by revenue generated by these two shows. *Id.*  Chisholm Trail also collects and pays sales tax to the State of Kansas for table rental fees charged during their gun shows. *Id.*  During the most recent fiscal year, Chisholm Trail paid $4,005.72 in sales tax to the State of Kansas. *Id.*

Plaintiff Allen Black is a firearms hobbyist and enthusiast who maintains a personal collection of firearms including self-defense weapons, which he has accumulated over many years and which he actively seeks to expand by attending gun shows. *See* Exhibit B – Declaration of Allen Black. He is an American citizen. *Id.* Black attends approximately 4-5 gun shows every year, where he buys and sells firearms from his personal collection. *Id.* Black is not a federal firearms

licensee. *Id.*

Plaintiff Donald Maxey is also a firearms hobbyist and enthusiast who maintains antique firearms, some reproductions of antique firearms, several modern sporting rifles and shotguns, and several revolvers which he depends on for self-defense. *See* Exhibit D – Declaration of Donald Maxey.  He is an American citizen. *Id.* Maxey attends approximately three gun shows every year. *Id.* At those gun shows, Maxey purchases firearms to add to his personal collection. *Id.* He also provides guidance to other gun show attendees on which firearms they should purchase. *Id.* He is not a federal firearms licensee. *Id.*

## LEGAL STANDARD

The Administrative Procedure Act ("APA") allows "the reviewing court" to issue "all necessary and appropriate process" to delay "an agency action or to preserve status or rights pending conclusion of review proceedings." 5 U.S.C. § 705. Section 705 of the APA provides the authority for a court reviewing administrative actions to issue a stay of agency action. *Branstad v. Glickman*, 118 F. Supp. 2d 925, 945 (N.D. Iowa 2000).

All four of the standard factors for preliminary relief weigh in favor of such relief here. "The factors to be considered in granting a stay pending judicial review are essentially those factors considered in granting preliminary injunctive relief." *Packard Elevator v. I.C.C.,* 782 F.2d 112, 115 (8th Cir. 1986). Preliminary injunctive relief is available to plaintiffs who demonstrate: (1) the probability or likelihood of success on the merits, (2) the real threat of irreparable harm or injury absent immediate relief, (3) that the balance of equities resulting from the issuance of the injunction against the order's effect on the defendant and third parties favors plaintiffs, and (4) that the public interest favors immediate injunctive relief. *See Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981) (en banc). While likelihood of success on the merits is generally the "most significant" factor, *S&M Constructors, Inc. v. Foley Co.*, 959 F.2d 97, 98 (8th Cir. 1992),

"[n]o single factor in itself is dispositive," *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987).

## ARGUMENT

## I.     PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A.     The Final Rule exceeds Defendants' statutory authority and is contrary to federal firearms law.

Congress has granted Defendants no authority to redefine statutory terms or create rebuttable presumptions. To the extent Defendants have the authority to implement the GCA, it does not extend to redefining and expanding terms that have already been defined by Congress. The Final Rule fails on both grounds.

#### 1.     Defendants have no authority to redefine statutory terms or to create rebuttable presumptions about those definitions.

Under the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions" that are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). Congress expressly limited how much authority to grant Defendants in issuing firearms-related regulations and only allowed them to "prescribe only such rules and regulations as are *necessary* to carry out the provisions of this chapter." 18 U.S.C. § 926 (emphasis added). Because Chapter 44 of Title 18 ("federal firearms law") gives ATF no statutory authority to redefine terms or to create rebuttable presumptions in the federal firearms law, those portions of the Final Rule must be set aside.[3] *See Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022) ("[A]gencies are creatures of statute . . . [and thus] possess only the authority that

---

[3] The Final Rule redefines "dealer," "engaged in the business," "principal objective of livelihood and profit," and it adds definitions for "personal collection (or personal collection of firearms, or personal firearms collection)," "former licensee inventory," "predominantly earn a profit," "responsible person," and "terrorism." *Definition of "Engaged in the Business" as a Dealer in Firearms*, 89 Fed. Reg. 28968, 29089-90.

Congress has provided."); *Gonzales v. Oregon*, 546 U.S. 243, 258 (2006) ("rule must be promulgated pursuant to authority Congress has delegated to the official") (citing *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2000))).

Congress and the Attorney General delegated the authority to administer and enforce federal firearms law to the Director of ATF, subject to the Attorney General's and Deputy Attorney General's direction. 28 U.S.C. § 599A(b)(1)-(2), (c)(1); 28 C.F.R. § 0.130(a)(1)–(2). The Director's statutory authority is defined in 18 U.S.C. § 926(a), which explains that he "may prescribe only such rules and regulations as are necessary to carry out the provisions of this chapter." *Id.*

Congress's limitation to "only . . . necessary" rules and regulations were intentional. It was based on experience in the years after it passed the GCA in 1968 showed an ATF "anxious to generate an impressive arrest and gun confiscation quota" and willing to cut corners to get arrests by "entic[ing] gun collectors into making a small number of sales … from their personal collections." *The Right to Keep and Bear Arms*, Report of the Subcommittee on the Constitution, Sen. Jud. Comm., 97th Cong., 2d Sess., at 21 (1982). Simply put, Congress made an intentional decision to limit the Defendants' authority.

In addition, two other contextual clues show that Congress did not delegate authority to the Director to redefine statutory definitions in the Final Rule. *First*, and most importantly, the statutory definition part of section 921(a) grants the Director rulemaking authority to define only the term "curios and relics." *See* 18 U.S.C. § 921(a)(13). *Second*, the statute's primary substantive sections—sections 922 (unlawful acts) and 923 (licensing)—expressly grant the Director rulemaking authority to implement some parts of the law. Considered together, and along with section 926's limited delegation of rulemaking authority, the statutory structure establishes that

Congress didn't delegate authority to the Director to redefine the challenged terms in the Final Rule.

Start with section 921(a) which defines of the relevant statutory terms—other than "personal collection," which is not defined. Just one subsection, section 921(a)(13), delegates authority to the Director to define a single term: "curios and relics," which is part of the statute's definition of "collector" and "licensed collector."[4] No other part of § 921(a) authorizes the Director to promulgate any rules to define statutory terms. *See Bittner v. United States*, 598 U.S. 85, 94 (2023) (use of "particular language in one section of a statute" paired with "omi[ssion] from a neighbor[ing provision]," "normally . . . convey[s] a difference in meaning (*expressio unius est exclusio alterius*)"). So too here. The express grant of authority to the Director to define "curios and relics" in § 921(a)(13) strongly suggests Congress withheld that same authority for other terms.

Another reason the authority to define "curios and relics" forecloses the possibility that Defendants might also have the implicit authority to define any other terms. If Defendants possessed such implicit authority, then the express grant of authority to define "curios and relics" would have been redundant and unnecessary. Such a reading of the statute would violate the interpretive cannon against surplusage – "the idea that 'every word and every provision is to be given effect [and that n]one should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence.'" *Nelson v. Priap*, 139 S. Ct. 954, 969 (2019)

---

[4] Even this limited grant of authority was later restricted in a spending prohibition. *See* Pub. L. 113-6, 127 Stat. 198, 248 (Mar. 26, 2013) ("[I]n the current fiscal year and any fiscal year thereafter, no funds appropriated under this Act shall be used to pay administrative expenses or the compensation of any officer or employee of the United States to … change the definition of 'Curios or relics' in section 478.11 of title 27, Code of Federal Regulations") (codified at 18 U.S.C. § 921 Note).

