## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## DELTA DIVISION

|  |  |
|---|---|
| STATE OF KANSAS, *et al.*, | |
| Plaintiffs, | Case No. 2:24-cv-00088-JM |
| v. | |
| MERRICK GARLAND, in his official capacity, as Attorney General of the United States, *et al.*, | |
| Defendants. | |

## OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION...................................................................................................................1

BACKGROUND ...................................................................................................................3

I.     Statutory and Regulatory Background ........................................................................3

      A.    The Gun Control Act of 1968 .......................................................................3

      B.    The Final Rule .............................................................................................7

II.    Factual and Procedural Background .........................................................................10

LEGAL STANDARD .........................................................................................................11

ARGUMENT ......................................................................................................................12

I.     Plaintiffs Lack Standing And Fail To Establish Irreparable Harm. .........................12

      A.    The State Plaintiffs' Alleged Financial Injuries Fail To Establish Standing
           And Irreparable Harm .................................................................................13

           1.    The Rule's Incidental Effect On State Revenues Does Not Confer
                 Standing Or Constitute Irreparable Harm ........................................13

           2.    The Rule's Incidental Effect On State Background Check Procedures
                 Also Does Not Confer Standing Or Constitute Irreparable Harm .......17

      B.    The Individual Plaintiffs Lack Standing To Bring A Pre-Enforcement
           Challenge And Fail To Show Irreparable Harm...........................................19

      C.    CTAGA Also Lacks Standing And Fails To Show Irreparable Harm...........25

II.    Venue Is Improper In This District Because No Plaintiff With Standing Resides
     Here ........................................................................................................................29

III.   Plaintiffs Are Not Likely To Succeed On The Merits Of Their Claims ...................30

      A.    The Rule Is Consistent With The GCA And ATF's Authority......................30

           1.    The Rule Does Not Exceed ATF's Authority And Does Not
                 "Redefine" Any Statutory Terms. .....................................................30

           2.    ATF Properly Exercised Its Authority In Promulgating The Rule's
                 Presumptions....................................................................................34

B.     The Rule's Definitions Of "Engaged In The Business" And "Personal Collection" Are Consistent With The GCA.................................................36

    1.     The Rule Does Not Change The Statutory Definition Of "Engaged in the Business."................................................................................36

    2.     ATF Is Authorized To Define "Personal Collection" And The Definition Does Not Conflict With The Statutory Meaning. ..........................39

C.     The Rule Is Not Unconstitutionally Vague.................................................42

D.     The Rule Is Not Arbitrary And Capricious .................................................45

    1.     The Rule Reasonably Explains Departures From Past Practices ..................45

    2.     The Rule Adequately Considered Reliance Interests .............................46

    3.     The Rule's Explanations Are Reasonable And Plausible.........................47

E.     Plaintiffs Are Not Likely To Succeed On Their Second Amendment Claim .............48

IV.   The Balance of Equities and Public Interest Disfavor Injunctive Relief. .....................52

V.    Any Relief Should Be Limited .....................................................................53

CONCLUSION ........................................................................................................56

# TABLE OF AUTHORITIES

## CASES

*A.J. Taft Coal Co. v. Barnhart,*
  291 F. Supp. 2d 1290 (N.D. Ala. 2003) ................................................................30

*ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters,*
  645 F.3d 954 (8th Cir. 2011) ................................................................................18

*Abramski v. United States,*
  573 U.S. 169 (2014) ..................................................................................... 1, 3

*Adam & Eve Jonesboro, LLC v. Perrin,*
  933 F.3d 951 (8th Cir. 2019) ..........................................................................42, 43

*Adventist Health Sys./SunBelt, Inc. v. HHS,*
  17 F.4th 793 (8th Cir. 2021) ................................................................................45

*Alaska Airlines, Inc. v. Brock,*
  480 U.S. 678 (1987) ................................................................................................56

*Arc of Iowa v. Reynolds,*
  94 F.4th 707 (8th Cir. 2024) ................................................................................27

*Arizona v. Biden,*
  40 F.4th 375 (6th Cir. 2022) ..........................................................................15, 54

*Ark. United v. Thurston,*
  626 F. Supp. 3d 1064 (W.D. Ark. 2022) ................................................................27

*ARRM v. Piper,*
  319 F.Supp.3d 1156 (D. Minn. 2018) ................................................................12

*Associated Gen. Contractors of Am., Inc. v. Fed. Acquisition Regul. Council,*
  ---F. Supp. 3d--, 2024 WL 1078260 (W.D. La. Mar. 12, 2024) ..........................29

*Babbitt v. United Farm Workers Nat'l Union,*
  442 U.S. 289 (1979) ................................................................................................22

*Biden v. Missouri,*
  595 U.S. 87 (2022) ................................................................................................45

*Blanton v. Kansas City S. Ry. Co.,*
  33 F.4th 979 (8th Cir. 2022) ................................................................................33

*Boyce Motor Lines v. United States,*
  342 U.S. 337 (1952) ................................................................................................44

*Bryan v. United States,*
     524 U.S. 184 (1998) ................................................................................................24

*Califano v. Yamasaki,*
     442 U.S. 682 (1979) ................................................................................................54

*Chambered Grp. USA LLC v. Babcock,*
     No. CV-23-01850-PHX-SPL, 2023 U.S. Dist. LEXIS 173796 (D. Ariz. Sept. 27, 2023) ................53

*Christian Action League of Minn. v. Freeman,*
     31 F.4th 1068 (8th Cir. 2022) ................................................................................22

*Clapper v. Amnesty Int'l USA,*
     568 U.S. 398 (2013) ....................................................................................18, 19, 28

*Cole v. U.S. Dep't of Agric.,*
     33 F.3d 1263 (11th Cir. 1994) ..........................................................................2, 34, 35

*Cox v. Louisiana,*
     379 U.S. 559 (1965) ................................................................................................45

*Dataphase Sys., v. C L Sys.,*
     640 F.2d 109 (8th Cir. 1981) ..........................................................................11, 52

*District of Columbia v. Heller,*
     554 U.S. 570 (2008) ..........................................................................................2, 48, 49

*Ezell v. City of Chicago,*
     651 F.3d 684 (7th Cir. 2011) ................................................................................49

*F.C.C. v. Fox Television Stations, Inc.,*
     567 U.S. 239 (2012) ................................................................................................42

*Firearms Regul. Accountability Coal., Inc. v. Garland,*
     __ F. Supp. 3d __, 2023 WL 5942365, at *2 (D.N.D. Sept. 12, 2023) ................................31

*Florida v. Mellon,*
     273 U.S. 12 (1927) ................................................................................................14

*Frost v. Sioux City,*
     920 F.3d 1158 (8th Cir. 2019) ................................................................................19

*Ga. Republican Party v. SEC,*
     888 F.3d 1198 (11th Cir. 2018) ..........................................................................28, 30

*Gardner v. Grandolsky,*
     585 F.3d 786 (3d Cir. 2009) ................................................................................46

*Gill v. Whitford,*
    585 U.S. 48 (2018) ..................................................................................................53

*Grasso Enters., LLC v. Express Scripts, Inc.,*
    809 F.3d 1033 (8th Cir. 2016) ...............................................................................13

*Guedes v. BATFE,*
    140 S. Ct. 789 (2004) .............................................................................................35

*Hendricks v. Bank of Am., N.A.,*
    408 F.3d 1127 (9th Cir. 2005) ...............................................................................29

*Hill v. Colorado,*
    530 U.S. 703 (2000) ...............................................................................................43

*Holland Livestock Ranch v. United States,*
    655 F.2d 1002 (9th Cir. 1981) ...............................................................................34

*Holmbeck v. Solomon,*
    639 F.Supp.3d 829 (E.D. Ark. 2022) .....................................................................12

*Huddleston v. United States,*
    415 U.S. 814 (1974) ..................................................................................................3

*In re Higgins,*
    No. 8:15-cv-103, 2015 WL 1651424 n.4 (D. Neb. Mar. 23, 2015) .......................30

*Inst. of Certified Pracs., Inc. v. Bentsen,*
    874 F. Supp. 1370 (N.D. Ga. 1994) .......................................................................30

*Iowa League of Cities v. EPA,*
    711 F.3d 844 (8th Cir. 2013) ............................................................................25, 26

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...............................................................................................22

*Keane v. Velarde,*
    No. 3:20-cv-00977, 2021 WL 4248896, (D. Conn. Sept. 17, 2021) ......................30

*Labrador v. Poe ex. rel Poe,*
    144 S. Ct. 921 (2024) .............................................................................................54

*Lawson v. DoorDash, Inc.,*
    658 F.Supp.3d 707 (W.D. Mo. 2023) .....................................................................13

*Licon v. Ledezma,*
    638 F.3d 1303 (10th Cir. 2011) .............................................................................46

*LIFE Rehab Servs. Inc. v. Allied Prop. & Cas. Ins. Co.,*
  616 F. Supp. 2d 924 (D. Minn. 2007)...............................................................32

*Louisiana v. Becerra,*
  20 F.4th 260 (5th Cir. 2021) ............................................................................53

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992)....................................................................................12, 17

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994)..........................................................................................53

*Maryland v. King,*
  567 U.S. 1301 (2012) ........................................................................................52

*Maybelline Co. v. Noxell Corp.,*
  813 F.2d 901 (8th Cir. 1987) ...........................................................................29

*McRorey v. Garland,*
  __ F.4th __, 2024 WL 1825398, at *3 (5th Cir. Apr. 26, 2024) ....................48

*McNaught v. Nolen,*
  76 F.4th 764 (8th Cir. 2023) ............................................................................27

*MD/DC/DE Broads. Ass'n v. FCC,*
  236 F.3d 13 (D.C. Cir. 2001)...........................................................................55

*Mich. Ass'n of Pub. Sch. Acads. v. United States Dep't of Educ.,*
  ---F. Supp. 3d---, 2024 WL 455079 (W.D. Mich. Jan. 10, 2024).................30

*Miller v. Albright,*
  523 U.S. 420 (1998)..........................................................................................28

*Miller v. Redwood Toxicology Lab'y, Inc.,*
  688 F.3d (8th Cir. 2012) ..................................................................................16

*Missouri v. Yellen,*
  39 F.4th 1063 (8th Cir. 2022) ..........................................................................20

*Morehouse Enters., LLC v. ATF,*
  78 F.4th 1011 (8th Cir. 2023) .............................................................12, 19, 28

*Nat'l Rifle Ass'n v. Brady,*
  914 F.2d 475 (4th Cir. 1990) ...........................................................................31

*Nebraska v. Biden,*
  52 F.4th 1044 (8th Cir. 2022) ..........................................................................52

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
  597 U.S. 1 (2022) ....................................................................................48, 50, 51, 52

*Nken v. Holder*,
  556 U.S. 418 (2009) ...........................................................................................11, 52

*Northport Health Servs. v. HHS*,
  14 F.4th 856 (8th Cir. 2021) .............................................................................45, 47

*Org. for Competitive Mkts. v. USDA*,
  912 F.3d 455 (8th Cir. 2018) ....................................................................................45

*Printz v. United States*,
  521 U.S. 898 (1997) ..................................................................................................18

*Pugin v. Garland*,
  599 U.S. 600 (2023) ..................................................................................................41

*Reading Health Sys. v. Bear Stearns & Co.*,
  900 F.3d 87 (3d Cir. 2018) .......................................................................................29

*Religious Sisters of Mercy v. Becerra*,
  55 F.4th 583 (8th Cir. 2022) .....................................................................................26

*Republic Aviation Corp. v. NLRB*,
  324 U.S. 793 (1945) ..................................................................................................34

*S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*,
  696 F.3d 771 (8th Cir. 2012) ...............................................................................19, 27

*Sampson v. Murray*,
  415 U.S. 61 (1974) ...............................................................................................13, 17

*Sleep No. Corp. v. Young*,
  33 F.4th 1012 (8th Cir. 2022) ...................................................................................12

*St. Louis Effort for AIDS v. Huff*,
  782 F.3d 1016 (8th Cir. 2015) ...................................................................................53

*State of Iowa ex rel. Miller v. Block*,
  771 F.2d 347 (8th Cir. 1985) .....................................................................................15

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ..............................................................................................25, 26

*Susan B. Anthony List v. Driehaus*,
  573 U.S. 149 (2014) .......................................................................................... *passim*

*Teixeira v. Cnty of Alameda,*
  873 F.3d 670 (9th Cir. 2017) ................................................................................49, 51

*TransUnion LLC v. Ramirez,*
  594 U.S. 413 (2021) ...............................................................................................55

*Tumey v. Mycroft AI, Inc.,*
  27 F.4th 657 (8th Cir. 2022) ..................................................................................12

*U.S. Steel Corp. v. Astrue,*
  495 F.3d 1272 (11th Cir. 2007)............................................................................2, 34

*United Food & Com. Workers Union v. USDA,*
  532 F. Supp. 3d 741 (D. Minn. 2021)....................................................................56

*United States v. Biswell,*
  406 U.S. 311 (1972)................................................................................................53

*United States v. Cook,*
  782 F.3d 983 (8th Cir. 2015)..................................................................................45

*United States v. Duncan,*
  Case No. 7:20-cr-00167-M-3, 2023 WL 7346042 (E.D.N.C. Nov. 7, 2023)..........49

*United States v. Flores,*
  652 F. Supp. 3d 796 (S.D. Tex. 2023) ...................................................................49

*United States v. Ghane,*
  673 F.3d 771 (8th Cir. 2012) .................................................................................44

*United States v. Hosford,*
  82 F.Supp. 3d 660 (D. Md. 2015), *aff'd*, 843 F.3d 161 (4th Cir. 2016) ...................53

*United States v. James,*
  172 F.3d 588 (8th Cir. 1999) .................................................................................24

*United States v. King,*
  646 F. Supp. 3d 603 (E.D. Pa. 2022) ....................................................................49

*United States v. Kocher,*
  948 F.2d 483 (8th Cir. 1991) .................................................................................35

*United States v. KT Burgee,*
  988 F.3d 1054 (8th Cir. 2021)...........................................................................42, 45

*United States v. Marzzarella,*
  614 F.3d 85 (3d Cir. 2010).....................................................................................49

*United States v. McNulty*,
 ---F Supp.3d.--–, 2023 WL 4826950 (D. Mass. July 27, 2023) ......................................49

*United States v. Nat'l Dairy Prods. Corp.*,
 372 U.S. 29 (1963) ......................................................................................45, 46, 47, 48

*United States v. Stephens*,
 594 F.3d 1033 (8th Cir. 2010) ......................................................................................12

*United States v. Texas*,
 599 U.S. 670 (2023) ................................................................................................14, 16

*United States v. Tilotta*,
 Case No. 3:19-cr-04768-GPC, 2022 WL 3924282, at *5 (S.D. Cal. Aug. 30, 2022) ............................49

*United States v. Tyson*,
 653 F.3d 192 (3d Cir. 2011) ....................................................................................23, 24

*USX Corp. v. Barnhart*,
 395 F.3d 161 (3d Cir. 2004) ..........................................................................................34

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
 455 U.S. 489 (1982) ......................................................................................................42

*Watkins Inc. v. Lewis*,
 346 F.3d 841 (8th Cir. 2003) ........................................................................................11

*West Virginia v. EPA*,
 669 F. Supp. 3d 781 (D.N.D. 2023) ..............................................................................53

*Winter v. Nat. Res. Def. Council, Inc.*,
 555 U.S. 7 (2008) ....................................................................................................11, 14

*Young America's Found. v. Kaler*,
 14 F.4th 879 (8th Cir. 2021) ..........................................................................................12

*Zanders v. Swanson*,
 573 F.3d 591 (8th Cir. 2009) ....................................................................................19, 23

## STATUTES

5 U.S.C. § 705 ............................................................................................................2, 55

18 U.S.C. § 921 ........................................................................................................*passim*

18 U.S.C. § 922 ........................................................................................................*passim*

18 U.S.C. § 923(a) ..........................................................................................................33

18 U.S.C. § 924(d)(1) ......................................................................................................23

18 U.S.C. § 926(a) ............................................................................................................7

28 U.S.C. § 1391(e)(1) .....................................................................................................29

Act of May 22, 1794, 1 Stat. 369, ch. 33, § 1, ...............................................................50

Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986) ..................5

Pub. L. No. 99-360, § 1(b), 100 Stat. 766, 766 (1986) .....................................................5

Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313 (2022) .........5, 6

Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993)...........4

## LEGISTLATIVE HISTORIES

*Administrative Procedure Act*, S. Doc. No. 248, 79th Cong., 2d Sess. 277 (1946)........................55

