**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

| | | |
|---|---|---|
| **STATE OF KANSAS, et al.,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:24-CV-88-JM |
| | ) | |
| **MERRICK B. GARLAND, et al.,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**BRIEF OF *AMICI CURIAE* BRADY CENTER TO PREVENT GUN VIOLENCE,
MARCH FOR OUR LIVES, GIFFORDS LAW CENTER TO PREVENT GUN
VIOLENCE, AND EVERYTOWN FOR GUN SAFETY SUPPORT FUND IN SUPPORT
OF THE DEFENDANTS**

## FEDERAL RULE OF CIVIL PROCEDURE 7.1 DISCLOSURE STATEMENT

*Amici* Brady Center to Prevent Gun Violence, March For Our Lives, Giffords Law Center to Prevent Gun Violence, and Everytown for Gun Safety Support Fund each state that they do not have a parent corporation and that no publicly held company owns 10% or more of their stock.

i

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES...  . .................................................................................. iii

STATEMENT OF INTEREST OF *AMICI CURIAE* ...................................... 1

INTRODUCTION ......................................................................................... 2

ARGUMENT .................................................................................................. 7

I.    The Final Rule Promotes Public Safety. ............................................... 8

II.   The Final Rule Will Assist Law Enforcement. .................................... 13

III.  The Final Rule Does Not Place An Undue Burden on Responsible, Law-Abiding
      Individuals............................................................................................ 16

CONCLUSION.............................................................................................. 17

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*City of Syracuse v. ATF,*
  No. 20-cv-06885 (S.D.N.Y. 2020)......................................................................2

*District of Columbia v. Heller,*
  554 U.S. 570 (2008)...........................................................................................1

*Everytown for Gun Safety Support Fund v. ATF,*
  No. 21-cv-00376 (S.D.N.Y. 2021).....................................................................2

*McDonald v. City of Chicago,*
  561 U.S. 742 (2010)...........................................................................................1

*Morehouse Enterprises, LLC v. ATF,*
  Nos. 22-2812, 22-2854 (8th Cir. Dec. 5, 2022) ................................................2

*N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York,*
  140 S. Ct. 1525 (2020).......................................................................................1

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen,*
  142 S. Ct. 2111 (2022).......................................................................................1

*United States v. Aulet,*
  S.D. Fla., No. 21-cr-80151, Dkt. 36 (Oct. 13, 2022) .....................................11

*United States v. Cunningham,*
  E.D. Pa., No. 22-cr-268, Dkt. 25 (Oct. 7, 2022) .....................................11, 13

*United States v. Dantinor,*
  S.D. Fla., No. 21-cr-60301, Dkt. 1 (Aug. 25, 2021) ......................................14

*United States v. Dimas,*
  M.D. Fla., No. 21-cr-109, Dkt. 39 (Aug. 3, 2022).........................................11

*United States v. Estep,*
  D. S.C., Criminal No. 2:22-518 (Aug. 9, 2022).............................................13

*United States v. Feldman,*
  D. Minn., No. 16-cr-53, Dkt. 1 (Feb. 16, 2016).............................................12

*United States v. Hayes,*
  555 U.S. 415 (2009)...........................................................................................1

*United States v. Kelly*,
   N.D. Ga., No. 20-cr-365, Dkt. 1 (Oct. 3, 2020) ...................................................11

*United States v. Martin*,
   W.D. Mich., No. 22-cr-112, Dkt. 28 (Jan. 17, 2023) ...........................................12

*United States v. Oliver*,
   D. Ariz., No. 21-cr-600, Dkt. 41 (May 10, 2022) ................................................11

*United States v. Rachal*,
   M.D. N.C., No. 22-cr-337, Dkt. 22 (Feb. 2, 2023) .........................................11, 12

*VanDerStok v. Garland*,
   No. 23-10718 (5th Cir. Aug. 16, 2023)...................................................................2

*Webber v. Armslist LLC*,
   70 F.4th 945 (7th Cir. 2023) ..................................................................................5

**Statutes**

12 U.S.C. § 1841(a)(2)..................................................................................................15

18 U.S.C. § 922(b)(1) ...................................................................................................10

18 U.S.C. § 922(b)(2) .....................................................................................................7

18 U.S.C. § 922(t)(5) ......................................................................................................8

18 U.S.C. § 922(z) ........................................................................................................10

18 U.S.C. § 923(e) ..........................................................................................................8

18 U.S.C. § 923(d)(1)(C) ..............................................................................................15

18 U.S.C. § 923(g)(1)(b)..................................................................................................7

18 U.S.C. § 923(g)(1), (2) .............................................................................................13

18 U.S.C. § 923(g)(3)(A), (5)(A)...................................................................................13

18 U.S.C. § 923(g)(6) ....................................................................................................13

18 U.S.C. § 923(t) ...........................................................................................................3

18 U.S.C. § 924(d)(1) ....................................................................................................15

18 U.S.C. § 924(p) ..........................................................................................................8

Bank Holding Company Act, Pub. L. 84-511.................................................................15

Bipartisan Safer Communities Act, Pub. L. 117-159 ............................................................ *passim*

Brady Handgun Violence Prevention Act, Pub. L. 103-159.....................................................3, 5, 8

Firearms Owners Protection Act, Pub. L. 99-308.......................................................................4, 13

Gun Control Act of 1968, Pub L. 90-618..................................................................................*passim*

