**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF ARKANSAS**
**DELTA DIVISION**

| | |
|---|---|
| **STATE OF KANSAS,** *et al.* | |
| Plaintiffs, | |
| v. | |
| **MERRICK GARLAND**, *et al.*, | Civil Action No. 2:24-cv-88-JM |
| Defendants. | |

**PLAINTIFFS' REPLY IN SUPPORT OF**
**MOTION FOR STAY/PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

INTRODUCTION ...................................................................................................................... 1

ARGUMENT .............................................................................................................................. 1

    A.    Defendants' Arguments on Standing Lack Merit .................................................... 1

        1.    The States have standing because they will lose tax revenue ...................... 2

        2.    The States have standing because they face increased administrative costs ................................................................................................................. 6

        3.    Individual Plaintiffs have standing ............................................................... 8

        4.    Plaintiff Chisholm Trail has standing ......................................................... 14

    B.    Defendants Lack Statutory Authority for the Final Rule ..................................... 15

        1.    Congress explicitly limited Defendants' rulemaking authority ................. 15

        2.    The statutory scheme undercuts Defendants' arguments ............................ 16

        3.    The BSCA did not magically grant Defendants authority to issue the Final Rule ................................................................................................... 17

        4.    Defendants do not have the authority to create presumptions ................... 19

        5.    Defendants' definitions of "engaged in the business" and "personal collection" are contrary to statute ............................................................... 20

    C.    The Final Rule is Unconstitutionally Vague ....................................................... 23

    D.    The Final Rule is Arbitrary and Capricious ........................................................ 29

    E.    The Final Rule Violates the Second Amendment ................................................ 30

    F.    Plaintiffs Face Irreparable Harm ......................................................................... 34

    G.    The Remaining Factors Weigh in Favor of a Preliminary Injunction ................. 36

    H.    Relief Should Not be Limited to the Parties ........................................................ 38

    I.    Venue is Proper ................................................................................................... 39

# TABLE OF AUTHORITIES

## Cases

*Adam-Mellang v. Apartment Search, Inc.*, 96 F.3d 297 (8th Cir. 1996)......................................34

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592 (1982).........................6

*Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022)..........................................................................4, 5

*Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466 (8th Cir. 1994)..............................................36

*Biden v. Nebraska*, 143 S. Ct. 2355 (2023) ...........................................................................1, 39

*Blanton v. Kansas City S. Ry. Co.*, 33 F.4th 979 (8th Cir. 2022)..................................................17

*Bryan v. United States*, 524 U.S. 184 (1998).............................................................................13

*City of Chi. v. Morales*, 527 U.S. 41 (1999) .............................................................................23

*City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) .....................................................................34

*Collins v. Yellen*, 141 S. Ct. 1761 (2021)....................................................................................2

*Dep't of Com. v. New York*, 139 S. Ct. 2551 (2019).....................................................................2

*District of Columbia v. Heller*, 554 U.S. 570 (2008)..............................................................32, 33

*Eckles v. City of Corydon*, 341 F.3d 762 (8th Cir. 2003) .............................................................9

*Entergy, Arkansas, Inc. v. Nebraska*, 210 F.3d 887 (8th Cir. 2000)............................................36

*Ezell v. City of Chi.*, 651 F.3d 684 (7th Cir. 2011) .....................................................................31

*Florida v. Mellon*, 273 U.S. 12 (1927) ......................................................................................4

*Hardin v. ATF*, 65 F.4th 895 (6th Cir. 2023)..............................................................................29

*Iowa ex rel. Miller v. Block*, 771 F.2d 347 (8th Cir. 1985)...........................................................5

*Kentucky v. Biden*, 23 F.4th 585 (6th Cir. 2022) .........................................................................6

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1 (D.C. Cir. 2016)....................................38

*LeMayne-Owen Coll. v. NLRB*, 357 F.3d 55 (D.C. Cir. 2004)....................................................30

*Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038 (4th Cir. 2023)............................................. 31

*Massachusetts v. EPA*, 549 U.S. 497 (2007) ................................................................................. 4

*Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475 (4th Cir. 1990) ............................................................ 16

*Nebraska v. Biden*, 52 F.4th 1044 (8th Cir. 2022)................................................................. 37, 39

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022)................................... 31, 32

*New York v. Yellen*, 15 F.4th 569 (2d Cir. 2021) .......................................................................... 2

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................................................... 36

*Novus Franchising, Inc. v. Dawson*, 725 F.3d 885 (2013) .......................................................... 35

*Org. for Black Struggle v. Ashcroft*, 978 F.3d 603 (8th Cir. 2020) ............................................... 6

*Range v. Attorney General*, 69 F.4th 96 (3d Cir. 2023)............................................................. 31

*Sackett v. EPA*, 566 U.S. 120 (2012) ........................................................................................ 13

*Sampson v. Murray*, 415 U.S. 61 (1974) ................................................................................... 34

*Sleep No. Corp. v. Young*, 33 F.4th 1012 (8th Cir. 2022)........................................................... 34

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) .................................................................. 34

*Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp.3d 807 (E.D. Tenn. 2022) .................................... 6

*Thompson v. DeWine*, 976 F.3d 610 (6th Cir. 2020) .................................................................... 6

*Tyler v. Hennepin Cnty.*, 598 U.S. 631 (2023) ............................................................................ 2

*U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590 (2016) ................................................ 13

*U.S. Postal Serv. v. Postal Regul. Comm'n*, 785 F.3d 740 (D.C. Cir. 2015).............................. 30

*United States v. Jackson*, 390 U.S. 570 (1968)........................................................................ 8, 9

*United States v. Texas*, 143 S. Ct. 1964 (2023) ....................................................................... 3, 4

*United States v. Tunley*, 664 F.3d 1260, 1263 n.3 (8th Cir. 2012) .............................................. 25

*Wyoming v. Oklahoma*, 502 U.S. 437 (1992) .............................................................................. 5

## Statutes

18 U.S.C. § 921 ................................................................................................. passim

18 U.S.C. § 922 ....................................................................................................... 7

18 U.S.C. § 926 ..................................................................................................... 16

28 U.S.C. § 1391(b)(2) .......................................................................................... 39

Act of May 22, 1794, 1 Stat. 369 .......................................................................... 33

Arkansas Code Title 26. Taxation § 26-52-518(a)(3)(B)(iii) ................................... 2

New Hampshire RSA 173-B:4 ............................................................................ 7, 8

Tenn. Code Ann. § 39-17-1316 .......................................................................... 6, 7

Tenn. Code Ann. § 67-6-310 ......................................................................... 6, 7, 36

## Other Authorities

168 Cong. Rec. S3124 (daily ed. June 23, 2022) .................................................. 19

*American Heritage Dictionary of the English Language*, Fifth Edition (2022) .......................... 21

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .... 12

Black's Law Dictionary (11th ed. 2019) ................................................................. 18

Interview of Joe Biden by Anthony Licata, Field and Stream (Feb. 25, 2013) ........................... 22

John Berrigan, Deborah Azrael, and Matthew Miller, "The Number and Type of Private Firearms

in the United States," Sage Journals .................................................................. 22, 24

Tenn. Op. Atty. Gen. No. 85-280 (Tenn.A.G.), 1985 WL 193831 (1985) ..................................... 7

*The Right to Keep and Bear Arms*, Report of the Subcommittee on the Constitution, Sen. Jud.

Comm., 97th Cong., 2d Sess. (1982) .................................................................. 17

U.S. State Dept., Office of the Historian, "John Jay's Treaty" ..................................... 33

**Regulations**

27 C.F.R. § 478.11 ................................................................................................... 24

27 C.F.R. § 478.13 ............................................................................................. 26, 27

Kan. Admin. Regs. § 92-19-22a(4) ........................................................................... 2

## INTRODUCTION

Defendants' Response is unpersuasive and lacks merit.  It cherry picks aspects of the Final Rule, Plaintiffs' Motion, and the Declarations to litigate a case different from the one that exists.  That is because Defendants cannot defend the Final Rule and the arguments against it on their own terms.  Knowing that their prospects on the merits are dim, Defendants spend the bulk of their brief arguing that none of the Plaintiffs have standing.  These arguments have no merit.  Once one moves past those standing arguments, it becomes clear that they are defending an indefensible Final Rule that fails because (1) it exceeds Defendants' statutory authority, (2) it is unconstitutionally vague, (3) it is arbitrary and capricious, and (4) it violates the Second Amendment.  The remaining factors also warrant the court granting a preliminary injunction.

## ARGUMENT

### A.    Defendants' Arguments on Standing Lack Merit

Defendants focus their attacks on the Plaintiffs' standing, likely because the only way this obviously unlawful rule can be allowed to take effect is if no one is able to challenge it.

At the outset, Defendants do not challenge the rule that "[i]f at least one plaintiff has standing"—here, that would mean one valid theory of standing for even one State or private party—the suit should "move forward."  *Biden v. Nebraska*, 143 S. Ct. 2355, 2365 (2023).  For good reason: the Supreme Court stopped the analysis in *Biden v. Nebraska* after concluding just one State had standing on just one theory.  *Id.* ("we need not consider the other theories of standing raised by the States").  Thus, as Defendants must concede, if any one Plaintiff has standing under any theory, the case should proceed.

### 1.    The States have standing because they will lose tax revenue

Defendants' argument that the States' anticipated loss of tax revenue does not confer standing defies logic, reality, and their own stated objective and estimates.  Monetary loss is a cognizable harm.  *Tyler v. Hennepin Cnty.*, 598 U.S. 631, 636 (2023) ("pocketbook injur[ies]" confer standing); *Collins v. Yellen*, 141 S. Ct. 1761, 1779 (2021); *New York v. Yellen*, 15 F.4th 569, 576 (2d Cir. 2021) (noting that "specific lost tax revenues and suffice to support standing" and differ from "allegations of generalized economic harm only").  Loss of revenue caused by a federal agency is an injury to the States.  The Supreme Court unanimously held that States had Article III standing to challenge inclusion of a citizenship question on the census because they alleged that they would "lose out on federal funds" as a result.  *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565 (2019).  Such a loss of federal funds because of agency action is economically indistinguishable from agency-cause loss of state tax revenues—both involve decreases in funds flowing into State treasuries as a result of challenged federal actions.  Just as New York had standing in *Department of Commerce*, so too do the States here.

