```
 1              IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF ARKANSAS
 2                       DELTA DIVISION

 3   STATE OF KANSAS, et al.,

 4                   Plaintiffs,

 5     v.                              No. 2:24-CV-00088 JM

 6                                     May 17, 2024
                                       Little Rock, Arkansas
 7                                     9:31 AM

 8   UNITED STATES ATTORNEY GENERAL, et al.,

 9                   Defendants.

10                 TRANSCRIPT OF MOTIONS HEARING
             BEFORE THE HONORABLE JAMES M. MOODY, JR.,
11                 UNITED STATES DISTRICT JUDGE

12              _____

13   APPEARANCES:

14   On Behalf of the Plaintiffs:

15       MR. KRIS W. KOBACH, Attorney at Law
         MR. ABHISHEK KAMBLI, Attorney at Law
16          Kansas Attorney General's Office
            120 Southwest Tenth Avenue, 2nd Floor
17          Topeka, Kansas  66612

18       MR. DYLAN JACOBS, Attorney at Law
         MR. NICHOLAS J. BRONNI, Attorney at Law
19          Arkansas Attorney General's Office
            323 Center Street, Suite 200
20          Little Rock, Arkansas  72201

21       MR. MICHAEL FRANK BEDNARZ, Attorney at Law
            Hamilton Lincoln Law Institute
22          1440 West Taylor Street, Suite 1487
            Chicago, Illinois  60607

23
         MR. MICHAEL D. MCCOY, Attorney at Law
24          Mountain States Legal Foundation
            2596 South Lewis Way
25          Lakewood, Colorado  80227            (continuing.)
```

1    <u>APPEARANCES CONTINUED</u>:

2    On Behalf of the Defendants:

3        MR. JEREMY S.B. NEWMAN, Attorney at Law
         MR. ZACHARY SHERWOOD, Attorney at Law
4        MS. KERI LANE BERMAN, Attorney at Law
           U.S. Department of Justice
5          1100 L. Street, N.W.
           Washington, DC  20001

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24        *Proceedings reported by machine stenography.  Transcript
     prepared utilizing computer-aided transcription.*

25

```
 1          (Proceedings commencing in open court at 9:31 AM.)
 2          THE COURT:  We're on the record in the State of
 3   Kansas, et al. versus the United States Attorney General, Case
 4   2:24CV88.
 5      Mr. Kobach, who do you anticipate speaking on behalf of
 6   the plaintiffs today?
 7          MR. KOBACH:  Your Honor, I anticipate that I will
 8   be.
 9          THE COURT:  You'll be the only one?
10          MR. KOBACH:  Yes, Your Honor.
11          THE COURT:  All right.  Then Kris Kobach, Kansas
12   Attorney General, will be principally here on behalf of the
13   plaintiff.  And I have three names that I had here on behalf of
14   the Attorney General, if I can skip over to them.  Looks like
15   Jeremy Newman, Keri Lane Berman, and Zachary Sherman.  Who do
16   y'all anticipate being the lead?
17          MR. NEWMAN:  Hi.  This is Jeremy Newman.  And this
18   is Zachary Sherwood and Keri Berman.  I anticipate that
19   Mr. Sherwood will be addressing standing and irreparable harm,
20   and I will address the merits, Your Honor.
21          THE COURT:  Okay.  Is your red -- have you got a
22   light on on your mic?  It's counter-intuitive, because the red
23   light means "on."
24          MR. NEWMAN:  Oh.  Sorry.
25          THE COURT:  No, we're good, and we got what you
```

 1    said.  You don't have to repeat all that.  I just wanted to

 2    make sure that everyone understood that it's counter-intuitive.

 3              MR. NEWMAN:  Thank you, Your Honor.

 4              THE COURT:  I just ask, since my court reporter's

 5    not keenly aware of who you are, that when you get up and

 6    speak, just remind her who you are.

 7         I take it y'all got the email.  I've read all of the

 8    briefs, the background on this case.  It's cited three or four

 9    times, and I've read all the pleadings twice.  So I think that

10    puts me up to eight or nine times on the background from Paul

11    Revere all the way up to the most recent rule-making.

12         And so I would ask that y'all make good use of your time

13    by giving me the benefit of comprehending that after eight

14    tries, and we can get right to what really matters on me making

15    a decision in this case.  I'm going to try to give you all the

16    time you need and let you -- let your conscience be your guide,

17    but I've had an unexpected command performance that I need to

18    be out of here at 12:30 for, and then I can come back if we

19    don't finish.  So don't think I'm cutting you off, because I

20    can circle back, but I do need to be somewhere that I didn't

21    expect to be a couple days ago.

22         So with that, Mr. Kobach, I'll give you the floor.  And

23    just so it doesn't go unnoticed, I have an amicus brief that I

24    also read that was from the State of Ohio, which is Docket

25    Number 10, and the Brady Center to Prevent Gun Violence, which

1   is Docket 48 that I also had the benefit of.  It's all you, Mr.

2   Kobach.

3         MR. KOBACH:  Thank you, Your Honor.  And I neglected

4   to introduce co-counsel.  I think you may be familiar with

5   those who have been here before representing the great State of

6   Arkansas.

7         THE COURT:  The recently highly-lauded lawyers from

8   Arkansas.

9         MR. KOBACH:  Yes.  Well, I won't introduce them

10  then.  I'll introduce Abhi Kambli, who's a deputy attorney

11  general in my office.

12        THE COURT:  Good morning, sir.

13        MR. KAMBLI:  Good morning, Your Honor.

14        MR. KOBACH:  And Frank Bednarz who is representing

15  Plaintiff Journey.  And -- is it Michael?

16        MR. MCCOY:  Michael McCoy.

17        MR. KOBACH:  Michael McCoy, who has just arrived and

18  is representing one of the other private plaintiffs.

19      With Your Honor's permission, what I'd like to do is go

20  straight to what I think is probably the most complex and

21  interesting part of this case, and probably the most worthy of

22  discussion.  And that is the various reasons why we believe

23  that Plaintiffs will prevail on the merits.  And I'll reserve

24  five minutes, if necessary, to come back if Defendants want to

25  talk at length about standing.  Or if you have questions about

1    standing, you're certainly welcome to ask me now.

2          THE COURT:  Mr. Kobach, you don't need to reserve

3    any particular time.

4          MR. KOBACH:  Okay.

5          THE COURT:  I'm going to try to give y'all all the

6    time you need, and if y'all are productive, give you as many

7    shots at the mic as you need, so long as we don't get

8    redundant.  But don't be worrying about reserving.

9          MR. KOBACH:  Okay.  Well, thank you, Your Honor.

10         THE COURT:  I may live to regret that comment.

11         MR. KOBACH:  Thank you.  And I also want to thank

12   the Court for making room for this hearing before Monday when

13   the regulation is scheduled to go into effect.  I know that the

14   timeline was pretty compressed.  So we appreciate that.

15      So I want to jump to the -- there are four issues on the

16   merits.  We argue, first, that the final rule is contrary to

17   the terms of the statute.

18         THE COURT:  Mr. Kobach, let me interrupt you real

19   quick.  Am I best following along with you in the Complaint or

20   your motion?

21         MR. KOBACH:  Probably in the reply, if that's okay.

22         THE COURT:  I can get there.  Save me a step.

23   Continue.

24         MR. KOBACH:  Okay.  If you're in the reply, I'll be

25   talking about A, Defendants lack statutory authority for the

1    final rule.  But I want to jump to A-2.  So there's

2    basically -- well, let me give you the broad picture.  So,

3    first, our arguments are:  Number one, it conflicts with the

4    statute; number two, it is vague -- void for vagueness; number

5    three, it violates the Second Amendment; and number four,

6    arbitrary and capricious.  And I'll leave out arbitrary and

7    capricious.  I think the briefing on both sides speaks for

8    itself.

9         But I want to go violates the -- violates the terms of

10   the statute.  And there are several reasons -- and I'm just

11   going to hone in on the ones that I think are the most

12   important.

13        The first one is:  Does the ATF have the authority to

14   define terms in Section 921?  And we argue that with the one

15   exception of 921(a)(13), the answer is "no."  Section 921 -- I

16   printed it out and brought up here -- is 14 pages if you use

17   8½ by 11 on my computer.  And so it's 14 pages of definitions,

18   and it goes on and on and on defining many terms -- more than

19   30 terms.  I think it's close to 40.  I didn't print it all

20   out, it's that long.

21             THE COURT:  I actually did, but go ahead.

22             MR. KOBACH:  Yeah, so it's quite long.  And as you

23   can see, each term is defined rather precisely by Congress.

24   You know, fugitive from justice means, and then it goes on and

25   on.  The only exception in this entire list of definitions is

```
 1   (a)(13).
 2              THE COURT:  Mr. Kobach, slow down just a half a
 3   step.
 4              MR. KOBACH:  You're right.  We've got plenty of
 5   time.
 6              THE COURT:  No, you're good, but go ahead.
 7              MR. KOBACH:  So you look at all these definitions,
 8   and the only one that is framed differently is (a)(13).  And
 9   that one says "the term 'collector' means any person who
10   acquires, holds, or disposes of firearms as curios or relics,
11   as the Attorney General shall by regulation define."
12       So this is the only definition where the statute invites
13   the attorney generals, more specifically the ATF, to define a
14   term.  And, similarly, in Section 922 and 923, ATF is
15   granted --
16              THE COURT:  Let me interrupt you one more time,
17   because everything I'm in in the reply has to do with
18   paragraph 2 dealt with standing, and is talking about
19   Tennessee.  Can you help me?
20              MR. KOBACH:  Oh, yeah, jump past all the standing,
21   Your Honor, please, and go to --
22              THE COURT:  I was on the wrong paragraph.
23              MR. KOBACH:  I can grab my copy.
24              THE COURT:  I'm there.  Go ahead.  I was trying to
25   listen and scan at the same time.  I'm there now.
```

 1             MR. KOBACH:  So I'm --

 2             THE COURT:  And I've followed everything you said so

 3     far.  I just couldn't find it on the page because I was wanting

 4     to highlight the -- I'm guessing we're talking about where you

 5     quoted at the top of page 16 the only -- that limited the

 6     argument from when you said the only exception or whatever.  Am

 7     I following you right?

 8             MR. KOBACH:  I believe that's right, Your Honor.

 9             THE COURT:  I remember reading the argument last

10     night, but I just needed to make sure I was pigeonholed in the

11     right section.

12             MR. KOBACH:  Oh, actually, Your Honor, I'm sorry.

13     I'll follow along with you.  I'm actually just using a separate

14     set of notes.  Yeah, so that reference to only, I'm skipping

15     over that.  That gets the scope by which --

16             THE COURT:  Are you in paragraph 2 at the bottom of

17     16 is where you started?

18             MR. KOBACH:  Exactly.  Exactly.  That's where I'm

19     starting.

20             THE COURT:  I'm with you completely now.  Thank you.

21             MR. KOBACH:  Okay.  So this is interesting.

22     Congress does -- spends 14 pages, give or take, defining a

23     bunch of really specific terms.  And then in one term says, "in

24     defining curios and relics, ATF shall define this term."

25         That suggests very strongly that ATF doesn't have the

1    authority to define all the other terms.  And, indeed, until

2    this regulation, ATF didn't define any of these other terms in

3    921.  They only defined where Congress told them to define,

4    which is curios and relics.

5        And I think this is important because if you are -- if

6    they claim the authority to define all of these terms and add

7    definition and redefine and add more content, then that -- then

8    the invitation to the ATF to, by regulation, define in (a)(13)

9    becomes meaningless, mere surplusage.  If they had it already,

10   why did the Attorney General give them -- direct them --

11   sorry -- Congress direct the Attorney General to define this

12   specific term?

13       Now, their answer to the argument, in their response

14   brief, is:  Well, it says "shall."  And since it says "shall,"

15   that implies we may define all the other terms, if we so

16   choose.  But I would say that that's not correct.

17       The reason that the Congress chose the term "shall" is

18   because the history of the Firearms Owners' Protection Act, and

19   all of the post-1968 acts, has been one of confining the

20   discretion of an agency, ATF, that had been exercising its

21   authority in ways that gun owners could not predict and seemed

22   arbitrary.  And so Congress was saying:  This one, you guys

23   shall define because you have to, you know, notify gun owners

24   what constitutes a curio or a relic so they know what to do.

25   So get to defining this term.

1    That doesn't imply that when you want to, you can

2    redefine all the other terms that we have very precisely

3    defined.  And so I think, at the outset, it's questionable

4    whether they have the authority to define any of the other

5    terms in Section 921.  And we argue they do not.

6        The second argument with regard to conflicting the

7    statutory authority -- or the second one I'm going to make this

8    morning is -- it's in subsection 3, if you follow on page 17.

9    The bipartisan -- the BSCA, that's the 2022 act -- didn't

10   magically grant them the authority to redefine the term

11   "engaged in the business."

12       Now, their answer is:  Well, sure it did.  Congress took

13   out the word "livelihood" from the definition of "engaged in

14   the business."  So now it's our job at ATF to tell you what

15   Congress meant by taking out the word "livelihood."

16       But that's not necessary.  And what they have done is

17   completely contrary to what Congress intended, and I'll get to

18   that in a minute because --

19           THE COURT:  So what did Congress intend by

20   "livelihood"?

21           MR. KOBACH:  So we, on the next page, talk about

22   that.  If you read the comments on the proposed regulation,

23   comments were submitted by Senators John Cornyn and Thom Tillis

24   who were involved in negotiating this bill, the 2022 BCSA

25   [sic].  And they say that we -- they did this, quote, "to

1    prevent someone who should register as a firearms dealer from

2    evading licensing requirements because he or she had another

3    job that supported his livelihood," end quote.

4         So they didn't want people to interpret "livelihood" in

5    the "engaged in the business" definition as meaning, no, that

6    has to be your sole job.  And if it's not your sole job, you're

7    free.  You're not engaged in the business.

8         And so they specified "because he or she had another job

9    that supported his livelihood."  That's what they were trying

10   to clarify.

11              THE COURT:  So are they trying to say that anybody

12   that has a 20,000-dollar regular job and makes $30,000 selling

13   guns is in the livelihood of business, and the same person

14   that's selling $30,000 worth of guns but has a 200,000-dollar

15   regular job isn't in the livelihood?  And so it depends on how

16   much you make in your other job to determine whether or not

17   you're in violation of the statute?

18              MR. KOBACH:  I don't think so, Your Honor.  I think

19   what they were clarifying is if you have -- if you have another

20   job, that doesn't free you from being considered engaged in the

21   business of firearms.

22              THE COURT:  And that's the way I understood it.  But

23   comparisons have been made and commentary has been said that

24   this is just a fraction of what these people are making

25   otherwise.  They're judges, or they're whatever occupation you

 1   want to fill in, and this is just kind of a side gig.  But that

 2   doesn't answer the question -- does it? -- as to how you relate

 3   profit or whatever motivation you have for dealing in guns.

 4   I'm having trouble pinning it down.  But I think we all

 5   understand what I'm saying.  And maybe this is a different

 6   point.

 7        But the notion that profit motivation is how we look at

 8   some of this stuff -- and we do it on a case-by-case basis --

 9   how do we reconcile the fact that there's a lot of people out

10   there trading guns that might make a profit on grandfather's

11   Belgian Browning Sweet Sixteen that he bought for nothing and

12   is worth, if you can find one, a lot of money?

13             MR. KOBACH:  I have one.

14             THE COURT:  But I don't want to get rid it for what

15   he paid for it.  And so, yeah, I'm going to make a profit, but

16   I still got this day job that pays me a lot of money.  So it's

17   insignificant, as opposed to somebody who might be lucky enough

18   to have that same gun in their possession that works at

19   McDonald's, and that might be a year -- a year's income to

20   them.

21        And so how do you reconcile those two things?  And if

22   that's a different point, we'll get to it.  I think what you

23   were trying to tell me is the mere fact that you have a day job

24   doesn't relieve you of the necessity to potentially need to

25   file as a federal arms dealer.

```
1            MR. KOBACH:  That is my main point.  And I
2    appreciate you bringing up the Belgian Sweet Sixteen because
3    that is my preferred quail gun, and I love that thing and will
4    never let it go because I'll probably never find another one.
5            THE COURT:  If you die, you can leave it to me in
6    your will, but -- I jest, but.
7        And as an aside, we had a criminal case where a guy had
8    300 guns, and one of them was in there.  And they confiscated
9    his guns and were going to put it in the crusher.  And it
10   crushed me to hear that, but I digress.  Go ahead, Mr. Kobach.
11           MR. KOBACH:  Well, I think my impression is, Your
12   Honor, based on what the senators said in their comments about
13   this rule, that they were just trying to eliminate the
14   possibility that someone could say, Look, I've got another job.
15   That's my livelihood.  This job here, selling guns, is not
16   really my -- it's my second job.  It's my side gig.
17       And so they were clarifying, look, having other jobs
18   doesn't matter.  And that's why they took out the word
19   "livelihood."  So what are you left with?  You're left with
20   what's in Section (a)(21)(C) -- sorry -- 21 -- (a)(21)(C), yes.
21   Subsection (a)(21)(C) of Section 921.  And that is the elements
22   are -- I think are -- nothing is crystal clear in any
23   definition, but the elements are fairly simple.
24       Number one, you devote time, attention, and labor to
25   dealing.  Number two, it's a regular course of trade or
```

1     business.  Number three, it's to predominantly earn a profit.

2     Number four, it involves the, quote, repetitive purchase and

3     resale of firearms.

4          And so those are the four elements, and then it has the

5     exclusion "but it shall not include a person who makes

6     occasional sales" from a personal collection or who liquidates

7     his personal collection.  So I think they said, We're not going

8     to -- we don't want ATF looking at how many jobs you have and

9     what your income is from one job versus another.  We're just

10    going to define dealing in firearms.

11         And regarding those senators, I would note that just

12    yesterday -- and we didn't have time to put in the brief, but

13    the -- a resolution was passed in the Senate, signed by 45

14    senators, five of whom were, you know, in this bill, and five

15    of whom were -- voted for this bill.  And if they had said --

16    if they had said that they would not -- they would not -- if

17    their votes had been taken out, the bill would never have

18    passed, the 2022 bill.  And they said this regulation is

19    inconsistent with what we did.  And then, similarly, Cornyn and

20    Tillis said, quote -- and this is in our brief -- "As chief

21    negotiators and drafters of the BCSA --

22              THE COURT:  Slow way down.

23              MR. KOBACH:  "As chief negotiators and drafters of

24    the BCSA, we can say with certainty that the BCSA would not

25    have passed with Section 12002 had we contemplated this

1    proposed rule or anything remotely similar to it."