(quoting Scalia, *Reading Law* at 174).

Both substantive sections assign rulemaking authority to the Director to implement various parts of the statute. Given these specific delegations—which includes licensing and recordkeeping requirements for importers, manufacturers, dealers, and collectors, *see* 18 U.S.C. § 923(a), (b), (g)(1)(A), (g)(2)—courts should be reluctant to infer a general delegation of authority to the Director to define other statutory definitions. *See Bittner*, 598 U.S. at 94.

Nor is there any reason to believe that the amended definitions in the Final Rule "are necessary." *See* 18 U.S.C. § 926(a). Before the BSCA, the statute defined a "dealer" as a person "engaged in the business" of selling firearms, *see* § 921(a)(11)(A), and further defined "engaged in the business" as "a person who devotes time, attention and labor to dealing in firearms as a regular course of trade or business with *the principal objective of livelihood and profit* through the repetitive purchase and sale of firearms," *see* FOPA, Pub. L. No. 99-308, § 101(6), 100 Stat. 449, 450 (May 19, 1986) (emphasis added). Drilling down, it defined "with the principal objective of livelihood and profit" as an "intent . . . [that] is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection." *Id.*

But the BSCA's amendment to the FOPA's definition of "engaged in the business" was extremely modest: it replaced "with the principal objective of livelihood and profit" with "to predominantly earn a profit." § 12002(1), (3), 136 Stat. at 1324-25. And without any meaningful change to the definition of "engaged in the business," the Final Rule's redefinitions can hardly be characterized as "necessary to implement the provisions of this chapter." *See* 18 U.S.C. § 926(a). Courts have been also applying this straightforward definition of the BSCA for nearly two years, and there is no sign that they have struggled to interpret any of its terms.

Not only does ATF lack the authority to modify statutory definitions, but it lacks the authority to create presumptions to determine when a person is engaged in the business or has the intent to predominantly earn a profit. No provision in the federal firearms law expressly grants ATF this authority. *See* 18 U.S.C. §§ 921–34. That the Final Rule's presumptions of when someone is "engaged in the business" apply to a *criminal statute* only reinforces this conclusion. ATF tries to reassure regulated parties that the presumptions would not apply in criminal proceedings, but it still concedes that the presumptions "may be useful to a court" in those proceedings. *See* 89 Fed. Reg. at 28976, 29011, 29014.

Even if the Final Rule's application in civil and criminal contexts is different, the meaning of its provisions must be the same in both contexts. *See Leocal v. Ashcroft*, 543 U.S. 1, 11–12 n.8 (2004). Because the statute has criminal applications, ATF's construction of it—through the creation of presumptions to define covered conduct—is entitled to no deference, *Guedes v. BAFTE*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., concurring in the denial of certiorari), so ATF can hardly claim that the Final Rule's presumptions are "necessary to implement the provisions of this chapter." 18 U.S.C. § 926(a).

Finally, depending on how the Supreme Court answers the question presented in *Loper Bright Enters. v. Raimondo*, 143 S. Ct. 2429 (2023) (granting certiorari on "[w]hether the Court should overrule *Chevron* or at least clarify that statutory silence concerning controversial powers expressly but narrowly granted elsewhere in the statute does not constitute an ambiguity requiring deference to the agency"), ATF may not receive any deference *at all*, even if this Court only considers the Final's Rule's application in a civil context.

For all these reasons, Plaintiffs are likely to prevail in the claim that Defendants have exceeded their authority by redefining statutory provisions and creating rebuttable presumptions

in the Final Rule that they have no authority to promulgate. This Court should declare that the Final Rule exceeds ATF's statutory authority, and it should be set aside.

### 2. Defendants' redefinition of "engaged in the business" and its definition of "personal collection" in the Final Rule contradict federal law.

Under the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions" that are "not in accordance with law." 5 U.S.C. § 706(2)(A). ATF's attempted rewrite of the terms "engaged in the business" and "personal collection" find no support in the statute ATF purports to interpret and should be set aside.

### a. "Engaged in the Business"

Federal law regulates the interstate firearms industry by imposing licensing requirements on firearms importers, manufacturers, and as relevant here, dealers. *See* 18 U.S.C. § 923. Any person who wishes to "engage in the business of . . . dealing in firearms" must obtain a federal firearms license. *See id.* § 923(a) (cleaned up); *see also id.* § 922(a)(1) (unlawful to engage in the business of dealing in firearms without a license). The license entitles the licensee to "transport, ship, and receive firearms and ammunition covered by such license in interstate commerce." *Id.* § 923(c); *see also id.* § 921(a)(2) (defining "interstate or foreign commerce" as "commerce between any place in a State and any place outside of that State" and excluding "commerce between places within the same State").

The statutory definitions made clear that federal firearms law focuses on *commercial* firearms operations. To start, it defines "dealer" as "any person engaged in the business of selling firearms at wholesale or retail." *Id.* § 921(a)(11)(A). It then defines "engaged in the business" as "a person who devotes time, attention, and labor to dealing in firearms *as a regular course of trade or business* to predominantly earn a profit through the *repetitive purchase and resale* of firearms." *Id.* § 921(a)(21)(C) (emphasis added); (Importantly, the statutory definition expressly excludes

persons "who make[] occasional sales, exchanges, or purchases" for "the enhancement of a personal collection or for a hobby," or "who sells all or part of his personal collection"). *Id*. Status as a "dealer" is thus tailored to capture commercial firearms operations and exclude private individuals who occasionally make firearms sales. *See id.* § 921(a)(21)(C) (envisioning person who devotes significant "time, attention, and labor" as part of a "regular course of trade or business"); *see also Regular*, DICTIONARY.COM, https://www.dictionary.com/browse/regular ("regular" means "recurring at fixed times" or "periodic"); *Course*, DICTIONARY.COM, https://www.dictionary.com/browse/course ("course" refers to "a customary manner of procedure"); *Repetition*, DICTIONARY.COM, https://www.dictionary.com/browse/repetition ("repetition" refers to "the act of repeating . . . or doing something again"—that is, "repeated action"). To meet the statute's definition of "dealer," a person must devote significant time to the commercial selling and reselling of firearms at routine intervals—periodic or irregular sales don't suffice. Federal firearms law never intended to impose dealer requirements on those making small-scale and infrequent firearms sales. Thus, the Final Rule stands in direct conflict with the terms of federal law. Nor does federal law authorize ATF to redefine "dealer" as a backdoor to impose universal background checks.

Defendants' grand vision of their own authority would violate the major questions doctrine. If Defendants really seeks to use the Final Rule to implement universal background checks—a hotly contested political issue—that would create a "major question," too. *See West Virginia v. EPA*, 597 U.S. 697, 721–22 (2022) (requiring "clear congressional authorization" when an agency invokes broad authority over matters of great economic and political significance); *Biden v. Nebraska*, 143 S. Ct. 2355, 2374 (2023) (same). Decisions on "major questions" must be made by "Congress itself, or [by] an agency acting pursuant to a clear delegation from that representative

19

body." *West Virginia*, 597 U.S. at 735. A "colorable" or "plausible" textual basis won't do. *Id.* at 723; *see also Whitman v. Am. Trucking Ass'n*, 531 U.S. 457, 468 (2001) (Congress doesn't "hide elephants in mouseholes"). If Congress intended the BSCA's minor changes to authorize Defendants to resolve these contentious issues, "common sense" suggests it would have done so plainly. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). But Congress wasn't unclear, it just didn't delegate this authority to ATF *at all*. *See supra* Sect.I.A.1.