## REGULATIONS

27 C.F.R. § 478.11 .....................................................................................................*passim*

27 C.F.R. § 478.13 ..............................................................................................................8

27 C.F.R. § 478.13(a) ...............................................................................................*passim*

27 C.F.R. § 478.13(b) .....................................................................................................8, 39

27 C.F.R. § 478.13(c) .....................................................................................................9, 35

27 C.F.R. § 478.13(d)(1) ....................................................................................................9

27 C.F.R. § 478.13(e) .......................................................................................................10

27 C.F.R. § 478.13(e)(4) ...................................................................................................43

27 C.F.R. § 478.13(f) .......................................................................................................10

27 C.F.R. § 478.13(g) ..................................................................................................10, 44

27 C.F.R. § 478.13(h) .......................................................................................................10

27 C.F.R. §§ 478.121-478.134 ...........................................................................................4

27 C.F.R. §§ 478.13(e)(2) ....................................................................................43

27 C.F.R. §§ 478.57(b) ........................................................................................10

27 C.F.R. §§ 478.57(c)-(d) ...................................................................................10

27 C.F.R. §§ 478.78 .............................................................................................10

28 C.F.R. § 25.2 ...................................................................................................17

28 C.F.R. § 25.6(a) ...............................................................................................17

Final Rule, Definition of "Engaged in the Business" as a Dealer in Firearms,
   89 Fed. Reg. 28,968 (Apr. 19, 2024) .......................................................*passim*

Executive Order No. 14092, § 3, 88 Fed. Reg. 16527 (Mar. 14, 2023) .......................7

Notice of Proposed Rulemaking, Definition of "Engaged in the Business" as a Dealer in Firearms,
   88 Fed. Reg. 61,993 (Sept. 8, 2023) ...........................................................7

## STATE STATUTES

1 Laws of the State of Maine 546 (1830) ..............................................................51

2 General Laws of Mass. from the Adoption of the Constitution to Feb. 1822 (1823) .........................50

3 Laws of the Commonwealth of Massachusetts, from November 28, 1780,
   to February 28, 1807, (1807) ...........................................................................51

15 The Public Records of the Colony of Connecticut, from May, 1775, to June, 1776, Inclusive 191,
   An Act for Encouraging the Manufactures of Salt Petre and Gun Powder (1890) ...................50

Acts of the General Assembly of the State of New-Jersey, at a Session Begun at Princeton on the
   27th Day of August 1776, and Continued by Adjournments 6, ch. 6, An Act for the Inspection of
   Gun-Powder, § 1 (1877) .................................................................................50

An Act Providing for the Appointment of Inspectors, and Regulating the Manufactory of Gun-
   Powder, secs. 1, 8 (1823) ...............................................................................50

Colonial Laws of Mass. Reprint. from the Ed. of 1672 (1890) ..................................24

Laws of the State of New Hampshire; With the Constitutions of the United States and of the State
   Prefixed 276-78, An Act to Provide for the Appointment of Inspectors and Regulating the
   Manufactory of Gunpowder, secs. 1, 8 (1830) ...................................................51

## OTHER AUTHORITIES

ATF, Complete Federal Firearms Listings,

https://www.atf.gov/firearms/listing-federal-firearms-licensees/complete?field_ffl_date_value%5Bvalue%5D%5Byear%5D=2024&ffl_date_month%5Bvalue%5D%5Bmonth%5D=4....................................................................................................50

ATF Form 4473, Firearms Transaction Record,
https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download..........................................................................................................................3

ATF, National Tracing Center,
https://www.atf.gov/firearms/national-tracing-center .......................................................................4

Comment of Attorney General of New York, et al., Definition of "Engaged in the Business" as a Dealer in Firearms, Docket No. ATF 2022R-17 (Dec. 7, 2023),
https://ag.ny.gov/sites/default/files/letters/multistate-comment-on-nprm-eitb-atf-rule.pdf .......54

David B. Kopel, *Does the Second Amendment Protect Firearms Commerce*,
127 HARV. L. REV. F. 230 (2014) ....................................................................................................51

FBI, About NICS,
https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/nics/about-nics .....18

FBI, National Instant Background Check System 2022 Operational Report,
https://www.fbi.gov/file-repository/nics-2022-operations-report.pdf/view ........................................4

Webster's Third New International Dictionary "collection" ...............................................................3

William J. Krouse, Cong. Rsch. Serv., IF12197, *Firearms Dealers "Engaged in the Business"* (2022),
https://crsreports.congress.gov/product/pdf/IF/IF12197/2...................................................................6

## INTRODUCTION

In the Gun Control Act (GCA), Congress required anyone engaged in the business of dealing firearms to obtain a federal firearms license.  When transferring firearms, licensees must verify the transferee's identity, run a background check (and deny the transfer if the background check reveals that the transferee is prohibited from receiving or possessing a firearm), and maintain records that can be used to trace the firearm if it is later recovered from a crime scene.  These requirements serve the "twin goals" of "keep[ing] guns out of the hands of criminals and others who should not have them, and . . . assist[ing] law enforcement authorities in investigating serious crimes." *Abramski v. United States*, 573 U.S. 169, 180 (2014).  Recognizing the harm to public safety caused by unlicensed dealing in firearms, Congress recently amended the GCA *via* the Bipartisan Safer Communities Act (BSCA) to expand the category of conduct that constitutes engaging in the business of dealing.

In the GCA, Congress vested the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) with authority to promulgate regulations necessary to carry out the GCA's provisions.  In the Rule at issue in this case,[1] ATF exercised that authority by defining "engaged in the business" of dealing in firearms and setting forth examples of conduct that presumptively does, or does not, rise to the level of engaging in the business of dealing.  In this lawsuit, Plaintiffs (twenty-one states, three individuals, and an organization) challenge the Rule and ask for a preliminary injunction that would prevent the federal government from implementing or enforcing the Rule against anyone, nationwide. The Court should deny this extraordinary relief for several reasons.

Plaintiffs are not likely to succeed on the merits.  The Rule falls within ATF's authority to promulgate regulations necessary to carry out the GCA.  Its provisions are consistent with the GCA's text and grounded in decades of case law and law enforcement experience.  In particular, each of the

---

[1] Final Rule, Definition of "Engaged in the Business" as a Dealer in Firearms, 89 Fed. Reg. 28,968 (Apr. 19, 2024) ("Rule").

rebuttable presumptions set forth in the Rule is lawful because a "rational nexus" exists between the facts that give rise to the presumptions and the presumed facts. *U.S. Steel Corp. v. Astrue*, 495 F.3d 1272, 1284 (11th Cir. 2007) (quoting *Cole v. U.S. Dep't of Agric.*, 33 F.3d 1263, 1267 (11th Cir. 1994)). The Rule is not arbitrary and capricious because ATF reasonably explained that it promulgated the Rule to implement the GCA's text (including the recent BSCA amendment), clarify the application of the GCA, and deter unlicensed firearms dealing in order to promote public safety. And the GCA's routine dealer-licensing requirements are entirely consistent with the Second Amendment, which permits "laws imposing conditions and qualifications on the commercial sale of arms." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).

But the Court need not reach the merits because Plaintiffs fail to satisfy their burden to establish standing — much less irreparable harm, which they must show to obtain relief. The incidental economic harms the State Plaintiffs will allegedly suffer as a result of the Rule fail to confer standing. The individual plaintiffs lack standing because the conduct they describe in their declarations does not constitute engaging in the business of dealing under the Rule. And the organizational plaintiff lacks standing because it does not identify a member with standing, and the Rule's alleged impact on the organization's finances is wholly speculative. Furthermore, because the Rule serves vital public safety interests, including preventing dangerous individuals from obtaining firearms from unlicensed dealers, the balance of the equities weighs strongly against injunctive relief.

Even if the Court were to grant some relief (which it should not), it should reject the nationwide relief Plaintiffs seek. Nationwide injunctions are disfavored because they extend beyond an equity court's traditional role of fashioning relief to be no more intrusive than necessary to prevent the parties' demonstrated irreparable harm — which here is nonexistent. Nor is universal relief appropriate under 5 U.S.C. § 705 — particularly where, as here, a party-specific injunction would fully remedy any cognizable injury Plaintiffs might establish, and universal relief would effectively pretermit

litigation pending in other federal district courts.

BACKGROUND

I.      **Statutory and Regulatory Background**

A.      **The Gun Control Act of 1968**

Congress enacted the Gun Control Act, 18 U.S.C. § 921 *et seq.* (GCA), in 1968 to promote public safety and curb crime and violence caused by the misuse of firearms. "The twin goals of [the GCA's] comprehensive scheme are to keep guns out of the hands of criminals and others who should not have them, and to assist law enforcement authorities in investigating serious crimes." *Abramski*, 573 U.S. at 180. The GCA prohibits various groups of people, including felons, fugitives from justice, and undocumented immigrants, from receiving or possessing firearms with a nexus to interstate commerce. *See* 18 U.S.C. § 922(g). In restricting the access of criminals and other dangerous individuals to firearms, "the focus of the federal scheme is the federally licensed firearms dealer." *Huddleston v. United States*, 415 U.S. 814, 825 (1974).

Federal firearms licensees (FFLs) must comply with various obligations when transferring firearms to non-licensees, to prevent prohibited persons from obtaining firearms. "The statute establishes a detailed scheme to enable the dealer to verify, at the point of sale, whether a potential buyer may lawfully own a gun." *Abramski*, 573 U.S. at 172. In most cases, a transferee must "appear in person at the licensee's business premises" when acquiring a firearm. 18 U.S.C. § 922(c). The licensed dealer must obtain the transferee's "name, age, and place of residence," *id.* § 922(b)(5), and must "verif[y] the identity of the transferee by examining a valid identification document," *id.* § 922(t)(1)(D). Transferees must fill out a form certifying that they are not prohibited by federal law from receiving or possessing firearms.[2] The dealer must submit information about the transferee to

---

[2] *See* ATF Form 4473, Firearms Transaction Record, https://www.atf.gov/firearms/docs/4473-part-1-firearms-transaction-record-over-counter-atf-form-53009/download.

3

the FBI's National Instant Background Check System (NICS), which then conducts a background check on the transferee and will deny the transaction if the background check reveals that the transferee is prohibited from receiving or possessing the firearm.  18 U.S.C. § 922(t)(1).[3]  Since the NICS became operational in 1998, it has conducted more than 443 million background checks, and more than 2.1 million firearms transactions have been denied.  FBI, National Instant Background Check System 2022 Operational Report 14-15, https://www.fbi.gov/file-repository/nics-2022-operations-report.pdf/view.

FFLs also maintain records of acquisitions and dispositions of firearms, which enable tracing of firearms recovered from crime scenes.  18 U.S.C. §§ 922(b)(5), 923(g)(1)(A); 27 C.F.R. §§ 478.121-478.134.  When a firearm is recovered from a crime scene, law enforcement (often state or local) can submit a request to ATF's National Tracing Center to trace the firearm.  *See* ATF, National Tracing Center,  https://www.atf.gov/firearms/national-tracing-center.  ATF's tracing process typically involves querying the records maintained by FFLs in order to trace the firearm to its first retail purchaser.  Firearms tracing, which is enabled by the records maintained by FFLs, helps all levels of law enforcement solve crimes involving firearms.  *See* Rule, 89 Fed. Reg. at 28,988.

Each of the above-described obligations relating to the disposition of firearms applies only to transfers by FFLs.  Therefore, the GCA's standard for when a person or business must obtain a federal firearms license to deal firearms has vital public safety implications.  Since the GCA's original enactment, Congress has prohibited individuals from "engag[ing] in the business of . . . dealing in firearms" without a federal firearms license.  18 U.S.C. § 922(a)(1)(A).  If a person is engaged in the business of dealing in firearms, that person must obtain a federal firearms license and comply with the verification, background check, and recordkeeping obligations described above.  But if a person is not

---

[3] The NICS was established pursuant to the Brady Handgun Violence Prevention Act, Pub. L. No. 103-159, 107 Stat. 1536 (1993).

engaged in the business of dealing in firearms, that person may transfer a firearm without conducting a background check, keeping transaction records, or complying with other obligations required of FFLs.[4]

When Congress first enacted the GCA, Congress did not further define what it means to engage in the business of dealing firearms.  In 1986, as part of the Firearms Owners' Protection Act, Pub. L. No. 99-308, 100 Stat. 449 (1986) ("FOPA"), Congress added a statutory definition of engaged in the business for the first time.  As applied to a dealer in firearms other than a gunsmith or pawnbroker, FOPA defined "engaged in the business" as follows:

> a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of livelihood and profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

*Id.* § 101 (amending 18 U.S.C. § 921).  Congress further defined the term "with the principal objective of livelihood and profit" to "mean[] that the intent underlying the sale or disposition of firearms is predominantly one of obtaining livelihood and pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection."  *Id.*  Several months later, Congress amended that definition to clarify that "proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism."  Pub. L. No. 99-360, § 1(b), 100 Stat. 766, 766 (1986).

In 2022, Congress amended the GCA by enacting the Bipartisan Safer Communities Act, Pub. L. No. 117-159, 136 Stat. 1313 (2022).  Congress enacted the BSCA in the wake of a series of tragic mass shootings.  In one of those mass shootings, which occurred between Midland and Odessa, Texas,

---

[4] Certain requirements apply even to firearms transfers by unlicensed individuals.  For example, no person may transfer a firearm if that person knows or has reasonable cause to believe that the transferee is legally prohibited from possessing or obtaining that firearm.  *See* 18 U.S.C. § 922(d).

an FFL refused to transfer a firearm to the perpetrator based on mental illness, but the perpetrator then unlawfully obtained the firearm used in the shooting from an unlicensed dealer who did not conduct a background check. That dealer later pleaded guilty to unlawful unlicensed firearms dealing. *See* Rule, 89 Fed. Reg. at 28,971-72 & nn.26-29. As relevant here, the BSCA expanded the GCA's definition of engaged in the business of dealing in firearms. The BSCA replaced the phrase "with the principal objective of livelihood and profit" with the phrase "to predominantly earn a profit," and defined that phrase in a separate subsection, which clarifies that the term "means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain." 136 Stat. at 1324-25, § 12002. The BSCA's sponsors intended to address potential confusion about the GCA's application to individuals who deal in firearms with the intent to earn profit, but possibly not as a principal source of livelihood, to "clarify who should be licensed, eliminating a 'gray' area in the law, ensuring that one aspect of firearms commerce is more adequately regulated." Rule, 89 Fed. Reg. at 28,972 (quoting William J. Krouse, Cong. Rsch. Serv., IF12197, *Firearms Dealers "Engaged in the Business"* 2 (2022), https://crsreports.congress.gov/product/pdf/IF/IF12197/2); *see also id.* at 28,972 n.31 (collecting statements of the BSCA's sponsors).

As amended by the BSCA, the GCA thus currently defines "engaged in the business" as applied to a dealer in firearms other than a gunsmith or pawnbroker as:

> a person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms, but such term shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or who sells all or part of his personal collection of firearms.

18 U.S.C. § 921(a)(21)(C). [5]

---

[5] A separate statutory provision defines "engaged in the business" as applied to a dealer in firearms as a gunsmith. 18 U.S.C. § 921(a)(21)(D). Another provision defines "dealer" to include any pawnbroker who receives any firearm as security for payment or repayment of money. *Id.* § 921(a)(11)(C). These provisions were not addressed in the Final Rule and are not at issue in this litigation.

The GCA further defines the term "to predominantly earn a profit" to

> mean[] that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain, as opposed to other intents, such as improving or liquidating a personal firearms collection: *Provided*, That proof of profit shall not be required as to a person who engages in the regular and repetitive purchase and disposition of firearms for criminal purposes or terrorism.

*Id.* § 921(a)(22).[6]

### B.    The Final Rule

ATF is a bureau within the Department of Justice responsible for implementing and enforcing federal firearms laws, including the GCA.  Congress has vested in the Attorney General the authority to prescribe regulations "necessary to carry out the provisions of" the GCA, *id.* § 926(a), and Congress and the Attorney General have delegated that authority to ATF.  On September 8, 2023, ATF issued a Notice of Proposed Rulemaking for a proposed rule to address when a person is engaged in the business of dealing firearms.  Notice of Proposed Rulemaking, Definition of "Engaged in the Business" as a Dealer in Firearms, 88 Fed. Reg. 61,993 (Sept. 8, 2023) ("NPRM").[7]  ATF received nearly 388,000 comments, including nearly 258,000 comments in support of and nearly 99,000 comments in opposition to the proposed rule.  Rule, 89 Fed. Reg. at 28,984.