**Regulatory Materials**

12 C.F.R. § 225.32 ..............................................................................................................................15

27 C.F.R. § 478.39a ...........................................................................................................................13

**Other Authorities**

168 Cong. Rec. S3045 (daily ed. June 22, 2022)...............................................................................8

89 Fed. Reg. 28968 (Apr. 19, 2024) ...................................................................................... *passim*

ATF, *Gun Shows: Brady Checks and Crime Gun Traces* (Jan. 1999) .............................................6

ATF, *National Firearms Commerce and Trafficking Assessment (NFCTA):
   Firearms Trafficking Investigations, Volume Three, Part XI: Summary and
   Conclusions* (Apr. 4, 2024)......................................................................................................10

ATF, *N.F.C.T.A., Vol. II, Part II: National Tracing Center Overview* (Jan. 2023) ......................14

Cordelia Mannix et al., *Trends in Pediatric Nonfatal and Fatal Injuries*, 152
   Pediatrics e2023063411 (2023) ................................................................................................7

Daniel Webster et al., *Effects of State-Level Firearm Seller Accountability
   Policies on Firearm Trafficking*, 86 J. Urban Health 525 (2009).............................................9

Daniel W. Webster et al., *Preventing the Diversion of Guns to Criminals through
   Firearms Sales Laws*, REDUCING GUN VIOLENCE IN AMERICA (Daniel W. Webster
   & Jon S. Vernick eds., 2013).....................................................................................................9

DOJ, Office of Inspector Gen., *The Bureau of Alcohol, Tobacco, Firearms and
   Explosives' Investigative Operations at Gun Shows* (June 2007) .............................................5

Elliot C. Matthay et al., *In-state and Interstate Associations Between Gun Shows
   and Firearm Deaths and Injuries: A Quasi-experimental Study*, 167 Annals of
   Internal Med. 837 (2017)...........................................................................................................5

Eric W. Fleegler et al., *Firearm Legislation and Firearm-Related Fatalities in the
   United States*, 173 JAMA Intern. Med. 732 (2013)...................................................................9

Everytown for Gun Safety Support Fund, *Unchecked: An Investigation of the Online Firearm Marketplace* (Feb. 1, 2021).................................................................................4, 5

Fed. Reserve Board, *Control and Divestiture Proceedings* (Jan. 30, 2020)................................. 15

Jacy Lewis, *Cornyn: Unlicensed Gun Dealers Need to Be 'Eliminated,'* Midland Reporter-Telegram (Aug. 31, 2020) ...................................................................................13

John Gramlich, Pew Research Ctr., *What the Data Says about Gun Deaths in the U.S.* (Apr. 26, 2023)...........................................................................................................6

Letter from Charles Houser, Chief, Nat'l Tracing Ctr., to Fed. Firearms Licensees (Jul. 12, 2011) .................................................................................................................13

Matthew Miller et al., *Firearm Acquisition Without Background Checks*, 166 Annals of Internal Med. 233 (2017) .....................................................................................3, 9

Michael Siegel & Claire Boine, Policy Brief, Rockefeller Inst. of Govt., *What are the Most Effective Policies in Reducing Gun Homicides?* (2019)............................................9

Rep. Mike Thompson (CA-04), Press Release, *Thompson, Jeffries Recognize 30th Anniversary of Brady Bill* (Nov. 30, 2023)................................................................................8

S. Rep. No. 90-1097 (1968)................................................................................................................7

Sahil Kapur, A Quiet Bipartisan Effort on Gun Background Checks May Have A Path to a Deal, NBC News (May 26, 2021)..............................................................................8

Sean Campbell & Colin Lecher, *Millions of Guns For Sale. Few Questions Asked.*, The Trace (Jan. 16, 2020)...................................................................................................4

U.S. Att'ys Off., D. Ariz., *Gilbert Man Sentenced to 33 Months for Dealing in Firearms Without a License* (Nov. 16, 2022) ..........................................................................11

U.S. Att'ys Off., D. Minn., *Saint Paul Man Sentenced to 18 Months in Prison for Dealing Firearms Without a License* (Aug. 30, 2016) .............................................................12

U.S. Att'ys Off., N.D. Tex., *Man Who Sold Midland/Odessa Shooter AR-15 Used in Massacre Pleads Guilty to Unlicensed Firearms Dealing* (Oct. 7, 2020)............................8

U.S. Att'ys Off., W.D. Mich., *Firearm Trafficker Sentenced to 37 Months in Federal Prison* (Jan. 23, 2023) .................................................................................................12

Violence Policy Ctr., *An Analysis of the Decline in Gun Dealers: 1994 to 2016* ......................5, 6

## STATEMENT OF INTEREST OF *AMICI CURIAE*

The Brady Center to Prevent Gun Violence ("Brady") is the nation's longest-standing non-partisan, non-profit organization dedicated to reducing gun violence through education, research, legal advocacy, and political action. Brady has filed numerous amicus briefs in cases involving the constitutionality of firearms regulations, and courts have cited Brady's research and expertise. *See, e.g.*, *United States v. Hayes*, 555 U.S. 415, 427 (2009) (citing Brady brief). Brady works across Congress, courts, and communities, uniting gun owners and non-gun-owners alike, to take action to prevent gun violence.