The Final Rule will decrease taxable firearm sales.  The point of penalizing an act is to stop or dissuade people from doing the act.  As Defendants have admitted, the point of the Final Rule is to reduce the number of firearms sold without a license.  *See* Resp. at 52 ("ATF has exercised its authority to issue regulations ... to reduce the volume of unlicensed dealing in firearms.").  Defendants also admit some number of people will refrain from selling their firearms rather than obtain licenses, Resp. at 14 n.10, thus conceding the issue.  Kansas collects a 6.5% sales tax both for admissions and sale of firearms during gun shows. Kan. Admin. Regs. § 92-19-22a(4).  Arkansas charges a 1% short-term-rental tax on the cost of any table rentals that are at gun shows.  Arkansas Code Title 26. Taxation § 26-52-518(a)(3)(B)(iii) - Special events.  Arkansas also has a sales tax that applies to sale of firearms at gun shows and online.  If there is

a greater than 50% chance that States would have collected a single dollar in tax revenue from one of these sales, the States have standing.  Defendants' argument that "only" 2.5% of people will refrain from selling firearms conflates the *fact* of harm with the *extent* of harm, the latter of which would only come into play when the Court balances equities, not when the Court determines whether the States will suffer harm.  There is no minimum amount of tax revieue that must be lost.  "[A]n identifiable trifle is enough for standing . . . ."  *United States v. Students Challenging Regul. Agency Procs. (SCRAP)*, 412 U.S. 669, 690 n.14 (1973).  In any case, the States have clearly established an injury to their State fiscs that they will not face if the Final Rule is stayed and later vacated.

Because they cannot avoid this conclusion, Defendants argue that the States' injury turns on the actions of third parties, and therefore does not confer standing.  To begin, they rely on an overbroad and incorrect reading of the nearly 100-year-old case *Florida v. Mellon*, 273 U.S. 12 (1927), and argue that under that case—which significantly predates both modern standing analysis and the APA—the States do not have standing because they have not suffered a "direct" injury attributable to the federal government.  Resp. at 14.  But, as is evident from Defendants' inability to cite a single case applying this 1927 precedent in such a manner, *Mellon* does not say what they want it to say.

The Supreme Court recently clarified the scope of *Mellon*'s holding, explaining that "federal policies frequently generate indirect effects on state revenues or state spending" and a "State's claim for standing *can become* more attenuated" when it asserts "that a federal law has produced *only* those kinds of indirect effects."  *United States v. Texas*, 143 S. Ct. 1964, 1972 n.3 (2023) (emphases added).  But the harm here is clearly more direct than that alleged in *Mellon*. In that case, Florida's theory of standing relied on an unproven assumption about the actions of

independent third parties—namely, Florida residents who may have "withdraw[n] property from the state" in response to a new federal statute, "thereby diminishing the subjects upon which the state power of taxation may operate." *Mellon*, 273 U.S. 12, 17–18 (1927). In contrast here, however, the States' tax-revenue-based harms do not rely on any speculative similar assumptions about the actions of third parties not before the Court; Defendants have effectively admitted that there will be some reduction in business at gun shows, Plaintiffs have submitted declarations attesting to the same, *see, e.g.*, Journey Dec. ¶¶ 4, 10, 15; Black Dec. ¶¶ 6–8; Maxey Dec. ¶¶ 4, 8–10, and Defendants do not challenge the facts in the declarations. *Accord Massachusetts v. EPA*, 549 U.S. 497, 526 (2007) (State's uncontested affidavits regarding the risk posed to State's shoreline in 100 years if EPA did not address emissions levels established standing).

Defendants' reliance on *United States v. Texas,* 143 S. Ct. 1964 (2023), *Iowa ex rel. Miller v. Block*, 771 F.2d 347 (8th Cir. 1985), and *Arizona v. Biden*, 40 F.4th 375 (6th Cir. 2022), Resp. at 14–15, is likewise misplaced. In *Texas*, the Court found it lacked Article III jurisdiction to grant "extraordinarily unusual relief" by ordering the "Executive Branch to change its [discretionary] arrest or prosecution policies so that the Executive Branch makes more arrests or initiates more prosecutions." 143 S. Ct. at 1970, 1976. The Court's decision rested on the idea that "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* (quoting *Linda R. S. v. Richard D.*, 410 U. S. 614, 619 (1973)). The Court, however, reaffirmed the well-established principal that "States sometimes have standing to sue the United States or an executive agency or officer" when their injury is one "traditionally redressable in federal court." *Id.* at 1970 & n.3.

Similarly, in *Arizona*, states sued to compel the Department of Homeland Security to "enforce [discretionary] immigration laws more vigorously." 40 F.4th at 383. The Sixth Circuit

found the states' injuries hinged on the discretionary actions of third parties (*i.e.* immigration officials), and "if an injury turns on choices made by others and if those choices permit considerable 'discretion,' the States have a burden to show those choices have been or will be made." *Id.* at 384 (internal quotation marks omitted). To the extent firearm owners' decisions to stop selling firearms or risk penalties in the wake of the Final Rule can be considered discretionary, the States have easily met this burden. Other Plaintiffs submitted declarations confirming that, if the Final Rule takes effect, they (and others they know) will stop selling firearms. *See* Journey Dec. ¶¶ 4, 10, 15; Black Dec. ¶¶ 6–8; Maxey Dec. ¶¶ 4, 8–10. Defendants predicted the same.

Finally, in *Iowa*, the Eighth Circuit found the state did not have standing to "*compel*" the Secretary of Agriculture to "implement several *discretionary* federal disaster relief programs." 771 F.2d at 348–49, 355 (emphases added). The court noted that the state's claimed injury ("increased responsibility for the welfare and support of its [] citizens") was a generalized grievance more properly brought by the state in its *parens patria* capacity. *Id.* at 353 & n.6. A direct injury to the state fisc though loss of tax revenue, on the other hand, is well-established to be a harm to the state itself. *Wyoming v. Oklahoma*, 502 U.S. 437, 448 (1992). And notably, while the *Iowa* court dismissed the case as to the state, it allowed the private plaintiffs to proceed. 771 F.2d at 355.

Even if the claimed injuries in this case were the same as those in *Texas*, *Arizona*, and *Iowa*, and they are clearly distinguishable from the States' injuries here, all three cases involve an attempt to compel an agency to take a discretionary action. Neither factor is present here; the States are suing to stop an agency from enforcing an unlawful regulation that will cause them monetary harm, which they have a right to do under the APA. If the courts take *Mellon*, *Texas*,

*Arizona*, and *Iowa* to mean that States do not have standing under these circumstances, the States will virtually never be able to vindicate their rights under the APA.

> **2.    The States have standing because they face increased administrative costs**

The States have also established standing because, as Defendants admit, the Final Rule will impose additional administrative costs.

While it is true that Tennessee and New Hampshire can alter their background check regimes, they should not be forced to do so simply because an agency has decided it will redefine a statute that goes against state law.  Tennessee's standing to bring this challenge is based upon the reality that state statutes, like Tenn. Code Ann. § 39-17-1316 and Tenn. Code Ann. § 67-6-310, would need to be revaluated, and redone, so as to effectively enforce the federal mandate. States have a "sovereign interest[] in enforcing their duly enacted state laws." *Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp.3d 807, 841 (E.D. Tenn. 2022); *see also Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982) (States have a "sovereign interest" in "creat[ing] and enforce[ing] a legal code").  In light of the conflict between the State's laws and the new rule, Tennessee "will continue to face substantial pressure" to disregard its own laws "in order to avoid material legal consequences." *Tennessee*, 615 F. Supp.3d at 841.  Any time "a State is [prevented] from effectuating statutes enacted by representatives of its people," it suffers irreparable harm.  *Thompson v. DeWine*, 976 F.3d 610, 619 (6th Cir. 2020); *Org. for Black Struggle v. Ashcroft*, 978 F.3d 603, 609 (8th Cir. 2020) ("Prohibiting the State from enforcing a statute properly passed . . . would irreparably harm the State."); *Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (6th Cir. 2022) ("[I]nvasions of state sovereignty . . . likely cannot be economically quantified, and thus cannot be monetarily redressed."); *see also Tennessee*, 615 F. Supp. 3d at 841 (collecting cases).  Tennesseans promulgated their own system for conducting background

checks, removed from federal agency oversight, Tenn. Code Ann. § 39-17-1316, and have

further provided benefits to nonprofits conducting gun sales in hopes of placing as few burdens

and costs on these entities as possible.  *See* Tenn. Op. Atty. Gen. No. 85-280 (Tenn.A.G.), 1985

WL 193831, at *4 (1985).  As stated in Plaintiffs' complaint, the new rule invalidates the intent

and purpose of Tenn. Code Ann. § 67-6-310 and requires substantial alterations to Tenn. Code

Ann. § 39-17-1316 so that Tennessee can effectively pursue its legislative intent and mandate.

And even if the change were practical, feasible, and not an injury to the State's sovereignty, it

would come with additional administrative costs, which are themselves an irredressable injury.

*See generally* Edwards Dec.

New Hampshire has important public policy reasons to be able to conduct its own

background checks through the NICS system.  Pursuant to the declaration of Eddie Edwards,

Assistant Commissioner of the New Hampshire Department of Safety, New Hampshire law

requires the Permits and Licensing Unit of the Division of State Police to "conduct a review of a

list of individuals produced by the New Hampshire Judiciary who currently have a domestic

violence protection orders issued against him or her.  This review is conducted because [New

Hampshire] state law prohibits firearm sales to individuals who are under an ex parte domestic

violence protective order; federal law contains a different standard."  *See* Decl. of Eddie Edwards

at ¶4 (emphasis added).  Specifically, New Hampshire RSA 173-B:4, II states, in pertinent part,

that: "The defendant may be prohibited from purchasing, receiving, or possessing any deadly

weapons and any and all firearms and ammunition for the duration of the [ex parte domestic

violence protective] order."  Whereas 18 U.S.C. § 922(g)(8) prohibits an individual from

possessing or receiving any firearm who is subject to a court order that "was issued after a

hearing of which such person received actual notice, and at which such person had an

opportunity to participate", NH RSA 173-B4, I *ex parte* domestic violence protective orders may

issue "with or without actual notice to the defendant." These orders "shall be valid in any

jurisdiction in [New Hampshire], and shall be effective until the close of the next regular court

business day." *See id.* So, it is simply not true that the increase in New Hampshire's

administrative costs "would be the product of their own voluntary decision to take responsibility

for conducting those background checks themselves." *See* Resp. at 31.  New Hampshire is

required to conduct searches on its own.  Otherwise, it would be unable to enforce or police its

own domestic violence laws which are stricter than the federal variant.

Moreover, Defendants themselves estimate that there will be an increase of individuals

who require licenses.  In Tennessee's case, that would mean significantly more background

checks a year.  *See* Plaintiffs' Memorandum in Support of Motion for Stay/Preliminary

Injunction, ECF 5, PID#15 (Information and chart showing over 570,000 background checks

performed in 2023).  Finally, it is unclear how effectively these new licensees will provide

pertinent information to Tennessee in order for it to adequately perform background checks.