2         So that gets to the point that the Defendants are taking

3    way too much authority out of the simple removal of the word

4    "livelihood" from that definition.  They say, "They took out

5    livelihood.  It's our job to tell you what that means."  Boom.

6    Here is this massive, complex, byzantine definition of several

7    terms.

8         Now, let me get to two terms -- two elements of their

9    byzantine definition that are in conflict with federal law.

10   And the first one is their novel definition of "personal

11   collection."  And if you're following along in the brief, I

12   would jump to subpart 5.

13              THE COURT:  Which page is that?

14              MR. KOBACH:  That would be on page 20.

15              THE COURT:  I'm there.  Go ahead.

16              MR. KOBACH:  So they basically say personal

17   collection does not include personal -- firearms used primarily

18   for personal protection.  This "personal protection" phrase is

19   found nowhere else in the firearms law in any of the statutes.

20   They invent that out of thin air, and they say, presto,

21   personal collection cannot include -- I'm sorry -- a personal

22   collection cannot include personal protection firearms.  It's a

23   brazen change.

24        Why did they do that?  Well, they tell us.  They say in

25   their -- opposing counsel says in their brief -- I'm trying to

1    look for their page number, but I've got it quoted here -- they

2    say it's "To better effectuate the statutory restriction on

3    dealing firearms," end quote.  Well, there's no question.  It

4    makes it much more restrictive.  You've taken the personal

5    collection exception and you've squeezed it down to virtually

6    nothing.

7          And they say, "Well, we can do that.  We can define

8    personal collection."  And my answer would be "no."  Congress

9    did not give you the authority, and especially in such a broad

10   way.  Because just consider how sweeping this is.  If you look

11   at the publicly-available studies, and we quote one of them at

12   length in our brief from Berrigan and others, 44 percent --

13   it's believed that approximately 44 percent of handguns -- of

14   guns in circulation among Americans are handguns.

15         Now, I would argue, and I think most people would argue,

16   that a handgun is probably one that you would consider a gun

17   primarily for personal protection.  Did Congress really mean

18   that you'd have to exclude the single-largest category of

19   firearms and that those cannot be considered in one's personal

20   collection?  That's a huge, sweeping redefinition of the term

21   "personal collection."

22         And it's not up to an agency to do that.  Congress can

23   say, "Okay, handguns or guns for personal protection are not

24   included."  And then if you add -- and I think we could

25   reasonably add -- that shotguns are frequently used for

1    personal protection, especially home defense.  And we quote in

2    our brief even President Biden has said that.  Well, that's

3    another 20 percent of firearms.  So now you're up to 64 percent

4    of all firearms in Americans' personal collections are no

5    longer to be considered part of their personal collection.

6          Now, Congress certainly could have done that.  Congress

7    could have said, "You know what, we are -- you can't count

8    handguns.  You can't count certain handguns.  You can't count

9    AR-style rifles.  We don't want to consider those part of a

10   personal collection."  But Congress didn't do that.

11         And so for them to pull this term "personal defense" out

12   of thin air and say, "We have decided that personal collection

13   excludes guns for personal defense" is extraordinary.  There's

14   just nothing in the statute that remotely points to it.  And

15   when we pressed them on that in the briefing, that's where they

16   say, "Well, we just want to make it more effectuate.  It better

17   effectuates Congress's definitions."

18         Now, the second -- so I think that's, by far, the biggest

19   contradiction with congressional statute -- the statutes

20   enacted by Congress.  The second one that we point to is the

21   single transaction element.  And this one is -- we kind of talk

22   about it throughout the brief.  I apologize, we don't have a

23   separate subheading for it.

24         But this is the change in the term to -- where they say

25   in the final rule mere -- "a single transaction or the intent

1  to engage -- the willingness to engage in a single transaction

2  is enough to be engaged in the business."  I would say that

3  that is contrary to the definition because --

4          THE COURT:  It could be or is?

5          MR. KOBACH:  Could be.  And they say depending on

6  what other factors might support it.  And we would argue --

7          THE COURT:  That's easy to conceive that your motive

8  for selling a gun, even if for a single time, could be

9  sufficient.  You only have to break the law once.  You only

10  have to rob one bank to get there, if what you're doing is

11  illegal.  If you're just making a withdrawal, it doesn't matter

12  whether it's one or not.  So I'm not sure I understand the

13  argument on one time's enough to break the law if you do it

14  illegally versus -- I guess, the single transaction situation

15  I'm not as impressed with because anybody could violate the

16  statute completely illegally once and be held responsible.

17      You don't have to be a career offender in the gun trade

18  to get convicted, I guess, is -- or sanctioned or whatever, if

19  we want to talk about administrative penalties versus criminal

20  offenses.  But I'm not sure I follow the argument as well on

21  one time breaking the law is enough to get you in trouble.

22          MR. KOBACH:  So, Your Honor, I apologize if I've

23  been unclear or our brief has been unclear.  We're not saying

24  that you cannot be charged and convicted until you have sold

25  lots and lots of gun or a certain number of guns.

THE COURT:  Or more than one.

MR. KOBACH:  Or more than one gun.

THE COURT:  I guess more than one transaction.
Because you could sell multiple guns in a single transaction.

MR. KOBACH:  We absolutely agree that the intent to
sell multiple guns could certainly bring you afoul of being a
person engaged in the business who doesn't have a license.  But
it has to involve multiple guns.  That's -- that's our point.
Because if you look at (21)(C) -- (a)(21)(C), the definition of
a dealer in firearms, it requires the repetitive purchase and
resale of firearms plural.

So you would have to have an intent to engage in the
repetitive purchase and resale.  That's the point.  There's a
multiplicity of guns involved in being a dealer in firearms.
And similarly -- this is interesting -- the exception for
occasional sales, even the exception is in plural form.  "This
shall not include a person who makes occasional sales."

So the way we read it is you have to have -- to be
engaged in the -- as a dealer in firearms, you have to have an
intent or an actuality of repetitive purchases and resales.
And even falling within the occasional sales exception for
personal collections, that one's plural too.  So I could make
multiple sales from my personal collection and still not get
into the category of repetitive purchase and resales of
firearms.  So we think that by indicating that a single sale is

 1  enough, that is an inconsistency.

 2          THE COURT:  So do you think the rule, as written,

 3  prohibits anybody from intermittently, or whatever the right

 4  word is, occasionally --

 5          MR. KOBACH:  Occasionally, yeah.

 6          THE COURT:  -- disposing of grandfather's

 7  collection, my collection?  I don't know that it matters.  It's

 8  my collection now that I've inherited it.  I can't sell it all

 9  to one guy, but I can sell it to three or four women or men, or

10  whoever wants to buy them, depending on how I want to let them

11  go.  And I'm getting rid of my personal collection, whether I

12  define it as curio, museum piece, or otherwise.  You say the

13  rule prohibits me from doing that?

14          MR. KOBACH:  No, but here's where it gets

15  interesting.  So let's say you had 20 guns, and your

16  grandfather had 20 guns, and now you've got 40.  And you're

17  starting to dispose of -- liquidate is the term the statute

18  uses -- you're starting to liquidate the collection.

19  Absolutely, the statute and the final rule permit a person to

20  liquidate the collection.

21          But where the final rule gets very confusing and, I would

22  argue, contrary to law, is that if you restock -- so you begin

23  selling off grandfather's guns, and then you decide, you know

24  what, I'm not going to just keep selling.  There are some new

25  guns I'd like to buy.  And then you start restocking, either

1  the same or different firearms, under this final rule it

2  appears that you are now engaged in the business of selling

3  firearms.  And that brings me to the next --

4         THE COURT:  So I'm not engaged in the business of

5  selling firearms if I restock, because I'm a buyer at that

6  point.

7         MR. KOBACH:  Well, you may be.  According to this

8  final rule, you may be now engaged in the business because you

9  started restocking.  And so this adds another complex element.

10        THE COURT:  So help me understand how this rule

11 affects my buying.  I didn't think I was required to be a

12 licensed anything to buy -- assuming that I am legal to buy

13 firearms, I can pass a background check and -- anyway, I'm not

14 going to go there.

15     But how does this rule affect how many guns I purchase

16 and whether I'm restocking or not?  I know it may affect how I

17 ultimately sell them.  But let's say I trade in an old gun that

18 doesn't have chokes for one that does, and I get rid of one.

19 And then three years later, I decide to upgrade to something

20 that will shoot a three-and-a-half instead of a three or a

21 two-and-three-quarters.  And I want to sell that gun to a

22 buddy.  You're telling me the rule prevents me from doing that?

23        MR. KOBACH:  Potentially, yes, in the -- and I

24 appreciate your analogy of the chokes too.  I had a Browning

25 20-gauge A5, the old style that didn't take chokes.  And I was

1    in that same situation, and I found a guy who actually can ream

2    out the barrel and he can make them take chokes, by the way.

3    But anyway that -- I digress.

4         The statute does not contain the term "restocking."  The

5    statute just says you make occasional sales or who sell -- for

6    your -- to and from your personal collection, and you're also

7    excepted from dealing if you sell all or part of your personal

8    collection of firearms.  The statute makes no mention of

9    restocking.

10        But the final rule brings in restocking and says, well,

11   you can -- you can liquidate your collection, but if you start

12   restocking, then we're going to look at all these different

13   factors to determine if you are a dealer in firearms.  And the

14   answer to your question, in short, is I don't know, because the

15   final rule is so vague as to how much restocking.  Do you have

16   to restock the same gun?  Do you have to restock multiple guns?

17   You'd have to be restocking with the potential to sell a gun in

18   the future again.  That's another thing they look at.  Are you

19   going to --

20             THE COURT:  But doesn't that make sense that if you

21   just inherited a collection and you want to get rid of it,

22   that's a pretty easy determination because there isn't a lot of

23   case-by-case analysis on that?  You're just getting rid of

24   something you got.

25        But if you're buying guns on Monday and selling them

1    three years later, that's one thing.  And if you're restocking,

2    and however long you keep them might decide whether or not

3    you're just swapping guns.  You buy them on Monday and sell

4    them on Thursday, that's a different analysis.

5         And so if you restock your guns, we may take a closer

6    look at it.  That's what I hear you telling me the rule says.

7    But not just because I restock means if I ever try to liquidate

8    my collection that's not for personal protection or otherwise,

9    that I'm running afoul of the federal licensing law.  Did you

10   just explain that to me that way?

11             MR. KOBACH:  What I'm saying is I think that's

12   right, based on the rather convoluted rule.  But the convoluted

13   rule doesn't give you a clear answer as to whether you --

14   whether restock --

15             THE COURT:  I'm with you on that part.  Whether or

16   not it's a bright line and it's easy to determine, that's

17   another issue.  But what I'm trying to figure out is -- I heard

18   you -- you may not have said it, but I heard you to say that if

19   you try to restock and then sell your guns, you can't do that

20   under the rule.

21             MR. KOBACH:  What I'm saying is that's inconsistent

22   with the statute.  The statute doesn't use the word

23   "restocking."  And, again, I'd definitely look at (a)(21)(C) --

24             THE COURT:  But you're saying the rule does.

25             MR. KOBACH:  The rule does.

1          THE COURT:  And I understood you to say that the

2     rule tells me if I try to restock and resell, I can't do that.

3          MR. KOBACH:  Right.

4          THE COURT:  That's not what I heard you say when I

5     asked you to explain what the rule says.  It just says if you

6     restock and resell, we're going to take a closer look.

7          MR. KOBACH:  That's right.  The rule doesn't say --

8     it doesn't draw a bright line.  It just says we're going to

9     take a look.  But my point is adding this restocking element is

10    also inconsistent with the statute.  Remember, their

11    authority -- they claim they have the authority to redefine

12    what is already a very thorough definition.

13         MR. BRONNI:  And I got the part that you -- once we

14    agree what they've done, you don't think they can even do that.

15    I got that part.  I'm just trying to figure out -- the

16    restocking issue, maybe I didn't drill down enough on, but now

17    I understand your argument.

18         MR. KOBACH:  Yeah.  So, yeah, to summarize the

19    statutory conflict argument, first, they don't have the

20    authority to define terms beyond curios and relics.  And if we

21    say otherwise, then we're turning curios and relics -- we're

22    turning the (a)(13) clause into mere surplusage.  Congress

23    didn't even need to do that.  It means nothing.

24         Second, the adding of personal protection weapons is

25    something pulled out of thin air, and it is -- they do not have

1    the authority to cut the personal collection exception that
2    Congress created in half by arbitrarily deciding that personal
3    protection weapons, whatever that means, are excluded from
4    personal collections.
5        And then, third, the inconsistency with a single sale is
6    enough.  We see the statute as using the plural word
7    "repetitive sales" both in the definition of what it is to be
8    engaged in the business and in the exception of occasional
9    sales from personal collection.
10       So now I want to move to the second overall argument, and
11   that's void for vagueness.
12           THE COURT:  Give me a page.
13           MR. KOBACH:  Let me jump ahead here.  That's sub B.
14   Or, C -- sorry.  Unconstitutionally vague.
15           THE COURT:  Try 23, Mr. Kobach.
16           MR. KOBACH:  Yeah, that's right.
17       So there are -- if you look down at the bottom of page
18   23, I talk about the three sources of vagueness.  And I just
19   want to quickly touch on those.
20           THE COURT:  It's even the three greatest sources of
21   vagueness.
22           MR. KOBACH:  Yeah.  And I think there's other.  We
23   just talked about restocking.  And we don't even go to that --
24   I mean, we could spend all day today talking about different
25   words and provisions of the rule that are vague.  But I want to

1   talk about the biggest ones.

2   So the first and, I think, obviously most vague one is,

3   well, what's a firearm used for personal protection?  As I

4   mentioned earlier, if you say handguns and shotguns are all

5   personal protection, then we're already up to 64 percent of

6   guns.  You know, the only category that you could have some

7   debate about is rifles.  And in that category, you -- I think

8   you would have to say that the very popular AR platform rifle

9   is purchased by most people for home defense and personal

10  protection.

11  But on the other end of the spectrum -- and I imagine you

12  own one or two of these too -- is the traditional long-barreled

13  deer rifle with a scope on it.  That one is not so handy for

14  personal protection.  But in a pinch, even that one could be

15  used for personal protection.  So which guns are, quote,

16  primarily for personal protection, end quote, which is the

17  phrase invented by ATF.

18  I would say it is impossible to say with certainty,

19  unless you're going to go with "could be used for personal

20  protection."  Then it's every functioning firearm could be used

21  for personal protection.  And so we pressed them on this.  And

22  in our original brief, we pressed them with the example of a

23  .25 caliber handgun.  And I actually have one of these.  And

24  these guns were extremely popular in the American market in the

25  '50s, '60s, and '70s, maybe because of the popularity of the

1  James Bond films.  Who knows?

2       But these were little guns that sold like hot cakes.  But

3  then they stopped selling them, and you can't buy one today in

4  the '90s, mainly because the .380 caliber became the popular

5  little gun -- the popular concealed gun.

6       And so now, their answer to our question is is this a --

7  is this a collector's item gun or is this a personal protection

8  gun?  Their answer, and I'll quote, is this, in their brief:

9  Here, the rule makes clear that the definition of personal

10 collection hinges on the purpose for which a person accumulates

11 the weapon, end quote.

12      Oh, wait a minute, so it's not defined by the weapon

13 itself.  It's subjectively defined by the buyer on the day he

14 buys it.  So when I bought that little .25 cal gun from the

15 1970s, was I buying it to protect myself, or was I buying it

16 because it looks really cool and I might even want to display

17 it in my home?  Well, I would say both.  But how is anyone to

18 determine the one reason, the primary reason they purchased

19 that gun on the day they purchased it?  And how is ATF to do

20 that?

21      Now, if you had to fill out a form every time you

22 purchase a gun, and on that form you had to write your main

23 reason for buying that gun, well then, I suppose that -- that

24 might not be so vague.  It might be possible for the ATF to

25 find all these forms and look up, hey, Mr. Smith bought this

1  gun primarily for personal protection.  And look, he bought

2  that gun because he wants to display it.  And he bought the

3  other gun for hunting.

4       But it is impossible to ascertain why you or I or anyone

5  purchased a gun ten years ago and say, "No, you bought it

6  primarily for personal protection."  And certainly, a person of

7  reasonable intelligence cannot look at this rule and decide

8  whether his conduct is forbidden or not forbidden.  And he

9  certainly can't anticipate what the ATF will say when the ATF

10 looks at that gun that he bought a couple years ago and says

11 "We think you bought it for personal protection.  Therefore, we

12 exclude it from your private collection.  Therefore, you're

13 engaged in the business."

14      So it is so vague as to what constitutes primarily for

15 personal protection.  And I think they acknowledge that,

16 because in their brief, opposing counsel, they immediately

17 retreat to, oh, it's not a characteristic of the gun.  It's a

18 characteristic of what you're thinking.  It's what's in your

19 mind when you bought it.  That defines whether the gun is for

20 personal protection.

21      And that subjectivity is itself unconstitutional.  A law

22 cannot define terms according to what's in someone's mind years

23 ago.  So that, in itself, would be -- certainly we have

24 criminal intent.  But in terms of defining your purposes for

25 which you bought a gun, it's probably impossible for most gun

1    owners to remember, and it's certainly impossible for the ATF

2    to ascertain, or for a judge to ascertain.

3         The second major source of vagueness that I talk about in

4    1, 2, and 3 at the bottom of page 23 is the -- is this whole

5    question of how many are enough.  The suggestion that one gun

6    is enough, and that there -- we would argue that this injects

7    vagueness, because if you look at the text of the statute

8    itself -- and we admit that the statute itself is somewhat

9    vague -- but the final rule doesn't clarify anything.  The

10   final rule makes it more vague.  The statute says "repetitive

11   purchases and resales of firearms."  Okay, that's engaged in

12   the business as a dealer.  But occasional sales are not.

13        So at least we have a sense of lots of repetitive

14   purchases brings you into the category of engaged in a

15   business.  And occasional sales, whatever that may be, is it

16   one once a year?  Is it once a month?  We don't know.  But at

17   least occasional sales are -- there's a line somewhere, between

18   repetitive purchases over and over again like a gun store, and

19   occasional sales.  But they've now confused the matter by

20   saying even one will also bring you up into this higher

21   category.