Being a federally licensed dealer comes with extensive obligations. For one, licensed dealers must maintain records at their places of business of all sales or other dispositions of firearms. 18 U.S.C. § 923(g)(1)(A). Dealers also face yearly compliance inspections of their sales and dispositions records. *Id.* § 923(g)(1)(B)(ii)(I). The Attorney General may also inspect a dealer's records without a warrant during criminal investigations. *Id.* § 923(g)(1)(B)(i), (iii). On top of the recordkeeping requirements, dealers must maintain premises in a state "from which he conducts business subject to license." *Id.* § 923(d)(1)(E). And dealers must certify that "secure gun storage or safety devices will be available at any place in which firearms are sold under the license." *Id.* § 923(d)(1)(G). Before transferring a firearm to a non-dealer, a dealer must complete a background check. *Id.* § 922(t)(1)(A); 18 C.F.R. § 478.102(a); *see also id.* § 478.124(a)-(b) (licensed dealers must record, and retain records of, each transaction with unlicensed persons on a firearms transaction record, Form 4473). On top of all this, obtaining a federal license costs $200. *Id.* § 923(a)(3)(B).

Current federal firearms law reflects congressional concerns that ATF agents eager to gin up lengthy arrest records focused on prosecuting individuals for purely local firearms should be prohibited from doing so. When Congress created the federal licensing regime, it did so to support federal and state law enforcement "in their fight against crime and violence." 82 Stat. at 1213. But

it did not intend to impose any "undue or unnecessary . . . burdens on law-abiding citizens" in the lawful "acquisition, possession or use of firearms" nor did it intend to "discourage or eliminate the private ownership or use of firearms by law-abiding citizens for lawful purposes." *Id.* at 1213–14.

Nothing in the BSCA's recent amendment hints that Congress shifted its focus to private sales by individuals. The BSCA amended the FOPA's definition of "engaged in the business" but it otherwise left section 921(a) untouched. *See* Pub. L. No. 117-159, § 3(b), div. A, tit. II, § 12002, 136 Stat. 1313, 1324–25 (June 25, 2022). The BSCA replaced the FOPA's definition of "with the principal objective of livelihood and profit" with "to predominantly earn a profit" and defined "predominantly earn a profit" as an intent that is "predominantly one of obtaining pecuniary gain"—a near carbon copy of FOPA's preexisting definition. § 12002(1), (3), 136 Stat. at 1324–25 (omitting only "livelihood"). Yet Defendants latch onto the BSCA's minor amendment in order to smuggle universal background checks in the back door.

Despite the BSCA's modest changes, Defendants exploited them to create presumptions for when a person would be considered to be "engaged in the business." *See* 89 Fed. Reg. at 29091. One such presumption includes individuals who "resell or offer for resale firearms, and also represent to potential buyers a willingness and ability to purchase and resell additional firearms (*i.e.*, to be a source of additional firearms for resale)," but Defendants could not say for certain that "a single firearm transaction or offer to engage in a transaction" would not trigger the presumption if it were combined with "other evidence." *Id.* (cleaned up). They provide little if any guidance on what that "other evidence" could be. *See id.* Whatever that "other evidence" might be, it cannot be acts commonly incidental to a single sale or liquidating all or part of a personal collection, like renting a table at a gun show or running advertisements, nor can it be evidence of a profit motive (a distinct element of being 'engaged in the business').

21

While the Final Rule retains the requirements for a "regular course of trade or business" and the "repetitive purchase and resale of firearms," it modifies those statutory requirements by noting that whether a person is "engaged in the business" is a "fact-specific inquiry" without any "minimum threshold number of firearms purchased or sold that triggers the licensing requirement." 89 Fed. Reg. at 29091 (quoting 27 C.F.R. § 478.13(a), (b)). However, the Final Rule's new definition fails to retain the statutory requirement of a "regular course of business" or "repetitive" transactions so the Final Rule conflicts with federal firearms law.

**b.    "Personal Collection"**

Defendants' new definition of "personal collection" also conflicts with the federal statute. Federal law excludes individuals from being "engaged in the business" if they "make occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby," or if they "sell all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C) (cleaned up).

Neither prior federal firearms law nor the BSCA delegated authority to Defendants to define "personal collection," *see* 89 Fed. Reg. at 28971, but they did so anyway, *see id.* at 29090. And the Final Rule redefines this previously unqualified "personal collection" exception by limiting it to "[p]ersonal firearms that a person accumulates for study, comparison, exhibition (*e.g.*, collecting curios or relics, or collecting unique firearms to exhibit at gun club events), or for a hobby (*e.g.,* noncommercial, recreational activities for personal enjoyment, such as hunting, skeet, target, or competition shooting, historical re-enactment, or noncommercial firearms safety instruction)" and by excluding "*any firearm* purchased for the purpose of resale with the predominant intent to earn a profit" and "firearms accumulated *primarily for personal protection*." 89 Fed. Reg. at 29,090 (emphases added) (to be codified at 27 C.F.R. § 478.11).

This final modification by Defendants is particularly odd. Nothing in the statute's text warrants excluding firearms obtained for personal protection from the statutory term "personal collection." Indeed, *Heller* expressly recognized that personal self-defense is "central to the Second Amendment right" and a primary reason that individuals acquire firearms for personal use. *District of Columbia v. Heller*, 554 U.S. 570, 628 (2008). And, for many Americans, personal protection is the primary reason they acquired a personal collection of firearms in the first place.

The exclusion of firearms sold for a small profit from "personal collection[s]" is also inconsistent with federal law. By removing "any firearm" purchased with a predominant intent to earn a profit from the "personal collection" exemption, the Final Rule—when combined with its new regulatory presumptions—threatens to turn a person who sells a single firearm at a miniscule, undefined "profit" into a felon, even though the statute demands "repetitive" transactions as a part of a "regular course" of business. *See* § 921(a)(21)(C). It's yet another example of ATF blurring the distinct statutory requirements for "repetitive" transactions and profit motive. For these reasons, the Final Rule contradicts ATF's statutory authority and should be set aside. Again, Plaintiffs are likely to prevail on this claim.

### B.     The Final Rule is Unconstitutionally Vague

The Final Rule's presumptions and their exceptions in the Final Rule are not only nebulous and confusing, they are also unconstitutionally vague. A regulation is unconstitutionally vague if it does not give a person of reasonable intelligence fair notice that his or her conduct is unlawful or it "fails to establish standards for the police and public that are sufficient to guard against the arbitrary deprivation of liberty interests." *City of Chi. v. Morales*, 527 U.S. 41, 52, 60 (1999); *see also United States v. Berger*, 553 F.3d 1107, 1110 (8th Cir. 2009) ("To defeat a vagueness challenge, a penal statute must pass a two-part test: The statute must first provide adequate notice of the proscribed conduct, and second, not lend itself to arbitrary enforcement."). Vague laws or

23

regulations have especially concerned courts when they are triggered by future actions that a person has no way anticipating. *Stahl v. City of St. Louis*, 687 F.3d 1038, 1041 (8th Cir. 2012) ("Though there are certainly times when a speaker knows or should know that certain speech or activities likely will cause a traffic problem, in many situations such an effect is difficult or impossible to predict.").