After considering these comments, ATF published the Final Rule on April 19, 2024.  ATF explained that the Rule "implement[s]" the BSCA's "statutory change" to the definition of engaged in the business, *id.* at 28,968, and thereby furthers Congress's design "to improve public safety by helping to prevent persons who are prohibited from possessing firearms under Federal law from acquiring

---

[6] This provision further contains a detailed definition of "terrorism," which is not at dispute in this litigation.  *See id.*

[7] On March 14, 2023, President Biden issued an Executive Order, which directed the Attorney General to "develop and implement a plan to . . . clarify the definition of who is engaged in the business of dealing in firearms, and thus required to become Federal firearms licensees (FFLs), in order to increase compliance with the Federal background check requirement for firearm sales, including by considering a rulemaking, as appropriate and consistent with applicable law."  Executive Order No. 14092, § 3, 88 Fed. Reg. 16527, 16527-28 (Mar. 14, 2023).

firearms and allowing law enforcement officers to trace firearms involved in crime," *id.* at 28,987.[8] The Rule also "provide[s] clarity to persons who remain unsure of whether" they are engaged in the business of dealing in firearms.  *Id.* at 28,968.

The Rule defines various subsidiary terms in the GCA's definition of "engaged in the business," consistent with statutory text and ordinary usage.  For example, the term "Dealer" includes "[a]ny person engaged in the business of selling firearms at wholesale or retail . . . wherever, or through whatever medium, they are conducted," including at "a gun show," a "flea market," "by mail order," "over the internet," or "through the use of other electronic means." *Id.* at 29,090 (27 C.F.R. § 478.11). ATF explained that this definition reflects the statutory text, because "there is no statutory exemption under the GCA for unlicensed persons to engage in the business of dealing in firearms at a gun show, or at any other venue."  *Id.* at 28,989.  The list of venues at which firearms dealing could occur is also consistent with decades of case law and ATF practice.  *See id.* at 28,973-74 & nn.35-46.

The Rule introduces a standalone section, 27 C.F.R. § 478.13, to define "engaged in the business as a dealer in firearms other than a gunsmith or a pawnbroker." Rule, 89 Fed. Reg. at 29,090-91.  Subsection (a) mostly repeats the statutory definition contained in 18 U.S.C. § 921(a)(21)(C), while also clarifying that being engaged in the business covers consignment-type auctions but not estate-type auctions.  *Id.* at 29,091 (27 C.F.R. § 478.13(a)).

Subsection (b) states that whether someone is engaged in the business of dealing "is a fact-specific inquiry," and that while "[s]elling large numbers of firearms . . . may be highly indicative of business activity, . . . there is no minimum threshold number of firearms purchased or sold that triggers the licensing requirement."  *Id.* (27 C.F.R. § 478.13(b)).  This subsection reflects ATF's sensible conclusion that defining "engaged in the business" through a bright-line threshold of number of

---

[8] *See also* Rule, 89 Fed. Reg. at 28,993-95 (the Rule will promote compliance with the GCA, which will effectuate the GCA's purposes of enhancing public safety by increasing the number of background checks performed, enabling more traces of firearms, and improving crime gun intelligence).

transactions would be inconsistent with the GCA's text and would necessarily be both underinclusive and overinclusive. *See id.* at 29,086. To clarify the GCA's application, subsection (c) sets forth a number of fact patterns that give rise to rebuttable presumptions "[i]n civil and administrative proceedings" (but not in criminal proceedings) that "a person shall be presumed to be engaged in the business of dealing in firearms." *Id.* at 29,091 (27 C.F.R. § 478.13(c)) (the "EIB presumptions"). For example, a person is presumed to be engaged in the business of dealing firearms when the person repetitively purchases for the purpose of resale stolen firearms, or resells or offers for resale stolen firearms. *Id.* (27 C.F.R. § 478.13(c)(2)(ii)(A)). These presumptions "are supported by the Department's investigative, regulatory, and enforcement experience, as well as conduct that the courts have found to require a license even before the BSCA expanded the definition of 'engaged in the business.'" *Id.* at 28,977; *see also id.* at 28,977-79 nn.72-73, 74-77, 79-83 (citing case law and examples of federal prosecutions supporting these presumptions).

Subsection (d) clarifies the application of the statutory term "predominantly earn a profit." It starts by repeating the statutory definition in 18 U.S.C. § 921(a)(22), which provides that the term "means that the intent underlying the sale or disposition of firearms is predominantly one of obtaining pecuniary gain," then clarifies that "a person may have the intent to profit even if the person does not actually obtain the intended pecuniary gain from the sale or disposition of firearms." Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(d)(1)). It then sets forth fact patterns giving rise to rebuttable presumptions in civil and administrative proceedings (but not in criminal proceedings) that a person has the intent to predominantly earn a profit. *Id.* (27 C.F.R. § 478.13(d)(2)) (the "PEP presumptions"). For example, a person is presumed to have intent to predominantly earn a profit if the person repetitively or continuously purchases or rents physical space to display firearms offered for resale. *Id.* (27 C.F.R. § 478.13(d)(2)(ii)). Like the EIB presumptions, the PEP presumptions are supported by decades of case law arising before the BSCA's expansion of the statutory language, and

enforcement experience.  *See id.* at 28,981-82 & nn.97-104.

The Rule then lists categories of conduct that are not to be presumed to be engaging in the business of dealing firearms, and can be used to rebut the EIB and PEP presumptions, such as reselling or transferring firearms "[o]ccasionally to a licensee or to a family member for lawful purposes."  *Id.* at 29,092 (27 C.F.R. § 478.13(e), (f)).  Subsection (g) specifies that the activities set forth in the EIB presumptions, PEP presumptions, and list of rebuttal evidence "are not exhaustive of the conduct or evidence that may be considered in determining whether a person is engaged in the business of dealing in firearms, or has the intent to predominantly earn a profit through the repetitive purchase and resale of firearms."  *Id.* (27 C.F.R. § 478.13(g)).  Subsection (h) provides that the EIB and PEP presumptions "shall not apply to any criminal case, although they may be useful to courts in criminal cases, for example, when instructing juries regarding permissible inferences."  *Id.* (27 C.F.R. § 478.13(h)).

Other provisions of the Rule address the procedures that former licensees must follow when they liquidate business inventory upon license revocation or other termination of their license.  Within 30 days of license termination, a former FFL must transfer its business inventory either to another FFL or a responsible person of the former FFL (meaning a person who had the authority to direct the former FFL's firearms business).  *Id.* (27 C.F.R. §§ 478.57(b), 478.78(b)).  After the 30-day period, the former FFL may occasionally sell firearms to a licensee without being presumed to be engaging in the business, but it must not continue to engage in the business of dealing firearms or restock its inventory by purchasing additional firearms for resale.  *Id.* (27 C.F.R. §§ 478.57(c)-(d), 478.78(c)-(d)).

The Rule is scheduled to take effect on May 20, 2024.  *Id.* at 28,968.

## II.    Factual and Procedural Background

Plaintiffs are 21 states, Compl. ¶ 1 (listing state plaintiffs), three individuals (Phillip Journey, Allen Black, and Donald Maxey), *id.* ¶¶ 3-5, and an association (Chisholm Trail Antiques Gun Association ("CTAGA")), *id.* ¶ 6.  The State plaintiffs allege that most of them collect sales taxes on

firearms sales and/or admissions to gun shows.  *Id.* ¶¶ 69-83, 90-91.[9]  Tennessee alleges that it runs background checks on licensed firearms transactions, *id.* ¶ 95, and New Hampshire alleges that a state agency is a point of contact for the federal government under the NICS, *id.* ¶ 109.  Individual plaintiffs allege that they attend multiple gun shows each year and have purchased or sold firearms at gun shows. *Id.* ¶¶ 3-5.  CTAGA allegedly "was organized for the purposes of serving the interests of collectors and shooters of antique and antique-replica firearms," and regularly sponsors and manages gun shows. *Id.* ¶ 6.  The individual plaintiffs, the president of CTAGA, and state employees in New Hampshire, Oklahoma, Virginia, and Wyoming submitted declarations concerning their firearms-related activities. *See* ECF Nos. 4-1 – 4-8.  The Complaint asserts five claims for violation of the Administrative Procedure Act (APA) and claims for void for vagueness, violation of the Second Amendment, and violation of the separation of powers.  *See* Compl. ¶¶ 119-213.  Plaintiffs filed a Motion for Preliminary Injunction, ECF No. 4 ("Mot."); *see also* Pls.' Mem. in Support of Mot. for Stay/Prelim. Injunction, ECF No. 5 ("Mem.").  Plaintiffs ask this Court to enjoin or stay enforcement of the Rule nationwide. Mem. 39-40.

## LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  The Court weighs four factors: likelihood of success on the merits, threat of irreparable harm to the movant, the balance between the movant's harm and the harm that granting the injunction would cause to other parties, and the public interest.  *Dataphase Sys., v. C L Sys.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc).  The balance of harms and public interest factors merge when the government is the opposing party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009). "Failure to show irreparable harm is an independently sufficient ground upon which to deny a

---

[9] Tennessee and local governments in Alaska allegedly charge fees to vendors that rent tables or booths at gun shows.  *Id.* ¶¶ 84, 92.

preliminary injunction." *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003). A plaintiff seeking an "injunction[] against the enforcement of statutes and regulations" must show that it is "more likely than not to prevail," a heightened standard given that such enactments "are entitled to a higher degree of deference and should not be enjoined lightly." *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022) (citation omitted). Because Plaintiffs bring a "facial challenge" prior to the Rule's enforcement, Plaintiffs must clear the "high hurdle" of "establish[ing] that no set of circumstances exists under which the [Rule] would be valid." *United States v. Stephens*, 594 F.3d 1033, 1037-38 (8th Cir. 2010) (citation omitted).

## ARGUMENT

### I. Plaintiffs Lack Standing And Fail To Establish Irreparable Harm.

Plaintiffs' demand for a preliminary injunction should be denied at the threshold because they fail to demonstrate that they have standing. To have Article III standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Young America's Found. v. Kaler*, 14 F.4th 879, 887 (8th Cir. 2021) (citation omitted). An injury confers standing only if it is "concrete and particularized," and "actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (citation omitted). Plaintiffs always bear the burden of establishing standing "as an 'indispensable part of [their] case.'" *ARRM v. Piper*, 319 F.Supp.3d 1156, 1160 (D. Minn. 2018) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)). And a plaintiff cannot meet that burden "[w]ithout factual allegations plausibly alleging that [it] actually suffered some kind of injury." *Holmbeck v. Solomon*, 639 F.Supp.3d 829, 845 (E.D. Ark. 2022).

Plaintiffs must also show that, in the absence of an injunction, "irreparable injury is *likely* . . . , not merely a possibility." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (cleaned up). To demonstrate irreparable harm, "a party must show that the harm is certain and great and of

12

such imminence that there is a clear and present need for equitable relief." *Morehouse Enters., LLC v. ATF*, 78 F.4th 1011, 1017 (8th Cir. 2023) (citation omitted).  A harm is generally irreparable "when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages." *Grasso Enters., LLC v. Express Scripts, Inc.*, 809 F.3d 1033, 1040 (8th Cir. 2016) (citation omitted).  But "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Sampson v. Murray*, 415 U.S. 61, 90 (1974).

Plaintiffs fail to plausibly establish that they have standing to seek preliminary injunctive relief and to make the requisite showing of irreparable harm.  *See Lawson v. DoorDash, Inc.*, 658 F.Supp.3d 707, 713 (W.D. Mo. 2023) (concluding that the plaintiffs' lack of standing "constitute[d] an independent basis for denying his Motion for Preliminary Injunction"); *see also Grasso Enters.*, 809 F.3d at 1040 ("Failure to show irreparable harm is an independently sufficient ground upon which to deny a preliminary injunction." (citation omitted)).

## A. The State Plaintiffs' Alleged Financial Injuries Fail To Establish Standing And Irreparable Harm

Twenty-one states, led by Kansas, challenge the Rule on multiple grounds, and they appear to base their standing to do so on the assertion that each "will suffer economic and other harms if the [Rule] goes into effect." Mem. 7.  Although the Rule exclusively regulates private individuals "engaged in the business" of firearms dealing, the State Plaintiffs nonetheless allege that the Rule will "harm[]" them in "two ways." Compl. ¶ 60.  But neither of those alleged harms are "concrete" and "imminent" enough to confer standing, nor are they irreparable.

### 1. The Rule's Incidental Effect On State Revenues Does Not Confer Standing Or Constitute Irreparable Harm

The State Plaintiffs' first alleged injury hinges on the following chain of possibilities: (1) the Rule, once effective, will "reduce the number of individuals who sell firearms, period"; (2) that

"expected decrease in individuals selling firearms will, in turn, decrease the number of vendors at gun shows"; (3) such a decrease in gun show vendors will "reduce the number of tables that are rented at gun shows"; and (4) "[s]tates that collect taxes or fees related to gun shows" will thus lose some unknown amount of revenue as a result. *Id.* ¶¶ 61–65.[10]  Plaintiffs also allege a similar future decrease in revenues derived from online firearms sales.  *See id.* ¶¶ 66–68.  But such incidental downstream effects of the Rule on state tax revenues does not constitute an injury in fact for purposes of standing for several independent but mutually reinforcing reasons.

To start, the Supreme Court long ago explained that a State may sue the federal government only if it has suffered a "*direct* injury" as a result of a federal action or policy.  *Florida v. Mellon*, 273 U.S. 12, 18 (1927).  In *Florida v. Mellon*, Florida challenged the constitutionality of a federal inheritance tax, and it argued that the tax would cause the State financial harm by "inducing potential taxpayers to withdraw property" and diminishing its tax base.  *Id.* at 17–18.  But the Court rejected that theory of standing, explaining that Florida needed to show a "direct injury," and that any harm caused by the tax was "purely speculative, and, at most, only remote and indirect."  *Id.* at 18.  And the Court reiterated this same principle less than a year ago when it observed that because "federal policies frequently generate indirect effects on state revenues or state spending," when a State "asserts . . . that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more

---

[10] Plaintiffs repeatedly allege that the Rule itself "estimates" that the "number of individuals who sell firearms" will decline by 10 percent after the Rule goes into effect.  Compl. ¶ 61.  But they misconstrue that figure.  The Rule summarizes the methods used by the Department of Justice to calculate "the population impacted by" the Rule.  Rule, 89 Fed. Reg. at 29,054.  And according to the Department's "subject matter expert-derived estimate," approximately 25 percent of currently unlicensed sellers are estimated "to be engaged in the business" under the Rule, and it was further estimated that roughly 10 percent of *those sellers* are "likely to be either unwilling or unable to become licensed."  *Id*; *see id.* at 29,066 ("[O]f the individual or new entities affected by this rule, the Department estimates . . . that 10 percent of *affected individuals* (or potential entities) may opt to stop selling firearms." (emphasis added)).  So, the Rule actually estimates that the number of currently unlicensed firearms sellers (not *all* sellers, which is what Plaintiffs cite) is expected to drop by roughly 2.5 percent (i.e., 10 percent of 25 percent), a substantially smaller decrease than what Plaintiffs allege.

attenuated." *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023); *see id.* ("[F]ederal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer."). The Eighth Circuit, too, has applied this bedrock principle to reject state standing premised on an assertion that administration of a federal program would injure a state due to "increased responsibility for the welfare and support of its affected citizens while its available tax revenues are declining." *State of Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985).

This principle clearly makes sense in light of the practical features of federal-state relations. Indeed, because virtually any federal action could conceivably have some incidental effect on state finances, the State Plaintiffs' reduced-revenue theory of standing would allow them to challenge nearly every federal policy to which their elected leaders object. Article III's standing requirements are not so boundless. *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) ("Are we really going to say that any federal regulation of individuals . . . that imposes peripheral costs on a State creates a cognizable Article III injury for the State to vindicate in federal court? If so, what limits on state standing remain?"). Accordingly, the alleged multi-step downstream effect of the Rule on the State Plaintiffs' gun show revenues is exactly the sort of incidental effect that fails to confer standing.