March For Our Lives ("MFOL") is a youth-led non-profit organization dedicated to promoting civic engagement, education, and direct action by youth to achieve sensible gun violence prevention policies that will save lives. Formed after the mass shooting at Marjory Stoneman Douglas High School in Parkland, Florida, MFOL immediately began organizing the largest single day of demonstration against gun violence in the nation's history. MFOL uses the power of youth voices to create safe and healthy communities and livelihoods for all. MFOL has filed numerous amicus briefs in cases involving firearm regulations. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525 (2020).

Giffords Law Center to Prevent Gun Violence ("Giffords Law Center") is a survivor-led non-profit policy organization serving lawmakers, advocates, legal professionals, gun violence survivors, and others who seek to reduce gun violence and improve the safety of their communities. Giffords Law Center has contributed technical expertise and informed analysis as an *amicus* in numerous cases involving firearm regulations and constitutional principles affecting gun policy. *See, e.g.*, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *District of Columbia v. Heller*, 554 U.S. 570 (2008).

1

Everytown for Gun Safety Support Fund is the education, research, and litigation arm of
Everytown for Gun Safety ("Everytown"), the largest gun violence prevention organization in
the country. Everytown seeks to improve public understanding of the causes of gun violence and
to help reduce that violence by conducting groundbreaking original research, developing
evidence-based policies, communicating this knowledge to the American public, and advancing
gun safety and gun violence prevention in communities and the courts. Everytown has extensive
experience litigating cases involving the interpretation of federal firearms laws and has submitted
numerous amicus briefs in cases involving challenges to federal firearms laws and regulations.
*See, e.g.*, *VanDerStok v. Garland*, No. 23-10718 (5th Cir. Aug. 16, 2023); *Morehouse
Enterprises, LLC v. ATF*, Nos. 22-2812, 22-2854 (8th Cir. Dec. 5, 2022); *Everytown for Gun
Safety Support Fund v. ATF*, No. 21-cv-00376 (S.D.N.Y. 2021) (challenge to ATF action); *City of
Syracuse v. ATF*, No. 20-cv-06885 (S.D.N.Y. 2020) (challenge to ATF actions).

## INTRODUCTION

*Amici* strongly support the Final Rule, in which the Bureau of Alcohol, Tobacco,
Firearms and Explosives ("ATF") of the U.S. Department of Justice ("DOJ") carefully seeks to
implement the amendments made to the Gun Control Act ("GCA") by the Bipartisan Safer
Communities Act ("BSCA") of 2022, taking into consideration the current state of the firearms
business and the reality that there is a vast sector of gun sellers who have evaded the
requirements of the GCA. *See* Definition of "Engaged in the Business" as a Dealer in Firearms,
89 Fed. Reg. 28968 (Apr. 19, 2024) ("Final Rule"). Simply put, the Final Rule requires that
those who sell firearms regularly obtain a license to sell firearms (a "Federal Firearms License"
or "FFL"). Based on its decades of investigative and enforcement experience and court rulings
across the country, ATF has carefully crafted regulations to reach those gun sellers that engage in
repetitive transactions for profit, to ensure that when they sell firearms through the internet and

2

other marketplaces they must obtain a license and comply with the GCA's requirements, including certain recordkeeping obligations, inspections and oversight by ATF, and the duty to conduct background checks of prospective buyers, just as brick-and-mortar dealers must do. Foremost amongst these requirements is the one mandating that sellers conduct a background check pursuant to the Brady Handgun Violence Prevention Act ("Brady Law"), which ensures that the purchaser is legally allowed to possess firearms. 18 U.S.C. § 923(t). At the same time, ATF has clearly recognized that Congress declined to require licensure of hobbyists and sellers who engage in low-volume transactions related to personal firearms collections, and thus the agency continues to exempt the hobbyists and personal collectors that Congress did not intend to reach.

The unregulated share of gun sales in the United States is a serious public safety problem. One in every five guns sold today in the U.S. is sold without a background check. Matthew Miller et al., *Firearm Acquisition Without Background Checks*, 166 Annals of Internal Med. 233 (2017). This means that at least 20 percent of firearms sold in the United States, amounting to millions of guns annually, are transferred without any consideration of whether the recipient is legally prohibited from possessing a firearm (*e.g.*, an individual with felony convictions for violent crimes). Many of these transactions are conducted by individuals who profit from the repetitive sale of firearms, yet avoid the important oversight Congress requires for licensed dealers.

Particularly after the BSCA's passage, ATF's existing rules clearly did not carry out Congress's intent to regulate firearms sellers that engage in regular, repetitive transactions, and thereby reduce the substantial volume of transfers made without background checks. The new rule ATF promulgated is therefore necessary in order to faithfully implement the GCA, which

3

Congress passed with the intent to reduce firearm sales to individuals prohibited by law from accessing firearms. This is particularly so because technological changes have dramatically changed the nature of the firearms marketplace.

When the GCA and the Firearm Owners' Protection Act ("FOPA") were enacted, firearms transactions generally occurred in brick-and-mortar establishments and the Internet was not available to the public. The firearms business has evolved, and unlicensed sellers now advertise guns for sale and often sell to unknown buyers on the Internet, including, in particular, through the website Armslist.com. Many unlicensed sellers conduct high-volume sales on Armslist, claiming that they are exempt from licensure requirements. One investigation of Armslist listings posted between December 2016 and March 2019 found 700 phone numbers that appeared in ten or more listings; 150 that were linked to 25 or more; 38 that appeared in 50 or more; and even one phone number that was associated with over 300 posts. Only 14 of the phone numbers attached to a high volume of ads appeared in ATF's database of federal firearms licensees. Sean Campbell & Colin Lecher, *Millions of Guns For Sale. Few Questions Asked.*, The Trace (Jan. 16, 2020), https://www.thetrace.org/2020/01/armslist-unlicensed-gun-sales-engaged-in-the-business.