Some newer licensees may not have the means to send Tennessee the pertinent information so

that it might conduct compliant background checks.  Thereby, forcing New Hampshire and

Tennessee to absorb even further administration costs to enforce the new, broad rule.

### 3.    Individual Plaintiffs have standing

Defendants' arguments regarding the private Plaintiffs' standing and harms are no more

correct or persuasive.

"Whatever might be said of Congress' objectives, they cannot be pursued by means that

needlessly chill the exercise of basic constitutional rights," including Second Amendment rights.

*United States v. Jackson*, 390 U.S. 570, 582 (1968).  When challenging the constitutionality of a

regulation as overbroad or vague, a plaintiff must show a "specific present objective harm or a

threat of specific future harm," *Eckles v. City of Corydon*, 341 F.3d 762, 767 (8th Cir. 2003), that

has an "unnecessary" chilling effect on a constitutional right, *Jackson*, 390 U.S. at 582.

Plaintiffs here have undoubtedly done so.  As laid out in detail in their declarations,[1] Plaintiffs

Journey, Black, and Maxey are American citizens who have a constitutional right to own, buy,

and sell their firearms.  They do so legally and intend to continuing doing so.  Their conduct,

however, is arguably covered by the Final Rule, and they are in danger of civil, administrative,

and criminal penalties if they persist without undergoing the burdensome process of obtaining

licenses.  At the very least, they reasonably believe Defendats interpret the Final Rule to cover

their conduct, and will refrain from exercising their rights because of the Final Rule.  Their

concerns are all concrete, specific, and imminent.

Plaintiff Journey attends four to five gun shows a year and buys or sells firearms at most

of them.  Journey Dec. ¶ 4.  Journey owns firearms for self-defense, and he sells firearms "for

various reasons."  *Id.* ¶¶ 3, 4.  As he noted, the Final Rule could require him to obtain a license if

he engages in "even a single firearm transaction or offer to engage in a transaction."  *Id.* ¶ 25

(quoting 89 Fed. Reg. at 29,091).  So, if the Final Rule is allowed to take effect, Plaintiff Journey

"believe[s] that [he] will have to give up selling firearms or register as [a licensee]."  *Id.* ¶ 10.

This will have an immediate impact on him because he intends to attend gun shows (where he

intends to buy and sell firearms) in July, October, and November, and the license application

process is burdensome and takes several months to complete.  *Id.* ¶¶ 4, 10.[2]  He is harmed

regardless of whether he is forced to unnecessarily apply for a license or if he skips the shows.

In fact, it is unlikely he could obtain a license before July.  There is a realistic danger he will be

---

[1] Defendants do not contest the facts in the declarations.

[2] *See also* ATF, Apply for a License, https://www.atf.gov/firearms/apply-license ("This process
will take approximately 60 days from the receipt of a properly completed application.").

subject to penalties, and his injury is certainly impending.

Plaintiff Journey is not alone in his confusion about the Final Rule.  He is aware of others like him who are concerned the Final Rule will apply to their otherwise perfectly legal conduct.  As he is a judge, many firearm owners have approached him for advice.  *Id.* ¶ 15.  Over 100 other firearm owners sought him out at a single gun show in "a panic" about the effects of the Final Rule.  *Id.*  Like him, these firearm owners will choose to stop attending gun shows and will stop buying and selling firearms if the Final Rule takes effect.  *Id.*

Plaintiff Black likewise attends multiple gun shows a year where he buys and sells firearms.  Black Dec. ¶ 4.  He has reviewed the Final Rule and believes that it applies to him and his purchases and sales—a supposition he is better suited to make at this time than Defendants.  *Id.* ¶¶ 6, 8.  If the Final Rule is allowed to take effect, he will either need to register as a licensee, which is a burdensome and time-consuming process, or stop buying and selling firearms altogether.  *Id.* ¶¶ 7, 8.  He is concerned that if he does not do so, an otherwise perfectly legal sale or offer to sell will put him at risk of "civil, administrative, and possibly criminal penalties."  *Id.* ¶ 13.  Plaintiff Maxey attends three gun shows a year and regularly purchases firearms.  Maxey Dec. ¶ 4.  He is aware that the Final Rule will decrease the number of people who sell firearms at gun shows.  *Id.* ¶¶ 8–10.  This will impact his constitutional and statutory rights to acquire firearms.

All three Plaintiffs reasonably believe the Final Rule applies to conduct they regularly (and legally) engage in.  If they are correct, the Final Rule impermissibly infringes on their Second Amendment rights by putting them at risk civil, administrative, and possibly criminal penalties if they continue.  If they are incorrect, it just goes to show how unworkable the Final Rule is; they are unnecessarily chilled from exercising their rights because no reasonable person

can decipher when and to whom it applies.

And while the Final Rule is confusing, Defendants' arguments addressing Plaintiffs' standing do not clear anything up.  Defendants' assertion that "the conduct described in the individual plaintiffs' declarations does not rise to the level of being 'engaged in the business' and thus would not subject them to any enforcement action," Resp. at 20,[3] is an *admission* that the Final Rule is unconstitutionally vague and overbroad.  Reasonable people—including a judge— cannot read the Final Rule and understand whether the conduct in which they intend to engage is covered or not.  So, they will forego any conduct that comes close to what the Final Rule describes.  And if their conduct is indeed not covered by the Final Rule, it is perfectly legal; yet Defendants are nonetheless unnecessarily chilling Plaintiffs' constitutional rights.

Moreover, Defendants are incorrect that the Final Rule does not apply to Plaintiffs' conduct.  For example, the Final Rule creates a sweeping new category and excludes personal protection weapons from the "personal collection" definition.  But Defendants ignore this category in arguing that Plaintiff Journey has not "plausibly claimed 'any intent to engage in conduct that is actually 'proscribed' by the Rule's interpretation of the GCA."  Resp. at 20-22.  But Defendants noted later in this very same brief that

> Firearms accumulated primarily for personal protection fit within neither the ordinary meaning of "collection," *see* Webster's Third New International Dictionary 444 ("an assembly of objects or specimens for the purposes of education, research, or interest"), nor the GCA's definition of "collector," 18 U.S.C. § 921(a)(13) ("any person who acquires, holds, or disposes of firearms as curios or relics").

---

[3] Defendants seemly did not intend to declare that Plaintiffs' regular attendance of gun shows— where they regularly buy and sell firearms—is always permissible under the Final Rule because they nit-pick the declarations and explain why individual actions (taken alone) would not be covered.  *See* Resp. at 21–22.  But even if one individual action might not subject a person to penalties, the actions in combination could.

Resp. at 41.[4]  As Plaintiff Journey averred, he intends to attend gun shows in the coming months

to buy and sell personal potection weapons.  Journey Dec. ¶¶ 3, 4.  Those fall outside of

Defendants' definition of "personal collection" and thus put him in realistic danger of liability.

Plaintiffs Black and Maxey likewise own, buy, and sell rifles, shotguns, and revolvers (some of

which may be used for personal protection) that do not fall neatly within Defendants' definition.

If Defendants do not understand their own rule, how can anyone else be expected to comply?

As another example, Defendants cite the Final Rule and argue Plaintiffs' conduct falls

outside it because "A person shall not be presumed to be engaged in the business of dealing in

firearms when reliable evidence shows that the person is only reselling or otherwise transferring

firearms . . . *[o]ccasionally* to obtain more valuable, desirable, or useful firearms for the person's

personal collection." Resp. at 22 (emphasis to "occasionally" added, other emphasis omitted).

Do Defendants mean that attending four to five gun shows a year to purchase and sell firearms is

"occasionally"?  If not, how many transactions fall within "occasionally"?  Further clarification

would certainly be a boon to all parties.  Regardless, a reasonable person reading the Final Rule

could reasonably believe purchasing or selling firearms at four to five gun shows a year is not

"occasionally" and that he or she is in realistic danger of liability if he or she does so without a

license.

Lastly, Defendants' argument that Plaintiffs are not in realistic danger of liability because

they have not met the elements of a criminal violations, Resp. at 23–24, is odd indeed.  A

violation of the Final Rule would have civil or administrative penalties, not criminal penalties,

*see* 89 Fed. Reg. 28,969.  The burden of proof on the government is higher in the criminal

---

[4] Webster's Third New International Dictionary "should be used with caution because of its
frequent inclusion of doubt, slipshod meanings."  Antonin Scalia & Bryan A. Garner, *Reading
Law: The Interpretation of Legal Texts* 422 (2012).

context than the civil context.  *See, e.g.*, *Bryan v. United States*, 524 U.S. 184, 191 (1998).

Defendants have not shown Plaintiffs are not at risk of civil and administrative penalties.

What is more, Plaintiffs do not need to declare an intent to break the Final Rule in order

to challenge it.  In *Susan B. Anthony v Driehus*, 573 US 149  (2014), the Supreme Court dealt

with the issue of what is needed to establish a "justiciable threat of prosecution" for standing

purposes.  In the *Driehus* case, Hawaii had outlawed butterfly knives.  The plaintiffs declared

under penalty of perjury that they wished to purchase a butterfly knife in the future, and would

do so but for Hawaii's ban.  The Supreme Court held that this simple desire to do something in

the future that could result in prosecution was sufficient to establish a "cognizable injury" for

purposes of standing, even if the plaintiffs had not established a specific date in the future or plan

to do the prohibited thing.  *Driehus* at 161. All that was needed was for the plaintiffs to establish

"an intention to engage in a course of conduct arguably affected with a constitutional interest, but

proscribed by a statute, and there exists a credible threat of prosecution".  *See also U.S. Army

Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 600 (2016); *Sackett v. EPA*, 566 U.S. 120, 127

(2012).

Here, Plaintiffs have articulated in their declarations a desire and intent to do the very

thing in the future that has been prohibited by the Final Rule (sell firearms multiple times a year

without an FFL).  Plaintiffs are aware of the Final Rule and ae justifiably concerned that it

applies to their conduct.  If the Final Rule remains in place and one or more of Plaintiff—aware

of the Final Rule and its general prohibition against selling firearms at gun shows without a

license—decides to go forward and sell one or more firearms, then it would be a very small step

for a federal prosecutor to establish that the plaintiff acted with the requisite knowledge and

intent.  This "cognizable threat" of potential prosecution based on the potential future conduct of

the plaintiffs is enough to refute the government's claim on this front.