22        So now, we don't have a division between occasional and

23   repetitive.  We have a very subjective and very amorphous new

24   definition that goes to intent to earn a profit, goes to

25   willingness to sell another one, maybe.  And the

```
1    quantitative -- any clarity that there was in the statute in
2    terms of quantity is completely gone now.  So they have
3    injected vagueness into the statute by taking away what was at
4    least a somewhat manageable distinction between repetitive
5    purchases and sales and occasional purchases and sales for a
6    personal collection.
7                 THE COURT:  So you're saying it's easier to define
8    repetitive versus occasional?
9                 MR. KOBACH:  I'm saying repetitive and occasional
10   are relatively -- they're easier to define.  And those are the
11   terms of the statute.  But the final rule leaves the statute
12   behind and says --
13                THE COURT:  So what's the number that I have to get
14   to for repetitive?  Or occasional.  You can take your pick,
15   versus the language that they used.
16                MR. KOBACH:  I concede, Your Honor, that the statute
17   itself -- which those are the terms the statute used -- is not
18   crystal clear.  But repetitive purchases and resales, probably,
19   in my view -- and I'm not an ATF officer and I haven't reviewed
20   every single criminal case under this -- but I would imagine
21   that repetitive involves, you know, probably selling guns at
22   least once a week, and that it is an all year long --
23                THE COURT:  Where does it say that in the statute?
24                MR. KOBACH:  It doesn't.  It doesn't say that.
25                THE COURT:  I guess what I'm trying to say is you're
```

1   saying that the rule is vague.  And I'm trying to figure out
2   how much more vague than the legislature made it to begin with.
3          MR. KOBACH:  I agree.  I agree.  The statute itself
4   is not crystal clear because it uses terms like "repetitive
5   purchases" versus "occasional sales."  But the final rule makes
6   it worse.  Because at least there, you had a distinction
7   between something up here that was a lot and something
8   permissible down here which was less than that amount.  Now
9   they say even one.
10          THE COURT:  So a lot and less than a lot is not
11  vague?
12          MR. KOBACH:  It is vague.  The statute itself is
13  vague.  I would concede that.  But they have made it worse and
14  to the point of unconstitutionally vague, where now there's no
15  quantitative element at all.
16          THE COURT:  There wasn't to begin with.
17          MR. KOBACH:  Well, there was an attempt.  Congress
18  tried.  There was something quantitative in that difference
19  between repetitive sales and occasional.
20          THE COURT:  They tried to quantify it but failed.
21  And so there is one?
22          MR. KOBACH:  They tried to quantify.  Maybe
23  Congress --
24          THE COURT:  Meaning the legislature.  So we know who
25  we're talking about for the record.  I get --

1      MR. KOBACH:  Right.  I think that's important to

2  clarify.

3      THE COURT:  -- frustrated with my kids for saying

4  "they" did it, and I don't know who they're talking about.  But

5  just for my record, we're talking about the legislature, you

6  said, quantified it by saying repetitive or whatever.  But I'm

7  not sure they did.  And then you said there's a lot and less

8  than a lot.  And I'm not sure that's quantitative either.

9      MR. KOBACH:  I agree that there is ambiguity in the

10  statute itself.  But there is greater ambiguity now when you

11  add the final rule, which basically says quantity doesn't

12  matter.  We're going to look at other stuff.  Congress could

13  concede -- you know, if Congress wanted to today, they could

14  come back and say, you know what?  We weren't clear enough

15  between repetitive purchases and occasional sales.  Here's what

16  we mean.  Here's a number, how many guns per period.  But

17  that's Congress's decision.  The agency --

18      THE COURT:  I understand.  And I'm not -- I'm not

19  quibbling there.

20      MR. KOBACH:  Yeah.

21      THE COURT:  You're just saying they made it worse.

22      MR. KOBACH:  Exactly.

23      THE COURT:  So to figure out whether or not I agree

24  with you, I got to know what my baseline is versus what the new

25  rule took it to.

1         MR. KOBACH:  Yeah.

2         THE COURT:  And I'm having trouble establishing the

3    baseline to figure out whether or not the rule made it worse or

4    whether or not any of these iterations of the legislative

5    attempts to quantify or redefine what they meant by a number

6    they didn't want to peg.  And so to decide whether or not they

7    arbitrarily made it worse, I need to figure out where to start

8    from.  And I guess that's my discussion with you about

9    occasional and repetitive, and here's a lot and here's less

10   than a lot, how I figure out where to start so I figure out

11   whether or not it really made a difference or made it worse or

12   better.

13        MR. KOBACH:  So what I would say is the statute

14   is -- sorry -- the final rule is extremely vague.  And so it's

15   really hard to say.  And I am really interested to hear you ask

16   opposing counsel some of these questions.  It's really hard to

17   say how many is enough and would this transaction count, would

18   this other transaction count, because the rule is so vague.

19        But what the rule did do is it removed any sort of --

20   well, it didn't remove it, but it confused the statute's

21   references to quantity, which repetitive sales, along with all

22   those other four elements I mentioned.  And it says, no, one is

23   enough -- or the intent to engage in one is enough, as long

24   as -- and then they have more caveats -- as long as you have to

25   have it express the possibility of maybe selling another one,

1    then one is enough.  And they don't say by when you would sell

2    another one or to whom you would sell this other one.  It's so

3    vague.

4          And even our -- you know, our judge plaintiff, Judge Phil

5    Journey, who's been a judge for his entire career, he's in --

6    he's about 70 now.  He said, "I went through this with a fine

7    tooth comb and I can't tell whether my" -- he goes to gun shows

8    and sells from his personal collection and buys four times a

9    year -- four to five times a year.  And he says, "I don't --

10   it's completely unclear to me what is definitely covered and

11   what is not covered.  And, therefore, I'm not going to go to

12   another gun show, being a judge, unless I've got a federal

13   firearms license, because I think my conduct might be illegal,

14   but I don't know."

15            THE COURT:  Didn't he basically get a "get out of

16   jail free card"?  Because he described what he does, and the

17   Justice Department is on record telling me that what he says he

18   does isn't going to be prosecuted because we don't think that's

19   in violation of the rule.  I mean, hasn't he gotten the go-by

20   established that anybody that wants to do what the judge wants

21   to do just has to take his declaration and stay within those

22   limits, and he has judicial estoppel to do exactly that, free

23   from prosecution?

24            MR. KOBACH:  You know, you raise a great point.

25   And, you know, I guess by that logic, any time a gun owner who

1    goes to gun shows and sells at gun shows wants to, you know,

2    get some judicial estoppel, they could file a case like this

3    one and get the Department of Justice attorneys to say, no,

4    that doesn't count.  Those are -- those are relics.  Those are

5    personal collections.  You're good.  But of course --

6              THE COURT:  I mean, this goes more to the standing

7    that the judge said, "This is what I do and what I want to do."

8    And they've declared, so to speak, on behalf of the Justice

9    Department, that everything you got in your declaration's fine

10   with us.

11         So I'm trying to figure out how the judge is at odds at

12   what he can and can't do, because I presume he put everything

13   in the declaration what he might do or want to do.  And they've

14   said that none of that runs afoul, because they took that

15   position to establish that he didn't have standing.  But the

16   practical effect of it is to give him a waiver on anything

17   that's in his declaration.

18         So I only bring that up because you say that it's so

19   vague that the judge doesn't know what to do.  But hasn't he

20   been given clearance on everything that he does doesn't run

21   afoul of the rule?  And they may say, "We didn't mean to or

22   intend to do that."  But that's kind of how I saw the practical

23   effect of their response.

24              MR. KOBACH:  Your Honor, you're correct that Judge

25   Journey, if he's ever prosecuted in the future, might be able

```
 1    to wave defense's response brief in the air and say, "No, they
 2    looked at me and they said I fall within the occasional sales
 3    from a personal collection rule.  So I'm good."
 4         But he also said in his -- but he had standing when we
 5    brought this suit.  When we brought this suit, he didn't have
 6    that defense brief to wave in the air and say, "Look, I'm
 7    good."
 8                   THE COURT:  This isn't a standing argument.
 9                   MR. KOBACH:  Okay.
10                   THE COURT:  I'm not trying to jump ahead.  We're
11    talking about vagueness.
12                   MR. KOBACH:  Yeah.
13                   THE COURT:  So I understand we're going down a
14    rabbit hole on standing because I brought it up.  I'm not
15    criticizing you for going there.  You were responsive to what I
16    said.  I'm talking about in response to your vagueness argument
17    and bringing up the judge, that he didn't have to wonder what
18    he can do or can't do.  And the public at large out there knows
19    that they can do whatever's in his declaration, at a minimum.
20                   MR. KOBACH:  But, of course, the public probably
21    doesn't use PACER and probably doesn't know how to find Judge
22    Journey's --
23                   THE COURT:  Or read the rule.
24                   MR. KOBACH:  Or read the rule.
25                   THE COURT:  Or read the statute, or do anything
```

1    except fill out some form when they buy a gun, to be fair.  I

2    mean, you and I would hope they did more.  But, realistically,

3    the 44 percent or the 60 percent of guns that you're referring

4    to, handguns or otherwise, were purchased by people like me who

5    never read this rule or the statute before you put it in front

6    of me.

7                 MR. KOBACH:  You know, Your Honor, I would respond

8    that --

9                 THE COURT:  We're getting beyond the argument -- the

10   legal arguments here, but the notion that they're not going to

11   read his declaration, they can, if they want to.  And it's

12   going to be -- Mr. Ellis is probably going to put it in the

13   paper and it's going to be available to them, because I

14   suspect --

15                MR. KOBACH:  Well, you know, Your Honor, I think the

16   general principle of criminal law at large is that everybody's

17   responsible for knowing the law.  And we would include in the

18   law regulations promulgated pursuant to the law, which also

19   have the effect of law.  But I don't think that, you know, most

20   Americans or most courts would say "and you're responsible for

21   reading all of the briefings" --

22                THE COURT:  The Justice Department's going to be

23   aware of this.  And if they bring an allegation against an

24   individual for something they did in this declaration, at least

25   in these parts, they've got some problems.

1          MR. KOBACH:  Yeah.

2          THE COURT:  With me.  And whether or not the

3  individual knows that.

4          MR. KOBACH:  But I guess the standard for

5  unconstitutional vagueness is whether a person of reasonable

6  intelligence would know -- would know that his conduct is

7  permitted or not permitted.

8          THE COURT:  Fair enough.

9          MR. KOBACH:  And that's the problem here.  Because

10 Judge Journey read and did not know.  And he said at the last

11 gun show he was just at, at the beginning of May, about a

12 hundred people came to him "in a panic" was his phrase in the

13 declaration, and said "Are we going to have to shut down now?

14 We don't know.  What is this?"

15      And this confusion among people at gun shows, you know,

16 gets to the reason why it appears that ATF did this in the

17 first place, is they wanted to close the so-called gun show

18 loophole without Congress doing it.  Because Congress has

19 failed to close the gun show loophole.  It's never reached a

20 majority in its efforts to consider that bill.

21         THE COURT:  And how did they know what to do before

22 the rule?

23         MR. KOBACH:  Before the rule, they had at least the

24 words of the statute, and they knew --

25         THE COURT:  Which we've agreed are vague or not

```
1    clear --
2              MR. KOBACH:  They're not perfect.
3              THE COURT:  -- and I guess that gets me back to how
4    did the rule make the law worse or more restrictive or
5    anything?  And I know you've talked about the single charge and
6    we've talked about the issue about restricting whatever the
7    personal protection definition or vagueness is.  I got all
8    that.  But I'm back to my baseline on -- if you said a hundred
9    people in a panic knew what to do before the rule, how so?
10             MR. KOBACH:  Then my point is that they -- the rule
11   sowed confusion because the rule messed up any sense of
12   quantity, that there's a quantitative line somewhere.  It's a
13   blurry line, but there's a quantitative line.  And the rule
14   injected -- and this gets to my last point on vagueness.  It
15   has this byzantine complexity with all of these exceptions, and
16   exceptions to the exceptions.  And then you have presumptions
17   in one direction and presumptions in the other direction.
18             THE COURT:  Slow.
19             MR. KOBACH:  Oh, I'm so sorry.
20             THE COURT:  You're good, but every syllable is a
21   word to her.  And so --
22             MR. KOBACH:  I'll restate that.
23             THE COURT:  Please.
24             MR. KOBACH:  The third cause of the vagueness is the
25   structure of the rule itself, which has exceptions, and
```

1   exceptions to exceptions, and then it injects presumptions.

2   And there's a whole bunch of them that presume in favor of you

3   being -- a person being a dealer engaged in the business of

4   dealing firearms.  And then there are presumptions that

5   presume -- that are essentially exceptions to those

6   presumptions, where you will not be presumed to be a dealer.

7          And this rule itself, because it has so many moving parts

8   and because it doesn't clearly say "This is the word.  If

9   you're one of these, you're in," it's impossible to know --

10  because of all of these competing presumptions, it's impossible

11  to know for any ordinary person to say, oh, yeah, yeah, I'm

12  good; or, no, my conduct is not good.  I'm going to have to get

13  an FFL license if I want to keep coming to these gun shows.

14         And so the -- and I think the rule speaks for itself.

15  People we -- attorneys we have shown this rule to have, you

16  know, agreed it's really, really hard to read.  And while the

17  statute wasn't perfect, the statute was a heck of a lot better

18  and a heck of a lot clearer.  At least it was essentially one

19  paragraph defining what it is to be a dealer.  Now you've got

20  three or four pages with opposing presumptions and exceptions

21  to exceptions that a layman is highly unlikely to be able to

22  understand.  So that's the third --

23              THE COURT:  Is that any different than the tax code?

24              MR. KOBACH:  You know, that's a --

25              THE COURT:  You talk about a layman hasn't figured

1    it out.  You and I have got law degrees, and I bet my money

2    that you've got an accountant doing your tax return.  I know I

3    do.  And I don't want to disparage your knowledge of the tax

4    code.

5            MR. KOBACH:  Oh, you can go right ahead.

6            THE COURT:  The notion that laws are complex and

7    hard to deal with from a layman's point of view probably isn't

8    enough.

9            MR. KOBACH:  So that's not my argument, Your Honor.

10   With respect, my argument is that -- certainly laws can be

11   complex.  But defining one term should not be this complex.

12   And it is -- if engaged in the business of dealing firearms can

13   be defined in one paragraph, and that definition has existed

14   for as long as we've had these modern federal gun laws, for

15   many decades, and there was apparently no problem in

16   understanding what this meant.  Now we've taken that one

17   paragraph defining one word, and we've made it into a

18   four-page, multiple presumptions.  That is unconstitutionally

19   vague.  The term itself is too complex now because of what the

20   defendants have done.

21          And now I want to go to the -- I'll just -- I'm going to

22   make three arguments on the merits.  I'll go to the third and

23   then sit down for a while.

24           THE COURT:  It's still in your reply?

25           MR. KOBACH:  Yes, still in the reply.  And I'll jump

1   to it violates the Second Amendment.

2           THE COURT:  Is that past page 23?  Or do I need to

3   move back in your reply?

4           MR. KOBACH:  Let me find it here.  Page 30.

5           THE COURT:  I'm there.  Continue.

6           MR. KOBACH:  I'm jumping ahead.  I'm trying to save

7   us all time here, Your Honor.

8           THE COURT:  Well, you take all the time you need.

9   But I'm on page 30-E, which really is 31.  Is that right?

10          MR. KOBACH:  Yeah.  You can just go right to 31.

11          THE COURT:  Okay.

12          MR. KOBACH:  So the test for the Second Amendment

13  violation under *Bruen*, which is, of course, the recent opinion,

14  *The New York State Rifle & Pistol Association versus Bruen*, and

15  is a new standard.  Well, maybe not a new standard, but it's a

16  standard built up after the *Heller* decision.  It's a pretty

17  simple test, and it's different from the other tests for other

18  constitutional rights.

19      You know, other constitutional rights, we decide whether

20  it's in strict scrutiny, or intermediate scrutiny, or minimal

21  scrutiny, and then we balance the interest.  The Supreme Court

22  said there's no more balancing.  And they said it multiple

23  times throughout *Bruen*.  No more balancing.  Here's how we do

24  the Second Amendment.

25      It's basically a two-part test.  The first half is the

1    text of the Second Amendment.  The second half is the history.

2    And that's all.  So it's a complete -- as an attorney who's

3    followed these issues, it's really interesting because we've

4    got a test that doesn't look like the other tests.

5           THE COURT:  With that we would agree.

6           MR. KOBACH:  And so the first half is do you -- do

7    you see -- does the text cover an individual's conduct.  And

8    I'm quoting from the Court in *Bruen*.  "When," quote, "the plain

9    text covers an individual's conduct, the Constitution

10   presumptively protects that conduct."

11       Continuing with the quote, The government must then

12   justify its regulation by demonstrating that it is consistent

13   with this nation's historical tradition of firearms regulation,

14   end quote.

15       So I believe Defendants concede that we satisfy the first

16   half of the test.  And that is the phrase "to keep and bear

17   arms" includes the right to purchase and sell arms, because you

18   can't keep and bear anything unless you can purchase it in the

19   first place.  Maybe in the very, very old days, you could make

20   one.

21          THE COURT:  Does it say that without restriction?

22          MR. KOBACH:  Well, that's the --

23          THE COURT:  I mean, I can't even buy liquor from

24   anybody, unless it's home-brewed beer, without going to a

25   licensed liquor store.

1          MR. KOBACH:  So I would say that there is no

2    question that purchasing and selling is included within keeping

3    and bearing arms in the Second Amendment.

4          THE COURT:  I agree with you there.

5          MR. KOBACH:  And then the question is -- and you

6    asked the same question that the defendants do.  They say,

7    "Well, what about -- isn't there some restriction on this

8    portion of -- on this purchasing and selling?  Isn't that

9    right" -- they use the term it's not unfettered.  It's limited.

10   That type of Second Amendment right is conditioned because the

11   government has an interest in, you know, deciding who can sell

12   and under what conditions you can sell.

13        And I would say the *Bruen* court made it pretty clear.

14   You don't -- we're not developing tiers of Second Amendment

15   rights.  It's either covered by the text or it's not covered by

16   the text.  It's a very absolutist test.  And I agree it's

17   really different now.  But once you're within the text, you

18   don't say, well, but this is a lower tier.  It's like

19   commercial speech.  It's not quite as good as political speech.

20        THE COURT:  So did *Bruen* judicially set aside the

21   firearms licensing act?  Or I'm not -- I've got the whole

22   acronyms from the FFA and the GCA and the FOPA, and I'm going

23   faster than I have asked you, but --

24        MR. KOBACH:  No, it didn't.  But the Court -- the

25   Court didn't do so expressly, but the Court said, "We are in no

1    way opining on that."  And they said it in *Heller* in 2008.  And

2    that is the quote that opposing counsel jump on.  And the quote

3    is "Nothing in our opinion should be taken to cast out on

4    longstanding laws," and then there are three different

5    categories, but then -- dot dot dot -- "imposing conditions and

6    qualifications on the commercial sale of arms."