The Final Rule does not give a person of reasonable intelligence fair notice of what conduct the Final Rule makes unlawful. Plaintiffs Journey and Black, for instance, sell firearms from their personal collection. Some of these the Final Rule would consider "of special interest," and others would be considered "for self-defense;" the latter would not meet the Final Rule's definition of "personal collection."   *See* Exhibits A-B (Declarations of Philip Journey and Allen Black). Imagine, for example, Plaintiff Journey seeks to sell a handgun considered to be for self-defense at a gun show. A fellow hobbyist approaches him and tells him he is not interested in the handgun but will buy a hunting rifle. As it happens, Plaintiff Journey had been considering selling a hunting rifle from his collection in order to purchase one with more historical pedigree and thus agrees to sell the inquiring hobbyist an unwanted hunting rifle from his personal collection instead. Has Plaintiff Journey violated the Final Rule the moment he offers the rifle for sale? It is unclear.

To begin, the Final Rule lacks clarity as to whether his conduct triggers the first presumption under the Final Rule: a person is presumed to be a "dealer" if he "sells or offers for resale firearms, and also represents to potential buyers or otherwise demonstrates a willingness and ability to purchase and resell additional firearms (*i.e.,* to be a source of additional firearms for resale)." 89 Fed. Reg. 29091. Does Plaintiff Journey's simple act of trying to sell a handgun and then acquiescing to sell a rifle instead in response to a fellow hobbyist's inquiry activate that presumption? The Final Rule does not provide an answer.

24

Assuming for the sake of argument that the presumption is triggered, Plaintiff Journey—or any other firearms collector in such a position—must now rebut that presumption or else he faces civil, administrative, and possibly criminal penalties for the sale of the hunting rifle.  The civil and administrative penalties could also include civil or administrative forfeiture (that has as an element a criminal action) such as seizure of Plaintiff Journey's firearms and/or money Defendants believe he obtained through the sale of firearms. One way he can rebut the presumption is by showing that this act counted as an occasional sale to obtain more valuable, desirable, or useful firearms for his personal collection. 89 Fed. Reg. 29092. How would Plaintiff Journey go about providing evidence of this? Would Defendants take his word for it? Would he need to show evidence that he used the specific proceeds from his hunting rifle to buy a better hunting rifle? If so, how close in time would that subsequent purchase have to be? How close in price must the two firearms be? The Final Rule again gives no answer.

He can also rebut the presumption by showing he sold the hunting rifle out of his personal collection. However, the presumptions in the Final Rule seem to extend to sales from a personal collection only the seller is "liquid[ating]" all or part of the collection "without restocking." *Id.* What behavior constitutes "liquidating" a personal collection versus just ordinary sales from one? Would the fact that he tried to sell a handgun—a self-defense weapon the Final Rule presumably does not consider part of a personal collection—preclude him from claiming this exception for the hunting rifle he sold? Yet again, the Final Rule gives no answer.

And even more frustratingly, the two exceptions to rebut the Final Rule's presumption are mutually contradictory. If Plaintiff Journey is covered by the liquidation exception, but months later discovers a more desirable firearm and purchases it, does the later purchase cancel out the first exception as "restocking"? Does the "more valuable, desirable, or useful"exception now

apply? *Id*. Does he retroactively become a dealer in firearms? How is he to know at the moment he agrees to sell the hunting rifle? Once more, the Final Rule gives no answer.

Whether these firearms qualify as part of a personal collection also depends on what Plaintiff Journey's mindset was at the time he originally bought the firearms. The Final Rule excludes from a "personal collection" any firearm purchased for resale or made with the predominant intent to earn a profit. *Id.* at 28,980. It does so without any consideration for time. For example, if Plaintiff Journey bought both firearms five years ago with the intent to eventually sell one or both for a profit, is he now subject to criminal penalties based on a thought that he had from a decade ago? What if his wife purchased the firearms believing they would increase in value, unknown to Journey at the time he sells them? The Final Rule provides no answer.

Unfortunately, there are even more complications if Plaintiff Journey does buy another firearm after selling his hunting rifle. The Final Rule prohibits "restocking," or buying another firearm after selling to liquidate all or part of a personal collection. *Id.* The act of selling the hunting rifle at a gun show without an FFL seemingly prohibits Plaintiff Journey from buying another firearm at any point in the future without registering as an FFL except to "obtain more valuable, desirable, or useful firearms for a personal collection." *Id.* at 29,027. What would Plaintiff Journey need to do at that point? Would he need to apply for an FFL license if he wants to buy a firearm in the future? Would he have to report the firearm purchase to Defendants and ask for an opinion as to whether he needs one? What if the "restocking" happens ten years later and he does not remember selling the original firearm? There is no guidance for what individuals in his position should do. To cap it off, all of this applies even if he never sells the rifle, as he can be presumed to be a dealer simply by offering it for sale or demonstrating a willingness to sell it. *Id.* at 28,976.

Or suppose that Plaintiff Black has an assortment of .25 caliber handguns that were popular

for concealment and personal protection in the 1950s, 1960s, and 1970s.  He displays the assortment at a gun show for "study, comparison, [and] exhibition" but he sells one of them to a customer who wants one for self-defense.  Has he violated the Final Rule by selling a gun for self-defense?  Or is he covered by the exception for study and comparison?  The Final Rule is unclear. In short, in many ways the Final Rule does not give individuals of reasonable intelligence, like Plaintiffs Journey and Black, fair notice of what conduct is unlawful. If ever a regulation was unconstitutionally confusing, this is it.

For many of the same reasons, the Final Rule is unconstitutionally vague because it is susceptible to arbitrary enforcement. *Parents Defending Edu. v. Linn Mar Cmty. Sch. Dist.*, 83 F.4th 658, 669 (8th Cir. 2023) ("The lack of clarity also makes the Final Rule susceptible to arbitrary enforcement."). In fact, the lack of clarity appears to be a feature, not a bug, as it provides cover for pretty much anything that Defendants want to do.

The "presumptions" and "exceptions" are written so vaguely that Defendants can point to almost any circumstance as justification for enforcement action. And if they cannot find one on point, the Final Rule contains a catch-all provision that states "activities set forth in the rebuttable presumptions in paragraphs (c) and (d)(2) of this section, and the activities and rebuttal evidence set forth in paragraphs (e) and (f) of this section, are not exhaustive of the conduct or evidence that may be considered in determining whether a person is engaged in the business of dealing in firearms." 89 Fed. Reg. 29,092. This sweeping provision is akin to a residual clause under which Defendants can initiate almost any enforcement action. A residual clause that "leaves grave uncertainty" about what behavior violates a statute is unconstitutionally vague. *Johnson v. United States*, 576 U.S. 591, 597 (2015). In any case, Defendants are clearly "able to decide arbitrarily which members of the public [the agency] will [enforce the law against]." *Morales*, 527 U.S. at

58.  This lack of precise definitions and lack of guardrails confining enforcement actions are an open invitation to arbitrary enforcement.