The State Plaintiffs' reduced-revenue theory also fails on its own terms. Most of the States tie this alleged harm to sales taxes that they impose on firearms sales. *See, e.g.*, Compl. ¶ 70 ("Plaintiff Arkansas also has a sales tax that applies to sale[s] of firearms at gun shows and online."); *id.* ¶ 75 (alleging that Kansas collects a 6.5% sales tax on sales of firearms during gun shows). And the State Plaintiffs suggest that the Rule will reduce their sales tax revenues by causing fewer firearms to be sold. But this bare assertion defies both logic and basic economic principles. For instance, even if the Rule marginally reduces the number of *individuals* who sell firearms, *id.* ¶ 61, that by no means compels the conclusion that the number of *firearms* sold will decrease in equal measure (or at all). To the contrary, it is entirely possible, if not expected, that those wanting to purchase firearms will just

go elsewhere, including to FFLs, to do so.  It is equally possible that the same quantity of firearms will be sold under such circumstances, just from a smaller pool of sellers.

A few State Plaintiffs suggest that the Rule will also cause a decrease in taxes that they specifically impose on admission tickets to gun shows and tables rented by gun show vendors.  *See, e.g.*, Compl. ¶ 70 (alleging that Arkansas "charges a 1% short-term-rental tax" on table rentals at gun shows); *id.* ¶ 75 (alleging that Kansas collects a 6.5% sales tax on gun show admissions).  But such an injury would depend on sales taxes not being paid by currently unlicensed firearms sellers who are impacted by the Rule; elect not to acquire a federal firearms license; and exit the firearms market entirely as a result — the epitome of an "indirect effect[] on state revenues" that does not amount to a cognizable injury in fact.  *Texas*, 599 U.S. at 680 n.3.

Additionally, the State Plaintiffs make no effort to quantify this alleged revenue loss, nor do they plausibly allege that such a loss will materialize in the first place.  For instance, even if some currently unlicensed firearms vendors choose not to participate in future gun shows because of the Rule, they could be readily replaced by other unlicensed vendors unaffected by the Rule, or by FFLs; indeed, gun shows would likely become more appealing to the latter, who would face less competition from unlicensed vendors that are not required to conduct background checks or comply with the GCA's recordkeeping requirements.  Nothing dictates that these new vendors would necessarily sell fewer firearms (thus causing States to collect less in sales taxes), or that gun show admissions would necessarily decline because a handful of unlicensed vendors exit the market.  Whether based on sales taxes or gun show taxes specifically, the State Plaintiffs' reduced-revenue theory of injury is simply too "conjectural" and "hypothetical" to satisfy Article III.  *Susan B. Anthony List*, 573 U.S. at 158.

That theory also implicates the well-settled rule that a plaintiff "cannot satisfy the causation element of the standing inquiry" when the injury in fact being alleged "is the result of actions by some third party" and "not the defendant."  *Miller v. Redwood Toxicology Lab'y, Inc.*, 688 F.3d at 935 (8th Cir.

16

2012) (citation omitted).  The State Plaintiffs' reduced-revenue theory suffers from this fundamental deficiency: the expected loss of sales tax revenues they allege would not be directly caused by the Rule, but rather by various "unfettered choices made" by myriad "independent actors not before the court[]" — including currently unlicensed firearms sellers, FFLs, gun show attendees, and firearms purchasers more generally — in response to the Rule.  *Lujan*, 504 U.S. at 562 (citation omitted).

Finally, even if some of the State Plaintiffs actually experience some loss in revenue that is sufficient to confer standing, that is not the end of the inquiry here.  To warrant a preliminary injunction, that revenue loss must be irreparable as well.  But even if, taking Plaintiffs' allegations at face value, any such dip in sales tax revenues is caused by a decrease in firearms sales as a result of the Rule, it follows that if the Rule is later set aside, those foregone sales would eventually take place.  And the State Plaintiffs would, in turn, receive sales tax revenues on those temporarily delayed sales.  The State Plaintiffs would thus eventually recover the lost revenues they allege, just "at a later date" following the "ordinary course of litigation," which is the opposite of irreparable.  *Sampson*, 415 U.S. at 90.

## 2. The Rule's Incidental Effect On State Background Check Procedures Also Does Not Confer Standing Or Constitute Irreparable Harm

The State Plaintiffs' second alleged injury is the increased "administrative costs" that the Rule will purportedly impose on two States.  *See* Compl. ¶ 108.  Federal law requires FFLs to run a background check through the NICS before transferring a firearm to a prospective purchaser, 18 U.S.C. § 922(t)(1)(A), and although ordinarily FFLs contact the federal government directly to perform background checks, federal regulations permit states to voluntarily serve as the point of contact for those background checks.  *See* 28 C.F.R. § 25.6(a) (noting that FFLs may initiate background checks in some instances by contacting a state Point of Contact); *id.* § 25.2 (defining "POC (Point of Contact)" as "a state or local law enforcement agency serving as an intermediary between [a federal firearm licensee] and the federal databases checked by the NICS . . . with express or implied authority

to perform POC duties pursuant to state statute, regulation, or executive order"). Tennessee and New Hampshire both require that FFLs run the background checks mandated by federal law through state agencies. *See id.* ¶¶ 95, 111.[11]   And both States allege that the Rule, once effective, will cause "a significant increase in the number of individuals becoming [FFLs]," which will lead to an "increase in background checks," which will in turn "result in an increase in administrative costs" incurred by the state agencies responsible for such background checks and a "reallocation of law enforcement resources." *Id.* ¶¶ 93, 107–08, 114.

This theory of standing fails for two independent reasons.  First, the expected increase in the number of FFLs would be a direct consequence of the BSCA's broadening of the definition of being "engaged in the business," meaning that any corresponding increase in background checks would be fairly traceable to the statute — which Plaintiffs do not challenge — rather than the Rule.  Second, any increase in administrative costs borne by Tennessee and New Hampshire would be the product of their own voluntary decision to take responsibility for conducting those background checks themselves. *See ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters*, 645 F.3d 954, 961 (8th Cir. 2011) ("A plaintiff who causes its own injury does not satisfy the traceability prong.").  While States are permitted to conduct federal background checks through NICS themselves, they are not required to do so; indeed, during a period when federal law mandated that state and local officials conduct background checks, the Supreme Court held that such requirements were impermissible. *See Printz v. United States*, 521 U.S. 898, 933 (1997).  Thus, if changes to federal firearms laws naturally require a greater number of background checks, and if a State elects to conduct those background checks itself (rather than having FFLs contact the NICS directly), any costs incurred by the State as a result of that voluntary arrangement are the sort of self-inflicted injury that fails to confer standing. *See ABF Freight Sys.*, 645

---

[11]   *See* FBI, About NICS, https://www.fbi.gov/how-we-can-help-you/more-fbi-services-and-information/nics/about-nics.

F.3d at 961; *cf. Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 418 (2013) (concluding that "respondents' self-inflicted injuries" were "not fairly traceable to" the government activity being challenged and thus "d[id] not give rise to standing").

Furthermore, although Plaintiffs generally assert that Tennessee and New Hampshire will bear "an increase in administrative costs" as a result of the Rule, they make no effort to even roughly quantify (1) how many more gun sellers in either State will likely obtain a federal firearms license, (2) what the corresponding increase in required background checks might be, and (3) what additional resources, if any, would be needed to handle such an increase. Put another way, Plaintiffs "do not explain the economic harm" they allege "in definite enough terms to show the extent of any harm is 'actual and not theoretical.'" *Morehouse Enters.*, 78 F.4th at 1018. Such "general allegations of *possible* or *potential* injury" fail to establish standing. *Zanders v. Swanson*, 573 F.3d 591, 594 (8th Cir. 2009). And they fail to clearly show irreparable harm as well. *See S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012) ("Speculative harm does not support a preliminary injunction.").

## B. The Individual Plaintiffs Lack Standing To Bring A Pre-Enforcement Challenge And Fail To Show Irreparable Harm

The individual plaintiffs in this case — Plaintiffs Journey, Black, and Maxey, *see* Compl. ¶¶ 3-5 — also fail to establish that they have standing, much less that they will be irreparably harmed by the Rule going into effect. Because these plaintiffs exclusively seek injunctive and declaratory relief, *see* Compl. ¶¶ 44-45, Demand for Relief, they must show that they face "an immediate threat" of future injury. *Frost v. Sioux City*, 920 F.3d 1158, 1162 (8th Cir. 2019) (citation omitted). That is, they must show that any alleged future injury is "certainly impending," or that there is a "substantial risk" that such injury "will occur." *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper*, 568 U.S. at 414 n.5).

The individual plaintiffs' alleged injury here hinges on the potential enforcement of the Rule's interpretation of the GCA against them for engaging in the business of dealing firearms without a license. More specifically, they collectively allege that they attend a few gun shows "every year," where

they buy firearms for and sell firearms from their "personal collection[s]."   Decl. of Phillip Journey ¶ 4, ECF No. 4-1 ("Journey Decl."); Decl. of Allen S. Black ¶ 4, ECF No. 4-2 ("Black Decl.").[12]   And the individual plaintiffs purportedly believe that if the Rule goes into effect, they will have to "give up selling firearms"; "register as a federal firearms licensee"; or "potentially be subject to civil, administrative, and possibly criminal penalties" for unlicensed dealing.   Journey Decl. ¶¶ 10, 24; Black Decl. ¶¶ 8, 13.   Potential future enforcement amounts to an Article III injury, however, only if the individual plaintiffs establish that they (1) "inten[d] to engage in a course of conduct"; (2) that intended future conduct is "arguably proscribed" by the Rule's interpretation of the GCA; and (3) "the threat of future enforcement" of the law "is substantial." *Susan B. Anthony List*, 573 U.S. at 161–64 (citation omitted).   The individual plaintiffs fail to satisfy this standard on multiple fronts.[13]

For one, none of the individual plaintiffs has plausibly claimed "any intent to engage in conduct" that is actually "proscribed" by the Rule's interpretation of the GCA.   *Missouri v. Yellen*, 39 F.4th 1063, 1069 (8th Cir. 2022).   The Rule will impact the individual plaintiffs only if their firearms-related conduct potentially amounts to being "engaged in the business" of dealing firearms under that interpretation, such that they would be required to obtain a federal firearms license or otherwise face consequences for unlicensed dealing.   *See* 18 U.S.C. §§ 922(a)(1)(A), 923(a).   But the conduct described in the individual plaintiffs' declarations does not rise to the level of being "engaged in the business" and thus would not subject them to any enforcement action.

---

[12] Notably, Maxey does not even assert that he sells firearms in any capacity.   *See* Decl. of Donald G. Maxey ¶ 4, ECF No. 4-4 ("Maxey Decl.") ("At . . . gun shows *I buy* firearms to add to my personal collection." (emphasis added)); *id.* ¶ 5 ("I have assembled [a personal firearms] collection over several years, and actively seek *to expand it* by attending gun shows in the future." (emphasis added)).   Any risk of future enforcement of the Rule's "engaged in the business" provisions against him thus appears to be nonexistent.

[13] Even if Maxey occasionally sells firearms from his personal collection, his other allegations regarding the Rule are materially indistinguishable from Journey's and Black's, meaning he would lack standing for the same reasons those two plaintiffs do.

Journey, for instance — whose declaration is by far the most detailed — avers that he "maintains a large personal collection of firearms" that he has "accumulated over many years" as a "firearms hobbyist and enthusiast." Journey Decl. ¶¶ 3-4; *see* Black Decl. ¶ 3 ("I am a firearms hobbyist and enthusiast who maintains a personal collection of firearms that includes handguns."); Maxey Decl. ¶ 3 (stating the same). Some of those firearms are "widely considered self-defense weapons," but many others are historical relics "of special interest." Journey Decl. ¶¶ 3, 5. Journey "attend[s] at least 4-5 gun shows every year," where he buys and sells firearms "to enhance [his] collection . . . by adding [ones] that [he] find[s] particularly interesting in terms of history, design and craftmanship." *Id.* ¶ 4; *see* Black Decl. ¶ 5 ("I presently have a large personal collection of firearms . . . which I actively seek to expand by attending gun shows . . . ."). His sales involve "trad[ing] up to a nicer model or better example of a historically significant model"; "free[ing] up funds or space for firearms that [he] would prefer to collect"; or "get[ting] rid of firearms that [he] simply no longer wish[es] to keep." Journey Decl. ¶ 4. And those sales were all "made in connection with [his] firearm collection and hobby." *Id.*; *see id.* ("I do not make any significant net profit from my hobby, nor is that my predominant purpose in collecting.").

Under the Rule's express terms, such occasional sales made for the purpose of "enhanc[ing]" a personal firearms collection, *id.* ¶ 4, *do not* qualify as being "engaged in the business of firearms dealing." The Rule defines a "personal collection" of firearms to include "[p]ersonal firearms that a person accumulates for study, comparison, [or] exhibition (*e.g.*, collecting curios or relics, or collecting unique firearms to exhibit," Rule, 89 Fed. Reg. at 29,090, which describes Journey's firearms collection almost to the letter, *see* Journey Decl. ¶¶ 4, 7. *See also* Maxey Decl. ¶ 5 ("I presently have a modest collection of antique firearms, some reproductions of antique firearms, [and] several modern sporting rifles and shotguns . . . ."). And both the Rule and the GCA explicitly exclude from the "engaged in the business" definition "a person who makes occasional sales, exchanges, or purchases of firearms

for the enhancement of a personal collection or for a hobby, or who sells all or part of the person's personal collection of firearms." Rule, 89 Fed. Reg. at 29,091; *see* 18 U.S.C. § 921(a)(21)(C); *see also* Rule, 89 Fed. Reg. at 29,092 ("A person *shall not be presumed to be engaged in the business* of dealing in firearms when reliable evidence shows that the person is only reselling or otherwise transferring firearms . . . [o]ccasionally to obtain more valuable, desirable, or useful firearms for the person's *personal collection*") (emphasis added). Thus, such occasional sales and purchases of firearms to enhance a personal collection would not trigger a licensing requirement under the GCA, as explained by the Rule, or otherwise subject Journey or the other two individual plaintiffs to potential civil or criminal penalties for unlicensed firearms dealing. Because there is no "realistic danger" that the Rule's "operation or enforcement" will "direct[ly] injur[e]" Journey, Black, or Maxey in any meaningful way, they lack standing. *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979); *see Christian Action League of Minn. v. Freeman*, 31 F.4th 1068, 1072 (8th Cir. 2022) ("[I]f the Statute doesn't prohibit [the plaintiff's] conduct, then [it] isn't affected by the Statute and has no injury in fact.").

Given that their planned conduct does not potentially implicate the Rule, the individual plaintiffs cannot manufacture an injury by claiming to be confused by the Rule's terms. Journey and Black assert that if the Rule goes into effect, they believe that they "will have to either give up selling firearms or register as a federal firearms licensee." Journey Decl. ¶ 10; *see* Black Decl. ¶ 8. *But see* Maxey Decl. (making no equivalent claim). But as just discussed, the terms of the GCA and the Rule make clear that neither plaintiff is engaged in the business based on the facts described in their respective declarations. Journey also contends that the Rule "makes portions of" his "lawful" firearms-related conduct "seem suspect," Journey Decl. ¶ 10, without identifying any particular presumption that could plausibly apply to him. These vague assertions cannot suffice to show standing to challenge any particular presumption.

Journey's further assertion that the Rule is "so convoluted, vague, and ambiguous that [he] . . . cannot determine what is prohibited versus what is allowed," *id.* ¶ 11, is precisely the sort of naked legal conclusion that the Court cannot credit for purposes of standing. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009); *cf. Zanders*, 573 F.3d at 594 (noting that "general allegations of *possible* or *potential* injury" do not sufficient to establish standing). Journey's assertion is also inaccurate. The GCA, as amended by the BSCA, establishes what firearms-related conduct is prohibited (e.g., engaging in the business of firearms dealing without a license) and permissible (e.g., making "occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby," 18 U.S.C. § 921(a)(21)(C)) under federal law. And the Rule — far from creating ambiguity or confusion — clarifies these general statutory provisions by, among other things, setting forth concrete fact patterns that help members of the public determine whether they are engaged in the business and require a license under the GCA.

The individual plaintiffs lack standing to bring a pre-enforcement challenge for a second reason: They fail to plausibly allege a credible threat that they would be subject to any sanctions as a result of their conduct. *See Susan B. Anthony List*, 573 U.S. at 164 (requiring that the "threat of future enforcement" against a plaintiff bringing a pre-enforcement challenge be "substantial").