Armslist, and websites like it, pose a significant threat to public safety when unlicensed sellers using these channels fail to conduct required background checks before transferring weapons. Per a study conducted by *amicus* Everytown, nearly 1 in 9 prospective buyers responding to ads from unlicensed sellers on Armslist could not legally own a firearm due to, for instance, convictions for violent felonies, age, or other prohibiting criteria. Everytown for Gun Safety Support Fund, *Unchecked: An Investigation of the Online Firearm Marketplace* (Feb. 1,

2021), https://everytownresearch.org/report/unchecked-an-investigation-of-the-online-firearm-marketplace/.

Not surprisingly, guns sold through Armslist have been used in many horrific acts of violence, including cases in which *amicus* Brady has represented the victims and their surviving family members. For example, in 2018, a man obtained a handgun through Armslist while on bond for domestic violence felony charges for having attacked his wife. After being charged with the felonies on January 2, he contacted an Armslist user who had listed a Glock handgun for sale. Because no background check was conducted, the man was able to buy that gun on January 8 from an unlicensed 19-year-old seller in a Walmart parking lot, and on January 9, he used it to open fire on his wife, killing her, when she arrived to pick up her three young children who were visiting him. He then used that same gun to kill himself. *Webber v. Armslist LLC*, 70 F.4th 945 (7th Cir. 2023).

ATF also recognized that gun shows have grown to provide a major forum for unlicensed sellers to sell firearms without background checks. *See* Final Rule, 89 Fed. Reg. at 28973. More than 4,000 gun shows are held in the U.S. every year, attracting *thousands* of attendees. Elliot C. Matthay et al., *In-state and Interstate Associations Between Gun Shows and Firearm Deaths and Injuries: A Quasi-experimental Study*, 167 Annals of Internal Med. 837 (2017); *see also* DOJ, Off. of Inspector Gen., *The Bureau of Alcohol, Tobacco, Firearms and Explosives' Investigative Operations at Gun Shows* (June 2007).

As Congress enacted a series of gun sales requirements for licensed dealers, starting with passage of the Brady Law in 1993, the number of licensed gun dealers significantly decreased, and gun shows became more popular, particularly with unlicensed sellers who asserted that they are exempt from licensure requirements. *See, e.g.*, Violence Policy Ctr., *An Analysis of the*

*Decline in Gun Dealers: 1994 to 2016* 1 (2016) (noting that from 1994 to 2016, the number of licensed gun dealers fell 77 percent). As noted in the Final Rule, a licensed gun dealer commented that "[t]here are 100s of guns sold at every gun show with no background check whatsoever. I see the same dealers at every show with tables full of guns selling to anyone with cash. I have had people who were denied in the NICS background check [I had conducted,] only to see them walk out with a gun." Final Rule, 89 Fed. Reg. at 28989.

Congress and ATF recognized the clear threat to public safety posed by unlicensed selling (*e.g.*, that a dangerous person who would not otherwise be able to legally obtain a firearm may obtain one and subsequently use it to cause harm). But the danger also is systemic: unlicensed firearms vendors at gun shows create a competitive disadvantage for licensed vendors that *do* comply with licensure requirements, as well as loss of revenue for state and local governments.[1]

ATF's careful analysis must also be considered against the backdrop of extensive gun violence in the U.S. Every year, over 100,000 Americans are shot, and over 40,000 Americans die from gun violence – including over 2,500 children and teenagers. *See, e.g.*, John Gramlich, Pew Research Ctr., *What the Data Says about Gun Deaths in the U.S.* (Apr. 26, 2023), https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s. In 2021, firearms fatalities surpassed car accidents as the leading cause of death for

---

[1] *See, e.g.*, *Analysis of the Decline in Gun Dealers*, *supra*, at 24 ("[N]one of the private sellers who exhibited indicia of being illegally 'engaged in the business' collected sales tax, even though all three states involved in this investigation require taxes on frequent, profit-oriented sales. Violation of these laws defrauds state, and often local, governments of revenue. Furthermore, several private sellers used the lack of sales tax as a selling point"); ATF, *Gun Shows: Brady Checks and Crime Gun Traces* 18 (Jan. 1999) (finding that, in an ATF survey about gun shows, some licensed dealers "expressed frustration that unlicensed persons were able to sell to buyers without any paperwork (and advertise this fact), leaving the [licensed dealer] at a competitive disadvantage").

children and teenagers in the United States. Cordelia Mannix et al., *Trends in Pediatric Nonfatal and Fatal Injuries*, 152 Pediatrics e2023063411 (2023). Further, firearm fatalities in that age group increased by 87.1 percent over a 10-year period, from 1,311 deaths in 2011 to 2,590 deaths in 2021. *Id.* The Final Rule will work to restore a significant portion of the protections Congress intended to address this health crisis through the GCA, as amended by the BSCA.

## ARGUMENT

The Final Rule is consistent with the Gun Control Act, and is necessary to effectively implement its statutory requirements, particularly because it furthers the GCA's primary goals of "keep[ing] firearms out of the hands of those not legally entitled to possess them because of age, criminal background or incompetency, and [assisting] law enforcement authorities in the states and their subdivisions in combating the increasing prevalence of crime in the United States," S. Rep. No. 90-1097 at 2113-14 (1968). At the same time, the Final Rule upholds Congress's intended exceptions for true hobby and personal collection transactions.