Eventually, Defendants give up trying to explain why Plaintiff Journey's conduct would still be permissible if the Final Rule takes effect. Rather, they state, "Journey's further assertion that the Rule is 'so convoluted, vague, and ambiguous that [he] . . . cannot determine what is prohibited versus what is allowed,' is precisely the sort of naked legal conclusion that the Court cannot credit for purposes of standing." Resp. at 23. This is also a "naked legal conclusion that the Court cannot credit" for the purposes of denying standing when Plaintiff Journey gave many specific examples and Defendants simply chose not to address them. The Court can and should consider the Final Rule and Plaintiffs' declarations. In so doing, it will find for itself that the Final Rule is unconstitutionally convoluted, vague, and ambiguous, that Plaintiffs face a realistic, imminent threat of danger or else are chilled from exercising their Second Amendment rights. They have standing.

### 4.     Plaintiff Chisholm Trail has standing

Defendants make two arguments that Plaintiff Chisholm Trail lacks standing. Both should be summarily rejected. First, Defendants are flatly incorrect that Chisolm Trail has not identified a member with standing. Resp. at 26. As discussed above, both Plaintiffs Maxey and Black are members of Chisolm Trail, *see* Fry. Dec. at 2, and both have standing. Both Plaintiffs discussed extensively that they own, sell, or purchase firearms repeatedly throughout the year. Despite Defendants incorrect reading of their own Rule, the firearms Black and Maxey sell and purchase can be used for self-defense, and thus fall within the ambit of the Final Rule. Plaintff Black and Maxey's activities relate to the purpose of Chisolm Trail, see Fry Dec. at 2–3, and therefor the organization has standing. *Friends of the Earth*, 528 U.S 167, 181 (2000) ("An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the

organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.").

Neither are Chisolm Trail's injuries "speculative" as Defendants claim.  Resp. at 27.  In his declaration, Jim Fry outlined how approximately 70% of Chisholm Trail's annual operating expenses are covered by revenue generated by the biannual gun shows they organize.  Fry Dec. at 2.  Since private party sales of firearms is what dominates these gun shows, it is reasonable to assume that the Final Rule will drive down attendance and with-it revenue for the organization (because there will be fewer people willing to risk selling a firearm without becoming a licensee).  Although Fry's declaration did not specify exactly how much revenue is generated for Chisholm Trail at their biannual gun shows each year, it did include information that last fiscal year Chisholm Trail paid sales tax to the State of Kansas for table rental fees charged during their gun shows in the amount of $4,005.72.  So, the loss of even a relatively small amount of the revenue generated by these gun shows would cause financial harm to both Chisholm Trail and the State of Kansas in the form of tax revenue.

For these reasons, Chisolm Trail also has standing to challenge the Final Rule.

**B.      Defendants Lack Statutory Authority for the Final Rule**

Once one gets past the Defendants' baseless arguments against standing, it becomes clear that Plaintiffs are likely to prevail on the merits for multiple reasons.  Plaintiffs' first claim is that Defendants have no statutory authority to implement this Final Rule.

### 1.      Congress explicitly limited Defendants' rulemaking authority

Defendants fail in their attempts to demonstrate that they had the authority to implement the Final Rule at all.  Contrary to their assertions, Congress did in fact limit their authority in issuing firearms-related regulations.  Defendants state that they "had the authority to engage in necessary rulemaking, including the definition of terms left undefined by the statute."  Resp. at

31.  The problem with Defendants' interpretation is they leave the key word "only" out of the statute.  18 U.S.C. § 926 states, "The Attorney may prescribe *only* such rules and regulations as are necessary to carry out the provisions of the statute."  *Id*. (emphasis added).  Defendants claim that they have the same amount of authority as any other agency to issue regulations is belied by this explicit statutory limitation from Congress.  Defendants cannot point to one instance where Congress had done the same for any other agency in support of their argument.

Defendants rely exclusively on *Nat'l Rifle Ass'n v. Brady*, 914 F.2d 475 (4th Cir. 1990) to support their claim.  This is an out-of-circuit case—which predates the *Heller* and *Bruen* precedents that transformed Second Amendment jurisprudence—that is not persuasive on whether Defendants have the authority to promulgate this Final Rule.  To the extent the case has any relevance here, it supports the Plaintiffs' position.  Plaintiffs' motion notes that Defendants were expressly granted authority to implement regulations for substantive sections of 18 U.S.C. §§ 922 & 923.  The *Brady* Court noted, "The argument that [ATF] retains statutory discretion to promulgate regulations is bolstered by the *specific grants of rulemaking authority* in a number of areas implicated by this litigation.  914 F.2d at 479 (emphasis added).  The statutory provisions that contained these explicit grants were under 18 U.S.C. § 923, which deals with the *mechanics* of federal firearms licensing.  That makes sense since the mechanics of licensing are a natural place for rulemaking.  However, the Final Rule has nothing to do with section 923 or the mechanics of licensing.  Rather, it attempts to redefine a substantive term defined by Congress under section 921.

### 2.    The statutory scheme undercuts Defendants' arguments

This points back to the contextual clues about why Defendants do not have the authority to redefine terms Congress has already defined.  Section 926 creates an explicit limitation on Defendants' authority to promulgate rules, while section 921(a)(13) and provisions of sections

16

922 and 923 grant specific authority to define terms and issue regulations.  Having an express limitation in one provision combined with explicit grants to define terms and issue regulations in others demonstrates that Defendants do not have authority to define terms in any other sections, or else those grants would be superfluous.  Defendants cite *Blanton v. Kansas City S. Ry. Co.*, 33 F.4th 979, 983 (8th Cir. 2022) for the proposition that provisions of a statute are to be "construed together and read in harmony with the entire act."  Plaintiffs wholeheartedly agree.  The problem for Defendants is reading the entire statutory scheme in harmony defeats their arguments.  This is especially true when one considers that Congress created the statutory scheme in this way to prevent Defendants from having too much power.  *See The Right to Keep and Bear Arms*, Report of the Subcommittee on the Constitution, Sen. Jud. Comm., 97th Cong., 2d Sess., at 20 (1982) (The Subcommittee found that "[a]gents anxious to generate an impressive arrest and gun confiscation quota [had] repeatedly enticed gun collectors into making a small number of sales— often as few as four—from their personal collections," even though each of the sales "was completely legal under state and federal law.").

### 3. The BSCA did not magically grant Defendants authority to issue the Final Rule

Instead of conceding that their authority is limited, Defendants rely on an incorrect interpretation of the BSCA as giving them authority to go after otherwise law-abiding citizens who choose to engage in private sales of firearms.  In their response, they state "Through the BSCA, Congress expressly expanded the language regarding what constitutes 'engaged in the business'" and that the removal of a requirement of an intent to earn a livelihood was "a significant departure from and broadening of the scope of the statutory definition."  Resp. at 38. This is wrong.  For starters, the BCSA made no changes to 18 U.S.C. § 926, and Defendants' limited authority is exactly the same as it was under the FOPA.

17

The only change in the statute at issue in this case was the removal of the "livelihood" provision.  18 U.S.C. § 921(A)(C).  In order to understand the flaws in Defendants' reasoning it is important to understand what "livelihood" actually means.  It is "a means of supporting one's existence, *esp.* financially."  Black's Law Dictionary (11th ed. 2019).  The rest of the statute remains intact: a person "devotes time, attention, and labor to dealing firearms as a regular course of trade or business to predominantly earn a profit through repetitive purchase and resale of firearms." 18 U.S.C. § 921(A)(C).  A plain reading of the statute shows that the removal of "livelihood" simply removed the requirement that someone has to deal firearms as a means of supporting one's existence (*i.e.* as their job).  In short, someone could not escape the reach of the revised statute simply because they had another job in addition to selling firearms.  It does not mean that someone who earns any money at all from selling firearms is suddenly engaged in the business of selling firearms.

To the extent the Court considers legislative intent (and it need not here, as the plain language is clear), statements from members of Congress confirm this interpretation.  Senators John Cornyn and Thom Tillis were two Senators who voted for the BCSA.  They wrote a comment letter opposing what would become the Final Rule.[5]  Both Senators stated, "As chief negotiators and drafters of the BCSA, we can say with certainty that the BSCA would not have passed with Section 12002 had we contemplated this proposed rule or anything remotely similar to it."  *Id.*  They described it as "a material breach of our agreement and understanding when we negotiated in good faith a bipartisan bill."  This makes sense.  The political reality of our modern

---

[5]*Comment Letter of Senators John Cornyn and Thom Tillis regarding Notice of Proposed Rulemaking: Definition of "Engaged in the Business*," located at https://bloximages.chicago2.vip.townnews.com/thetexan.news/content/tncms/assets/v3/editorial/c/7f/c7f9f3c0-f85f-11ee-a839-cf3fcb6c2ae7/66187a26da2b7.file.pdf.

times negates the idea that a bipartisan Congress in 2022 gave the Defendants the broad authority they claim they have.

Furthermore, the Senators noted that striking "livelihood" was "an incremental update." *Id.* And they did this "to prevent someone who should register as a firearms dealer from evading licensing requirements because he or she had another job that supported his livelihood." *Id.* This again cuts against Defendants' argument for broad authority. The fact that BCSA was narrow and incremental is also supported by proponents of the statute who believed it did not go far enough. Senator Ben Cardin, for instance, stated, "The legislation we pass in the Senate soon will save lives and help keep our communities safer, but there are *many more* reasonable steps we can and should take consistent with the Second Amendment rights of law-abiding citizens." 168 Cong. Rec. S3124 (daily ed. June 23, 2022) (emphasis added). Defendants did not promulgate the Final Rule in order to implement the BCSA. They utilized the BCSA as a pre-text for a political goal they could not get through the legislative process. Once that pre-text is dropped, the rest of their arguments fall apart.

**4.      Defendants do not have the authority to create presumptions**

Defendants also do not have the authority to create presumptions in a criminal statute. Defendants confuse the issues by citing cases that deal with whether agencies as a general matter have the ability to create presumptions. But Plaintiffs never argued that presumptions cannot exist in agency rules. Instead of engaging the Plaintiffs' actual arguments, Defendants create a strawman. The issue is whether these particular Defendants have the authority to create presumptions under a *criminal* statute. They do not because (1) their authority to issue rules and regulations at all was expressly limited by Congress, (2) the Defendants cannot point to an instance where courts have held an agency can apply presumptions to a criminal statute (regardless of whether the presumption claims to only apply in the civil context), and (3) the

presumptions are not "necessary" to carry out the provisions of the statute.