7            THE COURT:  And do you think they're referring to

8    the GCA, the FOPA?  It's pretty clear that they were.

9            MR. KOBACH:  I think they were not referring to any

10   specific statute; but, yeah, they probably are referring to

11   those.  But they're not saying that those are okay.  That's

12   what -- Defendants say, "Well, that means that the *Heller* court

13   was saying, oh, that was okay."  The *Heller* court --

14           THE COURT:  I guess my question was it's not a --

15   the *Bruen* is not a judicial repeal of all of those statutes.

16           MR. KOBACH:  No, it's not, but it's certainly --

17   because those weren't before -- *Bruen* is saying those statutes

18   aren't before us.  We are not expressing any opinion on those

19   statutes.  That's all that *Bruen* is saying.  And opposing

20   counsel says, "Aha.  We're going to read that fraction of a

21   sentence from *Heller* and say that means that statutes involving

22   commercial sales of firearms" -- and, by the way, we think the

23   regulation goes beyond commercial -- but statutes involving

24   commercial sales are okay under the Second Amendment.

25           But in *Bruen*, the Court came back to it because,

1    evidently, people had been reading that half a sentence.  And

2    that's where I talk in the brief, and I'm not sure --

3              THE COURT:  But aren't they correct for now?

4    Meaning --

5              MR. KOBACH:  I would say no, Your Honor, they're

6    not.  If you look under --

7              THE COURT:  Meaning the Justice Department is

8    correct for now that *Bruen* didn't repeal those statutes or set

9    them aside.  And has he not yet said that restriction on gun

10   sales isn't appropriate?

11             MR. KOBACH:  That is absolutely correct.  They can

12   certainly say that.  They can say *Bruen* did not in any way

13   repeal or set them aside.  But they cannot say --

14             THE COURT:  And isn't it -- they can say it, but

15   isn't that the fact?

16             MR. KOBACH:  That is correct.  *Bruen* did not say --

17   did not in any way say "we are opining on statutes involving

18   the sales or regulations involving the sales of firearms."  But

19   opposing counsel tries to take it a step further.  They say

20   this is a limitation -- *Bruen* -- or, *Heller* created a

21   limitation on the Second Amendment right for laws and

22   regulations involving the sales.  And that's where we come back

23   on page 32 and point out -- you can read the text there -- but

24   we said none of the *Bruen* court clarified that exact sentence.

25             And this is at page 2128 of *Bruen* where they're quoting

1  that sentence in *Heller*, and this is the quote.  And they're
2  referring to that sentence, to clarify for the world, hey,
3  don't draw too much from that sentence.  "That said, we
4  cautioned that we were not undertaking an exhaustive historical
5  analysis today of the full scope of the Second Amendment, and
6  moved on to considering the constitutionality of the District
7  of Columbia's handgun ban," end quote.
8      So the *Bruen* court clarified to everyone, hey, we're not
9  saying anything about commercial sales of firearms.  We
10 simply -- we're telling everyone we're not saying anything
11 about those.  We're not saying anything positive or negative.
12 We are -- that was a way of saying "we're not talking about
13 that.  We're only talking about the D.C. handgun ban."
14     And so I think the opposing counsel here is attempting to
15 draw too much from that one half a sentence in *Heller* and say
16 there's a special category, a lesser category of Second
17 Amendment rights involving the commercial sale of firearms.
18     But if you go -- either way, we go next to the second
19 half of the test.  And the second half of the *Bruen* test is the
20 government's burden to justify its regulation by demonstrating
21 consistency with the historical traditions of firearms
22 regulations.  And as *Bruen* goes on, it makes clear regulations
23 roughly at the time the Second Amendment was ratified.
24     And here, the defendants just -- they have a tough job.
25 There weren't regulations like this.  There was nothing like

1    this at the time of our country's founding.  And so they try to

2    find a couple of historical analogies.  And I wouldn't want to

3    be opposing counsel on this particular type of inquiry because

4    there's just nothing there.  And so they say, well, how

5    about --

6                    THE COURT:  Or me, for that matter, but go ahead.

7                    MR. KOBACH:  What's that?

8                    THE COURT:  I said, "Or me, for that matter, but go

9    ahead."

10                   MR. KOBACH:  Yeah.  They say, well, how about the

11   Act of 1794, which says you can't export various bayonet

12   swords, muskets, pistols, blah, blah, blah.  You can't export

13   those outside of the United States.  And that clearly doesn't

14   apply because the very next section, which Defendants don't

15   quote, says "Nothing in this Act shall be construed to prohibit

16   the removal or transportation of any of the articles aforesaid

17   from one port to another port within the United States."

18          And, of course, that law was about the impending or

19   threatened potential war with England and the fact that England

20   was intercepting ships under -- that were flying under -- that

21   were sailing under neutral flags and trying to collect any arms

22   and ammunition and gun powder that was leaving the United

23   States.

24          So then they say, well, how about this one?  How about

25   the multiple colonial laws, and even local ordinances,

1   concerning the storage of gun powder.  And they cite a couple

2   of them.  There's many more.  There have been law review

3   articles written about this.  But all of those gun powder laws

4   were about storage, and they all had one purpose:  Avoiding the

5   massive fires that had destroyed large sections of American

6   cities whenever gun powder caught fire.  And that has nothing

7   to do with the sales of the firearms themselves.

8        And so we would argue that they have failed to pass the

9   second half, where it's the government's burden to show

10   something -- something analogous, something similar to what

11  we're talking about here.  And for them to achieve that, they

12  would have to show that in that period of American history,

13  roughly maybe 1770 to 1800, that there was something like a

14  restriction on individual sales from one person to another and

15  requiring those sales to get licensed by a government before

16  those sales could legally occur.  And there's just nothing

17  there.

18       And it's a heavy, heavy burden for them in this

19  particular context.  Because I don't see how they can get

20  there.  But on the Second Amendment argument, I think that's

21  probably the -- of all the substantive arguments we've shown

22  that we are likely to prevail on, in many ways that one's

23  probably the clearest, although I think the inconsistency of

24  the statute is very clear too.

25       This one -- it's just tough under the new *Bruen* test.

1    It's very difficult for the government to take a modern, second
2    half of the 20th century licensing statute and find anything
3    that looks like it in this remote past period of American
4    history.  And people can say, well, the *Bruen* test is good or
5    bad.  That seems just too hard for the government.  May be.
6    But that's the new test.
7           THE COURT:  To take your interpretation of *Bruen*,
8    the logical end to all of these gun regulation statutes are
9    they're going to be struck down.
10          MR. KOBACH:  Perhaps.
11          THE COURT:  Nobody talked about restrictions of gun
12   sales when the Second Amendment was passed.  And so all
13   legislation in the 20th century regarding any restriction on
14   gun sales, if I were to take your argument at faith, and the
15   Supreme Court declined to go there by saying "We're just
16   talking about the District of Columbia.  We don't want to go
17   there."
18          MR. KOBACH:  Exactly.
19          THE COURT:  But you're suggesting that I do that.
20   Not necessarily this, but you're asking me to accept an
21   interpretation of *Bruen* that, if I applied it to each of these
22   gun laws, I would strike down everything that Congress has done
23   to limit, from Tommy guns in the prohibition era, to any
24   restriction on any sale of machine guns or otherwise.
25          MR. KOBACH:  And, Your Honor, that --

1          THE COURT:  And that may be what they intended, but

2     that's what you're arguing that I apply.

3          MR. KOBACH:  My -- yes, I am arguing that *Bruen*, as

4     written, requires you to strike down or enjoin this particular

5     rule.

6          THE COURT:  But it would also, if these other laws

7     were in front of me, would be a similar result.

8          MR. KOBACH:  It might, Your Honor.  And I think

9     that's -- and I think that's why the Supreme Court expressly

10    said "We're not talking about that yet."  And maybe the day

11    will come when they have to talk about that, and they have to

12    address whether the *Bruen* test is so absolute in its phrasing

13    that it potentially sweeps aside a lot of laws people thought

14    were fine.

15         THE COURT:  And that's essentially where we are,

16    aren't we?  While it's just this rule, as opposed to a law,

17    you're asking me to decide on a national basis whether *Bruen*

18    sets aside -- at least as to this count -- whether *Bruen* sets

19    aside any restriction on the sale of firearms.

20         MR. KOBACH:  Yes, Your Honor, if you get to the

21    constitutional issue.  We don't think you need to get there.

22    We think you can --

23         THE COURT:  I know, but I'm just talking -- we're

24    taking this -- eating this elephant a bite at a time.

25         MR. KOBACH:  Yeah.

```
 1          THE COURT:  And so I'm trying to stay within your
 2   brief at paragraph 32 on this particular argument that it's
 3   contrary to the Second Amendment.  You're asking me to go where
 4   the Supreme Court wasn't willing to go.
 5          MR. KOBACH:  Where the Supreme Court said "we aren't
 6   going right now."
 7          THE COURT:  Fair enough.  Yet to go, then.
 8          MR. KOBACH:  Right, as yet.  And I think this case
 9   may -- who knows -- this case may be the one that takes the
10   Supreme Court there.  But, again, eating that elephant one
11   little bite at a time, this particular final rule goes to only
12   sales between individuals, and dramatically restricts the sales
13   between ordinary individuals.
14          THE COURT:  I understand that, but the argument is
15   that it's contrary to the Second Amendment because any
16   restriction on the sale of guns is illegal.  Is that fair?  I
17   know that you're going "But we only want you to rule on this
18   rule."  But in applying the law and theory in this particular
19   count, you're asking me to interpret *Bruen* in that manner.
20          MR. KOBACH:  So, Your Honor, we are not going so far
21   as to say any restrictions on the sale of firearms would be
22   unconstitutional.  Because I think there may be -- and we
23   haven't done the research on this particular -- but there may
24   be restrictions on the sale of firearms to particular
25   categories of individuals.  But it just --
```

1    THE COURT:  But by arguing *Bruen*, that's what you're

2  telling me to do as it applies to this particular rule.

3    MR. KOBACH:  But as opposed to -- this particular

4  rule doesn't say -- like the firearms I'm -- the ones I'm

5  talking about -- and I'm just speculating.  There may be a

6  Colonial era or early Republic era laws concerning the sale of

7  firearms to foreign nationals, to slaves, to members of the

8  Native American tribes.

9    THE COURT:  But I'm talking about the ones that are

10  within the background history that we've discussed that brought

11  us from Paul Revere to here --

12    MR. KOBACH:  Yeah.

13    THE COURT:  -- that you're talking about --

14    MR. KOBACH:  And we are --

15    THE COURT:  -- to engage in the *Bruen* theory that

16  you want me to engage in would have applied to any of these

17  laws that came before this rule-making process.

18    MR. KOBACH:  Your Honor --

19    THE COURT:  If we say the founding fathers in

20  amendment two didn't even think about restrictions on the sale

21  of guns.  That's what I understood your argument --

22    MR. KOBACH:  My argument's a little -- it's more

23  narrow than that.  They didn't say anything about the

24  restriction on sales of guns between individual Americans.

25  They didn't say one American cannot sell a few guns to another

1    American.

2              THE COURT:  Gotcha.  But that would still apply to

3    the FFA, the GSA.  We're not talking about international gun

4    sales in any of these.  They may have sections in these, but

5    the part that you --

6              MR. KOBACH:  It might, Your Honor.  But there might

7    be --

8              THE COURT:  Let me finish real quick.

9              MR. KOBACH:  Okay.  Sorry.

10             THE COURT:  The part that you brought me up to speed

11   on the history of why this rule shouldn't be allowed to stand

12   was in the context of all of these various iterations of

13   Congress passing who can sell a gun to who, not -- while it may

14   be in there somewhere, we're not talking about the parts that

15   talk about international gun sales to -- pick a country.  So

16   I'm talking about your request that I apply *Bruen* the way you

17   want me to would equally apply to strike down any of these

18   before me.

19             MR. KOBACH:  The answer, Your Honor, is I am not

20   sure.  Because we haven't looked at -- there may be -- and now

21   I'm just speculating as an attorney who might in the future be

22   called on to defend the Gun Control Act.  There may be laws

23   from that period that define -- that in some towns license who

24   can be a gunsmith and who cannot be a gunsmith.  And it was the

25   gunsmiths who --

1          THE COURT:  Let's take away gunsmithing and let's

2     talk -- let's take out pawnshops or whatever.  But we're

3     talking about the portions of these laws that require a federal

4     firearms license.  I would have to strike down every bit of

5     that if I took your *Bruen* analysis and applied it to this rule.

6     They would equally apply to all of the legislation that's come

7     past me, unless you can show that the founders of the Second

8     Amendment anticipated a federal firearms license.

9          And maybe I'm wrong.  You're saying it's narrower than

10    that.

11          MR. KOBACH:  But the burden --

12          THE COURT:  We only want you to apply it to the rule

13    and not to foreign sales of guns or gunsmithing -- which you

14    learn something every day.  I didn't know you needed a federal

15    firearms license to repair guns.  But I digress again.

16          But I'm just trying to -- and I think I know the answer

17    to my question.  Maybe I'm just trying to get you to admit it,

18    that you're asking me to apply *Bruen* to strike down any

19    regulation on the domestic sale and purchase of firearms.  And

20    that's your basis that *Bruen* ought to strike down this rule.

21          MR. KOBACH:  So, Your Honor, I'm not asking you to

22    do that, because --

23          THE COURT:  No, you're not asking me to strike those

24    down.  I'm just saying that that would be the practical

25    effect --

1          MR. KOBACH:  Implication of it.

2          THE COURT:  -- if I took your theory as for what you

3    think it says.

4          MR. KOBACH:  So, Your Honor, I'm saying our theory

5    is narrower than that.  Because it's the government's burden to

6    show the historical analogue.  They have given us two

7    historical analogues.  We have shown that those analogues fail.

8    They're not -- they're not even remotely close.  It was not our

9    burden to research everything else that happened.  And I'm

10   speculating that there may be plenty of colonial laws governing

11   the sale -- the making of barrels, the making of shot and lead

12   balls.  You know, they used to have those huge towers they

13   would --

14         THE COURT:  I'm got going there.

15         MR. KOBACH:  Okay.

16         THE COURT:  Those are portions of that law that may

17   be justified.  But what I'm talking about is the necessity, or

18   whether or not if I applied *Bruen* to this rule, would anybody

19   else faced with applying it to these other laws throw out the

20   need of a federal firearms license?  Not the gunsmithing.  Not

21   the making barrels or cannons on ships or whatever weird little

22   thing we want to pull out.  I'm just talking about what we're

23   talking about here, domestic purchase and sale of firearms, and

24   whether or not you have to be licensed to do so.

25         And so I'll narrow it to that.  But that's a big deal, or

 1  you wouldn't be here.

 2          MR. KOBACH:  Yeah.

 3          THE COURT:  So is that fair or --

 4          MR. KOBACH:  I would say, Your Honor, if you decided

 5  to reach the Second Amendment question, and you decided to

 6  opine on the Second Amendment question, we are saying that

 7  there is no -- that they have failed the test because there is

 8  no historical analogue governing requiring a license for

 9  person-to-person sales of firearms in the founding era.  And

10  you could --

11          THE COURT:  That would apply all the way up the line

12  to federal firearms dealers anywhere.  Because that's all

13  you've asked them to do.  And that's all I'm asking.  Does it

14  equally apply to this narrow scope, to not just this

15  rule-making procedure, but also to the statute?  So would it be

16  found unconstitutional under *Bruen* when we're just talking

17  about licensing requirements?

18          MR. KOBACH:  And, Your Honor, I think we would have

19  to do that research, which the test didn't require us to do, to

20  find out whether there are analogues for things that go beyond

21  what this regulation does, and gets to the broader question

22  about commercial sale of firearms.

23      And bear in mind, the *Bruen* court did say -- and the

24  *Heller* court said "We were talking about" -- they used the term

25  "commercial sales of firearms," which suggests that

1  person-to-person private sales, personal private sales of

2  firearms, one person to another, are not covered by -- or that

3  they weren't including that from saying the thing they weren't

4  talking about.  You know, we're not talking about longstanding

5  rules governing the commercial sale of firearms.

6        And the answer to your question is I think if you reach

7  this issue, you could write an opinion very narrowly on the

8  Second Amendment issue.  I would also say that you don't need

9  to reach the Second Amendment because the statutory grounds are

10  more than adequate to show a likelihood of prevailing.

11        THE COURT:  So are you withdrawing that, or you want

12  me --

13        MR. KOBACH:  No, I would love you to -- I would love

14  for you to write about the Second Amendment, Your Honor.  But

15  if you have any hesitation, you do not necessarily need to go

16  there.

17        THE COURT:  If I didn't need it, why did you put it

18  in there?  I get it.  Okay --

19        MR. KOBACH:  And I am ready --

20        THE COURT:  -- we're -- giving you a hard time.

21  What else?

22        MR. KOBACH:  That's all I have for now, Your Honor.

23  I've covered the main things.  If you want me to come back up

24  and talk about standing or the balancing of injuries, I'll be

25  happy to do that.

1          THE COURT:  I don't have a desire that you do

2    anything but feel like you've made your record.  But once you

3    hear them talk, you can make a decision whether or not you have

4    anything to add on the stand.

5          MR. KOBACH:  All right.  Thank you, Your Honor.

6          THE COURT:  We're going to take about a ten-minute

7    break.  We'll come back at 11:00.

8        (Recess from 10:51 a.m. until 11:04 a.m.)

9          THE COURT:  All right.  We are back on the record.

10   Mr. Newman, are you the -- who's going to tackle the first

11   part?  Because I'm not sure which we're doing, standing or the

12   merits.

13         MR. SHERWOOD:  Your Honor, Zachary Sherwood with the

14   Department of Justice.  I'll start by addressing standing

15   briefly, and then hand it over to my colleague, Jeremy Newman,

16   to address the merits and the other arguments that were raised

17   by Plaintiffs.

18         THE COURT:  Mr. Sherwood.

19         MR. SHERWOOD:  Sherwood, yeah.

20         THE COURT:  Isn't that what I said?  I may -- it's a

21   southern slur.

22         MR. SHERWOOD:  Either way.  Appreciate it.

23         THE COURT:  Let me ask you a question before we get

24   started.  How many other districts are being faced with this

25   same question as we speak?  Meaning, is there simultaneous

1    litigation on this same question happening elsewhere?

2              MR. SHERWOOD:  Same question being the rule, or

3    standing, or both?

4              THE COURT:  I was talking about the rule.

5              MR. SHERWOOD:  The rule.  Okay.  I just wanted to

6    clarify.

7              THE COURT:  I'm assuming I'm the only one talking

8    about this particular standing issue.  But what I was talking

9    about are there other complaints that the Justice Department is

10   defending on the implementation of this rule?  And if so,

11   where, and what -- where are they?