These hypotheticals are not a parade of horribles describing situations that are unlikely to occur in real life.  *See* Exhibits A-D (Declarations of Plaintiffs Journey, Black, Maxey, and Fry). There are serious concerns that law abiding citizens of reasonable intelligence like Plaintiff Journey will have no fair notice as to how they can follow the law. Even worse, it opens the door for Defendants to engage in arbitrary enforcement against innocent people—in other words, for ATF to return to the same abusive and lawless enforcement that Congress sought to correct when it enacted the underlying statutes. What if a person wants to sell an unused firearm to his father or sister—does he have to carefully ensure that he does not make a profit off of that sale? What if multiple family members want to purchase a firearm from their siblings at an estate sale and so negotiate a price? Is that a crime dependent on the eventual deal cut? This Court can and should act as a safeguard to prevent Defendants from ever having an opportunity to arbitrarily wield this Final Rule. Here, the Court is left with no other choice as the Final Rule is unconstitutionally vague and must be set aside.

### C.      The Final Rule is Arbitrary and Capricious.

Under the APA, a reviewing court shall "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2). An agency acts arbitrarily and capriciously when it departs sharply from prior practice without reasonable explanation or ignores alternatives to its action or the affected communities' reliance on the prior rule. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020); *see also In re Operation of Mo. River Sys. Litig.*, 421 F.3d 618, 628 (8th Cir. 2005) (standard is met when agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its

decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise").

### a.    Departure from Past Practices

Until now, Defendants adopted the Congressional definitions of terms such as "engaged in the business" rather than attempting to expand those definitions beyond what Congress already included. *See* 27 C.F.R. § 478. That makes sense. Federal law limits Defendants' authority to draft rules and regulations to only those that "are necessary to carry out provisions of this chapter." 18 U.S.C. § 926(a). And Congress was explicit in what they allowed Defendants to define. *See* 18 U.S.C. § 921(a)(13). That is why the definitions Defendants previously adopted for 18 U.S.C. § 921(a)(21)(C) precisely mirrored what Congress wrote. *See* 27 C.F.R. 478.

Defendants now take a sharp turn from prior practice without a reasonable explanation. In fact, Defendants do not even acknowledge within the Final Rule that they are departing from prior practice at all. This is worse than the situation in *Department of Homeland Security v. Regents of the University of California*, where the agency at least acknowledged that it was changing course by rescinding a program. *Dep't of Homeland Sec.*, 140 S. Ct. at 1915. Defendants do not admit they are changing course from decades of past practice of adopting Congressional definitions of terms such as "engaged in the business" verbatim rather than trying to create their own definitions. Consequently, they do not provide any explanation for their departure from that past practice.  That alone is arbitrary and capricious.  In *Hardin v. ATF*, 65 F.4th 895 (6th Cir. 2023), the Sixth Circuit held unlawful an ATF rule banning "bump stocks" where, as here, ATF had allowed them "[f]or over a decade." *Id.* at 897.  "ATF's own flip flop in its position," the court explained, showed that the statute was "subject to more than one reasonable interpretation." *Id.* at 898.  Applying the rule of lenity, the Sixth Circuit was "bound to construe the statute in [the challenger]'s favor." *Id.* at

902.

### b.  Ignoring Reliance Interests

In departing sharply from prior practice, Defendants also refuse to acknowledge the States' reliance interests. The Final Rule acknowledges two consequences that will flow from it: (1) an increase in the number of federal firearms licensees and background checks and (2) an estimated 10% of private sellers declining to sell another firearm. 89 Fed. Reg. 29,898, 29,054. Both will hurt the States. For example, the Final Rule notes that Tennessee, Utah, and Florida conduct their own NICS background checks for firearms transfers that are normally required for federal firearms licensees. *Id.* at 29,606. It also acknowledges a spike in such licensees and background checks. But it does not acknowledge the increased administrative costs that this will place on state agencies. Similarly, the decrease in the private sales of firearms will reduce the number of vendors, and by extension sales, at gun shows and online platforms.  *See* Exhibit C - Declaration of Fry. This will reduce state tax revenue. *See* Exhibits F-H – Declarations of David Francis, Joseph E. Mayer, and Bret Fanning. The Final Rule does not acknowledge that either. The failure to consider these reliance interests that States have on the prior practice is arbitrary and capricious.

### c.  Implausibility of Explanation

Finally, the action is arbitrary and capricious because its explanation for its action is so implausible that it cannot be ascribed to a difference in view or the product of agency expertise. The Final Rule claims that it is "clarifying criteria for determining when a person is 'engaged in the business'" and establishes "specific, easy-to-follow standards regarding when buying and selling firearms presumptively crosses the threshold into being 'engaged in the business.'" 89 Fed. Reg. 29,070.

Unfortunately, the Final Rule's content does the opposite. It neither clarifies nor establishes

specific, easy-to-follow standards for anything. The Final Rule creates a new set of definitions of already-defined statutory terms and expresses those definitions through a series of presumptions. Then it creates exceptions to the presumptions that have their own exceptions within them. It creates a nebulous and convoluted standard that makes it impossible to precisely identify who and what conduct is covered under the Final Rule.  And if those presumptions and exceptions offered any clarity as to the terms they purport to define (they don't), the Final Rules savings clause eviscerates any such clarity. The Final Rule creates a nebulous and convoluted standard that makes it impossible to identify who and what conduct is covered under the Final Rule.

When an agency intends to apply "a multi-factor test through case-by-case adjudication," some explanation is required to provide "predictability and intelligibility" to regulated parties. *LeMoyne-Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004) (Roberts, J.); *see U.S. Postal Serv. v. Postal Regul. Comm'n*, 785 F.3d 740, 753–54 (D.C. Cir. 2015).  Otherwise, those seeking to conform their conduct to the regulation cannot know "which factors are significant and which less so, and why." *LeMoyne-Owen Coll.*, 357 F.3d at 61.  Those guardrails are particularly important in this context, where "[f]ailure to comply" with the Rule "carries the potential for ten years' imprisonment," "fines," and "a lifetime ban on ownership of firearms." *Mock v. Garland*, 75 F.4th 563, 570–71 (5th Cir. 2023).  But here, the Rule's "factors, which are both general and unweighted, invite inquiry into areas of doubtful relevance rather than make the [regulated] conduct any clearer." *Rec. Head Corp. v. Sachen*, 682 F.2d 672, 677 (7th Cir. 1982).

The Fifth Circuit recognized this deficiency clearly with respect to Defendants' stabilizing pistol brace rule.  As that court explained, "the six-part test provides no meaningful clarity about what constitutes an impermissible stabilizing brace." *Mock*, 75 F.4th at 585.  The Court should not condone ATF's "vague, indeterminate, multi-factor balancing test," which will use

"uncertainty" as "a Sword of Damocles hanging over the heads of American gun owners." *VanDerStok v. Garland*, 2023 WL 7403413, at *12 (5th Cir. Nov. 9, 2023) (Oldham, J., concurring). That is not reasoned decision making, it is an invitation for regulatory abuse. *See Kearney Reg'l Med. Ctr., LLC v. HHS*, 934 F.3d 812, 816 (8th Cir. 2019) (explaining that agency action is arbitrary where one cannot "discern what legal standard the agency applied").

A test that "provides no meaningful clarity about what constitutes an impermissible stabilizing brace," *Mock*, 75 F.4th at 585, thus betrays a "clear error of judgment." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Consider the following example of the lack of meaningful clarity. The Final Rule claims to follow a statutory exemption by not presuming someone selling firearms from their personal collection is a dealer. But the Final Rule creates the following exceptions to the exception to that presumption: (1) a personal collection excludes firearms purchased for self-defense, (2) excludes firearm that was brought with any intent to obtain profit, and (3) excludes anyone who buys any other firearms after selling from their personal collection. *Id.* at 29,068–69.