The GCA prohibits any person other than a "licensed dealer" from "engag[ing] in the business of . . . dealing in firearms." 18 U.S.C. § 922(a)(1)(A). To be criminally liable under § 922(a)(1)(A), however, an individual must "*willfully*" engage in the business of dealing firearms without a license. *See id.* § 924(a)(1)(D) (emphasis added); *see also United States v. Tyson*, 653 F.3d 192, 200 (3d Cir. 2011) ("To obtain a conviction under [§ 922(a)(1)(A)], the government must show that the defendant (1) engaged in the business of dealing in firearms; (2) was not a federally licensed firearms dealer; and (3) *acted*

*willfully*." (emphasis added)).[14]  That distinction matters.  Far from ensnaring "unwitting" violators, the GCA imposes criminal liability only on those individuals who (1) engage in the business of unlicensed firearms dealing *and* (2) "act[] with knowledge that [such] conduct [is] unlawful."  *Bryan v. United States*, 524 U.S. 184, 191-92 (1998) (citation omitted); *see United States v. James*, 172 F.3d 588, 591 (8th Cir. 1999).

Per the individual plaintiffs' declarations, however, their firearms-related conduct could not be considered a willful violation of the GCA.  Despite merely being a firearms "hobbyist and enthusiast" who maintains a "personal collection" consisting mainly of "relics of special interest" and who occasionally sells firearms "to enhance" that collection — conduct that, as explained above, does not qualify as being "engaged in the business" — Journey still purportedly "fear[s]" that the Rule might at some point result in him being subject to civil and "possibly" criminal penalties.  Journey Decl. ¶¶ 3–5, 16, 24; *see* Black Decl. ¶ 13 ("I do not want to give up selling firearms at gun shows from my personal collection but this Final Rule makes me concerned that I will be subject to civil . . . and possibly criminal penalties if I do.").  Yet the fact that Journey's alleged conduct so closely matches the "personal collection" exclusion to the GCA's "engaged in the business" definition, *see* 18 U.S.C. § 921(a)(21)(C), combined with his professed uncertainty as to whether his conduct is "prohibited" or "allowed" under the Rule's interpretation of that definition, Journey Decl. ¶ 11, renders any prospect of him being subject to liability for *willfully* engaging in unlicensed firearms dealing "imaginary" and "speculative."  *Susan B. Anthony List*, 573 U.S. at 159-60 (requiring that a plaintiff bringing a pre-enforcement challenge allege a "credible threat of prosecution") (citations omitted).[15]  Nor does

---

[14] Similarly, civil forfeiture of firearms involved in unlicensed dealing requires showing a "willful" violation of the GCA, 18 U.S.C. § 924(d)(1), and prior violations of the statute or its implementing regulations can warrant the denial of a federal firearms license application only if those violations were committed "willfully," *id.* § 923(d)(1)(C).

[15] This does not suggest, of course, that a conviction under 18 U.S.C § 921(a)(1)(A) would be precluded by an individual's purported ignorance of the scope of federal firearms regulations.  Whether someone

Journey (or either of the other two individual plaintiffs) suggest that ATF has done anything to threaten enforcement of the Rule against him in any way.  *Cf. id.*, 573 U.S. at 165 (finding standing in part because the "specter of" civil enforcement against the specific plaintiff was "substantial").

Finally, in addition to their failure to show that they would be injured by the Rule at all, the individual plaintiffs fail to show that any of their alleged injuries are irreparable.  Plaintiffs contend that once the Rule becomes effective, the individual plaintiffs would face "three options, each of which" would cause "a unique harm."  Mem. 38.  But even assuming Plaintiffs' conclusory assertions about the Rule are true, the first purported harm — having to "stop buying and selling firearms for their personal collections," *id.* — would only be temporary; if the Rule were later held invalid, the individual Plaintiffs would no longer be constrained by the Rule in regards to their firearms purchases and sales.  The second — "becom[ing] a federal firearms licensee," *id.* — would not be necessary at this stage, given that the plaintiffs could temporarily refrain from selling firearms during the course of litigation.  And the third — "fac[ing] civil, administrative, and possibly even criminal penalties," *id.* — is wholly speculative.

### C.   CTAGA Also Lacks Standing And Fails To Show Irreparable Harm.

Plaintiffs' request for a preliminary injunction cannot be saved by CTAGA because it too lacks standing and fails to establish irreparable harm.  CTAGA alleges that it is directly harmed by the Rule and that the Rule also harms the organization's members.  But CTAGA lacks both forms of standing here.

---

engaged in the business of dealing in firearms without a license and did so "with knowledge that [such] conduct was unlawful" is inherently a fact-intensive inquiry.  *Tyson*, 653 F.3d at 200-01 (acknowledging that determining whether a defendant was "engaged in the business" is "subject to the idiosyncratic nature of the fact pattern presented").  The relevant question here is whether the individual plaintiffs have clearly shown that their firearms-related conduct will subject them to a credible risk of prosecution, *see Susan B. Anthony List*, 573 U.S. at 159, and they have not.

Starting with the alleged harm to CTAGA's members, CTAGA has failed to satisfy the basic requirement of identifying at least one such member who "would otherwise have standing to sue in their own right." *Iowa League of Cities v. EPA*, 711 F.3d 844, 869 (8th Cir. 2013) (citation omitted); *see Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (explaining that associational standing "require[s] plaintiff-organizations to make specific allegations establishing that at least one identified member" has suffered or will suffer harm).

The only purported members whom CTAGA identifies with any degree of specificity are Plaintiffs Black and Maxey. *See* Compl. ¶ 6 (alleging that Black and Maxey are members). Yet as explained above, both lack standing to challenge the Rule in their own right. That leaves CTAGA's other unnamed members, "many of whom" allegedly "buy and sell firearms for their personal collections at gun shows" and thus, according to Plaintiffs, would "arguably" be required "to become federal firearms licensee[s]" under the Rule. Compl. ¶ 118. As a threshold matter, the Eighth Circuit recently made clear that an organization "lacks associational standing to sue on behalf of unnamed members." *Religious Sisters of Mercy v. Becerra*, 55 F.4th 583, 602 (8th Cir. 2022). Moreover, the Supreme Court has unequivocally explained that the sort of vague assertion made by Plaintiffs here that some unidentified members somewhere in the United States might engage in some unidentified firearms-related conduct and, based on Plaintiffs' interpretation of the Rule, be forced to acquire a license is wholly inadequate to establish associational standing. *Summers*, 555 U.S. at 498 (noting that such a "novel approach to the law of [associational] standing would make a mockery of [the Court's] prior cases").

Indeed, CTAGA fails to even mention — let alone allege with the requisite specificity, *see Summers*, 555 U.S. at 498 — the frequency of their members' purported firearms sales; the number of firearms sold during those transactions; the types of firearms being sold; or whether the circumstances indicate that such sales are being made with the intent to "predominantly earn a profit" or for another

reason.  In short, CTAGA makes no effort to demonstrate whether its unnamed members are engaging in conduct arguably proscribed by the GCA, as clarified by the Rule, let alone whether that conduct would be subject to a "credible threat of prosecution."  *Susan B. Anthony List*, 573 U.S. at 159 (citation omitted).  Because CTAGA fails to identify even a single member who would "otherwise have standing to sue in their own right," it lacks standing to seek preliminary injunctive relief on its members' behalf.  *Iowa League of Cities*, 711 F.3d at 869.

CTAGA separately claims that it will be directly harmed by the Rule as well.  "An entity may assert organizational standing when a challenged action or statute directly injures the entity's interests," and establishing such standing requires satisfying the same three-part test of injury in fact, causation, and redressability.  *Ark. United v. Thurston*, 626 F. Supp. 3d 1064, 1077 (W.D. Ark. 2022).  CTAGA alleges that the Rule will harm it by "reduc[ing] the revenue" the organization "generates from its biannual gun shows."  Decl. of James Fry ¶ 8, ECF No. 4-3 ("Fry Decl.").  That is, CTAGA speculates that once the Rule becomes effective, the number of vendors at its gun shows will decrease because "those who are not federal firearms licensees will not be able to sell their firearms," which will in turn "decrease . . . overall attendance at the[] gun shows."  *Id.*[16]; *see id.* ¶ 5 ("Approximately 70% of [CTAGA's] annual operating expenses are covered by revenue generated by [its] two gun shows.").

This alleged future harm is far too speculative to constitute an injury in fact.  *See Arc of Iowa v. Reynolds*, 94 F.4th 707, 711 (8th Cir. 2024) ("If the risk [of future harm] is too speculative, Article III standing is lacking.").  And it is also too speculative to constitute irreparable harm.  *See S.J.W. ex rel. Wilson*, 696 F.3d at 779 ("Speculative harm does not support a preliminary injunction.").  To begin, CTAGA does not identify the relevant sources of revenue from its gun shows such that any claim of

---

[16] CTAGA errs in asserting that no unlicensed vendors will be able to sell firearms at gun shows under the Rule.  Such vendors will be able to do so if they "make[] occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby," 18 U.S.C. § 921(a)(21)(C), or if the circumstances do not otherwise indicate that they are "engaged in the business" of firearms dealing.

impending loss could be fairly evaluated.  CTAGA does not identify, for instance, how a decrease in attendance would impact its revenue.  Nor does CTAGA explain how a reduction in gun sales would cause a decrease in its revenue.  CTAGA notes that it collects fees related to renting tables to vendors, Fry Decl. ¶ 11, but fails to explain the revenue mechanism:  do vendors pay a fixed price for a table, or does CTAGA receive a portion of each vendor's sale proceeds?  Absent allegations explaining how or why revenue would decline, CTAGA's claimed injury is unduly speculative.  *See McNaught v. Nolen*, 76 F.4th 764, 771 (8th Cir. 2023) (finding the claimed injury speculative where the record was "devoid of any facts demonstrating *how* or *why*" the alleged injury would occur).

To the extent CTAGA's theory of decreased revenue can be discerned, moreover, it depends upon a "speculative chain of possibilities" involving "guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413-14.  Assuming, for instance, that CTAGA receives fees from each vendor, CTAGA fails to plausibly allege (1) how many of the vendors at its gun shows are typically unlicensed; (2) what proportion of the revenue generated at those gun shows is attributable to unlicensed vendors; (3) how many of those unlicensed vendors would actually be impacted by the Rule; (4) what proportion of those impacted vendors would then decide not to participate in future shows rather than acquire a license; (5) whether those vendors would be replaced (either by FFLs or unlicensed vendors unaffected by the Rule); or (6) whether, at the end of this "chain of contingencies," CTAGA will actually lose any revenue at all.  *Id.* at 410 (noting that such a "chain of possibilities" fails to satisfy "the requirement that threatened injury must be certainly impending").  That theory of injury is highly dependent on the actions of independent third parties — namely, unlicensed firearms vendors and gun show attendees — who are not before the Court. CTAGA therefore lacks standing under both of the theories it advances, and it fails to "clearly show[]" that it will suffer irreparable harm as a result of the Rule, *Morehouse Enters.*, 78 F.4th at 1017.

**II.     Venue Is Improper In This District Because No Plaintiff With Standing Resides Here**

Even if the Court were to conclude that some of the State or individual plaintiffs have standing, the lone plaintiff that resides in this district — Arkansas — assuredly does not. Accordingly, venue in this district is improper. *See Ga. Republican Party v. SEC*, 888 F.3d 1198, 1205 (11th Cir. 2018) (transferring a case for improper venue where the only party that satisfied venue lacked standing); *Miller v. Albright*, 523 U.S. 420, 427 (1998) ("[T]he District Court concluded that Mr. Miller did not have standing and dismissed him as a party. Because venue in Texas was therefore improper, . . . the court transferred the case to [another district where a defendant resided]." (citation omitted)). And the lack of venue means that this Court "lack[s] authority to grant" preliminary relief. *Hendricks v. Bank of Am., N.A.*, 408 F.3d 1127, 1135 (9th Cir. 2005) (noting that a venue defense "bear[s] on [a] district court's power to issue [an] injunction"); *see also Reading Health Sys. v. Bear Stearns & Co.*, 900 F.3d 87, 95 (3d Cir. 2018) ("We agree that threshold disputes over venue and jurisdiction should be resolved before merits disputes."); *Maybelline Co. v. Noxell Corp.*, 813 F.2d 901, 907 (8th Cir. 1987) (reversing a preliminary injunction because the "district court erred in failing to grant . . . motion to dismiss or transfer for improper venue").

In a civil action in which the defendant is the federal government, venue is proper "in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). Given that none of the federal defendants here "resides" in Arkansas and that none of the "events . . . giving rise" to the Rule's promulgation took place in the state, *id.*, the only possible basis for venue in the Eastern District of Arkansas is the fact that Arkansas is one of the State Plaintiffs. Compl. ¶ 1. As explained in detail above, however, Arkansas clearly lacks standing, which requires that it be dismissed from the case. *See, e.g., Associated Gen. Contractors of Am., Inc. v. Fed. Acquisition Regul. Council*, ---F. Supp. 3d---, 2024 WL 1078260, at *7 (W.D. La. Mar. 12,

2024) ("[T]he Court concludes that the Individual Plaintiffs do not have standing under Article III . . . , and they will be dismissed from this lawsuit without prejudice."). The remaining Plaintiffs — none of whom have standing in any event — reside elsewhere.[17] And as various federal courts have held, when the plaintiff that serves as the sole basis for venue in a particular judicial district lacks standing, venue in turn is improper.[18]

Because no plaintiff with standing resides in this district, venue is improper, and Plaintiffs' motion for preliminary injunction should be denied as a result.

## III.   Plaintiffs Are Not Likely To Succeed On The Merits Of Their Claims

### A.   The Rule Is Consistent With The GCA And ATF's Authority

#### 1.   The Rule Does Not Exceed ATF's Authority And Does Not "Redefine" Any Statutory Terms.

Plaintiffs first argue that the Rule must be set aside because it "redefines" the terms "dealer," "engaged in the business," and "principal objective of livelihood and profit," and defines various terms in the first instance in excess of ATF's delegated authority. Mem. 13 & n.3. Plaintiffs argue that "Congress expressly limited how much authority to grant Defendants in issuing firearms-related regulations," and the Rule therefore exceeds ATF's and the Attorney General's authority to

---

[17] The other State plaintiffs obviously do not reside in Arkansas. The three individual plaintiffs all reside in Kansas. *See* Compl. ¶¶ 3–5. And CTAGA resides in Kansas as well. *See id.* ¶ 6 ("[CTAGA is a Kansas not-for-profit corporation founded in 1957 in Wichita, Kansas.").

[18] *See, e.g., Ga. Republican Party*, 888 F.3d at 1205; *Mich. Ass'n of Pub. Sch. Acads. v. United States Dep't of Educ.*, ---F. Supp. 3d---, 2024 WL 455079, at *5 (W.D. Mich. Jan. 10, 2024) (finding that "the Western District of Michigan is no longer the venue best suited to adjudicate this matter" where the only Michigan plaintiff "lack[ed] standing" and the remaining plaintiffs were residents of Ohio and West Virginia); *Keane v. Velarde*, No. 3:20-cv-00977, 2021 WL 4248896, at *5 (D. Conn. Sept. 17, 2021) (transferring a case to the Southern District of New York because the "only party residing in Connecticut" was dismissed for lack of standing); *Inst. of Certified Pracs., Inc. v. Bentsen*, 874 F. Supp. 1370, 1372 (N.D. Ga. 1994) ("Having found that the Institute lacks standing to bring this action and has failed to state a claim upon which relief can be granted, plaintiff cannot manufacture venue by adding the Institute as a party."); *A.J. Taft Coal Co. v. Barnhart*, 291 F. Supp. 2d 1290, 1304 (N.D. Ala. 2003) ("Venue is proper in this court because at least one Alabama plaintiff had standing."); *see also In re Higgins*, No. 8:15-cv-103, 2015 WL 1651424, at *2 n.4 (D. Neb. Mar. 23, 2015) (noting that because the plaintiff "lack[ed] standing," the court "either lack[ed] jurisdiction or venue").

promulgate regulations "necessary" to implement the GCA. *Id.* at 13. However, while the statute places parameters on the exercise of the Attorney General's rulemaking authority under the GCA, there can be no dispute that it expressly vests in the Attorney General, and by delegation ATF, authority to prescribe "such rules and regulations as are necessary to carry out the provisions" of the GCA. 18 U.S.C. § 926(a); *see also, e.g., Firearms Regul. Accountability Coal., Inc. v. Garland*, __ F. Supp. 3d __, 2023 WL 5942365, at *2 (D.N.D. Sept. 12, 2023) ("The authority to administer and enforce the . . . Gun Control Act is vested in the Attorney General."). And "[b]ecause § 926 authorizes the [Attorney General] to promulgate those regulations which are 'necessary,' it almost inevitably confers some measure of discretion to determine what regulations are in fact 'necessary.'" *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475, 479 (4th Cir. 1990). In *Brady*, the court approved as "necessary" ATF regulations defining terms in the GCA. *See id.* at 480-81 (upholding ATF regulations defining "business premises" and "gun show or event"). Thus, ATF had authority to engage in necessary rulemaking, including the definition of terms left undefined by the statute.