Congress enacted the GCA because firearms are particularly dangerous when they fall into the wrong hands. Accordingly, Congress chose to regulate firearms by requiring those engaged in the business of selling them to obtain a license and abide by standards of conduct to prevent unlawful sales; these regulations reflect Congress's intent, which was to prevent firearms from ending up in the hands of individuals most likely to use them to harm themselves or others.

Under federal law, only individuals "engaged in the business" of dealing firearms are required to obtain a federal firearms license and follow the requirements Congress has established for such licensees. *See* 18 U.S.C. § 922(b)(2). Only licensed individuals and entities are subject to ATF's administrative oversight and enforcement authorities, which allow ATF to inspect licensed dealers to ensure they are complying with firearms laws. *Id.* § 923(g)(1)(B). ATF may revoke the licenses of those that do not comply with the law, or take other

7

administrative actions in response to licensed dealer non-compliance, *id.* §§ 922(t)(5), 923(e), 924(p).

## I.      The Final Rule Promotes Public Safety.

ATF properly understood that requiring licensure of all sellers that engage in repetitive firearms transactions for profit implements Congress's goal of promoting public safety. Congress, in amending the definition of "engaged in the business" in the BSCA, sought to clarify that statute and prevent the evasion of the background check system by unlicensed sellers.[2] The cornerstone of the GCA is the Brady Law, which provides that licensed dealers (but only licensed dealers) must conduct background checks before transferring a firearm. Such checks keep guns out of the hands of prohibited persons: since its enactment in 1993, the Brady Law has stopped over *four million* prohibited firearms transactions. *See* Press Release, Rep. Mike Thompson (CA-04), *Thompson, Jeffries Recognize 30th Anniversary of Brady Bill* (Nov. 30, 2023), https://mikethompson.house.gov/newsroom/press-releases/thompson-jeffries-recognize-30th-anniversary-brady-bill#:~:text=In%20the%2030%20years%20since,Gun%20Violence

---

[2] *See, e.g.,* 168 Cong. Rec. S3045, 3055 (daily ed. June 22, 2022) (statement of Sen. Murphy). BSCA Sponsors and Senators Chris Murphy and John Cornyn both invoked the Midland-Odessa mass shootings in Texas on August 31, 2019, as a symbol of the need for federal law to clarify who must register as a licensed dealer. *See id.*; Sahil Kapur, *A Quiet Bipartisan Effort on Gun Background Checks May Have A Path to a Deal*, NBC News (May 26, 2021), https://www.nbcnews.com/politics/congress/quiet-bipartisan-effort-gun-background-checks-may-be-verge-deal-n1268630. The gunman there was federally prohibited from buying a gun because of his mental health history, and was denied a sale when he went to a licensed gun shop. But he then went online to Armslist, and found an unlicensed seller, Marcus Braziel, who transferred without a background check the firearm the shooter used to kill seven and wound 25. *See* U.S. Att'ys Off., N.D. Tex., *Man Who Sold Midland/Odessa Shooter AR-15 Used in Massacre Pleads Guilty to Unlicensed Firearms Dealing* (Oct. 7, 2020), www.justice.gov/usao-ndtx/pr/man-who-sold-midlandodessa-shooter-ar-15-used-massacre-pleads-guilty-unlicensed. As Senator Murphy explained, it turned out that the seller was in fact engaged in the business, but "didn't believe the definition applied to him because the definition is admittedly confusing." 168 Cong. Rec. S3045, 3055 (daily ed. June 22, 2022).

%20Prevention%20Task%20Force.

Background checks also reduce gun trafficking and violence. States that go beyond the GCA to require background checks for unlicensed gun sales have lower rates of illegal gun trafficking, ten percent lower homicide rates, and significantly lower rates of firearm suicide.[3]

Prior to the BSCA's passage, an increasing number of individuals sold firearms for profit every year without ATF oversight and the safeguard of background checks. As noted above, alarmingly, one in every five guns sold in the United States is now sold without a background check. Miller et al., *supra*. At least 20 percent of firearms sold – millions annually – are transferred without any consideration of whether the recipient is prohibited by federal law from possessing a gun. While some of these transactions may be legitimate single transfers between law-abiding individuals, most of these unregulated transfers are conducted by individuals who intentionally profit from multiple sales of firearms while avoiding the requirements Congress established for licensed dealers. Truly private transactions involving personal collections will remain exempt from the GCA's licensure requirements under the Final Rule.

Furthermore, firearm dealers are subject to various additional obligations Congress imposes to protect the public. For example, licensed dealers must provide child-safety locks with every transferred handgun. 18 U.S.C. § 922(z). Dealers must also abide by age restrictions

---

[3] *See, e.g.*, Daniel Webster et al., *Effects of State-Level Firearm Seller Accountability Policies on Firearm Trafficking*, 86 J. Urban Health 525 (2009) (finding that comprehensive regulation and oversight of gun dealers and state regulation of private sales of handguns were each associated with significantly lower levels of intrastate gun trafficking); Daniel W. Webster et al., *Preventing the Diversion of Guns to Criminals through Firearm Sales Laws*, *in* REDUCING GUN VIOLENCE IN AMERICA 117 (Daniel W. Webster & Jon S. Vernick eds., 2013) (finding that state-level regulation of private sales reduced interstate trafficking by 29 percent); Policy Brief, Michael Siegel & Claire Boine, Rockefeller Inst. of Govt., *What are the Most Effective Policies in Reducing Gun Homicides?* 9 (2019), https://rockinst.org/wp-content/uploads/2019/03/3-28-19-Firearm-Laws-Homicide-Deaths-Brief.pdf; Eric W. Fleegler et al., *Firearm Legislation and Firearm-Related Fatalities in the United States*, 173 JAMA Intern. Med. 732 (2013).