The last point is supported by the fact that the GCA has been around since 1968 without presumptions and there have never been any issues in determining who was required to become a licensee since Congress had already provided clear definitions for it.  Even the BSCA has been around for nearly two years and there is no evidence that any changes in the statute have created any confusion that require such presumptions.  In addition, "clarity" being necessary requires the Defendants to demonstrate some evidence of confusion surrounding the statute.  But they do not.  Instead they cite primarily noncompliance.  Resp. at 37.  They do not provide any information as to whether that noncompliance is due to those unaware that they have to be licensed or whether it is due to people intentionally violating the law.  If it is the latter, "clarity" would hardly be "necessary" since the noncompliance would exist regardless.  But even assuming it's the former, the presumptions still have to actually clarify something.  Instead, these presumptions make the law more confusing and do not clarify anything.  These points will be addressed more fully below.  But these presumptions are not "necessary," and having them in the first place exceeds the Defendants limited statutory authority.

> **5.**    **Defendants' definitions of "engaged in the business" and "personal collection" are contrary to statute**

This background also explains why Defendants' definitions of "engaged in the business" and "personal collection" are contrary to statute.  As to the "engaged in the business" definition, nothing in the BCSA requires licensing for someone who sells or attempts to sell one firearm combined with other nebulous behaviors arbitrarily decided by Defendants.  All of the FOPA requirements of "regular course of trade" and "repetitive purchase and resale" are still applicable.  18 U.S.C. § 921(a)(21)(C).  But the Final Rule contains a presumption that is triggered when someone sells one or no firearms at all.  89 Fed. Reg. 29,091.  Defendants try to run away from

20

this reality by addressing it in a footnote.  Regardless, the simple act of selling one firearm and indicating one could sell another cannot possibly be the type of behavior that qualifies as "regular course of trade" or "repetitive purchase and resale."  The fact that the Final Rule *presumes* someone who does this is a firearms dealer is contrary to statute and common sense.

Defendants' novel definition of "personal collection" does not fare any better. Defendants concede firearms purchased primarily for personal protection are excluded from the personal collection exception under the Final Rule.  Resp. at 41.  Whatever Defendants' motive, they do violence to statutory law by arbitrarily declaring that all firearms purchased for personal protection cannot be part of a personal collection.  They offer no support in any of the relevant statutes for this brazen change.  *Id.*  Instead they offer only their own desire to better "effectuate the statutory restriction on dealing firearms."  *Id.*  This they cannot do.  Only Congress can decide whether the statutory exception for personal collections is too large.

They also cherry pick a definition of collection that aligns with their misguided views. *Id.*  However, one needs to define both "personal" and "collection" to ascertain the plain meaning of the term "personal collection."  "Personal" is defined as "Of or relating to a particular person; private; Concerning a particular person and that person's private business, interests, or activities; intimate," *American Heritage Dictionary of the English Language*, Fifth Edition (2022), while "collection" is defined as "A group of objects or works to be seen, studied, or kept together," *American Heritage Dictionary of the English Language, Fifth Edition* (2022). Thus a "personal collection" is a group of objects belonging to one person.  There is no basis in the plain meaning of "personal collection" to exclude weapons purchased for personal protection as a collection is broad and encompasses any group of objects kept together by a particular person.  18 U.S.C. § 921(a)(13) provides no support either.  That definition is geared toward

those who become licensed collectors.  There is no support for the notion that it relates to someone's personal collection.

To understand just how sweeping Defendants' restriction on personal collections is, one needs to consider just how many guns fall into the massive category of "personal protection weapons."  Certainly, almost all handguns fall into this category.  An estimated 44% of all firearms in private possession in the United States today are handguns.[6]  Presumably, shotguns should also be included.  Shotguns account for an estimated 20% of firearms in private possession.[7]  According to President Biden, shotguns are ideal for personal protection: "you want to keep someone away from your house, just fire the shotgun through the door."[8]  Americans generally agree.  Finally, if one includes rifles as firearms usable for personal protection—which virtually every rifle is—then every functioning firearm in the country is excluded from Defendants' arbitrary and illogical definition of "personal collection."[9]  Defendants cannot point to any statutory authority to come up with this absurd result.

The claim that allowing personal protection weapons into a personal collection swallows the exception has no support.  Defendants point to no evidence here, let alone in the Final Rule, that individuals who were required to have a license were evading the licensing requirements by claiming personal protection weapons were part of their personal collection.  It is a completely hypothetical concern.  But even that hypothetical cuts both ways.  A person could claim he has a

---

[6] 145,027,290 out of a total of 325,974,664.  John Berrigan, Deborah Azrael, and Matthew Miller, "The Number and Type of Private Firearms in the United States," Sage Journals, Table 2, *available at* https://journals.sagepub.com/doi/full/10.1177/00027162231164855.)

[7] Footnote 65,384,747 out of a total of 325,974,664, Berrigan, *et al.*

[8] Interview of Joe Biden by Anthony Licata, Field and Stream (Feb. 25, 2013), *available at* https://www.fieldandstream.com/articles/guns/2013/02/gun-control-joe-biden-interview

[9] 25.5% of Americans own any firearm, 13.5% own only rifles.  Thus 12.0% have a collection that does not include rifles. Berrigan et al.

special interest or hobby in collecting handguns and claim they are part of his personal

collection.  Defendants would then have to arbitrarily read that person's mind to see what his

actual intent was.

Defendants' Response point to two other disturbing trends: (1) they do not understand

their own Final Rule and its implications and (2) they do not understand firearms, the very thing

they regulate.  Yet despite that, they want broad power to regulate the behavior of law-abiding

citizens.  The court should not allow it.  The bottom line is the Final Rule lacks statutory

authority.

**C.     The Final Rule is Unconstitutionally Vague**

The lack of statutory authority is not the only problem with the Final Rule. A regulation

is unconstitutionally vague if it does not give a person of reasonable intelligence fair notice that

his or her conduct is unlawful or it "fails to establish standards for the police and public that are

sufficient to guard against the arbitrary deprivation of liberty interests."  *City of Chi. v. Morales*,

527 U.S. 41, 52, 60 (1999).  Defendants implausibly assert that there is no vagueness whatsoever

in the Final Rule because counsel for Defendants has offered his opinion that all of the scenarios

presented by Plaintiffs will doubtless be resolved in favor of the seller, with no finding that the

seller has been "engaged in the business" of selling firearms.  Resp. at 43-44.  But the opinions

of brief writers before this Court will not bind ATF agents and ATF attorneys in the years ahead.

All that will bind them are the words of the Final Rule and the words of the applicable statutes.

And those words of the Final Rule create confusion and ambiguity for the millions of laymen

who sell firearms to one another.

The three greatest sources of vagueness injected by the Final Rule are: (1) the creation of

a new distinction between guns used for personal protection and guns not used for personal

protection, (2) the creation of a new standard that the mere suggestion of a willingness to sell a

23

single firearm may be enough to bring someone within the scope of being engaged in the business, and (3) the mind-numbing complexity of the rule itself, with its exceptions to exceptions and its multiple presumptions. Each of these sources of ambiguity will be reiterated below, along with replies to any responses offered by Defendants.

First consider the inherently vague phrase "primarily for personal protection"—arguably the greatest source of vagueness in the Final Rule. This phrase does not appear in any of the relevant statutes, and it is a completely new legal standard invented by Defendants. It appears in the Final Rule's definition of the term "personal collection," with the full sentence reading as follows: "In addition, the term shall not include firearms accumulated primarily for personal protection." 27 C.F.R. § 478.11. Defendants' insertion of this phrase into the Final Rule betrays a shocking lack of familiarity with the ordinary use of firearms. Virtually every firearm can be used for personal protection. Firearms are usually divided into three general categories (each of which has subcategories): handguns, shotguns, and rifles. It is beyond cavil that every handgun is useful for personal protection; handguns (both pistols and revolvers) can be easily carried on one's person, and even the heaviest handguns can easily be stored in one's automobile or kept in a useful location for home defense. As noted above, an estimated 44% of firearms in private possession in the United States are handguns. Berrigan, et al., Table 2. Shotguns, which represent approximately 20% of firearms, are also ideal for personal protection—particularly personal protection in one's home. *Id.* The only category about which reasonable debate might occur is the rifle category. At one end of the rifle spectrum, popular AR-platform carbine rifles are undeniably acquired primarily for home defense. At the other end of the spectrum, longer-barreled traditional hunting rifles equipped with a scope are admittedly less maneuverable for

personal protection,[10] and the scope may impede quick target acquisition.  But even those rifles can be used effectively for home defense if an individual has a limited personal collection.

So which guns are "primarily for personal protection?"  It is impossible to say with certainty.  Arguably almost every handgun falls under this umbrella.  But even within the handgun category there is some ambiguity because a handgun can serve two or more functions for its owner.  For example, certain handguns (especially those with adjustable sights) are excellent for target shooting, but they are also easily carried for personal protection.  So, which are they—guns used for personal protection or guns used for the hobby of target shooting?  They are both.

Plaintiffs presented another example in the opening brief:  .25 ACP caliber semi-automatic pistols, which were designed to be easily concealed in a suit pocket or elsewhere on one's person.  Memo. in Support of Mot. for Preliminary Injunction at 26–27.  These extremely small handguns were widely sold in the United States in the 1950s, 1960s, and 1970s.  Now, none of the major firearm companies manufactures a pistol chambered in .25 ACP, mainly because the small .380 caliber has become more popular.  The .25 ACP pistols remain extremely effective firearms for personal protection and are still carried by thousands of people without ever being noticed.  But because they are no longer produced, they have become collector's

---

[10] Courts have found that "personal protection" has a broader meaning than "self-defense."  *See United States v. Tunley*, 664 F.3d 1260, 1263 n.3 (8th Cir. 2012) (describing "the common law definition of self-defense" on which "courts have traditionally relied" as when "a person reasonably believes that force is necessary to protect himself or another person from what he reasonably believes to be unlawful physical harm about to be inflicted by another and uses such force." (quoting *United States v. Milk*, 447 F.3d 593, 598 (8th Cir. 2006)).  Thus, "personal protection" could apply to protection from animals and dangerous wildlife, where "self-defense" may not.  In that case, firearms that may not be useful for self-defense are very useful for "personal protection"—e.g. a large-caliber hunting rifle as protection from a bear.  Those situations may make the Final Rule even more vague.

items as well.  Which are they?  Defendants' perfunctory answer to this example only adds to the vagueness:  "Here, the Rule makes clear that the definition of personal collection hinges on the purpose for which 'a person accumulates' the weapon."  Resp. at 44.  Defendants seem to think that the buyer's purpose at the time of purchase is easily ascertained.  However, no gun buyer fills out a form when purchasing a firearm that requires him to state his purpose for buying the firearm.  And it would be difficult to do so even if such a form existed.  Most gun buyers have multiple purposes in mind—especially given the fact that every handgun can be used for personal protection.  In the case of the .25 ACP pistol, the buyer is likely to think, "This is a great little gun that I will carry for protection; but it's also cool looking and unusual, so I will want to show it to others, maybe even display it."  Did he "accumulate" the gun for personal protection?  The Final Rule is too vague for a reasonable person to understand and for any ATF agent to enforce fairly.