12             MR. SHERWOOD:  Sure.  So we came from a preliminary

13   injunction -- or a TRO hearing, in fact, in the Northern

14   District of Texas yesterday.  That was a complaint that was

15   filed there.  And then there was also a complaint filed in the

16   Middle District of Florida challenging the rule.  I've only

17   received the complaint, though.  There's no preliminary

18   injunction, as of right now, being sought.  So as of right now,

19   we're dealing with three cases.

20             THE COURT:  So you did this in Texas yesterday?

21             MR. SHERWOOD:  That's right.

22             THE COURT:  And you don't have a schedule to do this

23   in Florida yet.  Is that a fair summary of what you just said?

24             MR. SHERWOOD:  That's correct.

25             THE COURT:  Okay.  I'll give you the floor.

1          MR. SHERWOOD:  Thank you, Your Honor.  As I

2     mentioned, I'll start --

3          THE COURT:  Let me back up.  Did Texas tell you when

4     they plan to decide?

5          MR. NEWMAN:  So the judge in that case indicated

6     that he was, at this point, only considering whether to issue a

7     TRO.  And I believe it's possible that he might issue a ruling

8     before the rule goes into effect on -- before Monday or on

9     Monday, although I'm not sure of that.  But he was clear that

10    his initial ruling is just going to be about whether or not to

11    grant a TRO --

12         THE COURT:  What judge is that?

13         MR. NEWMAN:  -- preliminary injunction --

14         THE COURT:  Who in Texas did y'all draw?

15         MR. NEWMAN:  Judge Kacsmaryk in Amarillo.

16         THE COURT:  Say again.

17         MR. NEWMAN:  Judge Matthew Kacsmaryk in Amarillo.

18         THE COURT:  Okay.  Now you really can start,

19    Mr. Sherwood.

20         MR. SHERWOOD:  Thank you.  As I mentioned, I will

21    briefly address standing, seeing as -- or more specifically,

22    Plaintiffs' failure to meet their burden of establishing

23    standing, which is an indispensable part of their case.  And

24    Plaintiffs -- to briefly address the three different categories

25    of Plaintiffs' first -- the State Plaintiffs' failure to

1    establish a cognizable injury in fact, then move on to the

2    individual plaintiffs in this case, who lack standing to bring

3    a pre-enforcement challenge against the rule, and then finish

4    up with the organizational Plaintiff, Chisholm Trail, and how

5    they -- and how it lacks both associational and organizational

6    standing.

7             THE COURT:  Just keep mindful of your time for your

8    buddy.

9             MR. SHERWOOD:  Absolutely.  Yeah.  It'll be brief.

10   I just wanted to cover high level, just for the sake -- given

11   that it is a constitutional requirement.

12        Just beginning with the State Plaintiffs.  The State

13   Plaintiffs allege two economic harms:  Decrease in sales tax

14   revenue and increase in administrative costs related to federal

15   background checks, that fail to establish standing and

16   irreparable harm, as we explain in our brief.

17        The rule -- starting with the reduced revenue theory, if

18   you want to label it with a shorthand, the rules alleged

19   incidental effects on state revenues, which is the first injury

20   that the State Plaintiffs claim, does not confer standing for

21   several reasons.  To start, that theory depends on a chain of

22   contingencies that are by no means true on their face, or don't

23   lead to the outcome that they purport to on their face, and

24   also raise cognizability issues.  And that chain of

25   contingencies being once the rule is effective, a certain

1    number of currently unlicensed individuals who sell firearms

2    will believe that they are affected by the rule -- or will be,

3    in fact, affected by the rule.  That will result in a decrease

4    in firearm sellers, in turn, who will then sell, it is alleged,

5    fewer firearms, whether online or at gun shows.  And that, in

6    turn, will result in states that assess sales taxes on firearms

7    or other fees or taxes that are assessed at gun shows.

8         All of that will result in a decrease in state tax

9    revenues.  And that's what the states assert is an economic

10   injury sufficient to confer standing.

11        As an initial matter, the Eighth Circuit, in *Iowa ex Rel.*

12   *Miller v. Block*, noted that such downstream incidental effects

13   on state revenues is not, in general, a cognizable injury in

14   fact sufficient to confer standing.  That court described it as

15   the unavoidable economic repercussions of virtually all federal

16   policies suggest that such an injury, in fact, cannot be

17   cognizable, because every federal policy will have some

18   attenuated downstream effect on state revenues.

19        That principle was reasserted just last year by the

20   Supreme Court in *United States v. Texas* where the Court

21   acknowledged that indirect effects on state revenues can make

22   claims of state standing to challenge a federal policy based on

23   those downstream effects particularly attenuated.

24        And that is the case here.  And that principle makes

25   sense in light of our federal structure where, again, federal

1   policies just happen to incidentally impact state revenues

2   can't confer standing.  Otherwise, such a theory the standing

3   would effectively be boundless.

4       And then, importantly, the plaintiffs' reduced revenue

5   theory fails on its own terms.  To start, the reduction in

6   firearms sellers create -- and we explain in this our brief --

7   States -- or the plaintiffs cite a 10 percent reduction that

8   they draw from the rule.  That analysis is -- or that number

9   that is used is misconstrued.  In the final rule, the

10  Department of Justice, ATF laid out an analysis of estimates of

11  how the rule might impact the market of unlicensed sellers, and

12  the figure there was particularly small.  It was 10 percent of

13  the 25 percent of currently unlicensed sellers who would

14  potentially be considered engaged in the business of the rule.

15  So it's 2.5 percent, in effect, of the universe of currently

16  unlicensed sellers.  So marginal dip.

17          THE COURT:  I know that I use this when I get into

18  the weighing factors.  But to determine whether or not there is

19  any irreparable harm, do I even do a quantitative analysis of

20  how much?

21          MR. SHERWOOD:  So it's not so much -- we highlight

22  that not so much to say that because it's so small, it's

23  insignificant or could not be irreparable.  I think the point

24  there would be is that it highlights how attenuated the chain

25  of contingencies that Plaintiffs rely on is.  Because such a

1    marginal dip in sellers, which is what they claim is what the

2    rule would do, which is probably true in that some currently

3    unlicensed sellers may choose to leave the market.

4         But what's crucial for their theory of standing is that

5    that somehow results in fewer firearm sales on which taxes are

6    assessed, and that's just not necessarily true by any stretch.

7    Just because there's a marginal dip in sellers, by no means

8    mandates that there's going to be an equal decline in firearms,

9    if there's a decline at all.  Those interested in purchasing

10   firearms would be expected to just simply go elsewhere.  So if

11   there is the same amount of firearms, same tax revenues can be

12   assessed.

13        And I think, too, that speculative nature of injury

14   applies to the gun show context as well.  Maybe a few vendors

15   might leave, but nothing suggests that they wouldn't be

16   replaced by federal firearms licensees or individuals who just

17   wouldn't qualify for engaging in the business in the rule and,

18   therefore, don't have to worry about leaving the market at all.

19        So that theory, again, it's both too speculative, not

20   imminent enough to confer standing, and this also importantly

21   relies -- it suffers from a fundamental flaw in that it depends

22   on unfettered choices made by myriad third parties not before

23   the Court here, currently unlicensed dealers, federal firearms

24   licensees, those who attend gun shows, purchasers more

25   generally.  So I just wanted to highlight that point.

1        And then the second economic injury alleged by the States

2    is that the rule would also have an incidental effect on

3    background check procedures.  That, too, does not confer

4    standing for a number of reasons.  It doesn't amount to a

5    cognizable injury in fact.  There's a principal traceability

6    problem with this background check theory in that the

7    plaintiffs alleged -- or the theory of injury there relies

8    again on a chain of contingencies in that rule would result in

9    more people -- or more sellers becoming licensed, therefore

10   subjecting more firearms purchases to the federal background

11   check requirements which will increase a number of background

12   check requirements.

13       But that consequence flows from the Bipartisan Safer

14   Communities Act, which broadened the definition of "engaged in

15   the business," and, therefore, broadened the number of

16   potential sellers of firearms who would be required to get a

17   license.  And that's not what's being challenged here.  It's

18   the rule.  So the effect on or the increase in background

19   checks that Plaintiffs allege or assert is traceable to the

20   statute.

21       And also, the two states -- really this background check

22   depends on two states in particular:  Tennessee and New

23   Hampshire, both of whom have elected to become point of contact

24   states, to use the industry verbiage.  They have taken on the

25   burden of conducting the federal -- the mandatory federal

1   firearms background checks that, in the majority of other

2   states, licensees just conduct themselves.  So no costs are

3   borne by states that -- where that is a requirement, where

4   licensees do the checks themselves.

5       Tennessee and New Hampshire have taken on that burden,

6   which they're permitted to under federal law.  But then that

7   cannot be a base -- that sort of self-inflicted injury cannot

8   be a basis for challenging federal law as that changed that

9   background check requirement.

10      And then, importantly, there's also just again lack of

11  establishing with the sufficient degree of imminence and

12  concreteness that the background check administrative costs

13  that Plaintiffs allege will actually materialize or, you know,

14  there's no effort to quantify that even remotely.  And in, I

15  think, just recently Eighth Circuit in *Morehouse Enterprises*

16  talked about whether -- that was in the context of irreparable

17  harm.  But there, the criticism for the Court for -- toward the

18  plaintiffs was that they do not try to quantify or clearly

19  explain the generally-alleged compliance costs that those

20  plaintiffs alleged they would suffer because of a new ATF rule.

21      So here, too, a lack of -- a complete lack of specificity

22  on how, and also a dependence on a chain of contingencies on

23  how these background checks' administrative costs will actually

24  be incurred by states such that they have standing to challenge

25  the rule.

1          Just moving on briefly to the individual plaintiffs.
2    They, too, also have failed to establish an injury in fact.
3    And our focus was on individual plaintiffs' standing to bring a
4    pre-enforcement challenge which is subject to a particular
5    standard, namely the one outlined in *Susan B. Anthony List*
6    Supreme Court case from 2014.  And we submit that, based on the
7    declarations that were submitted by those individual plaintiffs
8    and the facts alleged and asserted in those declarations, the
9    plaintiffs have failed to sufficiently allege an intention to
10   engage in conduct that would actually be implicated by the
11   rule.  And that alone is sufficient to conclude that they lack
12   standing to bring a pre-enforcement challenge against the rule.
13         I think you talked about this with the other side, but I
14   just wanted to briefly clarify, again, that assessment in our
15   brief that the plaintiffs have not alleged an injury in fact,
16   or at least because the conduct that they describe in their
17   declaration is not encompassed by the rule, that's importantly
18   limited to both what we just have before us in the
19   declarations.
20              THE COURT:  Why would that not be a safe harbor rule
21   for anybody that wants to do exactly what these individual
22   plaintiffs want to do?  I mean, why would it be any different
23   if -- pick somebody out of New Hampshire or Montana or Wyoming
24   or whatever -- gave you the same declaration that said "this is
25   exactly what I want to do," why would that not be as equally

1    binding on you to say, well -- and we'll get into this in a

2    minute on the merits of the case -- but why is it going to

3    matter who said the declaration, if it applies to anybody under

4    this rule?  How do you get out of it, of what I think you have

5    established a safe harbor for anybody that wants to use a

6    judge's declaration as a go-by?  Because you've said what you

7    said in your declaration doesn't amount to a violation of our

8    rules, so you don't have standing.

9              MR. SHERWOOD:  So we think -- "we" being in our

10   response brief, didn't establish that safe harbor.  The

11   statute, and then the statute, as interpreted by the rule,

12   does.  I just wanted to be clear --

13             THE COURT:  I think you may not have meant to, but I

14   think you might have.

15             MR. SHERWOOD:  In the sense that, for the assessment

16   of standing --

17             THE COURT:  That's not before me now.

18             MR. SHERWOOD:  Sure.

19             THE COURT:  It's just incidental to interesting,

20   which has been kicked around as all this is interesting, which

21   I will concede.  And to the point of being a geek, I'll

22   actually say it's been fun.

23        But it appears that you may have, intentionally or

24   unintentionally, said grace over whatever conduct is set forth

25   in the declaration.  Are you saying otherwise, that even if

```
1   what the judge says is true and he did it, the rule doesn't
2   prevent him from doing any of that?  Because that's what I
3   understood your argument to be.
4          MR. SHERWOOD:  It was, Your Honor.  And we stand by
5   the argument where Plaintiff, for example -- I'm just bringing
6   up a precise example.  Plaintiff Journey in his declaration
7   says that the sales that he engages in at firearms -- or at gun
8   shows are not to earn a profit.  That is an essential element
9   of being engaged in the business of firearms dealing under the
10  Gun Control Act.
11         So that determination that that sort of conduct doesn't
12  qualify as being engaged in the business, that's not something
13  that just comes from our say-so in a response brief.  That's
14  just us applying the statutory language to the conduct that's
15  being described in the declaration.  And, crucially, to your
16  point about does it matter where the declaration comes from?
17  No.  If you replace the same declaration with another name,
18  it's the type of conduct described in that declaration so, too,
19  would not qualify as engaged in the business under the rule
20  because it doesn't -- it doesn't match the textual requirements
21  for being engaged in the business.
22         THE COURT:  We may be wandering into the merits,
23  which I understand isn't why you're here.  But you brought up
24  the -- I didn't mean to commit the Justice Department to a safe
25  harbor, and so I was addressing it with you.
```

1          MR. SHERWOOD:  And I appreciate that.  And I'm sure
2    my colleague can address that with more detail to the extent it
3    addresses the merits.  I just wanted to be clear -- and it also
4    emphasizes whether a seller of firearms is engaged in the
5    business is a fact-intensive inquiry just naturally
6    intuitively, but also that's what the rule provides.  And
7    applying that standard here on the facts currently before us,
8    the conduct asserted in the declarations does not rise to the
9    level of engaged in the business.

10         And that argument is specific to whether these plaintiffs
11   have established that they have standing to bring a
12   pre-enforcement challenge against a rule.  And the theory
13   being, if you're not the sort of plaintiff who's clearly going
14   to be impacted by a rule, then you don't have standing to
15   challenge it before it's even being enforced against you.

16         Of course the Supreme Court has made clear, you do not
17   have to wait for an enforcement action to be brought against
18   you to necessarily have standing to challenge a statute that
19   might be asserted against you.  But to bring a pre-enforcement
20   challenge, there is a requirement that you actually be impacted
21   by it, or at least allege conduct that will implicate the
22   provision of lawyer challenging.

23         So just wanted to make that -- just underscore what that
24   analysis was involving is the standing piece.  And to the
25   extent it flows into the merits, my colleague can address that.

1          And then I think, finally, just for the organizational

2     plaintiff, Chisholm Trail, they assert an associational

3     standing to bring suit on behalf of their members.  The only

4     members they identify with any degree of specificity are

5     Plaintiffs Black and Maxey, who themselves don't have standing

6     to bring suit.  So, therefore, an associational standing

7     doesn't exist either.

8          THE COURT:  So is it fair to say Chisholm Trail

9     rises or falls on my decision on Black and -- I don't know why

10    I can't remember the judge's name.  I don't mean any disrespect

11    to him.

12         MR. SHERWOOD:  Mr. Journey, I think.

13         THE COURT:  Journey.  Journey and Black -- the

14    Chisholm decision on their standing would rise and fall on

15    whether or not Black and Journey do.  Is that a synopsis of

16    what you're telling me?

17         MR. SHERWOOD:  At a high level, yes.  They're -- the

18    Chisholm Trail asserts two types of organizational standing.

19    Their claim of associational standing, i.e., whether they can

20    bring suit on behalf of their members, or they have standing to

21    do so, rises and falls with your assessment of the individual

22    plaintiffs who Chisholm Trail claims are members.

23         THE COURT:  I just read your brief to say that they

24    haven't picked out anybody individually that suffers from this,

25    except for these two guys that are also plaintiffs in this

1   lawsuit.

2   　　　　MR. SHERWOOD:  Right.  And that would be in that

3   suit -- like you said, their claim of associational standing

4   rises and falls with your assessment of the individual

5   plaintiffs who we submit lack standing themselves.

6   　　　And I just wanted to distinguish -- I interpret there

7   being -- and case law used the distinction between

8   associational standing, can you bring it on behalf of members.

9   Chisholm Trail also asserts an organizational standing claim,

10  meaning the rule, they allege, will directly impact the

11  organization in itself.  Specifically, they allege a financial

12  injury.  That depends on a chain of contingencies similar to

13  the reduced revenue theory that the states allege in that the

14  rule will reduce and cause some marginal dip in the number of

15  gun sellers, which will impact the revenues that Chisholm Trail

16  earns at gun shows.

17  　　　But as explained in our brief, that alleged injury is not

18  nearly developed enough or in such that it is concrete and

19  imminent to confer standing on the organization itself.

20  　　　And unless Your Honor has any further questions on

21  standing specifically, I'll pass it over to my colleague to

22  address the merits questions.

23  　　　　THE COURT:  Thank you.

24  　　　　MR. SHERWOOD:  Thank you.

25  　　　　MR. NEWMAN:  Thank you, Your Honor.  Jeremy Newman

1    for the Department of Justice.  And I'm going to delve into a

2    lot of the specifics of the rule, but before I do that, I want

3    to take a step back and talk about why this rule is important,

4    why it's important to ATF, to the federal government, and to

5    the public.

6         And that's important for the balancing of the equities,

7    which is a preliminary injunction factor.  It's also important

8    to the merits in terms of whether ATF is within its authority

9    to promulgate necessary regulations, and also whether the rule

10   is arbitrary and capricious.

11        So the Gun Control Act imposes a series of obligations on

12   federal firearms licensees when transferring firearms.  They

13   need to verify the identification of the purchaser.  They need

14   to run a background check so if the person's prohibited, like

15   if they're a felon or domestic abuser, they can deny the

16   transaction.  And they need to keep records so that when a

17   firearm shows up at a crime scene, ATF can use those records to

18   trace the firearm, which is one of the leading ways that a

19   serious crime is solved in this country.

20        And as the Supreme Court said in the *Abramski* case, which

21   we cited in our brief, those were the twin goals of this

22   scheme, to keep firearms out of the hands of dangerous

23   individuals and to assist in the investigation of firearms

24   crimes.  But what ATF had observed was significant

25   noncompliance with the GCA.  There have been many instances of

1   people who were engaged in the business of dealing, should have

2   gotten a license, should have run background checks, but they

3   weren't complying.  They were just selling firearms without

4   background checks and without a license.