Because it seeks to redefine terms that Congress has already defined, the Final Rule is unreasonable. The arbitrary exclusion of these firearms from "personal collection[s]" cannot be ascribed to a difference in view or product of agency experience. It demonstrates that this was not the reason for the agency's action. Some of the other explanations are not reasonable either. The Final Rule nods toward "new technologies, mediums of exchange, and forums in which firearms are bought and sold." 89 Fed. Reg. at 28973. But the Final Rule does not limit itself to those new forums. It mostly targets gun shows which have been around since at least 1895, well before the passage of the GCA, the FOPA, or the BCSA. Joan Burbick, *Cultural Anatomy of a Gun Show*, 17 Stan. L. & Pol'y Rev. 657, 660 (2006). Indeed, gun control advocates blame the FOPA for

popularizing gun shows. *See id.* at 667 ("In 1986, Ronald Reagan helped to pass [the FOPA], an act that created a boom in gun shows throughout the United States. By making it easier for licensed dealers to sell away from their place of business, gun shows became much more than small-scale events for antique and historical gun collectors and their hunting buddies.") (internal citations omitted).

When the veneer of clarification is stripped away, all that is left for the Final Rule's authority is Executive Order 14092 of March 14, 2023 (Reducing Gun Violence and Making Our Communities Safer), 88 Fed. Reg. 16527 (Mar. 17, 2023), which is no authority at all. That executive order was a politically-motivated document that proposed to circumvent Congress in pushing forward the Biden administration's gun control priority.  For example, the Executive Order requires Defendants to "clarify the definition of who is engaged in the business of dealing in firearms, and thus required to become Federal firearms licensees (FFLs), *in order to increase compliance with the Federal background check requirement for firearm sales*."  *Id.* (emphasis added).  "Clarity" and "emerging technologies" are merely pretexts for the Biden administration's true desire—to establish near-universal background checks through the rulemaking process after it failed to pass through Congress. This was apparent to commenters expressing support for the rule, as ATF acknowledged, "Many commentators indicated a belief that the proposed rule created a universal background check requirement or expressed support for such a development." 89 Fed. Reg. 28987. Defendants attempted to disclaim this notion, but the Final Rule ultimately did not clarify the proposed rule's language to foreclose this requirement. Their attempt to explain away the true motivation for its vague language falls flat.  Regardless of the merits of universal background checks, an implausible pretext cannot be used to effectively require them, and Plaintiffs are likely to prevail on this claim.

Because of this, the Final Rule is arbitrary and capricious.

**D.      The Final Rule Violates the Second Amendment**

The Second Amendment provides that "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." "When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, … the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2126 (2022).

The private sale of firearms among individuals is covered by the Second Amendment. Courts have held that the ability to buy a firearm is encompassed in the right to keep a firearm. *Range v. Attorney General*, 69 F.4th 96, 106 (3d Cir. 2023). Accordingly, the ability to sell a firearm to another is also protected. *See Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010), *abrogated on other grounds as recognized by Range*, 69 F.4th 96 (commercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment).[5] This makes sense. Without someone providing a firearm to an individual, it is impossible to possess a firearm.

In order to justify this regulation, "the government *must* demonstrate that the regulation is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126 (emphasis added). Therefore, it is Defendants' burden to present evidence that this Final Rule aligns with the historical traditional of firearm regulation at the time the Second Amendment was

---

[5] Although dicta in *Heller* stated "laws imposing conditions and qualifications on the commercial sale of firearms" may still be constitutional, the Supreme Court has yet to decide the contours of that potential caveat. *Heller*, 554 U.S. at 626-27. In addition, the Final Rule goes well beyond targeting "commercial sale of firearms" and targets private sales of firearms such as the ones Plaintiff Journey conducts.

ratified. They cannot possibly do this, because the Final Rule's attempt to regulate private, non-commercial sale of firearms between individuals does not even have a modern analogue, much less a historical one.  In fact, the historical record demonstrates the opposite.  In 1774, when King George III embargoed all imports of firearms and ammunition into the colonies, the Americans saw the embargo on firearms commerce as an attempt to enslave Americans and increased their efforts to engage in firearms commerce in response.  David B. Kopel, *Does the Second Amendment Protect Firearms Commerce*, 127 HARV. L. REV. F. 230, 234 (2014).  In 1777, when the British seemed on the verge of winning the American Revolution, Colonel Undersecretary William Knox drafted a plan to prevent any future rebellion that included a provision to prevent any import or manufacturing of arms or gunpowder without a license.  *Id.* at 235. Not surprisingly, there is no law from the Founding period that is remotely comparable to the Final Rule. In short, the Final Rule regulates firearms in a manner that would not be consistent with our nation's history and tradition. Plaintiffs are likely to prevail on this claim as well.

Because of that, the Final Rule violates the Second Amendment.

## II.   PLAINTIFFS SUFFER IRREPARABLE HARM AND THE COURT SHOULD WEIGH THE BALANCE OF EQUITIES IN PLAINTIFFS' FAVOR.

### A.   The Final Rule Irreparably Harms Plaintiffs.

Without preliminary injunctive relief, Plaintiffs will suffer irreparable harm from the illegal Final Rule. The remedy of damages against the United States is unavailable to Plaintiff States, so the Final Rule's effect on State sales tax revenue—both on items like tickets to gun shows and the firearms sold at those shows—is unrecoverable. There would inevitably be decreased vendors, attendees, and sales of firearms at firearms shows if this Final Rule takes effect.  *See* Exhibits A-D, Declarations of Journey, Fry, Black and Maxey. In the Plaintiff states that charge sales tax, there are 126 gun shows scheduled from May 20, 2024 (when the Final Rule takes effect) until

July 31, 2024. Most Plaintiff States also collect tax for internet sales of firearms purchased over the internet from buyers within their respective states. Many websites that allow people to sell firearms do not require someone to be a federal firearms license holder.  The Final Rule will likely reduce the number of individuals who sell on those websites as it contemplates 10% of currently unlicensed dealers leaving the market altogether 89 Fed. Reg. 29,898, further decreasing available sales tax revenue. None of those damages are recoverable from the United States due to sovereign immunity, and the Eighth Circuit recognizes that as a basis for finding irreparable harm. *See, e.g.*, *Entergy, Arkansas, Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000); *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994).

The Final Rule's anticipated increase in federal firearms licensees' harms Plaintiff States that perform their own background checks. Tennessee runs its own background checks and collects data on firearm sales from FFL transactions. Tenn. Code Ann. § 39-17-1316. ATF anticipates an increase in the number of federal firearms licensees across the country.  89 Fed. Reg. 28998.  The Final Rule also expects an increase in background checks and notes that it is state law enforcement agencies in Tennessee that conduct these background checks.  *Id.* 29088.  This will result in an increase in administrative costs for Plaintiff Tennessee as they process more firearms license applications and run background checks for new licensees that previously did not need to do so. *See Id.*  Once these costs are incurred, they cannot be clawed back.