ATF concluded that the Rule was necessary to provide "clarity" regarding when a federal firearms license was required and to "deter[]" unlawful unlicensed dealing, NPRM, 88 Fed. Reg. at 61,996, given that over its decades of enforcing the statute "ATF observed a significant level of noncompliance with the GCA's licensing requirements even prior to the BSCA," Rule, 89 Fed. Reg. at 29,086. And ATF further determined that the Rule would "improve public safety by helping to prevent persons who are prohibited from possessing firearms under Federal law from acquiring firearms and allowing law enforcement officers to trace firearms involved in crime." *Id.* at 28,987. These are unquestionably valid regulatory objectives that justified providing further clarity regarding the operation of statutory terms. *Brady*, 914 F.2d at 479; *see also infra*, pp. 46-48 (explaining that the Rule is not arbitrary and capricious because ATF explained why the Rule was necessary). To be sure, an agency may not "redefine" a statutory term inconsistently with unambiguous statutory text, *see* Mot.

13-14, but that does not mean an agency is constrained from exercising its authority in a manner *consistent* with the text. For the reasons explained elsewhere in this brief, the Rule is consistent with the GCA's text and does not "redefine" any statutory terms.

Plaintiffs argue that in addition to the general limitation on ATF to promulgate only "necessary" regulations, "contextual clues" from several "express delegations" of rulemaking authority to define terms in the GCA imply that "Congress didn't delegate authority to [ATF] to redefine the challenged terms in the Final Rule." Mem. 14-15. First, Plaintiffs contend that § 921(a) grants authority "to define only the term 'curios and relics.'" *Id.* at 14. Applying the statutory interpretation principle of *expressio unius*, Plaintiffs argue that the "express grant of authority" to define the single term in § 921(a) "strongly suggests Congress withheld that same authority for other terms." *Id.* at 15. But Plaintiffs' premise is mistaken. Section 921(a)(13) does not grant ATF some unique interpretive authority to define only "curios and relics," but rather states that ATF *must* use its general rulemaking authority to define those terms. 18 U.S.C. § 921(a)(13) ("curios and relics, as the Attorney General *shall* by regulation define….") (emphasis added). "It is a well-worn maxim that use of the term 'shall' reflects a mandatory imposition." *LIFE Rehab Servs. Inc. v. Allied Prop. & Cas. Ins. Co.*, 616 F. Supp. 2d 924, 934 (D. Minn. 2007). Plaintiffs are correct that no other section of § 921(a) directs ATF to define terms through rulemaking, but that is not because ATF lacks authorization to engage in such rulemaking. ATF simply is not compelled to do so by statutory directive. This straightforward reading of the statute also refutes Plaintiffs' other argument that the "express grant of authority to define 'curios and relics'" would be "redundant and unnecessary," and thus violate the "cannon against surplusage," if ATF had "implicit authority to define any other terms." Mem. 15. ATF does have such authority, not implicitly but by virtue of § 926, and there is no surplusage issue because § 921(a)(13) is not a separate grant of authority but a requirement to exercise authority that already exists.

Plaintiffs' argument fares no better with respect to §§ 922 and 923 of the GCA, which they argue confer an express authority to engage in rulemaking to the exclusion of all others. *See* Mem. 16. But those provisions simply address particular types of regulations issued by ATF; they do not purport to withdraw the general grant of rulemaking authority explicitly granted by Congress in § 926, which ATF has from the beginning relied upon to promulgate regulations interpreting the GCA's terms. *See, e.g., Blanton v. Kansas City S. Ry. Co.*, 33 F.4th 979, 983 (8th Cir. 2022) ("The provisions of a legislative act are . . . construed together and read in harmony with the entire act.") (alteration in the original) (citation omitted)). Additionally, like § 921(a)(13), § 923(a) & (b) both direct ATF to use its existing authority to promulgate regulations. 18 U.S.C. § 923(a) (referring to the conditions of "eligibility for licensing as the Attorney General shall by regulation prescribe…."); *id.* § 923(b) (*id.*).[19]

Plaintiffs also contend that the Rule's "redefinition" of terms cannot be characterized as "necessary" because the BSCA's amendment to the definition of "engaged in the business" was "extremely modest," and courts have already applied the definition for two years with "no sign that they have struggled to interpret any of its terms." Mem. 16. Through the BCSA, though, Congress adopted a significant change in the definition of "engaged in the business," and it is eminently reasonable and appropriate to provide guidance to the public regarding how that change will be implemented. ATF also provided a lengthy explanation for the myriad other reasons the Rule was warranted. *See* Rule, 89 Fed. Reg. at 28,972, 28,987-89, 28,993-95, 29,082-87. Plaintiffs have provided nothing of substance to contradict ATF's reasoned analysis. Moreover, it is by no means unusual for regulations to issue several years or more after the enactment or amendment of a statute, nor is the

---

[19] Plaintiffs do identify two subsections of § 923 which state the Attorney General may — as opposed to must — promulgate specific regulations. But those provisions authorize the Attorney General to impose specific requirements not contained in the GCA itself, *see* § 923(g)(1)(A) (regarding record-keeping obligations that the Attorney General may by regulations prescribe); § 923(g)(2) (regarding the nature of a bound volume of records that the Attorney General may by regulations prescribe). Again, those specific authorizations cannot plausibly be read to implicitly withdraw the more general grant of rulemaking authority in § 926. *See supra.*

purpose of regulations exclusively or even primarily to assist courts in making decisions.  As the Rule makes clear, it serves to clarify licensure requirements for firearms sellers as well as to assist the ATF in administering the GCA.

### 2.    ATF Properly Exercised Its Authority In Promulgating The Rule's Presumptions.

As explained above and in the Rule itself, the Rule identifies certain activities that give rise to rebuttable presumptions in civil and administrative proceedings that a person is engaged in the business, as defined in the GCA, pending consideration of additional evidence.  Rule, 89 Fed. Reg. at 29,091.  These presumptions help effectuate the GCA as revised and provide increased clarity, deter unlicensed dealing, and improve public safety.

Plaintiffs contend that ATF lacks authority to create presumptions at all.  The Supreme Court has said otherwise, and decades of precedent across the country have followed.  *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 804-05 (1945)) (for "a statutory presumption or one established by regulation, the validity . . . depends upon the rationality between what is proved and what is inferred.").  ATF, like any other federal agency, has general authority to promulgate regulations to effectuate its administration of the statutes it is charged with administering.  Such regulations can include presumptions when such presumptions establish a rational nexus between the facts found and the facts to be presumed.  *U.S. Steel Corp.,* 495 F.3d at 1284 ("Preliminarily, administrative agencies may establish presumptions, as long as there is a rational nexus between the proven facts and the presumed facts." (citation omitted)); *see also*, *e.g.*, *USX Corp. v. Barnhart*, 395 F.3d 161, 171 (3d Cir. 2004) ("Presumptions may, of course, be established both by legislative bodies and by administrative agencies, but their validity depends as a general rule upon a rational nexus between the proven facts and the presumed facts." (citation omitted)); *Cole v. USDA*, 33 F.3d 1263, 1267 (11th Cir. 1994) ("The law is well established that presumptions may be established by administrative agencies, as long as there is a rational nexus between the proven facts and the presumed facts."); *Holland Livestock Ranch v.*

*United States*, 655 F.2d 1002, 1005 (9th Cir. 1981) ("Administrative agencies are entitled to create evidentiary presumptions.").

As the cases above firmly establish, the creation of presumptions is an *inherent* power of an agency authorized to issue regulations or conduct adjudications and to administer a statute, regardless of whether the particular statute explicitly addresses presumptions. Moreover, "in challenging the validity of [a] regulatory presumption . . . [the Plaintiff] bears the heavy burden of demonstrating that there is no rational connection between the fact proved and the ultimate fact to be presumed." *Cole*, 33 F.3d at 1267; *id.* at 1268 ("It is the party challenging the validity of the presumption who must demonstrate that it is irrational.").

Plaintiffs attempt to confuse the issues by pointing out that the GCA is a criminal statute. Mem. 17. The argument appears to be that because the statute has criminal elements, and because an agency interpretation of a criminal statute is not entitled to deference, the GCA cannot abide presumptions, even where those presumptions only apply to civil and administrative proceedings. *Id.* This argument makes no sense. As noted above, promulgating presumptions is an inherent power of any agency and many, including ATF, administer statutes with criminal implications.

Plaintiffs rely predominantly on a concurrence by Justice Gorsuch to a denial of certiorari in *Guedes v. BATFE*, 140 S. Ct. 789, 790 (2004) (Gorsuch, J., concurring in denial of certiorari). There, Justice Gorsuch opined that, in interpreting criminal statutes, courts may not afford *Chevron* deference and "bear an 'obligation' to determine independently what the law allows and forbids." *Id.* at 791. But the concurrence did not suggest that agencies are prohibited from using presumptions outside of the criminal context. *See* Rule 89 Fed. Reg. 28,976; *id.* at 29,091 (27 C.F.R. § 478.13(c)) (clearly stating that the presumptions do not apply to criminal proceedings). Nor is there anything infirm in the Rule's unremarkable observation that the presumptions might nevertheless be "useful" to a criminal court. *See id.* at 28976 n.66 (explaining that a court in the exercise of its own authority could choose to use

the presumptions to inform permissive inferences in jury instructions only).  It is well settled that courts may so instruct juries on permissible presumptions.  *See, e.g.*, *United States v. Kocher*, 948 F.2d 483, 486 (8th Cir. 1991) (In criminal jury instructions, "[a] permissive presumption allows the jury to draw an inference from certain facts…[p]ermissive presumptions are constitutional so long as the inference to be drawn is not irrational.").

Notably, Plaintiffs do not challenge the rational nexus underlying any of the Rule's specific presumptions, and therefore have failed to carry their burden to invalidate them.  Their argument instead is an attack on the use of presumptions as a general matter.  But even if they had challenged the specific presumptions, such challenges would fail.  Each of the Rule's presumptions is supported in detail by reference to legal precedent, many decades of ATF's enforcement experience, statutory interpretation, and common sense.  *See, e.g.*, Rule, 89 Fed. Reg. 28,977-78; *id.* at nn.73-77, 79; *id.* at 29,030 (supporting the Rule's presumption that a person repeatedly purchasing or reselling unlawful firearms or through unlawful methods, 27 C.F.R. § 478.13(c)(2), is engaged in the business of dealing); *id.* at 28,981-82, n.100; *id.* at 29,049 (supporting the Rule's presumption that a person securing financial services for the purpose of accepting repetitive payments for firearms transactions, 27 C.F.R. § 478.13(d)(2)(iv), is intending to predominantly earn a profit from the sale of firearms).

**B.    The Rule's Definitions Of "Engaged In The Business" And "Personal Collection" Are Consistent With The GCA.**

**1.    The Rule Does Not Change The Statutory Definition of "Engaged In The Business."**

Plaintiffs contend that the Rule improperly redefines the definition of "engaged in the business" to "shift[] its focus to private sales by individuals," contrary to the intent of Congress. Mem. 18-21.  It does not.

As an initial matter, the Rule does not shift the focus of the GCA.  Congress amended the *statute* to encompass a broader class of conduct within the definition of "engaged in the business."

Congress replaced the phrase "with the principal objective of livelihood and profit" with "to predominantly earn a profit" to broaden the definition of engaged in the business by replacing one intent requirement with a broader intent requirement that did not include an intent to earn a "livelihood." *See* 89 Fed. Reg. at 28,972 & nn.30-31 (discussing BSCA's legislative history). All of the conduct that was encompassed by the earlier definition of engaged in the business is still regulated by the statute, and any conduct that was explicitly excluded from the statutory definition remains excluded. Congress's broadening of the statutory definition did not, as Plaintiffs suggest, shift the focus of enforcement from businesses to private individuals. Rather, it clarified that any person meeting the conditions of the statutory definition required licensure whether they did so with an intent to earn a livelihood or otherwise. *See id.* nn.30-31.

ATF's Rule advances the letter and intent of this statutory change. ATF concluded that the Rule was necessary to provide "clarity" regarding when a federal firearms license was required and to "deter[]" unlawful unlicensed dealing, NPRM, 88 Fed. Reg. at 61,996, given that "ATF observed a significant level of noncompliance with the GCA's licensing requirements even prior to the BSCA," Rule, 89 Fed. Reg. at 29,086. ATF further determined that the Rule would "improve public safety by helping to prevent persons who are prohibited from possessing firearms under Federal law from acquiring firearms and allowing law enforcement officers to trace firearms involved in crime." *Id.* at 28,987; *see also id.* at 28,972 nn.30-31 (reflecting Congress's public safety rationale for the BSCA amendments).

Plaintiffs are correct that the basic terms of the statutory definition should be given their ordinary meaning. Plaintiffs simply err in suggesting ATF failed to do so. For example, rather than implying some unstated bright-line distinction between regulated "commercial sellers" and unregulated "private sellers," the statute requires regulation of any person, operating individually or as a business entity, that satisfies the conditions of the statutory definition. *See* 18 U.S.C. § 921(a)(21)(C)

(stating that "a person" meeting the statutory conditions is engaged in the business as "a dealer in firearms").   Although a commercial firearms business more naturally meets all of the statutory conditions of being engaged in the business, as the BSCA and the Rule make clear, informal resellers of firearms, including individuals selling firearms through the internet, may also meet those conditions. *See* 89 Fed. Reg. at 28,972 & nn.30-31.

Plaintiffs separately argue that Congress's intent in earlier iterations of the GCA was to avoid imposing onerous licensure requirements on private individuals or limiting lawful private gun acquisition or ownership. Mem. 20-21. But the statute is quite clear:  Through the BSCA, Congress expressly expanded the language regarding what constitutes "engaged in the business."   The amended definition is not a "near carbon copy of FOPA's preexisting definition," *id.* at 21, but rather removes the requirement of an intent to earn a livelihood, a significant departure from and broadening of the scope of the statutory definition.   Plaintiffs identify no meaningful substantive divergence between the Rule and the statute, and instead resort to labeling the substantial changes Congress undertook as "minor."

In order for an individual to be engaged in the business of dealing in firearms under the GCA, the individual must "devote[] time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms."   18 U.S.C. § 921(a)(21)(C); *accord* Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a). Plaintiffs argue that these statutory terms imply consistent or repeated activity, whereas the Rule, by their reading, permits liability to attach based on the totality of the circumstances with no minimum number of firearms transactions, thus altering the statute's reach. Mem. 21-22. This argument misunderstands the nature of the presumptions.  As explained *supra*, the presumptions are rebuttable by reliable evidence.  In other words, as ATF explained in the Rule, certain facts — such as repetitively engaging in the sale of illegal firearms, *see* Rule, 89 Fed. Reg. 28,977-78; *id.* at nn.73-77, 79; *id.* at 29,030,

or repetitively reselling firearms within 30 days of purchase, *see* Rule, 89 Fed. Reg. at 29,031 & n.204; *id.* at 28,978-79 & nn.80-81 — logically support a rebuttable presumption that a person in fact meets all of the statutory conditions of being engaged in the business. Nevertheless, if the evidence demonstrates that, despite the presumption, that person actually has not met one or more of the elements of the statutory definition, they would not be found to be engaged in the business of dealing. Thus, nothing about the use of presumptions alters the statutory requirements in any way.[20]

Finally, Plaintiffs state that "[i]f Defendants really seek[] to use the Final Rule to implement universal background checks . . . that would create a 'major question.'"  Mem. 19.  It is unclear why Plaintiffs are speculating about universal background checks here.  ATF explicitly stated in the Rule's preamble that the Rule *does not* implement universal background checks.  *See* Rule, 89 Fed. Reg. 28,987. And Plaintiffs do not even appear to contend that it does.  The Rule is clear that it does not require all sellers of firearms to become licensed.

### 2.    ATF Is Authorized To Define "Personal Collection" And The Definition Does Not Conflict With The Statutory Meaning.

Plaintiffs contend both that 1) ATF lacks authority under the GCA to define the statutory term "personal collection" and 2) the definition established by the Rule is an impermissible interpretation of the statute and a violation of the Second Amendment.  Mem. 22-23.  Neither of these contentions holds water.