9

– federal law prohibits the sale of handguns to anyone under 21, and long guns to anyone under 18. § 922(b)(1).

These regulations are important because unlicensed sellers regularly undermine public safety. Countless firearms sold by unlicensed individuals who engage in repetitive transactions have been used in the commission of violent crimes. ATF investigations have shown that unlicensed sellers supply the illicit gun market, and prosecutions show that these dealers are a go-to source of firearms for buyers who cannot pass a dealer-required background check. In fact, a recent analysis of ATF firearms trafficking investigations between 2017 and 2021 found that unlicensed dealing by private persons was "the most frequently identified trafficking channel at nearly 41% of cases," leading ATF to conclude that "unregulated private sales facilitate the movement of a significant volume of firearms from the legal marketplace to prohibited persons."[4]

---

[4] *See* ATF, *National Firearms Commerce and Trafficking Assessment (NFCTA): Firearms Trafficking Investigations, Volume Three, Part XI: Summary and Conclusions* 2 (Apr. 4, 2024), https://www.atf.gov/firearms/docs/report/nfcta-volume-iii-part-xi/download. This analysis also found that: (1) unlicensed dealers were associated with "the largest number of trafficked firearms (68,388) and averaged 20 trafficked firearms per investigation"; (2) in 16 percent of cases, firearms trafficked through unlicensed dealers were used in shootings; and (3) firearms trafficked by unlicensed firearm dealers circumvent background checks – approximately 60 percent of the end users of trafficked firearms had at least one prior felony conviction. *Id*.

Those firearms are often recovered in the hands of prohibited persons,[5] at crime scenes both domestic and international,[6] and in investigations involving armed robbery and murder.[7] For example, in 2016, a defendant was sentenced to 18 months in prison for illegally dealing in firearms without a license. The defendant "regularly dealt firearms without a license" by repeatedly purchasing firearms and offering them for resale within days of obtaining them. More specifically, he regularly listed and offered the guns he purchased for sale – often for profit – on Armslist. Multiple firearms the defendant sold were linked to crime scenes, including assault and drug trafficking, within days of his reselling them. According to the indictment, the defendant sold two firearms to undercover ATF officers for cash in the parking lot of a mall,

---

[5] *See, e.g., United States v. Rachal*, M.D. N.C., No. 22-cr-337, Dkt. 22 (Feb. 2, 2023) (at least 27 firearms sold by defendant who pleaded guilty to unlicensed firearms dealing were recovered in four separate states; the investigation was aided by a convicted felon informant from whom law enforcement seized one of defendant's guns, and who admitted to purchasing "numerous" firearms from defendant over the past year even after the informant advised defendant that he was prohibited from possessing firearms).

[6] *See, e.g., United States v. Aulet*, S.D. Fla., No. 21-cr-80151, Dkt. 36 (Oct. 13, 2022) (at least 28 firearms sold by unlicensed dealer defendant were later recovered in crimes including a homicide in North Miami, Florida; pursuant to another federal firearms trafficking investigation in Texas; and in various crimes in Nassau, Bahamas); *United States v. Dimas*, M.D. Fla., No. 21-cr-109, Dkt. 39 (Aug. 3, 2022) (four firearms sold to a cartel associate by unlicensed defendant were recovered by Mexican military personnel in Tamaulipas, Mexico, following firefights with suspected cartel members); *United States v. Kelly*, N.D. Ga., No. 20-cr-365, Dkt. 1 (Oct. 3, 2020) (multiple firearms re-sold and shipped by defendants to international buyers were recovered with obliterated serial numbers in the United Kingdom and St. Kitts, and tied to various criminal networks abroad).

[7] *See, e.g.*, *United States v. Cunningham*, E.D. Pa., No. 22-cr-268, Dkt. 25 (Oct. 7, 2022) (co-defendants re-sold approximately 60 guns, at least 24 of which were later recovered in numerous shootings and homicides in Philadelphia); *United States v. Oliver*, D. Ariz., No. 21-cr-600, Dkt. 41 (May 10, 2022) (at least 30 guns sold by unlicensed dealer defendant were recovered by law enforcement, including in six separate homicide investigations, one of which involved the shooting and killing of a Stockton, California, police officer responding to a domestic violence call, *see* U.S. Att'ys Off., D. Ariz., *Gilbert Man Sentenced to 33 Months for Dealing in Firearms Without a License* (Nov. 16, 2022), www.atf.gov/news/pr/gilbert-man-sentenced-33-months-dealing-firearms-without-license).

telling one that he was a "gun collector" and making no effort to obtain identification or determine the firearms eligibility status of either. *United States v. Feldman*, D. Minn., No. 16-cr-53, Dkt. 1 (Feb. 16, 2016). *See also* U.S. Att'ys Off., D. Minn., *Saint Paul Man Sentenced to 18 Months in Prison for Dealing Firearms Without a License* (Aug. 30, 2016), https://www.justice.gov/usao-mn/pr/saint-paul-man-sentenced-18-months-prison-dealing-firearms-without-license.