The second major source of vagueness is the Final Rule's creation of a new standard whereby the offer to sell a single firearm is enough to trigger the licensing requirement.  The wording of the Final Rule exudes vagueness:  "[T]here is no minimum number of transactions that determines whether a person is 'engaged in the business' of dealing in firearms.  For example, even a single firearm transaction or offer to engage in a transaction, when combined with other evidence … may require a license."  27 C.F.R. § 478.13.  This stands in contrast to the wording of federal law prior to the issuance of the Final Rule.  The wording of the law is fairly easy to understand:  a person is "engaged in the business" through "the repetitive purchase and resale of firearms," but not through "occasional sales, exchanges, or purchases" of guns in a "personal collection."  18 U.S.C. § 921(a)(21)(C).  So, put simply, the law indicates that lots of repetitive sales constitute being "engaged in the business," and a few "occasional" sales are not

enough.  The Final Rule changes all of that.  Now the mere offer to sell a single gun is enough.
There is no longer a meaningful element of quantity in the definition of illegal conduct.

When pressed on this point, Defendants only add to the vagueness of the new standard.
They repeatedly offer the same answer in both the standing section and the vagueness section of
their Response Brief when responding to an example of a person who makes multiple sales in
apparent violation of the Final Rule.  They say, in effect, "There's nothing to worry about here,
because the law allows for 'occasional sales.'"  *See* Resp. at 21–22, 43-44.  In other words, every
time Defendants are pressed about the Final Rule's statement that one firearm is enough, they
retreat to the words of the statute which allow for "occasional sales" (which indicates multiple
firearms).  Even in the case of Plaintiff Judge Journey, who repeatedly sells multiple firearms at
4–5 gun shows every year, and who would appear to be violating the Final Rule if it goes into
effect, Defendants retreat to the "occasional sales" wording of the statute.  Resp. at 21–22.
Defendants' response proves the point.  The Final Rule says one thing, but the statute says
another.  The Final Rule does not clarify the statute, it conflicts with the statute.  And the result is
the creation of vagueness making it unclear whether a person's conduct is illegal or not.

The third principal source of vagueness comes from the Byzantine complexity of the
Final Rule itself.  The Final Rule's definitions contain multiple exceptions and multiple
presumptions.  And the multiple presumptions are accompanied by multiple opposing
presumptions that serve as exceptions to the presumptions.  *See generally* 27 C.F.R. § 478.13.
Even after reading the Final Rule for half an hour, a person of ordinary intelligence cannot easily
comprehend exactly what conduct is prohibited.  To this argument Defendants offer no response
at all.

Finally, Defendants' Response Brief compounds the vagueness problem in another

respect as well.  Defendants propose a definition of "personal collection" that bears no resemblance to what any person of reasonable intelligence would believe that term to mean.  To most people, "personal collection" means all of the guns that a private individual owns personally.  If the statute is left alone, it is quite simple to understand.  But Defendants protest that this cannot possibly be the correct definition:  "If 'personal collection' were to be interpreted [sic] as 'firearms owned by a person,' as Plaintiffs appear to suggesting, then no 'occasional sales, exchanges, or purchases or firearms" could be regulated."  Resp. at 40.  Yes, that is exactly what Plaintiffs are suggesting.  And yes, "occasional sales" of privately owned guns were not intended by Congress to be regulated.  *See* 18 U.S.C. § 921(a)(21)(C).

In their zeal to expand the definition of illegal conduct beyond what Congress established, opposing counsel construct a new, much broader, definition of personal collection.  They potentially exclude all handguns and shotguns from what can be included in a "personal collection."  In so doing, they twist the meaning of "personal collection" so much that a person of reasonable intelligence would no longer recognize it.  Defendants evidently do not realize (or refuse to acknowledge) that firearms sold on a commercial basis at a gun shop are not "personally" owned.  They are owned by the person named listed on the ATF paperwork.  Only after the gun shop sells the gun to an individual does it become "personally" owned by a single person.  That is what Congress understood when it enacted the statute.  The operative word in "personal collection" is "personal."  The average American gun owner possesses 5 guns.  Berrigan, *et al.*  If you ask him, he will say that every one of his guns is part of his "personal collection."  Once he bought it, it became part of his collection.  Defendants' puzzling assertion that guns used for personal defense are not part of this personal collection lacks basis in common practice or Congress's chosen language.  But that does not entitle them to change it and create

confusion in the process.  The Final Rule is unconstitutionally vague.

**D.     The Final Rule is Arbitrary and Capricious**

First, the Final Rule deviates sharply from past practice without reasonable explanation.

Defendants admit there was a sharp deviation from past practice but claim that they

acknowledged it and provided a reasonable explanation.  Resp. at 46.  That argument is without

merit.  Defendants concede that over the course of multiple decades, they have never engaged in

rulemaking to provide a definition for the term "engaged in the business" which is a term

Congress has already defined.  *Id.*  They claim the Final Rule acknowledges this departure but it

does no such thing.  Defendants cite to the Final Rule's preamble which gives a generic history

of the statute and prior rulemaking where it states that a prior Rule did not define the term

"engaged in the business."  89 Fed. Reg. at 28,969-70.  The Final Rule made no connection

between that past practice and the current rulemaking.  Defendants' characterization of that

preamble as somehow an acknowledgement of its sharp deviation is a post hoc rationalization

that finds no support in the Final Rule.  But even if this were to qualify as acknowledgement of

sharp deviation from past practice, it lacks a reasonable explanation.

This type of flip-flop in Defendants' own position is especially problematic because it

demonstrates that the statute is "subject to more than one reasonable interpretation" and that the

rule of lenity dictates that the court is "bound to construe the statute in [the challenger]'s favor."

*Hardin v. ATF*, 65 F.4th 895, 898 (6th Cir. 2023).  Defendants did not address or attempt to

counter this specific argument.  The court should treat it as Defendants having conceded this

point and waiving any argument against it.

The Final Rule also failed to consider the reliance interests of the states.  Here,

Defendants claimed they did consider these reliance interests since the Final Rule acknowledged

it "would lead to an increase in sellers becoming licensed, an increase in background checks, and

a decrease in the number of private sellers, and that certain states run their own background checks." Resp. at 46–47.  This position is curious since the Plaintiff States raised all these issues in their irreparable harm arguments, yet Defendants still contend that they lack standing.  It is difficult to square the idea that they adequately considered the harms states would face based on the Final Rule but at the same time say those harms do not exist for the purpose of standing.  It continues a trend of Defendants engaging in post hoc rationalizations to survive the legal challenge.  The court should not accept that.  Regardless, the Final Rule did not adequately address the state reliance interests on the prior practice.  It did not acknowledge the administrative and personnel costs associated with increased background checks and it did not acknowledge the loss of state tax revenue as a reduced vendors and sales at gun shows.

Finally, the Defendants' explanations for their actions are implausible.  Defendants entirely failed to respond to one of the key arguments which is that they intend to apply "a multi-factor test through case-by-case adjudication," without some explanation to provide "predictability and intelligibility" to regulated parties.  *LeMayne-Owen Coll. v. NLRB*, 357 F.3d 55, 61 (D.C. Cir. 2004) (Roberts, J.); *see U.S. Postal Serv. v. Postal Regul. Comm'n*, 785 F.3d 740, 753-54 (D.C. Cir. 2015).  The court should treat it as Defendants having conceded this point and waiving any argument against it.  This Final Rule's attempt to establish such a test without any explanation to provide predictability and intelligibility makes the explanation that it was designed to provide "clarity" implausible.  There is no doubt to any reasonable observer that the Final Rule is a politically motivated measure and utilizes "clarity" as a guise to push through what they could not from Congress.  It is certainly not the product of well-reasoned decision making.  It is therefore arbitrary and capricious.

E.      **The Final Rule Violates the Second Amendment**

In Response to Plaintiffs' Second Amendment claim, Defendants offer a rambling tour of

various Second Amendment cases; but they fail to correctly apply the test laid out by the Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). The Court succinctly stated what the test is. "We reiterate that the standard for applying the Second Amendment is as follows:  When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 142 S.Ct. at 2130.  In other words, the first half of the test is the text, the second half is the history.

Plaintiffs unquestionably satisfy the first half of the test, which is simply whether the "Second Amendment's plain text covers an individual's conduct."  There is no doubt that the Second Amendment phrase "to keep and bear arms" includes the right to purchase or sell arms. *Range v. Attorney General*, 69 F.4th 96, 106 (3d Cir. 2023) (*en banc*); *Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011).  Defendants acknowledge as much. *See* Resp. 49.  While the Second Amendment expressly protects the right to "keep and bear arms," the only way to exercise this right "is to get one, either through sale, rental, or gift," *Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1043 (4th Cir. 2023), or to build a firearm oneself.

Instead of moving on to the second half of the test, Defendants take a detour to argue that the right to engage in the buying and selling of firearms is not "unfettered." *Id.*  But that is not the test.  The Bruen Court made clear that such balancing of government interests that might limit or fetter one's right is no longer permissible in the Second Amendment context.  There is no special government interest in regulating the buying and selling of firearms that must be balanced against the gun owner's rights.  "*Heller* and *McDonald* do not support applying means-ends scrutiny in the Second Amendment context."  Bruen, 142 S.Ct. at 2127 (Citing *District of*

*Columbia v. Heller*, 554 U.S. 570 (2008)).  "*Heller* relied on text and history."  *Id.* at 2129.

Still avoiding the second half of the test, Defendants then repeatedly quote a single sentence of dicta from *Heller*, in which the Court said that its ruling was limited to the case at hand, "was not an exhaustive historical analysis today of the full scope of the Second Amendment" and "nothing in our opinion should be taken to cast doubt on longstanding … laws imposing conditions and qualifications on the commercial sale of arms."  *Heller*, 554 U.S. at 626-27.  *See* Resp. 48, 49.  Defendants erroneously claim that the *Heller* Court was stating that all laws regarding the commercial sale of firearms are presumed to be constitutional.  *Id.*  But Defendants fail to mention that the *Bruen* Court returned to this very same sentence in *Heller*, and emphasized that it was nothing more than a statement that the Heller decision did not involve any analysis of other laws.  "That said, we cautioned that we were not 'undertak[ing] an exhaustive historical analysis today of the full scope of the Second Amendment' and moved on to considering the constitutionality of the District of Columbia's handgun ban."  *Bruen*, 142 S. Ct. at 2128 (quoting *Heller*, 554 U.S. at 627).  The Court was in no way opining on the constitutionality of laws regulating the commercial sale of firearms or limiting the protections of the Second Amendment in that context.  Moreover, this language in Heller refers to regulations on commercial sales, not the non-commercial sales that are at principally at issue here. Nor are dealer licensing laws a "longstanding" laws; rather they arose in second half of the 20th century.