5       And one unfortunate example cited in the brief is the

6   Midland-Odessa mass shooting in Texas where the purchaser went

7   to a licensee, tried to get a firearm.  He had a history of

8   mental illness.  And that purchase was denied.  And then he

9   went to an unlicensed dealer and got a gun without a background

10  check, and used it to shoot and kill many people.

11      And that person who sold him the gun was an unlicensed

12  dealer engaged in the business of dealing.  He admitted that.

13  He pled guilty to the crime of unlicensed dealing in firearms.

14  And so ATF promulgated this rule to promote compliance with the

15  statute, to clarify the application of the statute, to deter

16  unlicensed dealing, all with the goal of enhancing overall

17  compliance with the statute.

18      And ATF explained in the rule that that would lead to

19  important public safety benefits like keeping firearms out of

20  the hands of dangerous individuals because of background checks

21  that dealers perform, and enhancing crime gun tracing and

22  intelligence.

23      And that's not just the ATF's view.  Twenty states and

24  the District of Columbia submitted a comment in support of the

25  rule, which we cited in our brief.  It explained how they

1   considered this rule a vital public safety measure for their

2   states.  And so I think it's -- you know, there are 21 states

3   on Plaintiffs' side in this action, but it's worth noting that

4   the same number of jurisdictions came out on the other side in

5   supporting the rule in the comment they submitted.

6        So now I'd like to go to the rule itself.  And there's

7   been a lot of rhetoric about how the rule purportedly redefines

8   or rewrites the statute.  So I'd like to start by comparing the

9   statutory definition to the rule's baseline definition of

10  "engaged in the business of dealing."

11       And this is sufficiently important that I'm going to read

12  two somewhat lengthy provisions side by side.  And I apologize.

13  It's going to sound like I'm repeating myself.  But that's

14  because I am repeating myself because the rule tracks the words

15  of the statute so closely.  So here's how the statute defines

16  being --

17            THE COURT:  Have you done this in your briefing

18  where --

19            MR. NEWMAN:  Yeah.  So this would be in the

20  background section of our brief.  So I believe the -- I believe

21  the statute is quoted on 6 --

22            THE COURT:  Maybe page 6?

23            MR. NEWMAN:  Yeah.  Bottom of page 6.  And I don't

24  think we -- we cite the provision of the brief, but I don't

25  think we have the block quote of the rule provision in the

1    brief.

2          THE COURT:  Well, I'm going to spare you the

3    necessity to read me what is at the bottom of page 6, because

4    I've had the benefit of that.  And I can read it.  But go

5    ahead.  You can point out the differences, if there are any

6    between the two.

7          MR. NEWMAN:  Okay.  So what I'm going to point to

8    now is the provision of the rule 27 C.F.R. 478.13 subsection A,

9    which is on 29091 of 89 Federal Register.

10         THE COURT:  Okay.  So if I've got the rule in front

11   of me, do you have a page number?

12         MR. NEWMAN:  29091.  It's a few pages from the end.

13         THE COURT:  I'm going to a get a finger in one.  So

14   my entire thing stops at 205, including the citation.  So

15   you're in -- even if I get rid of all of the footnotes or -- my

16   text of at least the copy I have ends on page 172.  So help me

17   find where you're going to read from within the rule.

18         MR. NEWMAN:  So I believe you have not the copy that

19   was printed in the Federal Register, but --

20         THE COURT:  No, I have the Westlaw printed version.

21         MR. NEWMAN:  Okay, so it's --

22         THE COURT:  Give me the section or the paragraph.

23         MR. NEWMAN:  So at the very end of the rule is the

24   regulatory text.  And the section of the regulatory text I'm

25   referring to is 27 C.F.R. 478.13, subsection A.

```
 1              THE COURT:  478 point what?
 2              MR. NEWMAN:  .13.
 3              THE COURT:  I've got to 24.  I'm real close.  13
 4    what?
 5              MR. NEWMAN:  478.13, subsection A.
 6              THE COURT:  Okay.  So I wasn't close.  I was at 124.
 7    I should have been at .13.  But that's not near the back.  Do
 8    you have a copy of what you want me to follow along with you?
 9    Because I'm having trouble getting to where you are in the text
10    of the rule.
11              MR. NEWMAN:  Yes.  What I'm handing you is the very
12    end of the rule as printed in the Federal Register, which is
13    the regulatory text.  So what I point to is on 29091, the top
14    of the first column.  And it defines "engaged in the business
15    as a dealer in firearms other than a gunsmith or pawnbroker,"
16    as "a person who devotes time, attention, and labor" --
17              THE COURT:  Slow down just a little bit.  But keep
18    going.
19              MR. NEWMAN:  "A person who devotes time, attention,
20    and labor to dealing in firearms as a regular course of trade
21    or business to predominantly earn a profit through the
22    repetitive purchase and resale of firearms.  The term shall not
23    include a person who makes occasional sales, exchanges, or
24    purchases of firearms for the enhancement of a personal
25    collection or a hobby, or who sells all or part of the person's
```

1    personal collection of firearms."

2         Now, that is word for word the same as the statute,

3    except that it breaks one sentence into two sentences.  That's

4    the only difference.  And so the point here is that the

5    baseline definition of "engaged in the business" under the rule

6    is exactly the same as under the statute.  So the rule is

7    starting from the statute, but then the rule is also -- has

8    additional provisions which, consistent with the statutory

9    text, clarify the application of the statute in --

10             THE COURT:  So two questions.

11             MR. NEWMAN:  Sure.

12             THE COURT:  Why did you break one sentence into two,

13   and did it have any effect in changing what you meant to do?

14   Three questions.  And if so, why did you do it at all?

15             MR. NEWMAN:  I don't believe it had any -- I don't

16   believe it had any change in --

17             THE COURT:  Breaking the sentence in two didn't

18   change the meaning of the language?

19             MR. NEWMAN:  No, I believe -- I believe the reason

20   it was done is because, at the end of that provision, there's

21   an additional sentence which clarifies the application to

22   auctions, that it doesn't cover a estate-type auctions because

23   in an estate type auction the person is not actually acquiring

24   and disposing of firearms.  They're just serving as the agent

25   of the estate.  And so since that estate portion was added, it

1    would have been too long.  It would have been too long of a

2    run-on sentence to do it as one sentence.  So just for

3    grammatical clarity, it was divided into two sentences.

4                THE COURT:  But now we're here on this auction

5    situation.

6                MR. NEWMAN:  Yeah, so that's one of the -- one of

7    the ways that it clarifies how the statute applies in certain

8    instances.

9                THE COURT:  I want to ask you about that.

10                MR. NEWMAN:  Sure.

11                THE COURT:  So grandpa dies.  He's got a lot of

12    guns.  Are you saying it's okay to sell his guns inside the

13    estate, but once it's distributed to the beneficiaries, they

14    can't distribute that same collection otherwise?

15                MR. NEWMAN:  No, no.  That's specifically excluded.

16                THE COURT:  Either by auction or otherwise.

17                MR. NEWMAN:  Either by auction or otherwise.  So in

18    terms of the -- in terms of the grandson who's distributing

19    them, that's covered in 478.13 at (e)(5), which clarifies that

20    liquidating firearms that are inherited is not considered to be

21    engaged in the business.  So you're selling grandpa's weapons,

22    that's okay.  That's not covered.

23          And then with this -- what this auction provision is

24    saying is if I'm serving as your auctioneer in an estate

25    auction and helping you sell those off, I'm not covered either.

1  Where if I'm running a consignment-type auction where I'm

2  getting firearms, taking them into my inventory, and then

3  selling them at auction, that's different because then I am

4  buying and selling firearms that's covered.  So that's one of

5  the instances in which it clarifies the rule.

6          Another is in the definition of purchase and sale in the

7  rule.  And this is in 478.11, which is at page 29090.  And

8  purchase and sale are both defined to cover exchanges for

9  anything of value, not just exchanges for money.  And that's

10  consistent with dictionary definitions of purchase and sale.

11  And it's also consistent with case law holding that, you know,

12  when you -- when people have exchanged guns for other guns, for

13  drugs, for various other non-cash mediums of exchange, that

14  still -- that still can fall within the definition of engaging

15  in a business.

16          The definition also makes clear that it treats purchases

17  and sales activities the same way regardless of where they

18  occur, whether it's at a brick-and-mortar shop, at a gun show,

19  or online, or anywhere else.  And that's in -- that's on the

20  first column of 29090, the definition of "dealer."  It says

21  that the term includes such activities -- meaning purchase and

22  sale activities -- regardless -- sorry -- wherever or through

23  whatever medium they're conducted, including at a gun show,

24  flea market, and it lists a few other examples.

25          And to correct something my friend said on the other

1    side, there's no gun show loophole in the statute.  The statute

2    is defined by the activity and the intent.  It's not defined by

3    where it occurs.  So if you're engaged in the business of

4    dealing, if you're doing it at a gun show, it's the same as if

5    you're doing it in a brick-and-mortar store, and the rule

6    clarifies that consistently with the statute.

7         And then another way that the rule clarifies the

8    application of the statute is through the various presumptions.

9    And what the presumptions set forth are there are certain

10   situations where, if a person engages in certain conduct, then

11   in civil and administrative proceedings they're presumed to be

12   engaged in the business of dealing or have the intent to

13   profit, although they can rebut that.

14        And what these presumptions reflect is there are a number

15   of fact patterns that have come up in the case law, they've

16   come up in ATF's investigations, that when someone engages in a

17   certain type of conduct, they're probably engaged in the

18   business of dealing.

19        For example, if you're repetitively reselling firearms of

20   the same make and model within a short time of purchasing them,

21   then you're probably engaged in the business of dealing and

22   that type of firearm is part of your product line.  Now, that's

23   rebuttable.  So if you have some other explanation of why

24   you're selling, you know, ten Glock pistols within a year after

25   you purchase them, then you can try to rebut that presumption.

 1    But it's a -- but it's -- these presumptions are reasonable

 2    because they reflect fact patterns that indicate a probability

 3    that someone is engaged in the business of dealing.

 4         And we cited case law in our briefs saying that agencies

 5    are entitled to promulgate presumptions, as long as there's a

 6    rational nexus between the fact that gives rise to the

 7    presumption and the fact that's being -- that's being presumed.

 8         So when you step back at what that rule's really doing,

 9    it's starting from the baseline of the statutory language and

10    then clarifying the application of the statute in various

11    circumstances to -- in ways that are consistent with the

12    statutory text.

13              THE COURT:  And I think the meat of the coconut is

14    in what manner did you accomplish that goal.  And that's really

15    what we're here to talk about, not whether or not agencies can

16    do what they're doing.  It's the manner in which they did it

17    that the plaintiffs have a beef with.

18         And so I'm following you so far, but I'm trying to -- and

19    I think I found in my larger-type version where you were in the

20    rule, both referring to 478.11 and 478.13, so I'm at least

21    better in the ballpark now.  So I'll let you continue.  But I'm

22    trying to figure out -- it's the manner in which you did it and

23    how you define terms and whether or not you exceeded your

24    authority within the scope of what you did that I'm really kind

25    of interested in.

1          MR. NEWMAN:  Yeah.  So I think this is a good point

2    to try to delve right into some of the arguments that the other

3    side made and why we disagree with them.  So -- but I think it

4    is important to establish that background that what the statute

5    is doing is starting from -- sorry -- what the rule is doing is

6    starting from the statutory baseline and then clarifying the

7    application in the statute.

8          And their first, sort of, overarching argument is ATF

9    doesn't have authority to do this anyways because ATF only has

10   very narrow authority, they say, to define terms.  And they

11   argue that, because the statute says that the Attorney General

12   shall define curio and relic, that means that the agency cannot

13   define anything else.  And that's not a -- that's not a fair

14   reading for -- I'd say for three reasons.

15         The first reason is that ATF explicitly has regulatory

16   authority to promulgate regulations necessary to carry out the

17   provisions of the Gun Control Act.  That's in 18 U.S.C. 926(a).

18   And the case *NRA versus Brady* out of the Fourth Circuit

19   established that that means that ATF has discretion to

20   determine what regulations are necessary.  And in that case,

21   the Fourth Circuit upheld ATF regulations that define terms in

22   the Gun Control Act.  One of them was business premises.  One

23   of them was gun show.

24         ATF promulgated regulations to make those statutory terms

25   clearer.  And the Fourth Circuit said that's fine, that's

1   necessary, that's within the ATF's authority.  And so reading

2   this one provision that says ATF shall define curio and relic

3   as forbidding all other definitional activity is too much.

4   Because all that means is that this was the one provision where

5   Congress wasn't even going to attempt to define it and say

6   "Attorney General, ATF, you must do this, you need to do this."

7   But they weren't withdrawing the same authority that they gave

8   elsewhere to promulgate other necessary regulations.

9       My friend on the other side also said that this is the

10  first time that ATF's ever defined a term in the Gun Control

11  Act.  That is just transparently not true.  I would urge you to

12  look at 27 C.F.R. 478.11.  That is the ATF's definitional

13  regulation.  It's defining terms in the firearms laws including

14  many in the Gun Control Act.  And it's -- if you print it out,

15  it'll be very, very thick, because ATF defines terms in the Gun

16  Control Act all the time.

17      And so I think that this is another example -- and one of

18  them is the Second Amendment, which I'll get to later -- but

19  this is an example of the other side taking an extreme theory

20  that if you accept it to its logical conclusion would basically

21  result in a hatchet job to sensible regulations that have long

22  been understood to be within the agency's authority.

23      So -- but now I'd like to get to some of the more

24  specific criticisms they have of the language in the statute --

25  sorry -- the language in the rule, and to explain why the

1    specific provisions of the rule that they criticize are

2    consistent with the statute.

3         And I'll start with personal collection.  So the rule

4    excludes from the definition of engaging in the business

5    occasional sale -- purchases and sales to enhance a personal

6    collection or to sell all or part of a personal collection.

7    And that comes from the statute.

8         And their main criticism of personal collection is that

9    the rule defines personal collection to exclude firearms that

10   are accumulated primarily for the purpose of personal

11   protection.  But that is -- that's consistent with the ordinary

12   meaning of personal collection.  It's consistent with other

13   provisions of the statute.

14        THE COURT:  Okay, let me ask you about that.

15   Hypothetical, it's not too farfetched, because it's appeared in

16   this courtroom.  I live in a really dangerous neighborhood.

17   I'm not talking about me.  I'm saying that the average guy in

18   this hypothetical.

19        MR. NEWMAN:  Sure.

20        THE COURT:  Buys a gun for protection.  Never uses

21   it.  Throws it in a drawer, and later gets a good job and gets

22   to move out of the dangerous neighborhood.  Now he's got this

23   gun in his house.  He doesn't need it anymore.  He keeps it for

24   a while, thinking maybe he'll just go out and play around with

25   it to target shoot, but he doesn't get around to that.  Now he

1    wants to get rid of it.  Does he have to get a federal firearms

2    license to do so?

3              MR. NEWMAN:  No.  No.

4              THE COURT:  How come?

5              MR. NEWMAN:  The reason why is because just selling

6    one firearm like that is not going to meet several elements of

7    the definition of being in the business.

8              THE COURT:  Let me take it a step further.  I was

9    really concerned about my safety, so I bought 12 Glocks and put

10   them in every drawer in my house.  I moved and I don't need

11   them anymore.  Can't sell them all at one time.  So I sell them

12   one at a time to get rid of them.  How does that work?  So I

13   know you're saying, no, it's got to be more, but it doesn't

14   really change the scenario.

15        This is kind of where I was headed with opposing counsel

16   that I'm trying to figure out if I buy a stash of guns for what

17   I will admit is for personal protection, but they're no longer

18   for that use, how do I navigate this rule?  Because they're not

19   for protection anymore.  I did buy them for that, and it

20   doesn't change the fact that I'm trying to sell them for a

21   nefarious purpose.  And I know it doesn't have to be that.  But

22   how do I navigate that rule when I want to dispose of these

23   guns that are in my possession and remain in my possession, not

24   really any differently than had I inherited them?  I just had a

25   problem that I bought them for initially that no longer exists.

1   And they're not for my personal protection certainly anymore.

2           MR. NEWMAN:  So first of all, that would not fall

3   within the safe harbor, the exclusion for personal collection.

4   And selling your personal collection is excluded, meaning that

5   even if you would have otherwise satisfied all the elements of

6   the definition, if you're selling off your personal collection,

7   that's excluded.  So it doesn't fall within the exclusion, but

8   that doesn't mean that it's being engaged in the -- in the

9   business of dealing.  It's got to meet each of the elements.

10  And so one of them is regular course of devoting time and

11  attention and labor to dealing.  And so --

12          THE COURT:  So that applies to any gun in this

13  situation.  Why carve out personal protection guns?  Because if

14  you're saying that it's just a regular gun, I can treat it one

15  way, but if it's a pistol, that -- let's say I even admitted

16  that it was initially purchased for personal protection.  Why

17  treat that any differently if it's part of my collection and

18  it -- it -- I haven't figured out why it matters that if it's

19  my gun and in my personal collection, whether it's multiple

20  guns or not, why it matters how I dispose of it because of the

21  way I might have used it.

22          MR. NEWMAN:  So the -- the -- I'd make three points.

23  One is that there's a different provision of the GCA that

24  defines -- that defines "collector" and it defines a collector

25  -- hold on.  Let me find it.  I want to make sure.

```
 1              THE COURT:  Am I clear that it's not the type of gun
 2    that distinguishes it, but the type of use?
 3              MR. NEWMAN:  Yes, that's correct.  And that's --
 4    that's consistent with the ordinary meaning of collection.  And
 5    we cited Webster's Third --
 6              THE COURT:  My question is:  If something changes
 7    its character from personal protection to just sitting in my
 8    closet for recreational use, why do you have a different rule
 9    for that?  And how do you handle that?
10              MR. NEWMAN:  Well, so I think that's consistent with
11    the definition of -- it's consistent with the ordinary
12    understanding of the word "collection" and the --
13              THE COURT:  Let me --
14              MR. NEWMAN:  -- and the meaning of "collector."
15              THE COURT:  -- let me make my question a little
16    simpler.
17              MR. NEWMAN:  Sure.
18              THE COURT:  Because you're relying on the definition
19    of collection.  It starts as a gun for personal protection and
20    becomes a gun just in my collection.  Because I don't use it
21    for personal protection, and it's not the nature of the fact
22    that it's a pistol anymore.  It's just in my collection because
23    at one time I needed it.  And how do I know which of my guns
24    now that are sitting in my closet for three years that I've
25    never even contemplated using for personal protection because I
```

1    live in a nice neighborhood, how do I know whether or not I

2    need to get a license to sell those?