The Final Rule further harms Plaintiff Tennessee because it conflicts with Plaintiff Tennessee's policy governing nonprofits' participation in gun shows. Plaintiff Tennessee generally provides more favorable treatment to nonprofit gun collectors who engage in the firearms trade, including by exempting them from paying any sales taxes on proceeds at gun shows. Tenn. Code Ann. § 67-6-310. Tennessee law generally does not require nonprofit gun collectors to have

a license to minimally partake in the sale and showing of firearms; instead, they have fallen into a safe harbor under Tennessee law, as they have not historically qualified as firearms dealers. Tenn. Code Ann. § 39-17-1316. Such policies aim to avoid onerous fees levied upon organizations that pursue purposes other than purely maximizing profit. *See* Tenn. Op. Atty. Gen. No. 85-280 (Tenn.A.G.), 1985 WL 193831, at *4 (1985) (referencing Tennessee's statutes and Constitution favoring nonprofits and exempting such entities from various expenses). By requiring nonprofit gun collectors providing limited wares at gun shows to acquire federal licenses, the Final Rule runs afoul of Plaintiff Tennessee's legal treatment of nonprofit gun collectors and the State's policy of exempting nonprofits from burdensome regulations.

The Final Rule will also irreparably harm Plaintiff New Hampshire by increasing administrative costs associated with increased backgrounds and increasing the resources dedicated to those background checks. *See* Exhibit E – Declaration of Edwards. Once these costs are incurred, they cannot be recouped. Plaintiff New Hampshire will also have to expend additional resources and personnel to determine how to implement this expansion to transactions not previously covered. (See Declaration of Eddie Edwards.) Once these cases are incurred, they similarly cannot be recouped.

The Final Rule will also harm Plaintiff Chisolm Trail. *See* Exhibit C - Declaration of Fry. Chisholm Trail organizes two gun shows each year in Kansas. *Id.* Approximately 70% of Chisholm Trail's annual operating expenses are covered by revenue generated by these two shows. *Id.* The Final Rule will harm Chisholm Trail because it will reduce the revenue that this not-for-profit corporation generates from its biannual gun shows. *Id.* The Final Rule will do this in two ways: (1) by decreasing the number of attendees that sell firearms at these shows because those who are not federal firearms licensees will not be able to sell their firearms; and (2) by decreasing overall

attendance at these gun shows, as fewer firearms for sale will decrease the options available and reduce public interest in these events. *Id.*

The Final Rule will also harm Plaintiffs Journey and Black, as their ability to sell firearms from their personal collections at gun shows will be impaired. Neither of them is a federal firearms licensee. Both have a personal collection of firearms that include self-defense weapons. *See* Exhibits A-B - Declarations of Journey and Black. The Final Rule excludes firearms from someone's personal collection if they are weapons for self-defense. 89 Fed. Reg. 29039. The Final Rule also prohibits purchasing additional firearms for individuals "liquidating" all or part of their personal collection. *Id.* at 29092.  The Final Rule gives them three options, each of which has a unique harm: (1) stop buying and selling firearms for their personal collections, (2) become a federal firearms licensee and comply with the laborious requirements of one, or (3) face civil, administrative, and possibly even criminal penalties. This harm would occur the moment the Final Rule takes effect.

In addition, Plaintiffs Journey and Black, as well as Plaintiff Maxey, buy firearms at gun shows. *See* Exhibits A-D – Declarations of Journey, Black, Fry, and Maxey. The Final Rule is likely to decrease the options available to purchase their firearms, and reduce public interest in gun shows, thereby reducing the avenues that lawful hobbyists such as Plaintiffs have to expand their collection or sell unwanted parts of it. *See* Exhibit A – Declaration of Journey. Because the process for obtaining a federal firearms license is a multi-month process, and some of the individual Plaintiffs wish to attend gun shows in the very near term and buy and have the option to sell firearms there, the Final Rule has an immediate impact on them. *Id.*

None of this harm can be remedied after it has occurred; therefore a preliminary injunction is necessary to prevent it.

**B.     The Balance of the Equities and Public Interest Favor Plaintiffs.**

This novel rule presents a stark departure from the long-standing status quo that more fully protected Second Amendment rights. The Eighth Circuit tasks district courts with asking "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Nebraska v. Biden*, 52 F.4th 1044, 1046 (8th Cir. 2022) (quoting *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 370 (8th Cir. 1991)).

This Court should grant a preliminary injunction because the "merits of the appeal before this court involve substantial questions of law which remain to be resolved" and "the equities favor an injunction considering the irreversible impact" the Final Rule will have "as compared to the lack of harm an injunction would presently impose." *Id.* (quoting *Walker v. Lockhart*, 678 F.2d 68, 71 (8th Cir. 1982)). There is no harm to Defendants in pausing their attempted usurpation of Congress's role by maintaining the decades-long status quo. Defendants agree that they do not have the power to impose universal background checks, and claim they are not doing so here. 89 Fed. Reg. at 28,987. Most firearms sold by those "engaged in the business" of firearms sales already accompany a background check. *Id.*  And the Final Rule risks turning everyday citizens of Plaintiff States into felons if they inadvertently sell guns consistent with longstanding law but in violation of this new change. *Id.* at 28,995. On balance, maintaining the status quo while Plaintiffs challenge this rule will ensure that otherwise law-abiding citizens are not caught in the drag net of this overly broad and intrusive federal regulation.

This Court should weigh the balance of equities in favor of Plaintiffs and issue a preliminary injunction while it considers the case.

## III.    RELIEF SHOULD NOT BE LIMITED TO THE PARTIES.

This Court should stay enforcement of the Final Rule nationwide pending a decision on the merits. The APA allows a reviewing court to "hold unlawful and set aside agency action." 5 U.S.C.

§ 706(2). "'When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *Nat'l Min. Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh,* 878 F.2d 484, 495 n. 21 (D.C.Cir.1989)); *see also Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335, 2351 (2020) (explaining that when "a provision is declared invalid," it "cannot be lawfully enforced against others").

Section 705 of the APA establishes a similar rule for stays. Under § 705, a court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceeding." 5 U.S.C. § 705. "Nothing in the text of Section 705" suggests that preliminary relief "needs to be limited to" the parties before the court. *Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024).

 "[T]ailoring" relief "to address the alleged harms to the remaining States would entail delving into complex issues and contested facts that would make any limits uncertain in their application and effectiveness." *Nebraska v. Biden*, 52 F.4th at 1048. Relief limited to the 21 plaintiff States would create a patchwork of requirements that vary from State to State. And Defendants should not be permitted to violate non-Plaintiff States citizens' constitutional or apply federal firearms statutes unevenly. This Court should not permit such an inequitable outcome.

Given the significant harms that the Final Rule will impose if allowed to go into effect in Plaintiff States, it should not be permitted to go into effect in any States while this Court examines the legality of the Final Rule.

## CONCLUSION

Because Plaintiffs have established that they will succeed on the merits and that the other three factors favor preliminary relief, this Court should preliminarily enjoin Defendants from enforcing the Final Rule.  Because the Final Rule will otherwise take effect on May 20, 2024, Plaintiffs suggest that an expedited briefing schedule be set.  Counsel for Plaintiffs are available any day May 14-17 or May 20 to attend a hearing in this Court.  In the event that an expedited schedule is not possible, Plaintiffs respectfully request a temporary restraining order in the interim.