First, as explained above, ATF has delegated authority to establish "regulations necessary to effectuate the statute."  The term "personal collection" is entirely undefined by the statute, but serves as the basis for an exception to the "engaged in the business" definition that is potentially so broad

---

[20] Plaintiffs also profess confusion about how one firearm transaction might combine with "other evidence" to implicate the presumptions, faulting ATF for not providing a clear example of how that might work.  But the Rule does provide such an example.  *See* Rule 89 Fed. Reg. 29,091 (27 C.F.R. § 478.13(b)) (discussing circumstance where an individual engaging in a single transaction also shows a willingness and ability to purchase more firearms for resale).

that it could swallow the rule almost entirely.  If "personal collection" were to be interpreted as "firearms owned by a person," as Plaintiffs appear to be suggesting, then no "occasional sales, exchanges, or purchases of firearms" could be regulated.  *See* 18 U.S.C. § 921(a)(21)(C).  Since the BSCA amendment made clear that Congress did not intend that only the purchase and sales of formal firearms businesses be regulated, such a conclusion clearly is not a tenable interpretation of the statute.  To prevent such an outcome, the meaning of "personal collection" is an obvious circumstance in which it is "necessary" for ATF to exercise its rulemaking authority.

Second, the actual terms of the definition are well supported by a common-sense understanding of the statute and the generally accepted definition of a "collection."  Plaintiffs rely heavily on dictionary definitions of relevant terms to imply that ATF is improperly changing the meaning of the statute, Mem. 18–19, but do not address the fact that the definition of "personal collection" is premised on just such a definition.  The Rule distinguishes between the set of firearms a person owns for any purpose and "[p]ersonal firearms that a person accumulates for study, comparison, exhibition, . . . or for a hobby."  Rule, 89 Fed. Reg. 29,090 (27 C.F.R. § 478.11).  ATF explains in detail that the "definition is from standard dictionary definitions" of the term "collection," which means "an accumulation of objects gathered for study, comparison, or exhibition or as a hobby."  *Id.* at 29,038; *id.* at n.216 (citing the definition of "collection" in two well-known dictionaries).  Moreover, the definition "is consistent with how the GCA views a 'collection,'" as the statute "defines the term 'collector' as 'any person who acquires, holds, or disposes of firearms as curios or relics,'" and ATF regulations (at the direction of Congress) have long further defined "curios and relics" as "'[f]irearms which are of special interest to collectors by reason of some quality other than is associated with firearms intended…as offensive or defensive weapons.'"  *Id.* (quoting 18 U.S.C. § 921(a)(13); 27 C.F.R. § 478.11).  Finally, the Rule cites to various legal precedents antecedent to the BSCA which limit the definition of a collection in this manner.  *Id.* at n.217.

40

This well-developed explanation refutes Plaintiffs' remaining arguments concerning the definition of "personal collection."  Plaintiffs contend that excluding from the definition of personal collection "firearms accumulated primarily for personal protection" contradicts the intent of the statutory definition and violates the Second Amendment right to acquire firearms for personal defense.  Mem. 23.  Firearms accumulated primarily for personal protection fit within neither the ordinary meaning of "collection," *see* Webster's Third New International Dictionary 444 ("an assembly of objects or specimens for the purposes of education, research, or interest"), nor the GCA's definition of "collector," 18 U.S.C. § 921(a)(13) ("any person who acquires, holds, or disposes of firearms as curios or relics").  Again, Plaintiffs' disagreement is with the terms used by Congress.  However, as the Rule explains, excluding firearms acquired for personal protection from the definition of a personal collection effectuates the statutory restrictions on dealing firearms.  "[I]ncluding all firearms usable for self-defense in the definition of 'personal collection' is inconsistent with the statutory scheme" and would "allow the limited definitional exclusion for enhancing and liquidating a personal collection to swallow the rule . . . because one could nearly always claim that a firearm was purchased or sold to improve or liquidate the firearms one keeps for self-defense."  Rule, 89 Fed. Reg. 29,038-39.  Therefore, including firearms accumulated primarily for personal protection in the definition of personal collection both would be inconsistent with the common definition of collection and would undermine the central purpose of the GCA.  *See Pugin v. Garland*, 599 U.S. 600, 607 (2023) (courts "should not lightly conclude that Congress enacted a self-defeating statute." (citation omitted)).  ATF acted within its delegated authority to exclude such firearms from the Rule's definition.

Nor is there any genuine Second Amendment concern with this exclusion.  The definition itself has no bearing on any person's ability to purchase or sell firearms for personal protection; it simply means "persons who buy or sell such firearms cannot avail themselves of the statutory exception for personal collections" for those firearms.  Rule, 89 Fed. Reg. 29,039.  Under the Rule,

being engaged in the business still requires that a person "devote[] time, attention, and labor to dealing in firearms as a regular course of trade or business" with the predominant intent "of obtaining pecuniary gain" "through the repetitive purchase and resale of firearms." *Id.* at 29,091 (27 C.F.R. § 478.13(a), (d)(1)); *accord* 18 U.S.C. § 921(a)(21)(C). An individual selling firearms acquired for personal protection will not be considered as engaged in the business unless those requirements are met. Indeed, the definition explicitly states "that nothing in this definition shall be construed as precluding a person from lawfully acquiring firearms for self-protection or other lawful personal use." *Id.* at 29,090 (27 C.F.R. § 478.11).

## C. The Rule Is Not Unconstitutionally Vague

Under the Fifth Amendment's Due Process Clause, a statute or rule is unconstitutionally vague only if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Adam & Eve Jonesboro, LLC v. Perrin*, 933 F.3d 951, 958 (8th Cir. 2019) (quoting *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012)). To establish that a law is unconstitutionally vague on its face, "the complainant must demonstrate that the law is impermissibly vague in all of its applications." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 497 (1982). Only if an enactment "is vague as applied to the [party's] conduct . . . will [courts] consider whether [it] is facially unconstitutional." *United States v. KT Burgee*, 988 F.3d 1054, 1060 (8th Cir. 2021).

Plaintiffs cannot make that showing. Far from being vague, the Rule provides clarity by setting forth specific circumstances that give rise to presumptions that a person is engaged in the business of dealing in firearms or has the predominant intent to earn a profit, while also setting forth specific types of conduct that do not constitute being engaged in the business of dealing and can be used to rebut the presumptions.

For the most part, Plaintiffs attempt to establish vagueness by positing hypothetical

circumstances — prefaced by "[i]magine," "[i]f," "[w]hat if," and "suppose that," Mem. 24–26 — under which the application of the Rule would purportedly be unclear. But "[a] vagueness challenge . . . does not permit a plaintiff to 'speculat[e] about possible vagueness in hypothetical situations not before the Court.'" *Adam & Eve Jonesboro*, 933 F.3d at 959 (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)).

In any event, the Rule even provides fair notice regarding Plaintiffs' hypotheticals. For example, Plaintiffs ask whether it would constitute being engaged in the business for a person to offer to "sell[] a hunting rifle from his collection in order to purchase one with [a] more historical pedigree." Mem. 24. The Rule provides that being engaged in the business "shall not include a person who makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby," 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)), and further provides that "hunting" is a "hobby," *id.* at 29,090 (27 C.F.R. § 478.11).

Plaintiffs argue that two provisions regarding personal collections, 27 C.F.R. §§ 478.13(e)(2), (e)(4), are internally contradictory, Mem. 25, but that is not so. A person is not engaged in the business if the person is selling firearms merely "[t]o liquidate (without restocking) all or part of the person's personal collection," Rule, 89 Fed. Reg. at 29,092 (27 C.F.R. § 478.13(e)(4)); *see also id.* at 29,091 (27 C.F.R. § 478.13(a)), even if the personal collection being liquidated is large; this is consistent with the statutory text providing that being engaged in the business excludes a person "who sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C). But if a person is seeking to *enhance* a personal collection (i.e., "to obtain more valuable, desirable, or useful firearms for the person's personal collection"), that activity is excluded from the definition of engaged in the business (and can be used to rebut a presumption that a person is engaged in the business) only if the activity is "[o]ccasional[]." Rule, 89 Fed. Reg. at 29,092 (27 C.F.R. § 478.13(e)(4)). Again, that is consistent with the statute, which excludes "a person who makes occasional sales, exchanges, or purchases of firearms

for the enhancement of a personal collection or for a hobby." 18 U.S.C. § 921(a)(21)(C). The Rule's provisions regarding personal collections give fair notice to the public and are both internally consistent and consistent with statutory text.

Plaintiffs ask whether a firearm is part of a personal collection if the person acquired it for study, comparison, and exhibition, but sells it to a person who wants to use it for self-defense. Mem. 26-27. Here, the Rule makes clear that the definition of personal collection hinges on the purpose for which "a person accumulates" the weapon. 89 Fed. Reg. at 29,090 (27 C.F.R. § 478.11).

Plaintiffs also argue that the Rule is subject to arbitrary enforcement because it states that the presumptions are not exhaustive of the conduct or evidence that can be considered in determining whether a person is engaged in the business of dealing in firearms. Mem. 27 (citing Rule, 89 Fed. Reg. at 29,092 (27 C.F.R. § 478.13(g)). Yet if a situation does not fall within a presumption, it is subject to the Rule's general definition, which, consistently with the statute, defines "engaged in the business" as "[a] person who devotes time, attention, and labor to dealing in firearms as a regular course of trade or business to predominantly earn a profit through the repetitive purchase and resale of firearms." Rule, 89 Fed. Reg. at 29,091 (27 C.F.R. § 478.13(a)); *accord* 18 U.S.C. § 921(a)(21)(C). That standard both provides fair notice to regulated parties and reasonably constrains enforcement activity.

Plaintiffs try to demonstrate vagueness by arguing that there could be some close cases in applying the Rule, but even if that were true, "the existence of a close case in the application of a statute" — or here, a regulation — "does not render it unconstitutionally vague." *United States v. Ghane*, 673 F.3d 771, 778 (8th Cir. 2012). Indeed, the statutory definition (which Plaintiffs do not contend is unconstitutionally vague) uses general language that could undoubtedly lead to close cases, such as "devotes time, attention, and labor" and "regular course of trade or business." 18 U.S.C. § 921(a)(21)(C). "[M]ost statutes must deal with untold and unforeseen variations in factual situations, and the practical necessities of discharging the business of government inevitably limit the specificity

44

with which legislators can spell out prohibitions." *Boyce Motor Lines v. United States*, 342 U.S. 337, 340 (1952). The Supreme Court and the Eighth Circuit have rejected vagueness challenges to criminal laws imposing standards as open-ended as: "near" a courthouse, *Cox v. Louisiana*, 379 U.S. 559, 568 (1965); "unreasonably low prices," *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 31-33 (1963); "anything of value," *United States v. Cook*, 782 F.3d 983, 988 (8th Cir. 2015); and "conduct that by its nature is a sex offense against a minor," *United States v. KT Burgee*, 988 F.3d 1054, 1060 (8th Cir. 2021) (citation omitted). The Rule, by setting forth numerous specific examples of conduct that presumptively does constitute or does not constitute being engaged in the business of dealing in firearms, is even more precise and therefore not void for vagueness.

### D. The Rule Is Not Arbitrary And Capricious

Plaintiffs wrongly contend that the Rule is arbitrary and capricious. The arbitrary and capricious standard "is a highly deferential standard of review." *Adventist Health Sys./SunBelt, Inc. v. HHS*, 17 F.4th 793, 803 (8th Cir. 2021). "[T]he role of courts in reviewing arbitrary and capricious challenges is to simply ensure that the agency has acted within a zone of reasonableness." *Biden v. Missouri*, 595 U.S. 87, 96 (2022) (citation omitted). The reviewing court "defers to agency action so long as an agency examined the relevant data and articulated a satisfactory explanation for its action." *Adventist Health Sys./SunBelt*, 17 F.4th at 803 (cleaned up). "A court cannot substitute its judgment for that of the agency." *Id.* (citation omitted). "If an agency's determination is supportable on any rational basis, a court must uphold it." *Org. for Competitive Mkts. v. USDA*, 912 F.3d 455, 459 (8th Cir. 2018) (citation omitted). The Rule easily meets that standard.

### 1. The Rule Reasonably Explains Departures From Past Practices

Plaintiffs claim incorrectly that the Rule did not acknowledge or explain departures from past practices. Mem. 29-30. A change in agency policy requires only that "the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which

the conscious change of course adequately indicates." *Northport Health Servs. v. HHS*, 14 F.4th 856, 875 (8th Cir. 2021).

In the Rule's preamble, ATF explained what aspects of the Rule differed from past practice and the reasons for those changes.  ATF acknowledged that it had not previously promulgated a regulation providing a detailed definition of "engaged in the business" of dealing, and in fact decided not to do so in 1980.  *See* Rule, 89 Fed. Reg. 28,969-70.  Yet ATF concluded that the Rule was necessary, in part, "[t]o implement the new statutory language in the BSCA," *id.* at 28,972, which expanded the statutory definition of engaged in the business.  ATF further explained that the Rule was necessary to provide "clarity" regarding when a federal firearms license was required and to "deter[]" unlawful unlicensed dealing, NPRM, 88 Fed. Reg. at 61,996, given that "ATF observed a significant level of noncompliance with the GCA's licensing requirements even prior to the BSCA," Rule, 89 Fed. Reg. at 29,086.  ATF further determined that the Rule would "improve public safety by helping to prevent persons who are prohibited from possessing firearms under Federal law from acquiring firearms and allowing law enforcement officers to trace firearms involved in crime." *Id.* at 28,987.

ATF thus adequately justified the change by citing valid regulatory objectives, including public safety.  *See Gardner v. Grandolsky*, 585 F.3d 786, 793 (3d Cir. 2009) (holding that agency regulation was not arbitrary and capricious because it furthered "legitimate" objective of "protecting the public safety"); *Licon v. Ledezma*, 638 F.3d 1303, 1311 (10th Cir. 2011) (regulation was not arbitrary and capricious because agency reasonably explained that it promoted "public safety").

### 2.    The Rule Adequately Considered Reliance Interests

Plaintiffs argue that the Rule did not consider reliance interests of states in the preexisting regulatory scheme. Mem. 30. Yet ATF explicitly acknowledged that the Rule would lead to an increase in sellers becoming licensed, an increase in background checks, and a decrease in the number of private

sellers, and that certain states run their own background checks.  Rule, 89 Fed. Reg. at 28,998, 29,054, 29,065.  And ATF meticulously estimated the costs of the Rule, *id.* at 29,070-82, and having done so, concluded that the Rule's substantial benefits, including "significant public safety benefits," *id.* at 29,082-86, outweighed those costs.  Plaintiffs identify no flaws in that cost-benefit analysis.  The Rule is designed to "increase compliance with the GCA's licensing and recordkeeping requirements."  *Id.* at 29,083.  ATF rationally concluded that it was not precluded from acting by any purported reliance interests in widespread violations of the GCA, which allow dangerous individuals such as felons to obtain firearms without background checks in untraceable transactions. *See Northport Health Servs.*, 14 F.4th at 876 (noting that the agency in question "reasonably explained the departure from . . . prior policy in spite of . . . reliance interests").

### 3.    The Rule's Explanations Are Reasonable And Plausible

In arguing that ATF's explanations for the Rule are so "implausible" as to be arbitrary and capricious, Mem. 30, Plaintiffs mostly rehash their statutory arguments.  Plaintiffs argue that the Rule does not "clarif[y]" matters but instead "makes it impossible to identify" what is covered by the Rule. Id. at 30-31.  As explained above, the Rule clarifies the application of the statutory definition of engaged in the business by, for example, setting forth specific examples of conduct that presumptively does, and does not, rise to the level of engaging in the business of dealing.

Plaintiffs also argue that ATF failed to plausibly explain the Rule's definition of "personal collection."  Mem. 32.  As explained above, that definition is lawful.  More important for the arbitrary and capricious analysis, ATF rationally explained how it formulated its definition to be consistent with dictionary definitions, case law, the definition of "collector" in another provision of the GCA, and the existing regulatory definition of "curio or relic."  Rule, 89 Fed. Reg. at 28,980-81, 29,037-40.

Plaintiffs argue, without basis, that the Rule is a politically motivated attack on gun shows. Yet the Rule makes clear that it treats purchases and sales at gun shows the same as such activities

47

anywhere else by defining "Dealer" to be a "person engaged in the business of selling firearms," and encompasses "such activities wherever, or through whatever medium, they are conducted," listing gun shows as just one item in a long, non-exhaustive list of venues where such activities may occur. *Id.* at 29,090 (27 C.F.R. § 478.11). ATF explained that this definition reflects statutory text, because "there is no statutory exemption under the GCA for unlicensed persons to engage in the business of dealing in firearms at a gun show, or at any other venue." *Id.* at 28,989. ATF further explained that the list of venues at which firearms dealing could take place is also consistent with decades of case law and ATF practice. *See id.* at 28,973-74 & nn.35-46.