In another example, the defendant was sentenced to 37 months in federal prison in 2023, for trafficking guns used in several crimes throughout the state. The defendant purchased guns from FFLs and immediately re-sold them to his "customers," including convicted felons prohibited from buying guns for themselves, for a profit. Mere months after the defendant re-sold those guns, 14 of them had been recovered by police. One was used to shoot an 11-year-old girl; two were used in separate homicides (including one in the slaying of 2-year-old Khalise Brewer); another was used in a shooting injuring four persons in downtown Grand Rapids and was subsequently linked to two prior shootings; and the fourth was used in three separate drive-by shootings. *United States v. Martin*, W.D. Mich., No. 22-cr-112, Dkt. 28 (Jan. 17, 2023); *see also* U.S. Att'ys Off., W.D. Mich., *Firearm Trafficker Sentenced to 37 Months in Federal Prison* (Jan. 23, 2023), www.atf.gov/news/pr/firearm-trafficker-sentenced-37-months-federal-prison.

These cases are merely the tip of the iceberg, and show that there has been widespread evasion of Congress' plan for the licensing of gun sales. Indeed, in many of the preceding cases the unlicensed dealers had already been warned by ATF that they needed licenses but were undeterred and continued to engage in unlicensed commercial sales.[8] There can be no doubt that

---

[8] *See, e.g.*, Aff. ISO Application for a Warrant by Telephone or Other Reliable Electronic Means, Case No. 1:22MJ426-1, 19 ¶ 33 (M.D. N.C. Oct. 28, 2022) (*United States v. Rachal*, *supra* n.5); Aff. ISO Application Under Rule 41 for a Warrant to Search and Seize, Case No. 2:22-MJ-387, 4 (continued…)

12

the Final Rule will advance Congress's goal of requiring such unlicensed sellers to obtain

licenses, and therefore more firearms sales to be subject to background checks, to prevent gun

violence. *See, e.g.*, Jacy Lewis, *Cornyn: Unlicensed Gun Dealers Need to Be 'Eliminated,'*

Midland Reporter-Telegram (Aug. 31, 2020), https://www.mrt.com/news/article/Cornyn-

Unlicensed-gun-dealers- need-to-be-15528740.php (quoting BSCA Sponsor Sen. Cornyn: "If we

can do something good – like making sure we eliminate these unlicensed firearms dealers who

bypass the background check system, then we will save lives.").

**II.      The Final Rule Will Assist Law Enforcement.**

The Final Rule will also help law enforcement in important ways.  Federal record-

keeping requirements for licensed dealers assist law enforcement in investigating and

prosecuting illegal trafficking and gun-related violence.  Licensed gun dealers, or FFLs, must

keep firearm transaction records and provide them to ATF in the event that the firearm is

recovered in connection with a crime.  This allows ATF to trace the firearm back to its first retail

purchaser, a process that is critically important to investigating gun crime and gun trafficking.

*See, e.g.,* 18 U.S.C. § 923(g)(1), (2).  In addition, licensed dealers must report when a firearm

from the licensee's inventory or collection has been lost or stolen within 48 hours of discovery.

*See* § 923(g)(6); 27 C.F.R. § 478.39a.  They must report to ATF when a single purchaser buys

more than one handgun in the same transaction or within a five-day period, and for dealers in

southwest border states, certain long guns as well.  18 U.S.C. § 923(g)(3)(A), (5)(A); *see* Letter

from Charles Houser, Chief, Nat'l Tracing Ctr., to Fed. Firearms Licensees (Jul. 12, 2011).

---

¶ 9 (S.D. Ohio June 1, 2022) (*United States v. Cunningham*, *supra* n.7).  *See also United States v. Estep*, Criminal No. 2:22-518, Government's Opposition to Motion to Modify Bond 2-3, 4 (D. S.C. Aug. 9, 2022) (stating that "since August 2013, defendant has purchased at least 452 firearms from FFLs, at least 425 of which were purchased after ATF first advised defendant that it was illegal for him to engage in the business of selling firearms without a license").

These records are critically important to ATF: they are used to investigate potential illegal gun buyers and trafficking rings, to solve gun-related crime through efficient tracing, and to prevent future illegal trafficking and violent crime by identifying and confronting gun customers engaged in suspicious buying activities. *See, e.g.*, *United States v. Dantinor*, S.D. Fla., No. 21-cr-60301, Dkt. 1 (Aug. 25, 2021) (ATF initiated an investigation resulting in the discovery of a multi-defendant illegal gun trafficking ring in Southern Florida involving well over 100 guns after the agency received multiple sale reports involving firearms purchased by one of the implicated individuals); ATF, *N.F.C.T.A., Vol. II, Part II: National Tracing Center Overview* 8 (Jan. 2023), https://www.atf.gov/firearms/docs/report/nfcta-volume-ii-part-ii-ntc-overview/download (noting that in 2021 alone, over 40,473 traces were completed using these reports).

The existence of unlicensed guns sellers creates significant burdens on law enforcement's attempts to solve and prevent gun crime. Unlicensed gun sales are exceedingly difficult to trace because there is no effective way to track such guns beyond the first retail sale when there are no records regarding subsequent transfers. And without multiple sales and other required records reporting, law enforcement has significantly fewer tools to investigate and prevent gun trafficking and subsequent violence.