Finally, Defendants get to the second half of the Bruen test, where it is the government's burden to "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearms regulation."  *Id.* at 2130.  Here, Defendants' argument does not even pass the blush test.  They offer two historical laws that bear no resemblance whatsoever to the Final Rule.  First, they claim that a 1794 Act of Congress making it unlawful "to export from the

United States any cannon, muskets, pistols, bayonets, swords, cutlasses, musket balls, lead, bombs, grenades, gunpowder, sulpher, or saltpetre," Act of May 22, 1794, 1 Stat. 369, ch. 33 § 1, as an historical analog to the Final Rule.  Their claim is preposterous.  The Act of 1794 was about the export of valuable arms and components to foreign countries at a time when the United States faced the threat of war with Great Britain.  It had absolutely nothing to do with regulating or limiting the sale of firearms between U.S. citizens.  Indeed, Defendants neglect to mention that in that in the very next section, the act states that, "nothing in this act shall be construed to prohibit the removal or transportation of any of the articles aforesaid from one port to another port within the United States…." *Id.* at § 3.  It was a measure that was likely enacted to address the fact that the British navy was at the time seizing military supplies bound to enemy ports on neutral ships.  U.S. State Dept., Office of the Historian, "John Jay's Treaty," 1794-95," available at https://history.state.gov/milestones/1784-1800/jay-treaty.

Defendants' second stab at finding an historical analog is equally unavailing.  They point to several colonial or state laws requiring the inspection of gunpowder magazines.  Resp. 50-51.  Such laws had nothing to do with the sale of guns between U.S. citizens.  They had everything to do with the prevention of fires in American cities.  Justice Breyer similarly attempted in his *Heller* dissent to argue that such gunpowder storage laws were analogous to modern firearms restrictions.  The *Heller* majority opinion emphatically rejected that argument:  "Nothing about these fire-safety laws undermines our analysis; they do not remotely burden the right of self-defense as much as an absolute ban on handguns." *Heller*, 554 U.S. at 632.  Nor did such fire-safety laws burden the right of citizens to sell firearms to one another.  In sum, Defendants fail to identify any law in the period when the Second Amendment was ratified that comes close to requiring individual Americans to obtain a license prior to selling firearms to one another.

Accordingly, Plaintiffs are likely to prevail on this claim.

**F.     Plaintiffs Face Irreparable Harm**

As discussed above, Plaintiffs have established that they will be harmed (i.e. will suffer a legally cognizable injury) if the Final Rule is allowed to take effect.  These injuries are directly attributable to Defendants and will be redressable by an injunction and then vacatur of the Final Rule.  They have standing to challenge the Final Rule.  These injuries are imminent and irreparable, and thus call for a preliminary injunction while a decision on the merits is reached.

To the extent that Defendants suggest standing's injury element is more demanding in this preliminary injunction posture, Resp. at 17, they are wrong.  Plaintiffs must, of course, show "standing for each type of relief sought."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).  But even when that relief is "injunctive" the ordinary harm test for standing applies.  *Id.* ("concrete and particularized"; "actual and imminent").  Irreparable harm remains a merits showing, not a standing one.  In *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983), for instance, the Court discussed "a showing of irreparable injury" only after "assum[ing]" the "suit affords [plaintiff] Article III standing to seek an injunction."  *Id.* at 111.

Loss of income is not necessarily irreparable harm that justifies a preliminary injunction if damages are later available, *see Adam-Mellang v. Apartment Search, Inc.*, 96 F.3d 297, 300 (8th Cir. 1996), or a statute provides that the lost income will be repaid, *see Sampson v. Murray*, 415 U.S. 61, 90 (1974) (discussing the availability of relief under the Back Pay Act).  In either case, there is an adequate remedy at law.  *Sleep No. Corp. v. Young*, 33 F.4th 1012, 1018 (8th Cir. 2022) ("Irreparable harm occurs when a party has no adequate remedy at law.").  But the possibility of self-help at a later date is not an "adequate remedy at law" brought about through the ordinary course of litigation.  That the Final Rule may later be invalidated, and the firearms may later be sold, and the States may later be able to collect tax revenue is not a "remedy at

law."  The States will suffer lost tax revenue and the effects of that lost tax revenue as soon as the Final Rule takes effect.  They cannot later recover damages or lost revenue from Defendants because Defendants are immune from damages and there is no equivalent of the Back Pay Act here.  As discussed above, the States will, therefore, suffer an irreparable harm absent a preliminary injunction.

Private Plaintiffs will also be irreparably harmed.  They have plans to attend gun shows—where they will buy and sell firearms—shortly after the Final Rule is set to take effect. They plan to do so repeatedly.  Absent an injunction, each will either be (a) required to undertake the burdensome process of applying for an FFL (which likely would not even be completed in time); or (b) in realistic danger of civil, administrative, and potentially criminal penalties by attending the shows and hoping their interpretation of a vague and confusing rule is correct. Defendants' assertion that Plaintiffs do not need to apply for a license "at this stage" is disingenuous given Plaintiffs' declarations that they want to continue to engage in their multi-decade hobby of firearm collecting which requires continuous engagement in the marketplace to trade unique firearms.  Defendants cannot retroactively compensate them for their time, and are unlikely to ensure them that they will not be penalized.

Importantly, Defendants do not claim the harm to any Plaintiff from denying the preliminary injunction could be remedied through money damages and have thus conceded a key factor in the irreparable harm analysis.  *Accord Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (2013) ("Furthermore, we question whether Novus's alleged injuries, *i.e.*, 'a loss of customers or customer goodwill,' Appellant's Br. at 36, are truly 'irreparable' in the sense that they could not be addressed through money damages if Novus is successful following a trial on the merits.").

35

**G.      The Remaining Factors Weigh in Favor of a Preliminary Injunction**

Preliminarily enjoining the Final Rule is in the public interest.[11]  Plaintiffs have already

demonstrated that the States will lose tax revenue whether from lost gun show ticket sales or

from lost sales tax were the Final Rule to go into effect.  The Final Rule will cause New

Hampshire to incur addition administrative costs that cannot be recovered from the federal

Defendants.  *See generally* Edwards Dec.  As well, Defendants anticipate an increase in the

number of federal firearms licensees across the country, 89 Fed. Reg. at 28,998, so the Final

Rule will cause an increase in background checks that state law enforcement agencies in

Tennessee will need to conduct.  *Id.* at 29,088.  This will result in an increase in unrecoverable

administrative costs for Plaintiff Tennessee as they process more firearms license applications

and run background checks for new licensees that previously did not need to do so.  These lost

revenues and increased administrative costs are not otherwise recoverable from the federal

Defendants.  *See*, *e.g.*, *Entergy, Arkansas, Inc. v. Nebraska*, 210 F.3d 887, 899 (8th Cir. 2000);

*Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1473 (8th Cir. 1994).

And if that were not enough, the Final Rule runs roughshod over Tennessee's enacted

law, *see* Tenn. Code Ann. § 67-6-310, because it conflicts with Plaintiff Tennessee's policy

governing nonprofits' participation in gun shows.  By requiring nonprofit gun collectors

providing limited wares at gun shows to acquire federal licenses, the Final Rule runs afoul of

Plaintiff Tennessee's legal treatment of nonprofit gun collectors and the State's policy of

exempting nonprofits from burdensome regulations.

---

[11] While Defendants claim that the balance of the equities and the public interest merge "when
the government is a party," citing *Nken v. Holder*, 556 U.S. 418, 435 (2009), that case involved a
motion for a stay by an alien who had been ordered removed.  Here the movants include twenty-
one States, and each is as much "the government" with sovereign powers and interests as are the
Defendants.

Perhaps most importantly, the Second Amendment rights and Due Process rights of individual Plaintiffs will be violated. Both the States and the federal government have a weighty interest in preserving and protecting constitutional rights.

Defendants ignore all of this in their Response.  As well, they ignore the panoply of harms demonstrated by the private Plaintiffs.  *See* Mem. in Support of Mot. for Preliminary Injunction, at 37–38.  District courts are tasked with asking "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the *status quo* until the merits are determined."  *Nebraska v. Biden*, 52 F.4th 1044, 1046 (8th Cir. 2022) (internal quotation omitted).

Defendants contend that the balance of the equities is not in the Plaintiffs' favor because they "have failed to raise even a substantial question on the merits, have not established any harm to themselves in allowing the Rule to take effect during the pendency of this case, and have identified no benefit to the public generally of enjoining the Rule."  Resp. at 52.  But these assertions blink reality.  Plaintiffs have not only raised a substantial question on the merits but also have shown they are likely to succeed.  The Journey, Fry, Black and Maxey declarations make plain the harm to the Plaintiffs.

Moreover, the balance of equities weighs in favor of granting a preliminary injunction. There is no indication that a preliminary injunction would cause any harm—let alone substantial harm—to the Defendants.  As Plaintiffs demonstrated, Memorandum in Support at 16, "Courts have been also applying this straightforward definition of the BSCA for nearly two years, and there is no sign that they have struggled to interpret any of its terms."  Delaying the implementation of the Final Rule while this Court resolves the substantial questions that have been raised regarding it will therefore cause no harm to the Defendants.  In contrast, each of the

Plaintiffs will be immediately harmed if the Final Rule is not enjoined.

Courts find "no public interest in the perpetuation of unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Defendants claim that there is no long-standing *status quo* because of the statutory tweak Congress enacted in 2022. Resp. at 52. But that simply begs the question, because this litigation raises the question whether the Defendants have the statutory authority to implement the Final Rule that they claim. A preliminary injunction here would simply perpetuate the status quo, thereby avoiding the demonstrated harm to Plaintiffs while precluding the possible "perpetuation of unlawful agency action."

The question before this Court is whether to maintain the *status quo* while this litigation proceeds. It should. All the factors weigh in favor of a preliminary injunction. Plaintiff show both the requisite likelihood of success on the merits and irreparable injury absent an injunction. Additionally, they demonstrate an injunction is in the public interest and will not harm Defendants. Defendants have no equitable interest in an invalid, unlawful rule, but the public, and the Plaintiffs, have a substantial interest in not seeing their livelihoods threatened, in not being caught up in an overly-broad regulatory scheme, in not incurring the unrecoverable administrative costs the rule imposes, and in not seeing their duly-enacted public policy trampled by arbitrary federal regulation. When a rule such as this one seeks to upend a decades-long status quo, judicial review of the merits should be allowed to play out before the effects spread. The equities favor an injunction while this Court reviews the validity of the Final Rule.