3              MR. NEWMAN:  So the rule defines "personal

4    collection" as firearms that are accumulated for study,

5    comparison, or exhibition, or for a hobby, such as something

6    like hunting or target shooting.  And that's consistent with

7    Webster's Third, which says collection means an assembly of

8    objects or specimen for the purposes of education, research, or

9    interest.  It's consistent with the definition of "collector"

10   in the Gun Control Act --

11             THE COURT:  Right.

12             MR. NEWMAN:  -- which is any person who --

13             THE COURT:  And so for the five years preceding when

14   I want to sell these guns, that's exactly what these were.

15             MR. NEWMAN:  So I think that -- I think that the --

16   and I'm using an analogy here I think will clarify things a

17   little bit.  Collection doesn't just mean a mass of things that

18   you have in your possession.  Collection has a specialized

19   meaning, things that you collect for display, for research, for

20   interest.

21             THE COURT:  Or for target shooting.

22             MR. NEWMAN:  Or for target shooting, because the

23   statute specifically says or for a hobby, to clarify that hobby

24   comes with that.

25             But I think I'd use an analogy of a stamp collection.  If

1  you -- so stamps can be used to put postage on letters and mail

2  them.  That's the ordinary, practical usage of them.  But the

3  stamps that you have for their ordinary practical use aren't a

4  stamp collection.

5       So say, to say use an example of someone from Arkansas, I

6  go to the store and I buy a book of stamps with President

7  Clinton on it.  And in the first hypothetical, I go home, I

8  have my binder of my collection of presidential stamps.  I've

9  got Washington.  I've got Adams.  I've got Lincoln.  And I put

10  my Clinton stamp in that binder.  That's a personal collection.

11       In the second hypo --

12            THE COURT:  The difference between --

13            MR. NEWMAN:  -- in the second hypo --

14            THE COURT:  I have both.  So the difference between

15  my stamp collection and my gun collection is that I can't use

16  my stamps.  But I can have a collection of guns and actually

17  use them.  Once I have a -- pick a stamp -- the No. 1 Federal

18  Duck Stamp, and I lick it and I stick it on something.  It's

19  not good for postage.  Probably a bad example, but let's say I

20  do that.  I can actually use it, but it's gone from my

21  collection.

22       Stamps, you can't use in recreation or a hobby.  You can

23  use them as a hobby, but you can't actually use them in

24  recreation like you can a pistol.  You can fire a pistol, both

25  for recreation and self-protection.  And so how do you

1    determine at any given time what the gun in my possession is?

2    Is it for self-protection or part of my collection?  And how

3    does anybody know that when it might change over time?

4              MR. NEWMAN:  Well, I would say that it's -- it's

5    whether it's being used for study, comparison, exhibition.

6    Whether you're displaying it or whether you're using it as a

7    hobby, but sort of ordinary -- other than the hobby, such as

8    hunting, ordinary sort of practical use of the firearm is not

9    within the definition of collection.  And there's actually case

10   law that we -- that was cited --

11             THE COURT:  So I can't -- my guns that I use for

12   hunting aren't part of my collection?

13             MR. NEWMAN:  No, they are, because it specifically

14   includes -- it specifically -- the statute includes hobby.

15             THE COURT:  That's what I thought.  I just thought I

16   misheard you.

17             MR. NEWMAN:  No, no.  But, sorry.  If you're using

18   it -- if you're just sort of, you know, carrying the -- if

19   you're using the gun to protect your home or carry it around

20   with you when you walk in a dangerous neighborhood, then that's

21   not part of a collection under the ordinary sense of the word,

22   and it's not -- it's not within the safe harbor.

23        Now, that doesn't mean -- that doesn't mean that you

24   can't sell them if you -- for example, if you -- if you're

25   engaging in sales but it doesn't rise to that level of a

1  regular course of trade or business for the intent to profit,
2  that's not going to fall within the definition.
3           THE COURT:  No, you're not helping me with the
4  distinction.  I know that all guns, you can't exceed some
5  undefined volume.  You can't do it for profit, which is also
6  undefined.  But I'm talking about the distinction of personal
7  protection versus a collection.
8       So let's use the shotgun situation.  I go duck hunting
9  and I throw my gun in the back of my truck to drive back and
10 forth.  Arguably, it could be used to be protecting me from
11 point A to point B, but my primary purpose was to shoot ducks
12 and enjoy my hobby.  How do I know when I have a dual-purpose
13 firearm that could act as personal protection or otherwise?
14 And I don't know that because you haven't defined a pistol or a
15 shotgun as a rifle as being personal protection.  When it comes
16 time that I'm tired of it, how do I know if I need a license to
17 sell it?
18           MR. NEWMAN:  So first of all, in terms of whether it
19 comes --
20           THE COURT:  Or a bunch of them.
21           MR. NEWMAN:  So a two-part answer.  The first part
22 of it is if the question is does it fall within the personal
23 collection exclusion, then the question is was it accumulated
24 primarily for personal protection.  And, granted, there could
25 be some close calls, but --

1       THE COURT:  But does it matter -- does it matter the

2  point of purchase?  When it is accumulated.  That's the words

3  I'm dialing in on right now.

4       MR. NEWMAN:  Yes.

5       THE COURT:  So you're going to go back in time and

6  say "even though you don't do anything but hunt with this gun

7  now, since you bought it for personal protection, and we don't

8  know any way to do that except ask you if that's why you did

9  it, we're not going to let you sell it now on your own."

10  That's what I'm struggling with, that how do you know -- first

11  of all, I think you've told me that if it was accumulated for

12  personal protection, that tells me point of sale.  And I don't

13  have a little box on anything, especially a gun show if I don't

14  have to fill out any of that paperwork, to tell anybody why.

15  And I suspect I could say, if you asked me, it's none of your

16  business why I want my gun.  I'm going to buy it because I

17  think it's nice.

18       But I'm having trouble grappling with this notion of the

19  carve-out of a gun that is acquired, or whatever word you used.

20  I'm struggling.  Was that the word, that it was acquired?

21       MR. NEWMAN:  Accumulated.

22       THE COURT:  Accumulated.  Fair enough.  Wrong A

23  word.  That it was accumulated for some purpose, and that

24  purpose has changed.  But the statute or rule appears to say it

25  doesn't matter why you bought it.  We're not going to let --

1  excuse me -- doesn't matter what you use it for now.  We're not

2  going to let you sell it, because when you bought it, it was

3  for personal protection.  Is that a fair reading of the rule?

4       MR. NEWMAN:  No, that's not a fair reading of the

5  rule.  And the reason it is, because the -- putting the --

6  putting the safe harbor aside, being engaged in the business of

7  dealing still requires engaging in a regular course of trade or

8  business predominantly for -- with the intent to profit.

9       THE COURT:  We keep falling into the single gun

10 versus a bunch of them.  So let's assume, for my whole deal,

11 that I bought 30 shotguns to begin with, all for personal

12 protection.  And I don't need them for personal protection

13 anymore.  And now I have them in my collection.  And I want to

14 get rid of them, but I can't get rid of them all at one time.

15      And so I want to carve out the repetition part, and I

16 want to carve out the for-profit part.  I'm trying to figure

17 out why the rule is in place to keep me from selling a gun that

18 I initially bought for personal protection that I could

19 otherwise sell if it was just in my collection, or a number of

20 them.

21      MR. NEWMAN:  Yeah, I think in a circumstance like

22 that, ATF would probably consider that at some point the --

23 when you began sort of using the firearm for your hobby for

24 hunting, that it essentially became transferred to your

25 personal collection at that point.

```
 1            THE COURT:  Is that the way the rule reads?  When it
 2   was -- as accumulated or whatever?  I mean, how am I going to
 3   know that from reading the rule, what the ATF is probably going
 4   to do?
 5            MR. NEWMAN:  Well, I think that that is -- I think
 6   that it's -- it's -- the rule -- the rule separately addresses
 7   transfers to personal collections.  And that's more in the
 8   realm of former licensees who are losing their license.  But I
 9   think that captures the idea that a firearm can be essentially
10   transferred into the -- into --
11            THE COURT:  And I'm not talking about I've got a
12   store and I'm closing it, and I'm going to take all my
13   inventory into my personal collection.  That's not the part of
14   the rule at all that I'm talking about.  What I'm talking about
15   is this limitation on selling a gun that was initially
16   accumulated for personal protection.  Or you could say a number
17   of guns that was acquired or accumulated for personal
18   protection.  Why have that in there?  And if it's in there, how
19   do I navigate that situation if I want to get rid of them?
20            MR. NEWMAN:  So I'd say that it's in there -- so
21   it's in there to basically avoid the notion that essentially
22   any firearm that a person has in their possession is part of a
23   personal collection.  Because if you say that any firearm that
24   can be used for personal protection is a personal collection
25   firearm, then that means basically any firearm would qualify
```

1   and people could, you know, amass firearms and any number of --

2           THE COURT:  Isn't it fair to say any operable

3   firearm in my collection could be used for personal protection?

4           MR. NEWMAN:  I think that's -- I think that's fair.

5   And so if you -- if you included --

6           THE COURT:  It's kind of a layup on that one, but --

7           MR. NEWMAN:  But, yes, if you included personal

8   protection firearms within the definition of personal

9   collection --

10           THE COURT:  But we're not defining a pistol or

11   anything as the type of firearm.  It's the nature of how I'm

12   possessing it, as I understood.

13           MR. NEWMAN:  Correct.  Correct.  And the rule has

14   several safety valves in it.  Because I think -- I gather one

15   of the concerns is there may be some unusual situations in

16   which it just doesn't feel like being engaged in the business

17   of dealing, and is that going to be wrapped up.  And there are

18   numerous safety valves in the rule.  And one of them is

19   subsection (b) of 478.13, which clarifies that it's a

20   fact-specific inquiry.  You've got to look at all the facts and

21   circumstances to determine whether someone meets that baseline

22   definition of being engaged in the business of dealing.

23           THE COURT:  But that doesn't address the issue of

24   the particular firearm for -- accumulated for personal

25   protection.  The rest of it applies to any gun that you might

1    want to sell and -- but why are you more narrowly restricting

2    some gun that was initially, not based on the type of gun, but

3    by some subjective issue of whether or not -- I mean, it --

4    what do I do in a dual-purpose situation where I buy it

5    primarily 60 percent for duck hunting, 40 percent for personal

6    protection?  And then that ratio varies along my life span when

7    I quit this job and I'm no longer really worried about somebody

8    from Kansas coming and shooting me anymore.

9           And so I retire and I hunt and I don't worry too much

10   about my personal protection anymore.  But it was accumulated

11   originally for that purpose.  And how do you -- how does the

12   average Joe navigate that rule to know whether or not I run

13   afoul of selling multiple guns on multiple occasions that

14   ordinarily would be okay, but for the fact that they were

15   accumulated for personal protection?

16                MR. NEWMAN:  Well, I think that goes to the -- to

17   that it's a fact-specific inquiry.  You got to look at all the

18   facts and circumstances.  It is the person -- is the person

19   dealing as a regular course of trade or business with the

20   intent to profit.  And I think that what ATF determined was

21   that you basic -- was that unless personal protection firearms

22   were excluded from personal protection, then, essentially,

23   every firearm would be part of a personal collection, which

24   isn't what the statute was intended to mean.  It's -- you know,

25   the statute defines "collector" as someone who's collecting

1    curios and relics.  And there's a -- there's case law in --

2    it's on footnote 217 of the rule -- reading collection and

3    collector in the GCA narrowly and saying that the personal

4    collection has to be read in line with collector in the GCA.

5        So it's really both a fair reading of the statutory text

6    and one that is necessary to prevent the personal collection

7    safe harbor from essentially immunizing all unlicensed gun

8    sales.

9            THE COURT:  As the ATF or the Justice Department,

10   how are you going to determine whether or not a given gun was

11   accumulated for personal protection?  How does that work?

12           MR. NEWMAN:  You know, it would -- I think in any

13   case, the normal fact-finding tools.  You know, people can --

14   people can explain their purpose in --

15           THE COURT:  I don't have to tell you why I've got

16   the gun.  I've got a Fifth Amendment right not to help you put

17   me in jail.  How are you going to establish that the guns that

18   are in my gun safe that I just sold to anybody out on the

19   street that was lawful to buy them, how are you going to

20   establish that?  I guess that's what I'm trying to figure out

21   is why is it not arbitrary to just say for personal protection,

22   when you're really trying to make sure guns don't wind up in

23   the hands of the wrong people?  Why does it matter why I was

24   using them before I sold them, to accomplish that purpose?

25           MR. NEWMAN:  Well, you have a Fifth Amendment right

1   not to testify, but there's case law even before --

2   THE COURT:  It's a simpler question than that.  How

3   does -- how would you anticipate establishing the guns that I

4   sold were for personal protection as opposed to recreational

5   use that's allowed to be considered as part of my collection?

6   MR. NEWMAN:  There might be witnesses who, you know,

7   can testify about how you use that weapon in your daily life.

8   And just like in any -- and another point I'd make is that in

9   -- there's case law, even preceding this rule, saying that

10  because -- because the personal collection safe harbor is an

11  exception to an overall statutory provision, it's actually the

12  person's burden to establish the applicability of that

13  exception.  And so --

14  THE COURT:  But it's my job to find out whether or

15  not it's arbitrary and capricious, not who's got this burden of

16  establishing it.  And I'm trying to figure out what purpose

17  does it serve.  And I've -- you've told me that to limit the

18  collection exception.  But the purpose of the whole rule is to

19  make sure that people who don't belong -- people who aren't

20  entitled to have guns in their hands get guns in their hands,

21  is my understanding.  Is that the overall reason for the rule,

22  the main reason?

23  MR. NEWMAN:  That's the overall -- and it would

24  undermine that goal if personal collection firearms were

25  included within the definition -- if personal protection

```
1   firearms were included within the definition of a personal
2   collection, it would seriously undermine that goal.
3        First of all, it would be inconsistent with the ordinary
4   meaning of collection.  It would be inconsistent with the GCA's
5   definition of collector.  But it would also undermine that
6   statutory goal, because then -- then anyone could sell off
7   their cache of weapons.  As long as they're operable, they can
8   be used for personal protection, and they can say these weapons
9   are personal protection weapons.  Therefore, they're part of my
10  personal collection.  Therefore, I can sell them off without a
11  license, without conducting background checks.  And that's
12  exactly what the GCA is meant to prohibit.  If you're engaged
13  in the business of selling firearms, then --
14           THE COURT:  Well, I'm not.  I'm not.  In the
15  scenario, I'm not engaged in the business of selling firearms.
16  You may say that -- and that's what I'm trying to get to is the
17  disposal of my collection of firearms that just happened to be
18  originally purchased for personal protection but is now --
19  there's no plausible proof that I do anything but hunt and
20  store these guns at this point in time.
21       What is gained by that -- by restricting my otherwise
22  legal disposition or disposal of those guns, liquidation,
23  whatever word you want to use?  In that scenario, which I don't
24  think is too outlandish, I'm not reaching for the fence on this
25  example, I don't think -- that why would I be restricted from
```

1  liquidating firearms that are, as a current matter at the time
2  of sale, clearly would have qualified as my collection at the
3  time I sold them, when they may have had some different use at
4  a prior time?
5          MR. NEWMAN:  Well, that's -- that is evidence that
6  can be considered in the overall facts and circumstances
7  inquiry of whether someone is engaged in the regular course of
8  trade or business with the intent to profit.
9          THE COURT:  And if that's the case, why do you need
10 the exception to the exception?  Why can't you determine
11 whether or not something is part of a collection by that
12 fact-intensive inquiry at the time, without saying "we're not
13 going to let people have guns for personal protection and then
14 sell them on their own"?
15         MR. NEWMAN:  Well, you -- you can sell firearms if
16 it doesn't rise to that level of being a regular course of
17 trade or business for the intent to profit.  But what the other
18 side is arguing is they want sales of personal protection
19 firearms to be within the exclusion so that, even if you are
20 selling them off as a regular course of trade or business for
21 the intent of profit, as long as they're guns that can be used
22 for personal protection, they say, then they're excluded.  And
23 if that were accepted, then essentially anyone could deal
24 without a license.  And that's what the GCA is meant to protect
25 against.

1    And I'd like to move on to another point that they -- the
2  other side makes, which is they talk a lot about discussion of
3  a single transaction and what relevance that has.  And I think
4  that they twist what the rule actually says about that.  And
5  this is in 478.13(b), which is the same subsection that -- that
6  talks about how it's a fact-specific inquiry.  You've got to
7  consider the facts and circumstances.
8    And this is -- it says, sort of halfway down that -- "For
9  example, even a single firearm transaction or offer to engage
10 in a transaction, when combined with other evidence (e.g.,
11 where a person represents to others a willingness and ability
12 to purchase more firearms for resale) may require a license;
13 whereas, a single isolated firearm transaction without such
14 evidence would not require a license."
15    And what that's getting at is there's no -- the statute
16 didn't set a numerical threshold.  It would have been easier to
17 apply if the statute said, you know, you can sell up to 20
18 guns, but the 21st, you got to get a license.  That's not --
19 that's not how Congress wrote the statute.  So this is saying,
20 consistent with the statute, you've got to consider the facts.
21    And one situation that has been recognized in the case
22 law, which we cited in our brief, is if you're selling -- if
23 you're selling -- if you're offering to sell a firearm, and
24 you're saying, "Hey, by the way, I've got a big inventory of a
25 bunch of arms for resale, and any gun you want, I can go out

1    and get it on the market, I'll get it for you.  Whatever you

2    need, I got it.  I'm your source of firearms for resale."

3    There are cases upholding that, convictions for being engaged

4    in the business of dealing.

5          And so what this is addressing is you've got to look at

6    the facts.  And even if you don't meet some arbitrary numerical

7    threshold that's not in the statute, your conduct might meet

8    the standard.  But a single isolated firearms transaction is

9    not going to meet that standard.

10              THE COURT:  So what if I do everything you just

11   said, and then before I sell you any more I change my mind?

12   Make a single transaction.  I tell you, "I got so many guns you

13   can't buy them all."  And we go home, and I decide that's

14   stupid.  I probably could violate a law if I sell one more.  So

15   I'm not going to do it.  And I'm trying to get a handle on the

16   effect of these laws so I can make a more broad deal.  And

17   that's why I'm asking and poking holes at each side's arguments

18   so I get a better understanding.

19          But if we read from page 6, which is the thing that

20   says -- and with Mr. Kobach, I had this argument over

21   multiple -- or I can't remember the words that I was using that

22   weren't very definitive as to what a number was.

23              MR. NEWMAN:  Right.

24              THE COURT:  And we were looking for a baseline.  And

25   you remember that conversation.  How does a single sale, no

1   matter what the situation is, not run afoul of that language?