KRIS W. KOBACH
Kansas Attorney General

/s/Abhishek S. Kambli
*Abhishek S. Kambli
*Deputy Attorney General*
*Jesse A. Burris
*Assistant Attorney General*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-2215
Fax: (785) 296-3131

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Kansas*

TIM GRIFFIN
Arkansas Attorney General

/s/ Nicholas J. Bronni
Nicholas J. Bronni (2016097)
 Solicitor General
Dylan L. Jacobs (2016167)
 Deputy Solicitor General
323 Center Street, Suite 200
Little Rock, AR  72201
Telephone: (501) 682-2007
Fax: (501) 683-2520

*Counsel for Plaintiff State of Arkansas*

BRENNA BIRD
Iowa Attorney General

*/s/ Eric H. Wessan*
*Eric H. Wessan
Solicitor General
Office of the Iowa Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
Eric. Wessan@ag.iowa.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Iowa*

AUSTIN KNUDSEN
 Montana Attorney General

*/s/ Christian B. Corrigan*
*CHRISTIAN B. CORRIGAN
 Solicitor General
*PETER M. TORSTENSEN, JR.
 Deputy Solicitor General
MONTANA DEPARTMENT OF JUSTICE
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Montana*

STEVE MARSHALL
Alabama Attorney General

*/s/ Edmund G. LaCour, Jr.*
Edmund G. LaCour, Jr.
Solicitor General
Office of the Alabama
Attorney General
501 Washington Avenue
P.O. Box 300152
Montgomery, AL  36130
Telephone: (334) 242-7300
Fax: (334) 353-8400
Email: Edmund.LaCour@AlabamaAG.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Alabama*

TREG R. TAYLOR
Alaska Attorney General

*/s/ Aaron C. Peterson*
*Aaron C. Peterson
Senior Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: aaron.peterson@alaska.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Alaska*

CHRISTOPHER CARR
Georgia Attorney General

*/s/ Stephen Petrany*
*Stephen Petrany
Solicitor General
Office of the Attorney General of Georgia
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Georgia*

RAÚL R. LABRADOR
Idaho Attorney General

*/s/ Joshua N. Turner*
*Joshua N. Turner
Chief of Constitutional Litigation and
Policy
*Alan M. Hurst
Solicitor General
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
Tel: (208) 334-2400
Josh.turner@ag.idaho.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Idaho*

TODD ROKITA
Indiana Attorney General

*/s/ James A. Barta*
*James A. Barta
Solicitor General
Office of the Attorney General of Indiana
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, Indiana 46204
Telephone:  (317) 232-0709
James.Barta@atg.in.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Indiana*

RUSSELL COLEMAN
Kentucky Attorney General

*/s/ Victor B. Maddox*
*Victor B. Maddox
*Aaron J. Silletto
*Zachary M. Zimmerer
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Victor.Maddox@ky.gov
Aaron.Silletto@ky.gov
Zachary.Zimmerer@ky.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff Commonwealth of
Kentucky*

43

ANDREW BAILEY
Missouri Attorney General

*/s/ Bryce Beal*
*Bryce Beal
Assistant Attorney General
Missouri Attorney General's Office
207 West High Street
Jefferson City, MO 65101
(573) 751-6633
Bryce.Beal@ago.mo.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Missouri*

MICHAEL T. HILGERS
Nebraska Attorney General

*/s/ Zachary A. Viglianco*
*Zachary A. Viglianco
Deputy Solicitor General
Office of the Nebraska
Attorney General
2115 State Capitol
Lincoln, NE 68509
(531) 739-7645
zachary.viglianco@nebraska.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Nebraska*

JOHN M. FORMELLA
New Hampshire Attorney General

*/s/Brandon F. Chase*
*Brandon F. Chase
Assistant Attorney General
New Hampshire Department of Justice
1 Granite Place – South
Concord, NH 03301
(603) 271-3650
brandon.f.chase@doj.nh.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff New Hampshire*

DREW H. WRIGLEY
North Dakota Attorney General

*/s/ Katie L. Carpenter*
*Katie L. Carpenter
*Deputy Solicitor General*
North Dakota Office of the Attorney
General
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
Email: katcarpenter@nd.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of North
Dakota*

GENTNER DRUMMOND
Oklahoma Attorney General

/s/ Garry M. Gaskins, II
*GARRY M. GASKINS, II
 *Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:      (405) 521-3921
garry.gaskins@oag.ok.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State Oklahoma*

ALAN WILSON
South Carolina Attorney General

/s/ Joseph D. Spate
*Joseph D. Spate
Assistant Deputy Solicitor General
Office of the Attorney General
State of South Carolina
1000 Assembly Street
Columbia, SC  29201
(803) 734-3371
josephspate@scag.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State South
Carolina*

MARTY J. JACKLEY
South Dakota Attorney General

/s/ Charles D. McGuigan
*Charles D. McGuigan
Deputy Attorney General
Office of the Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Facsimile: (605) 773-4106
charles.mcguigan@state.sd.us

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of South Dakota*

JONATHAN SKRMETTI
Tennessee Attorney General and
Reporter

/s/ Whitney D. Hermandorfer
*WHITNEY D. HERMANDORFER
Director of Strategic Litigation Unit
*BRIAN DANIEL MOUNCE
Counsel for Strategic Litigation &
Assistant Solicitor General
Office of the Tennessee Attorney
General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-1400
whitney.hermandorfer@ag.tn.gov
brian.mounce@ag.tn.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for the State of Tennessee*

45

JASON S. MIYARES
Attorney General of Virginia

/s/ Kevin M. Gallagher
*Kevin M. Gallagher
*Principal Deputy Solicitor General*
*Brendan T. Chestnut
*Deputy Solicitor General*
*M. Jordan Minot
*Assistant Solicitor General*
Virginia Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Fax: (804) 786-1991
Email: kgallagher@oag.state.va.us
Email: bchestnut@oag.state.va.us
Email: mminot@oag.state.va.us
*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff Commonwealth of
Virginia*

BRIDGET HILL
Wyoming Attorney General

/s/ Ryan Schelhaas
*Ryan Schelhaas
*Chief Deputy Attorney General*
Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State Wyoming*

PATRICK MORRISEY
West Virginia Attorney General

/s/ Michael R. Williams
*Michael R. Williams
*Principal Deputy Solicitor General*
Office of the Attorney General of West
Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) forthcoming

*Counsel for State of West Virginia*

/s/ Michael D. McCoy
*Michael D. McCoy
*William E. Trachman
Mountain States
Legal Foundation
2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
Mmccoy@mslegal.org

*Counsel for Plaintiffs Allen Black,
Donald Maxey, and Chisholm Trail
Antique Gun Association*

*Motion for admission *Pro Hac Vice*
under Local Rule 83.5(d) pending

46

*/s/ Anna St. John*
*Anna St. John
Hamilton Lincoln Law Institute
1629 K St. NW Suite 300
Washington, DC 20006
(917) 327-2392
anna.stjohn@hlli.org

*/s/ M. Frank Bednarz*
*M. Frank Bednarz
Hamilton Lincoln Law Institute
1440 W. Taylor St. #1487
Chicago, IL 60607
(801) 706-2690
frank.bednarz@hlli.org

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff Phillip Journey*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was filed via the

Court's electronic filing system on this May 6, 2024.

I additionally certify that a true and correct copy of the foregoing document will be served

via United States mail on May 7, 2024 on the following:

BUREAU OF ALCOHOL, TOBACCO, FIREARMS, AND EXPLOSIVES
99 New York Avenue, NE
Washington, DC 20226

STEVEN DETTELBACH, ATF Director
99 New York Avenue, NE
Washington, DC 20226

United States Department of Justice
950 Pennsylvania Ave., NW,
Washington, D.C. 20530

MERRICK B. GARLAND, Attorney General
950 Pennsylvania Ave., NW,
Washington, D.C. 20530

_/s/Dylan L. Jacobs_
Dylan L. Jacobs