Finally, Plaintiffs argue that the Rule is "implausible" because it requires "universal background checks." Mem. 33. Plaintiffs mischaracterize the Rule. ATF explained that the Rule does *not* require "universal background checks" because it "does not require unlicensed individuals who are not engaged in the business of manufacturing, importing, or dealing in firearms to run background checks for private firearm sales between individuals." Rule, 89 Fed. Reg. at 28,987.

### E.   Plaintiffs Are Not Likely To Succeed On Their Second Amendment Claim

The Rule comports with the Second Amendment. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court made clear that "longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures," *id.* at 626-27 & n.26, and the Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022), "did nothing to disturb that part of *Heller.*" *McRorey v. Garland*, __ F.4th __, 2024 WL 1825398, at *3 (5th Cir. Apr. 26, 2024).

In *Bruen*, both the majority opinion and Justice Kavanaugh's concurrence affirmed the constitutionality of "'shall-issue' licensing regimes," in which the right to carry weapons is conditioned on passing a "background check" and obtaining a license. *Bruen*, 597 U.S. at 38 n.9; *see also id.* at 80 (Kavanaugh, J., concurring). And the Fifth Circuit recently held that the background check

requirements of the BSCA are constitutional, even though those background checks may delay an individual's ability to purchase a firearm.  *McRorey*, 2024 WL 1825398, at \*5-6.  A requirement that firearms dealers be licensed has an even more attenuated relationship to the right protected by the Second Amendment's text than such requirements, and it is no surprise that courts both before and after *Bruen* have regularly rejected arguments that the Second Amendment precludes regulation of those engaged in the business of dealing firearms.  *See, e.g.*, *Teixeira v. Cnty of Alameda*, 873 F.3d 670 (9th Cir. 2017) (en banc); *United States v. Flores*, 652 F. Supp. 3d 796 (S.D. Tex. 2023).[21]

Plaintiffs note, correctly, that some courts have held that the Second Amendment's right to keep a weapon implies a right to purchase a weapon.  *See, e.g.*, *Teixeira*, 873 F.3d at 677 ("the core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms" (citation omitted)).  But that hardly suggests an unfettered right to engage in the business of dealing firearms without regulations such as licensing.  Indeed, such "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures," *Heller*, 554 U.S. at 626-27 & n.26.

The cases cited by Plaintiffs are not to the contrary.  *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011), held that the Second Amendment protected a right to practice shooting at a firing range, not to engage in the business of dealing firearms without a license.  In *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), the court noted in dicta that there may be a "constitutional defect in prohibiting the commercial sale of firearms," but the court did not suggest that mere regulations on commercial sales would violate the Second Amendment.  *Id.* at 92 n.8.  Plaintiffs do not and cannot

---

[21] *See United States v. Duncan*, Case No. 7:20-cr-00167-M-3, 2023 WL 7346042, at \*3 (E.D.N.C. Nov. 7, 2023) ("impos[ing] a condition, namely licensing, on firearms commerce . . . does not violate the Second Amendment"); *United States v. King*, 646 F. Supp. 3d 603, 607 (E.D. Pa. 2022) ("the Second Amendment does not protect the *commercial* dealing of firearms"); *United States v. McNulty*, ---F Supp.3d.---, 2023 WL 4826950, at \*4 (D. Mass. July 27, 2023); *United States v. Tilotta*, Case No. 3:19-cr-04768-GPC, 2022 WL 3924282, at \*5 (S.D. Cal. Aug. 30, 2022).

claim that the Rule prohibits the commercial sale of firearms. There are currently more than 49,000 federally licensed firearms dealers,[22] and the Rule is likely to lead to more people and businesses becoming licensed. Individuals can also acquire firearms from unlicensed parties whose firearms sales activity falls short of being engaged in the business of dealing under the Rule's interpretation of the GCA.

The GCA's modest requirements for commercial sales are, moreover, "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17. As ATF explained in the Rule's preamble, "there is a robust historical tradition supporting the Government's authority to require licenses and inspection of firearms sellers." Rule, 89 Fed. Reg. at 29,002. For example, in 1794, Congress enacted a law temporarily making it unlawful "to export from the United States any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenades, gunpowder, sulpher, or saltpetre," Act of May 22, 1794, 1 Stat. 369, ch. 33, § 1, making clear that the Founding generation believed that it was constitutionally permissible to regulate arms sales.

Colonies and states in the early republic also regulated firearms commerce. Several states or colonies, including Massachusetts in 1651 and 1809, Connecticut in 1775, and New Jersey in 1776, required licenses or inspection to export or sell gunpowder, which was necessary to operate a firearm.[23]

---

[22] *See* ATF, Complete Federal Firearms Listings, https://www.atf.gov/firearms/listing-federal-firearms-licensees/complete?field_ffl_date_value%5Bvalue%5D%5Byear%5D=2024&ffl_date_month%5Bvalue%5D%5Bmonth%5D=4. In the Excel spreadsheet linked on that page, rows with "01" for "LIC_TYPE" in Column D are licensed dealers in firearms other than destructive devices.
[23] *See* Colonial Laws of Massachusetts Reprinted from the Edition of 1672, at 126, Powder (1890) (1651 statute requiring license to export gunpowder); 2 General Laws of Massachusetts from the Adoption of the Constitution to February, 1822, at 198-200, ch. 52, An Act Providing for the Appointment of Inspectors, and Regulating the Manufactory of Gun-Powder, secs. 1, 8 (1823) (1809 statute providing for the appointment of an "inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder," and imposing penalties for any sale or export of gunpowder "before the same has been inspected and marked"); 15 The Public Records of the Colony of Connecticut, from May, 1775, to June, 1776, Inclusive 191, An Act for Encouraging the Manufactures of Salt Petre and Gun Powder (1890) (1775 Connecticut law establishing, among other

Massachusetts in 1805 and Maine in 1821 required pistol barrels to be "proved," meaning inspected and marked, before they could be sold.[24]  In concluding that "[t]he historical record confirms that the right to sell firearms was not within the 'historical understanding of the scope of the [Second Amendment] right,'" *Teixeira*, 873 F.3d at 683 (citations omitted), the Ninth Circuit cited additional historical materials showing that many colonies enacted restrictions on commercial sales of firearms to Indians, and Connecticut and Virginia "controlled more generally where colonial settlers could transport or sell guns," *id.* at 685.

Plaintiffs entirely ignore this historical evidence.  The only historical evidence cited by Plaintiffs is a law review article noting that during and immediately before the Revolutionary War, the colonists resisted efforts by the British to prohibit entirely the imports of firearms and ammunition into the colonies.  Mem. 35 (citing David B. Kopel, *Does the Second Amendment Protect Firearms Commerce*, 127 HARV. L. REV. F. 230, 234-35 (2014)).  At most, this evidence suggests that a total ban on firearms commerce would be constitutionally suspect.  Yet even the law review article cited by Plaintiffs acknowledges that "regulation of how firearms are commercially sold enjoys a presumption of constitutionality."  Kopel, *supra*, at 230.  The extensive history of colonies, states, and the federal government regulating firearms commerce provides a "historical *analogue*," *Bruen*, 597 U.S. at 30, which demonstrates that the Rule is consistent with historical tradition.  Plaintiffs may argue that the Court

---

things, that no gunpowder manufactured in the colony "shall be exported out" of the colony "without [an applicable] licence"); Acts of the General Assembly of the State of New-Jersey, at a Session Begun at Princeton on the 27th Day of August 1776, and Continued by Adjournments 6, ch. 6, An Act for the Inspection of Gun-Powder, § 1 (1877) (No person shall offer any gunpowder for sale "without being previously inspected and marked as is herein after directed."); Laws of the State of New Hampshire; With the Constitutions of the United States and of the State Prefixed 276-78, An Act to Provide for the Appointment of Inspectors and Regulating the Manufactory of Gunpowder, secs. 1, 8 (1830) (authorizing "inspector of gunpowder for every public powder magazine, and at every manufactory of gunpowder in this state" and imposing penalties for any sale or disposition of gunpowder "before the same has been inspected and marked").
[24] *See* 3 Laws of the Commonwealth of Massachusetts, from November 28, 1780, to February 28, 1807, at 259–61 (1807); 1 Laws of the State of Maine 546 (1830).

should disregard this history because the historical regulations did not regulate firearms commerce in precisely the same way as does the Rule, but *Bruen* specifically rejected the requirement of a "historical *twin*" or "dead ringer." *Id.*

## IV.    The Balance of Equities and Public Interest Disfavor Injunctive Relief.

The balance of the equities and public interest merge when the government is a party. *Nken*, 556 U.S. at 435. In this case, the balance tips decidedly against preliminarily enjoining the regulation. Plaintiffs bear the burden of establishing each of the preliminary injunction factors, and they have not demonstrated that "justice requires the court to intervene to preserve the status quo" in this case. *Nebraska v. Biden*, 52 F.4th 1044, 1046 (8th Cir. 2022) (citation omitted). Plaintiffs have failed to raise even a substantial question on the merits, have not established any harm to themselves in allowing the Rule to take effect during the pendency of this case, and have identified no benefit to the public generally of enjoining the Rule. *See id.* (quoting *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 113 (8th Cir. 1981)( "[W]here the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing of success on the merits can be less."). Nor, as Plaintiffs claim, Mem. 39, does the Rule actually make any changes to the statutory scheme or potentially attach liability to any person whose conduct would not be unlawful under the statute. *See supra.* There is no "decades-long status quo" to preserve because the statute itself has worked a change on the universe of regulated people. Consequently, Plaintiffs have placed nothing at all on their side of the balance.

Conversely, here ATF has exercised its authority to issue regulations to effectuate laws enacted by Congress to reduce violent crime. Congress specifically amended the definition of "engaged in the business" to encompass more conduct and to reduce the volume of unlicensed dealing in firearms. Under such circumstances, if the government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (citation omitted). Moreover, courts have long

recognized that the regulation of "dealers in firearms" is "undeniably of central importance to federal efforts to prevent violent crime and to assist the States in regulating the firearms traffic within their borders." *United States v. Biswell*, 406 U.S. 311, 315 (1972); *see also, e.g.*, *United States v. Hosford*, 82 F.Supp. 3d 660, 667 (D. Md. 2015) ("[R]egulating firearms dealers…furthers the Government's substantial interest in protection the community."), *aff'd*, 843 F.3d 161 (4th Cir. 2016); *Chambered Grp. USA LLC v. Babcock*, No. CV-23-01850-PHX-SPL, 2023 U.S. Dist. LEXIS 173796, at *13-14 (D. Ariz. Sept. 27, 2023) ("A licensee's failure to follow the GCA regulations jeopardizes public interest because it poses a danger to society."). Therefore, granting the requested preliminary injunction would significantly harm the government's interest in law enforcement and public safety. The public consequences of continuing to permit what Congress and ATF have identified as a significant source of unlicensed dealing in firearms weighs heavily against granting an injunction.

## V.    Any Relief Should Be Limited

For the reasons explained above, no relief is warranted. But in the event the Court were to award any relief, such relief should be no broader than necessary to remedy any demonstrated harms of the Plaintiffs in this case. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). "[A] preliminary injunction must be narrowly tailored to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law." *St. Louis Effort for AIDS v. Huff*, 782 F.3d 1016, 1022-23 (8th Cir. 2015) (cleaned up).

*First*, the Court should decline to issue a so-called "universal remedy" or "nationwide injunction" that bars application of the Rule to any party nationwide. "[P]rinciples of judicial restraint warrant against a nationwide injunction." *West Virginia v. EPA*, 669 F. Supp. 3d 781, 819 (D.N.D.

2023); *see also Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) ("judicial restraint" is warranted when crafting injunctive relief, and district courts should consider "whether one district court should make a binding judgment for the entire country"). Three Justices of the Supreme Court recently concluded that a "district court's universal injunction defied . . . foundational principles" that "a federal court may not issue an equitable remedy 'more burdensome to the defendant than necessary to [redress]' the plaintiff's injuries." *Labrador v. Poe ex. rel Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., joined by Thomas, J., and Alito, J., concurring in the grant of the stay) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979)); *see also id.* at 931 (Kavanaugh, J., joined by Barrett, J., concurring in the grant of the stay) ("prohibiting nationwide or statewide injunctions may turn out to be the right rule as a matter of law").

Here, the reasons counseling against nationwide injunctions have special force. Nationwide injunctions "short-circuit the decisionmaking benefits of having different courts weigh in on vexing questions of law and allowing the best ideas to percolate to the top." *Arizona v. Biden*, 40 F.4th 375, 396 (6th Cir. 2022) (Sutton, C.J., concurring). Here, challenges to the Rule are pending in two other cases in different circuits.[25] Nationwide injunctions also "sometimes give States victories they do not want." *Id.* at 396. That is the case here, where twenty states and the District of Columbia submitted a comment in support of the Rule, concluding that the Rule is lawful and would promote public safety within their jurisdictions. Comment of Attorney General of New York, et al., Definition of "Engaged in the Business" as a Dealer in Firearms, Docket No. ATF 2022R-17 (Dec. 7, 2023), https://ag.ny.gov/sites/default/files/letters/multistate-comment-on-nprm-eitb-atf-rule.pdf.

The fact that Plaintiffs invoke § 705 of the Administrative Procedure Act (APA) does not change the inadvisability of a universal remedy. That section provides: "On such conditions as may

---

[25] *See Kansas v. Garland*, Case No. 2:24-cv-88 (E.D. Ark.); *Florida v. ATF*, Case No. 8:24-cv-1041 (M.D. Fla.).

be required and to the extent necessary to prevent irreparable injury, the reviewing court . . . may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. In limiting such relief "to the extent necessary to prevent irreparable injury," *id.*, the statute directs courts to apply traditional equitable principles, which include tailoring relief to be no more intrusive than necessary to prevent irreparable harm to the parties. Indeed, the House Report for the APA indicates that relief under § 705 should "normally, if not always, be limited to the parties complainant." *Administrative Procedure Act*, S. Doc. No. 248, 79th Cong., 2d Sess. 277 (1946).[26]

*Second*, relief should extend only to Plaintiffs that the Court concludes have demonstrated both standing and irreparable harm. "Article III does not give federal courts the power to order relief to any uninjured plaintiff." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) (citation omitted). If the Court agrees with Defendants' arguments in part and concludes that only some Plaintiffs have demonstrated injury in fact and irreparable harm, the Court should (indeed, must) exclude from any relief the Plaintiffs who have not made that showing.

*Third*, if the Court concludes that Plaintiffs are likely to succeed in showing that only certain provisions or aspects of the Rule are unlawful, the Court should limit relief to the provisions or aspects held likely unlawful. The Rule contains a "[s]everability" section expressing ATF's intent that the Rule's provisions be severable to the maximum extent possible, such that if any aspect of the Rule is held unlawful, the remainder "shall not be affected and shall be construed so as to give them the maximum effect permitted by law." Rule, 89 Fed. Reg. at 29,070. Typically, "[w]hether the offending portion of a regulation is severable depends upon [1] the intent of the agency *and* [2] upon whether

---

[26] *See id.* ("[t]he authority granted is equitable and should be used by both agencies and courts to prevent irreparable injury or afford parties an adequate judicial remedy" and that "[s]uch relief would normally, if not always, be limited to the parties complainant and may be withheld in the absence of a substantial question for review").

the remainder of the regulation could function sensibly without the stricken provision." *MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001); *see also United Food & Com. Workers Union v. USDA*, 532 F. Supp. 3d 741, 777 (D. Minn. 2021) (noting that the APA "permits a court to sever a rule" by limiting relief to "only the offending parts of the rule"). The Rule's severability section makes clear ATF's intentions with respect to severability. *See Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 686 (1987). Thus, any "objectionable provision[s]" should be temporarily enjoined while the others remain in place. *Id.*

## CONCLUSION

The Court should deny Plaintiffs' Motion for a Preliminary Injunction.

DATED: May 14, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Director, Federal Programs Branch

*/s/ Zachary W. Sherwood*
ZACHARY W. SHERWOOD
JEREMY S.B. NEWMAN
KERI L. BERMAN
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20005
Phone: (202) 616-8467
Fax: (202) 616-8470
Email: zachary.w.sherwood@usdoj.gov

*Attorneys for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

On May 14, 2024, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Eastern District of Arkansas, using the electronic case filing system of the court.  I hereby certify that I have served all parties electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Zachary W. Sherwood*