The Final Rule will support effective enforcement of the GCA, as amended by the BSCA, by enumerating specific factors (reflected in rebuttable presumptions) that tend to show that a person is dealing firearms with the predominant intent to earn a profit from firearms transactions. These factors are "supported by [DOJ]'s investigative and regulatory efforts and experience." Final Rule, 89 Fed. Reg. at 28982.

These presumptions will assist ATF in determining whether an unlicensed seller is engaged in the business. ATF will then have the ability to enforce the BSCA's prohibition on

such selling by warning an unlicensed seller who is engaged in the business to cease their unlicensed activity. Such persons can then become licensed and continue to sell firearms for a profit while complying with GCA regulations including background checks. Conversely, if the person continues to sell firearms for a profit without applying for licensure, ATF can, when legally authorized, seize firearms involved in the illegal unlicensed selling scheme (18 U.S.C. § 924(d)(1)); file a civil forfeiture action (§ 924(d)(1)); and/or deny any future license application from that individual for willfully violating the GCA by continuing to sell firearms without a license (§ 923(d)(1)(C)).

Rebuttable presumptions are not inherently suspect. Other federal agencies have similarly promulgated rules that include rebuttable presumptions, rather than bright lines, to implement their regulatory schemes. For example, the Federal Reserve Board adopted a rule in 2020 to provide guidance on when an investor company has "control" over a target company under the Bank Holding Company Act ("BHCA").[9] The BHCA provides three prongs that can constitute such "control," the third of which being when the first company "directly or indirectly exercises a controlling influence over the management or policies of the other company." *See* 12 U.S.C. § 1841(a)(2). The Board recognized that this prong requires a fact-based determination; the regulation clarifies this prong through a series of rebuttable presumptions of control. 12 C.F.R. § 225.32. That such rebuttable presumptions were not enumerated in the BHCA does not limit the Board's authority to include rebuttable presumptions in its rules implementing the statute. The same is true for ATF's authority in this case.

---

[9] Fed. Reserve Board, *Control and Divestiture Proceedings* (Jan. 30, 2020), https://www.federalreserve.gov/aboutthefed/boardmeetings/files/control-rule-fr-notice-20200130.pdf; *see also* 12 C.F.R. § 225.32.

15

ATF's ability to enforce BSCA's licensing requirements through the Final Rule will reduce the number of firearms being sold for profit by individuals evading licensure requirements. Further, because the rule's presumptions clarify when a person is considered to be engaged in the business, they also allow individual sellers to understand when their activities require licensure, which will in turn encourage individuals repetitively selling firearms for a profit to obtain licensure and conduct background checks during their sales.

## III. The Final Rule Does Not Place An Undue Burden on Responsible, Law-Abiding Individuals.

Contrary to Plaintiffs' claims, the Final Rule does not interfere with the rights of law-abiding individuals. The rule faithfully implements the GCA by continuing to exempt law-abiding Americans who transfer firearms as bona fide gifts, who make occasional sales to enhance a personal collection, or who transfer firearms as a hobby—unless their conduct demonstrates a predominant intent to earn a profit, as envisioned by the BSCA. Final Rule, 89 Fed. Reg. at 29092; Pub. L. 117–159, § 12002, 136 Stat. 1313, 1324 (2022). All the Final Rule requires is that a person who sells firearms for profit obtain a license to do so.

Plaintiffs argue that ATF ignores the statutory requirement of repetitive sales because the preamble to the Final Rule states that evidence of a single sale could be a basis for identifying a seller as a dealer if "other evidence" supports such a conclusion. *Id*. at 29016. But the Final Rule makes clear that "a single sale must be coupled with additional evidence to support a determination that the seller required a license," and, "in any event, all presumptions in this rule are rebuttable." *Id*. At most, Plaintiffs' arguments would be appropriate for an as-applied challenge if ATF were ever to pursue such a case.

The Final Rule helps law-abiding individuals by providing greater clarity as to when the statute requires licensure. Plaintiffs object strenuously to ATF's use of rebuttable presumptions

16

to describe the agency's view of facts that would show that an individual was likely engaged in the sorts of repetitive sales for profit that would qualify as dealer activities. But these presumptions are simply criteria the agency will consider, and they provide transparency for sellers. Plaintiffs cannot complain about uncertainty and at the same time reject ATF's efforts to provide clarity on the factors it will consider. In any event, the presumptions are rebuttable. They would not alter the burden of proof, but at most impose a (relatively minimal) burden of production.

## CONCLUSION

*Amici* support the Final Rule, which is tailored to the text and the goals of the statute. By clarifying situations in which persons are required to obtain an FFL, hewing closely to both the letter and the spirit of the GCA, the Final Rule will provide significant benefits to public safety and law enforcement. The Final Rule will prevent the sales of firearms to persons who are prohibited from possessing them because of their history of felonies or domestic violence or other disqualifying conditions. This will in turn save numerous lives, and significantly reduce the number of people who are wounded physically and emotionally by gun violence.

Respectfully submitted,

*/s/ William Isasi*

William Isasi (470878)
John D. Graubert*
Jocelyn G. Jezierny*
COVINGTON & BURLING LLP
850 Tenth Street NW
Washington, DC 20001
(202) 662-6000
JGraubert@cov.com
WIsasi@cov.com
JJezierny@cov.com

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Amici Curiae*

May 14, 2024