## H.   Relief Should Not be Limited to the Parties

Defendants argue that if relief should be granted, it must be narrow and limited to the parties. Resp. at 54-55. This ignores the reality that relief limited to 21 states and a few private plaintiffs would create an unworkable patchwork of requirements that vary from state to state.

The Eighth Circuit and Supreme Court have both found nationwide preliminary relief appropriate when even fewer states (six) sought it. *See Nebraska v. Biden*, 52 F.4th at 1048; *Biden v. Nebraska*, 143 S. Ct. at 2376.

Furthermore, this case involves Defendants violating the constitutional rights of citizens and imposing criminal penalties based on the Final Rule. Given the consequences, relief from their unlawful actions should certainly not be granted unevenly. Defendants do not attempt to make an argument as to why the court should allow such an inequitable outcome. Instead, they throw out legalistic arguments that are divorced from reality. Ultimately, there is no adequate framework to limit relief to Plaintiffs in this case and as a result, such relief should not be limited to them.

I.    **Venue is Proper**

Venue is proper in any "judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2); *see also* Resp. at 29. Defendants' only argument is that venue is improper because the State of Arkansas lacks standing. Resp. at 29. They implicitly concede that, if Arkansas has standing, venue is proper. As discussed above, Arkansas, like the other States, will lose tax revenue and face sovereign injuries if Defendants' Final Rule takes effect. Arkansas has standing, and venue is proper.

**CONCLUSION**

For the reasons stated above, the Court should grant Plaintiffs' Motion for a Preliminary Injunction.

Dated:  May 16, 2024                    Respectfully submitted,

*KRIS W. KOBACH
Kansas Attorney General

*/s/Abhishek S. Kambli*
*Abhishek S. Kambli
*Deputy Attorney General*
*Jesse A. Burris
*Assistant Attorney General*
**Erin B. Gaide
*Assistant Attorney General*
Office of the Kansas Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-2215
Fax: (785) 296-3131
abhishek.kambli@ag.ks.gov
jesse.burris@ag.ks.gov

*Admitted *Pro Hac Vice*
** *Pro Hac Vice* forthcoming

*Counsel for Plaintiff State of Kansas*

BRENNA BIRD
Iowa Attorney General

*/s/ Eric H. Wessan*
*Eric H. Wessan
Solicitor General
Office of the Iowa Attorney General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 281-5164
Eric. Wessan@ag.iowa.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Iowa*

TIM GRIFFIN
Arkansas Attorney General

*/s/ Nicholas J. Bronni*
Nicholas J. Bronni (2016097)
 Solicitor General
Dylan L. Jacobs (2016167)
 Deputy Solicitor General
323 Center Street, Suite 200
Little Rock, AR  72201
Telephone: (501) 682-2007
Fax: (501) 683-2520
nicholas.bronni@arkansasag.gov
dylan.jacobs@arkansasag.gov

*Counsel for Plaintiff State of Arkansas*

AUSTIN KNUDSEN
 Montana Attorney General

*/s/ Christian B. Corrigan*
*CHRISTIAN B. CORRIGAN
 *Solicitor General*
*PETER M. TORSTENSEN, JR.
 *Deputy Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707
christian.corrigan@mt.gov
peter.torstensen@mt.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Montana*

STEVE MARSHALL
Alabama Attorney General

*/s/ Edmund G. LaCour, Jr.*
*Edmund G. LaCour, Jr.
Solicitor General
Office of the Alabama
Attorney General
501 Washington Avenue
P.O. Box 300152
Montgomery, AL  36130
Telephone: (334) 242-7300
Fax: (334) 353-8400
Email: Edmund.LaCour@AlabamaAG.gov


*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) pending

*Counsel for Plaintiff State of Alabama*

TREG R. TAYLOR
Alaska Attorney General

*/s/ Aaron C. Peterson*
*Aaron C. Peterson
Senior Assistant Attorney General
Department of Law
1031 West Fourth Avenue, Ste. 200
Anchorage, AK 99501
Telephone: (907) 269-5232
Facsimile: (907) 276-3697
Email: aaron.peterson@alaska.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) pending

*Counsel for Plaintiff State of Alaska*

CHRISTOPHER CARR
Georgia Attorney General

*/s/ Stephen Petrany*
*Stephen Petrany
Solicitor General
Office of the Attorney General of Georgia
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Georgia*

RAÚL R. LABRADOR
Idaho Attorney General

*/s/ Joshua N. Turner*
*Joshua N. Turner
Chief of Constitutional Litigation and Policy
*Alan M. Hurst
Solicitor General
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
Tel: (208) 334-2400
Josh.turner@ag.idaho.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Idaho*

TODD ROKITA
Indiana Attorney General

/s/ James A. Barta
*James A. Barta
Solicitor General
Office of the Attorney General of Indiana
IGC South, Fifth Floor
302 W. Washington St.
Indianapolis, Indiana 46204
Telephone:  (317) 232-0709
James.Barta@atg.in.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Indiana*

RUSSELL COLEMAN
Kentucky Attorney General

/s/ Victor B. Maddox
*Victor B. Maddox
*Aaron J. Silletto
*Zachary M. Zimmerer
Office of the Attorney General
700 Capital Avenue, Suite 118
Frankfort, Kentucky 40601
Phone: (502) 696-5300
Victor.Maddox@ky.gov
Aaron.Silletto@ky.gov
Zachary.Zimmerer@ky.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff Commonwealth of
Kentucky*

ANDREW BAILEY
Missouri Attorney General

/s/ Bryce Beal
*Bryce Beal
Assistant Attorney General
Missouri Attorney General's Office
207 West High Street
Jefferson City, MO 65101
(573) 751-6633
Bryce.Beal@ago.mo.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Missouri*

MICHAEL T. HILGERS
Nebraska Attorney General

/s/ Zachary A. Viglianco
*Zachary A. Viglianco
Deputy Solicitor General
Office of the Nebraska
Attorney General
2115 State Capitol
Lincoln, NE 68509
(531) 739-7645
zachary.viglianco@nebraska.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of Nebraska*

JOHN M. FORMELLA
New Hampshire Attorney General

/s/Brandon F. Chase
*Brandon F. Chase
Assistant Attorney General
New Hampshire Department of Justice
1 Granite Place – South
Concord, NH 03301
(603) 271-3650
brandon.f.chase@doj.nh.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff New Hampshire*

DREW H. WRIGLEY
North Dakota Attorney General

/s/ *Katie L. Carpenter*
*Katie L. Carpenter
*Deputy Solicitor General*
North Dakota Office of the Attorney
General
600 E. Boulevard Ave., Dept. 125
Bismarck, ND 58505
Telephone: (701) 328-2210
Email: katcarpenter@nd.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of North
Dakota*

GENTNER DRUMMOND
Oklahoma Attorney General

/s/ Garry M. Gaskins, II
*GARRY M. GASKINS, II
*Solicitor General*
OFFICE OF THE ATTORNEY GENERAL
STATE OF OKLAHOMA
313 N.E. 21st Street
Oklahoma City, OK 73105
Phone:      (405) 521-3921
garry.gaskins@oag.ok.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State Oklahoma*

ALAN WILSON
South Carolina Attorney General

/s/ *Joseph D. Spate*
*Joseph D. Spate
Assistant Deputy Solicitor General
Office of the Attorney General
State of South Carolina
1000 Assembly Street
Columbia, SC  29201
(803) 734-3371
josephspate@scag.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State South Carolina*

MARTY J. JACKLEY
South Dakota Attorney General

*/s/ Charles D. McGuigan*
*Charles D. McGuigan
Deputy Attorney General
Office of the Attorney General
1302 E. Hwy. 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Facsimile: (605) 773-4106
charles.mcguigan@state.sd.us

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff State of South Dakota*

JONATHAN SKRMETTI
Tennessee Attorney General and Reporter

*/s/ Whitney D. Hermandorfer*
*WHITNEY D. HERMANDORFER
Director of Strategic Litigation Unit
*BRIAN DANIEL MOUNCE
Counsel for Strategic Litigation &
Assistant Solicitor General
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-1400
whitney.hermandorfer@ag.tn.gov
brian.mounce@ag.tn.gov

*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for the State of Tennessee*

JASON S. MIYARES
Attorney General of Virginia

/s/ *Kevin M. Gallagher*
*Kevin M. Gallagher
*Principal Deputy Solicitor General*
*Brendan T. Chestnut
*Deputy Solicitor General*
*M. Jordan Minot
*Assistant Solicitor General*
Virginia Office of the Attorney General
202 North 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-2071
Fax: (804) 786-1991
Email: kgallagher@oag.state.va.us
Email: bchestnut@oag.state.va.us
Email: mminot@oag.state.va.us
*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff Commonwealth of
Virginia*

PATRICK MORRISEY
West Virginia Attorney General

*/s/ Michael R. Williams*
*Michael R. Williams
*Principal Deputy Solicitor General*
Office of the Attorney General of West
Virginia
State Capitol Complex
Building 1, Room E-26
Charleston, WV 25301
(304) 558-2021
michael.r.williams@wvago.gov

*Admitted *Pro Hac Vice*

*Counsel for State of West Virginia*

BRIDGET HILL
Wyoming Attorney General


/s/ Ryan Schelhaas
*Ryan Schelhaas
 *Chief Deputy Attorney General*
Office of the Wyoming Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov


*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) pending

*Counsel for Plaintiff State Wyoming*

/s/ Michael D. McCoy
*Michael D. McCoy
*William E. Trachman
Mountain States
Legal Foundation
 2596 South Lewis Way
 Lakewood, Colorado 80227
 (303) 292-2021
Mmccoy@mslegal.org


*Counsel for Plaintiffs Allen Black, Donald
Maxey, and Chisholm Trail Antique Gun
Association*

*Admitted *Pro Hac Vice*

/s/ Anna St. John
*Anna St. John
Hamilton Lincoln Law Institute
1629 K St. NW Suite 300
Washington, DC 20006
(917) 327-2392
anna.stjohn@hlli.org

/s/ M. Frank Bednarz
*M. Frank Bednarz
Hamilton Lincoln Law Institute
1440 W. Taylor St. #1487
Chicago, IL 60607
(801) 706-2690
frank.bednarz@hlli.org


*Motion for admission *Pro Hac Vice* under
Local Rule 83.5(d) forthcoming

*Counsel for Plaintiff Phillip Journey*