2            MR. NEWMAN:  So a single sale on its own would not.

3   But I think you need to look at the word -- at devoting time,

4   attention, and labor to dealing in firearms as a regular course

5   of trade or business.  And so the instances in which a single

6   transaction would -- you know, could reach that level is when

7   it's part of a course of conduct.  When you're saying, "I spent

8   all this time" --

9            THE COURT:  I follow you now.

10           MR. NEWMAN:  Okay.  And so I'd like to move to the

11  Second Amendment now.  And, you know, I think I'd like to just

12  start by saying that the position taken by the other side is

13  very extreme.  They're clearly asking you to go further than

14  the Supreme Court has gone, and to issue a ruling that would

15  have the logical ramification of meaning that no licensing

16  requirement, no background check requirement could be within

17  the Second Amendment.  And that is certainly not what the

18  Supreme Court said in *Heller* and *Bruen*.

19       And, in fact, it's the opposite of what the Supreme Court

20  said.  In *Heller*, the Supreme Court affirmed that

21  qualifications on the commercial sale of arms are presumptively

22  lawful.  In *Bruen* -- and I particularly point to footnote 9 of

23  *Bruen* -- the Supreme Court said it's okay to have a shall-issue

24  licensing regime where to get a license to carry a firearm you

25  need to pass a background check and get a license if you want

1    to go out and carry a firearm.

2         And so even a licensing requirement to carry a firearm,

3    which is one of the core textual rights of the Second

4    Amendment, keep arms, have a weapon, bear arms, carry a weapon.

5    Even to exercise one of those two textual rights, the Supreme

6    Court said it's okay to require a license and to require a

7    background check.

8         And yet, the other side is saying that to engage in the

9    business of dealing firearms, which is not directly covered by

10   the text "keep arms or bear arms," that you can't require a

11   license for that.  And that's not supported by any case law.

12   Both before and after *Bruen*, courts have consistently ruled

13   that it's consistent with the Second Amendment to require

14   licensing to engage in the business of dealing firearms.  We

15   cited those cases in our briefs.

16        And I'd also point you to the *McRorey* case, which is a

17   case just a couple weeks ago out of the Fifth Circuit, which

18   held that the background check regime in the BSCA, which says

19   that for 18-, 19-, and 20-year-olds, they got to go through

20   some extra background check procedures.  It can take up to two

21   weeks before they get their gun.

22        The Fifth Circuit said that's fine, and that's within

23   the, sort of, presumptively-lawful commercial requirements.

24   And I think that really gets at a common sense reading of the

25   text, which is the Second Amendment guarantees the right to

1   keep arms and bear arms, have weapons, carry weapons.  It
2   doesn't directly address buying and selling weapons.
3        Now, of course there -- that's relevant to this Second
4   Amendment analysis because if there were -- if there were, you
5   know, bans on buying weapons or selling weapons, clearly you
6   couldn't exercise your Second Amendment rights.  But that
7   doesn't mean that reasonable, common-sense licensing
8   restrictions on engaging in the business of dealing firearms
9   interferes with the exercise of the textual Second Amendment
10  rights.  It doesn't.
11       And furthermore, it -- if you even get to the second
12  prong of *Bruen*, it is consistent with historical tradition.
13  There is -- there are numerous historical commercial
14  regulations on commercial firearms dealings.  And I think we
15  cited many of them in our brief.  One of them, there were
16  licenses required to sell gun powder, which is a thing that was
17  needed to use a weapon.  So I think that to say that you can
18  require a license for the sale of gun powder but not for the
19  sale of firearms doesn't -- doesn't make that much sense.
20       And also there were -- there were regulations that were
21  aimed at keeping firearms out of the hands of dangerous
22  individuals.  You know, at the time, there were a lot of
23  fighting and skirmishes between the colonists and the Native
24  Americans.  And there were restrictions on selling guns to
25  Native Americans because the thought was, you know, they're

1    fighting with us.  It could be dangerous if they have weapons.

2        And so these licensing and background check regimes,

3    they're not exactly the same as these historical regulations.

4    But *Bruen* teaches that you need a historical analogue, and not

5    a twin.

6        So I would -- I think that -- that you should not do what

7    the other side is suggesting, which is to go further than the

8    Supreme Court has gone and in direct tension with what the

9    Supreme Court has guided in this field.

10       And the last thing I'd like to address -- I'll take any

11   questions you have -- but the last point that I wanted to

12   address is the scope of relief.  We believe that you should

13   deny their motion.  You shouldn't grant any relief.  But if you

14   do order some relief, it should be tailored.  It should be

15   limited.  It should not be a nationwide injunction or the

16   equivalent, which is a nationwide stay on the rule going into

17   effect.

18       You know, both the Supreme Court and the lower courts

19   have shown increasing skepticism recently on this idea of

20   universal remedies.  And the idea is that when talking about

21   national policy, a single district judge shouldn't necessarily

22   be making the decision for the whole country.  That's something

23   that Judge Sutton warned in the Arizona case.

24       And that's especially the case here where we just came

25   from -- we just came from Amarillo.  There's another suit going

1    on in Florida.  There are three different district judges in

2    three different circuits who will consider this.  And there are

3    20 states and the District of Columbia on the other side who

4    have said "We support this rule.  It's vital for our public

5    safety."

6         And so, you know, doing -- granting the kind of remedy

7    that the other side -- that the other side asks for would

8    directly impede their view of what's necessary for public

9    safety in their jurisdiction.  And the fact that they invoke

10   Section 705 of the APA doesn't change matters.  That statute

11   says that relief should be limited to the extent necessary to

12   prevent irreparable injury.  And the House report for the APA

13   said this relief should, quote, "Normally, if not always, be

14   limited to the parties complaining."

15        So it's not -- 705 is not a roving license to issue a

16   nationwide injunction.  So if the Court does order relief, it

17   should be limited to any parties that the Court concludes has

18   standing and has established irreparable harm.

19        And also there's a severability provision in the rule.

20   So if you conclude that only certain aspects of the rule are

21   problematic, such as the personal collection section, for

22   example, I would disagree on that.  But if that's where you end

23   up, you could limit the relief to any provisions that you

24   believe are legally problematic, and not toss out the -- or

25   stay the effectiveness of the entire rule.

1    If there are no further questions, I would urge the Court

2  to deny the motion.

3         THE COURT:  Thank you, sir.

4    Do you want to talk about standing briefly?  I know I

5  told you I'd give you all the time, and I may can, but it may

6  not be before I've got to leave.

7         MR. KOBACH:  Your Honor, I will be mindful of the

8  fact that you've got to get out of here shortly.  So I'll try

9  to just --

10        THE COURT:  I'll try to give you all the time you

11  need.  Just don't talk fast in trying to get me there.

12        MR. KOBACH:  Okay.  Let's go to standing briefly.

13  The opposing counsel said that our loss of tax revenue basis of

14  standing for the states depends on contingencies that are

15  attenuated.  I have four answers to that.

16    First of all, no, they're not attenuated.  They're very

17  direct.  It's a two step.  A decrease in the number of vendors

18  will occur.  We know this because the defendants say there will

19  be a 2.5 percent decrease in the people who sell.  And we know

20  this because our declarations from people who are vendors say

21  "I will not go."

22    And then step number two is:  When you have a decrease in

23  the vendors, you have a direct decrease in taxes, because both

24  Arkansas and Kansas have a fee on the table that you -- as a

25  vendor, you buy a table at the show, and the state taxes that

1   table fee.  And that's in our declarations as well.  And it's

2   in the Fry declaration in particular, which I believe is

3   document 4-5.  Sorry 4-3.

4        And in that document, Mr. Fry, who is one of the leaders

5   of the Chisholm Trail organization, says that in one fiscal

6   year his organization gave $4,005 to the state of Kansas

7   through those table taxes.  And so, even if it's only

8   2.5 percent of 4,000, we're still talking about dollars that

9   are lost to the state.

10       You mentioned, I believe, is there a threshold.  Or maybe

11  it was defense counsel who said there's no threshold, or that

12  there might be a threshold.  There isn't.  When it comes to

13  financial loss for standing a, quote, "identifiable trifle,"

14  end quote, will suffice.  And that's from the Supreme Court in

15  the *United States versus SCRAP*, which is in our brief.

16       THE COURT:  I don't think they said there was a

17  threshold.  I think they were arguing the numbers to show that

18  there wasn't a direct loss, not that there was a quantitative

19  threshold to amount.  Because I asked him specifically that.

20  And just so he doesn't have to get up and defend himself, it's

21  my recollection that he didn't go there.

22       MR. KOBACH:  Okay.  Well, then, set that aside.  At

23  any rate, I think we all agree there's no minimum dollar

24  amount.

25       So we have a two step.  There's a decrease in the number

1    of vendors.  That results in a reduced number of tax revenue

2    from the fee that is placed on vendors for buying a table.

3          And then he persisted in this and said, Well, you know,

4    it's -- there's still -- if the results of third actors, third

5    parties, and it's attenuated, that's what's causing the

6    decrease in the revenue to the state.

7          We need to look at the test itself that the Supreme Court

8    laid out in *Lujan versus Defenders of Wildlife* in, I believe it

9    was, 1992, 504 U.S. 555 at page 360.

10                 THE COURT:  Thank you.  How do you spell Lujan?

11                 MR. KOBACH:  L-U-J-A-N.

12                 THE COURT:  Thank you.

13                 MR. KOBACH:  And the Court says this was, quote, not

14   the result of the independent action of some third party not

15   before the Court.

16          All of these parties are before the Court.  The vendor,

17   Journey, and the others are before the Court, the members of

18   the association, the host of the gun show is before the Court,

19   Chisholm Trail, and the states that receive the tax revenue,

20   Arkansas, Kansas, and 19 others are all before the Court.

21          So even if it was a third-party action, they're all

22   before the Court.  And so it does not get excluded from the

23   injury under *Lujan*.

24          Well, then let's jump to standing based on the states'

25   administrative costs.  Opposing counsel says, Well, that's

1    self-inflicted.  New Hampshire and Tennessee have decided to

2    become what are called "point of contact states" where they do

3    the background check instead of having the Feds do the

4    background check.  And, in addition, they also check judicial

5    records for any restraining orders.  He said, "Well, that's

6    their choice."

7         Well, that's true.  It is their choice.  But for the

8    purposes of standing, Defendants cannot say to a state, "Go

9    ahead, change your law.  You won't have a problem if you change

10   your law."  And we cite multiple cases on page 6 of our reply

11   brief, but I want to bring out another case because I think

12   this goes right to it.  This is *Texas versus United States*.

13             THE COURT:  Is this something separate than what

14   you've cited?

15             MR. KOBACH:  Yeah.  It's a new one, because as I was

16   thinking about this, I thought, you know, this case really is

17   the one.  *Texas versus the U.S.*  It's a Fifth Circuit case, 809

18   F.3d 134 at page 153.  And in that case, it was a challenge to

19   the DAPA, which was an executive, kind of, amnesty or, you

20   know, a grace given to certain aliens.  And Texas said, "Well,

21   these individuals are going to live in our state, and we have

22   to give them driver's licenses because our law says we have to

23   give them driver's licenses."  And the Department of Justice

24   said, "That's self-inflicted, Texas.  You can just change your

25   law.  You don't have to give them driver's licenses which costs

you money."

Here's what the Court said:  "Second, DAPA affects the states' 'quasi-sovereign' interests by imposing substantial pressure on them to change their laws, which provide for issuing driver's licenses to some aliens and subsidizing the licenses.  States have a sovereign interest in the power to create and enforce a legal code," end quote.  And then it goes on.  But the bottom line is Texas had standing.

Now I want to go to -- briefly to the standing of Chisholm Trail.  That standing is not just based on the standing of one or more members, of which there are several members who provide declarations.  There's also organizational standing.  And the organizational standing is based on the injury that 70 percent of Chisholm's annual operating expenses are generated from the two gun shows it hosts every year.  And that's also in the Fry declaration.  And so those revenues to the Chisholm Trail organization will go down.  I just don't think there's much difficulty in agreeing that at least one, if not all, of the plaintiffs here have standing.

Now, I want to go to a couple of things, if I can, briefly on the merits just in a few minutes.  The -- first, right at the beginning about the power of the ATF to define items in Section 921.  Their answer was, "Well, the ATF defined other terms, like the term 'gun show'."

Those were in Section 923.  And Section 923 is about the

1  mechanics of issuing licenses.  And in Section 923, Congress

2  gave the ATF the authority to define the terms in that section.

3  921 is different.  There, Congress only gave them the authority

4  in one subsection, and that's subsection (a)(13).

5      Now I want to go to personal protection, which you and

6  opposing counsel spent a great deal of time talking about.  He

7  says -- he leads off and says, "Personal protection is

8  consistent with the statute."  But he never points to a single

9  use of the phrase in the statute.  The statute makes no

10  distinctions whatsoever based on guns for personal protection

11  versus other guns.

12      So there still is this incredible vacuum in the other

13  side's position of personal protection comes out of nowhere.

14  This new standard of personal protection is not part of a

15  personal collection is nowhere found in federal law.

16      And then they fall back to a different argument.  They

17  say, "Well, it's consistent with the definition of licensed

18  collector."  Licensed collector is for collectors of curios and

19  relics, and that is a specific category of person who has to

20  get a federal license to become a licensed collector.  That's

21  not the same thing as your collection and my collection and

22  every other person in America's collection.  To simply say that

23  they both have the same root, collector and collection, is

24  not -- because licensed collector is a subset of individuals

25  who need a specific license.  So that's not relevant to whether

1    what you and I have is a collection and whether our personal

2    protection firearms count.

3         He says that the ordinary personal use of the handgun for

4    protection -- handgun for personal protection is not part of a

5    collection in the ordinary sense of the word.  I don't know

6    where that comes from.  There is no -- if you ask any person on

7    the street if guns in their collection do not -- if the guns

8    used for personal protection don't count, they would not say

9    that.  It's certainly not in the ordinary sense of the word.

10        And then, Your Honor, you pressed and you said, "I'm

11   trying to figure out why personal protection firearms would be

12   excluded."  And after going back and forth, he eventually said,

13   "Well, if you included personal protection, then people could

14   acquire" -- I don't think he used the word massive -- use large

15   or massive personal collections.  If you include the personal

16   protection firearms, then people could acquire massive personal

17   collections.

18        Maybe.  But it's not ATF's job to decide that the

19   exclusion for personal collections is too large.  That's

20   Congress's job.  They have made a policy judgment -- and he

21   just admitted it -- that we think that personal collection

22   exception is too big.  We're going to set out to shrink it.

23   And we're going to shrink it by excluding all firearms that are

24   for personal protection.  Well, if Congress wants to do that,

25   they can.  But the ATF absolutely cannot.  That is a policy

1    decision that they made.

2         And then with respect to your own hypothetical, he said,

3    "I think the ATF would say that over time you changed the use

4    of your gun, which you initially bought for personal

5    protection, to some other use."  Well, now we've got even more

6    vagueness, because that's not what the rule says.  The rule

7    says it's the purpose you acquired it for.  And you pressed

8    opposing counsel on this.  And then he eventually relented by

9    saying, "Well, maybe it changes."  Well, now we don't even know

10   what the rule says because, apparently, it's either what you

11   acquired it for or what you use it for now; and, therefore, it

12   is vague.

13        And so I think I've responded to all of the points

14   that -- the most important points brought up.  With regard to

15   the Second Amendment, I'll just mention one thing.  Footnote 9

16   in *Bruen* is not some sort of open door for licensing of

17   transactions.  And opposing counsel may not have understood

18   this.  Footnote 9 was about concealed carry licenses.  And

19   *Bruen* was about New York State's requirement that you have to

20   prove you have a good reason to get the license.

21        Here's what it says, footnote 9:  "To be clear, nothing

22   in our analysis should be interpreted to suggest the

23   unconstitutionality" --

24             THE COURT:  Slow down.

25             MR. KOBACH:  Oh, I'm so sorry.

1        "To be clear, nothing in our analysis should be
2   interpreted to suggest the unconstitutionality of the 43 states
3   shall issue licensing regimes under which a general desire for
4   self-defense is sufficient to obtain a permit," period, end
5   quote.  I'm not sure if permit is the right -- I scribbled a
6   little bit.  Anyway, it's sufficient.  End quote.

7        And then finally, I just wanted to hit scope of relief,
8   since that's relevant here.  If it's arbitrary and capricious
9   or if it's vague in one state, it's arbitrary and capricious or
10  vague in all states.  And a patchwork quilt, where just the 21
11  states would be subject to a preliminary injunction and the
12  other 29 would not be subject to a preliminary injunction,
13  would not serve the ends of justice here.  This is a situation
14  where it would be inappropriate to leave in place part of the
15  regulation for part of the country and the -- or the whole
16  regulation for part of the country and no regulation for the
17  other part of the country.  It's --

18        THE COURT:  By the same token, it would be
19  inappropriate for 21 states to impose their will on the other
20  whatever the number is.

21        MR. KOBACH:  Well, Your Honor, I'd say it would be
22  the will of the judiciary.  And it's not the will of the
23  judiciary, it's the judgment of the judiciary that the statute
24  is vague.  So we're not imposing our will.  We're merely
25  raising the question.

```
 1              THE COURT:  No, this has to do with the scope --
 2              MR. KOBACH:  The scope, yeah.
 3              THE COURT:  -- of the deal.  That wasn't, perhaps,
 4    the will.  You're arguing scope and that everybody should be
 5    treated alike because 21 states want it to be that way.
 6              MR. KOBACH:  Right.  And I'm saying we 21 have noted
 7    the problem and brought it to the judiciary.  Not just you, but
 8    to the judiciary's attention.  But I think when the judiciary
 9    resolves this, the judicial branch should recognize that
10    uniformity is probably the most appropriate.  Thank you so much
11    for your time, Your Honor.
12              THE COURT:  I want to thank all the lawyers and
13    everybody that took part in the briefing of all this.  It was
14    well briefed.  It was well argued.  And as I said, it was
15    interesting and fun, and I appreciate it.  I'm not going to
16    commit myself to any time to resolution of this issue, but I
17    will be diligently at it to give you the timeliest response I
18    can provide.
19              MR. KOBACH:  Thank you, Your Honor.
20              THE COURT:  All right.  Thanks, everyone.
21         (Proceedings adjourned at 12:36 PM.)
22                        REPORTER'S CERTIFICATE
23      I certify that the foregoing is a correct transcript of
      proceedings in the above-entitled matter.
24
      /s/ Karen Dellinger, RDR, CRR, CCR
25    ---------------------------------        Date: May 22, 2024
      United States Court Reporter
```

Karen Dellinger, RDR, CRR, CCR
United States Court Reporter
Karen_Dellinger@ARED.uscourts.gov (501)604-5125